UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**06 CV 3433**

-----------------------------------------------------------x
KINGS ROAD INVESTMENTS LTD.,

        Plaintiff,

v.

GLOBAL POWER EQUIPMENT GROUP INC.,

        Defendant.
-----------------------------------------------------------x

JUDGE JONES

Civ. No.:_____

**COMPLAINT**

RECEIVED
MAY 0 4 2006
U.S.D.C. S.
CASHIER

        Plaintiff Kings Road Investments Ltd. ("Kings Road"), by its attorneys Schulte Roth & Zabel LLP, as and for its Complaint against defendant Global Power Equipment Group Inc. ("Global Power" or the "Company"), hereby alleges on the basis of knowledge with respect to itself and its actions and on the basis of information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

    1.    This is an action for damages resulting from Global Power's breach of representations, warranties and covenants relating to a Convertible Senior Subordinated Note issued to Kings Road, including Global Power's refusal to redeem that Note as it is required to do.

## THE PARTIES

    2.    Plaintiff Kings Road Investments Ltd. is a Cayman Islands exempted company with its registered office at George Town, Grand Cayman.

    3.    Defendant Global Power is a Delaware corporation with its principal place of business at 6120 South Yale, Suite 1480, Tulsa, Oklahoma.

10134048.1

## JURISDICTION AND VENUE

4. Jurisdiction in this action is based upon diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332.

5. The amount in controversy exceeds the sum of seventy-five thousand dollars, exclusive of interest and costs.

6. Venue for this action is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this District.

7. In addition, the parties have agreed that this dispute may be adjudicated in this Court. The Note that is the subject of this action was issued pursuant to a Securities Purchase Agreement, further described herein, to which plaintiff and defendant are parties. The Securities Purchase Agreement provides in Paragraph 9(a):

> Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

## FACTS

**The Securities Purchase Agreement**
**and Convertible Senior Subordinated Note**

8. On November 23, 2004, Global Power completed a $69 million private placement of 4.25% Convertible Senior Subordinated Notes (the "Notes"). The Notes are convertible into shares of the Company's common stock at a conversion price of $10.61 per share of common stock (subject to adjustment in certain circumstances). The purchasers of the Notes were Kings Road ($27,000,000), Steelhead Investments Ltd. ($27,000,000), D.B. Zwirn Special

Opportunities Fund, L.P. ($3,000,000), D.B. Zwirn Special Opportunities Fund, Ltd. ($6,000,000) and HCM/Z Special Opportunities LLC ($6,000,000) (collectively, the "Note Holders").

9. To effect the private placement, on November 23, 2004, Global Power entered into a Securities Purchase Agreement with Kings Road and the other Note Holders. Pursuant to the Securities Purchase Agreement, also on November 23, 2004, the Company executed a Convertible Senior Subordinated Note in the amount of $27 million in favor of Kings Road (the "Note"). Notes were executed for the other Note Holders as well.

10. The Note provides, *inter alia*, that Kings Road may require the Company to redeem the Note at a premium if there is an Event of Default thereunder. Specifically, the Note provides that "holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding" "may require the Company to redeem all or any portion of the Notes" if there is an Event of Default. (Note ¶¶ 30(uu), 4(b).) In addition, the Note provides that "[f]rom and after the occurrence of an Event of Default the Interest Rate shall be increased to 9.25%." (Note ¶ 2.)

Events of Default Under Note Paragraph 4(a)(x)

11. Paragraph 4(a)(x) of the Note provides that an Event of Default occurs if "the Company materially breaches any representation, warranty, covenant or other term or condition of the Note . . . or any other Transaction Document to which the Holder is a party." Among the Transaction Documents are the Note, the Securities Purchase Agreement and the Registration Rights Agreement.

12. In Paragraph 3 of the Securities Purchase Agreement, "[t]he Company represents and warrants to each of the [Note Holders]" that as of November 23, 2004, among other things:

   a. no event or circumstance had occurred or existed that would be required to be disclosed by the Company on a registration statement, and that had not been publicly announced (Securities Purchase Agreement ¶ 3(m));

   b. except as would not reasonably be expected to have a material adverse effect (as defined in the Securities Purchase Agreement), the Company maintained a system of internal controls sufficient to provide certain reasonable assurances, including, without limitation, that "transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability" (Securities Purchase Agreement ¶ 3(bb));

   c. the Company's Securities and Exchange Commission (the "SEC") filings and the disclosure materials given to the Note Holders, did not, when taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading (Securities Purchase Agreement ¶¶ 3(k), 3(dd)); and

   d. there had been "no material adverse change and no material adverse development in the business" of the Company since December 27, 2003 (Securities Purchase Agreement ¶ 3(l)).

13. In Paragraph 4(c) of the Securities Purchase Agreement, Global Power covenanted that "the Company shall file all reports required to be filed with the SEC pursuant to the 1934 Act."

14. In Paragraph 8(b) of the Registration Rights Agreement, executed on November 23, 2004 in connection with the Securities Purchase Agreement and by the Company and the Note Holders, the Company agreed to "file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act."

15. As described herein, the Company has breached each of the representations, warranties and covenants enumerated above and each breach constitutes an Event of Default under the Note. Based on these Events of Default, each of the Note Holders have demanded that the Company redeem the Notes. Despite its clear contractual obligation to do so, the Company has refused.

16. The Company disclosed in its Current Report on Form 8-K filed on March 8, 2006 (the "March 8 Form 8-K") that its "[m]anagement [had] become aware of unrecognized expenses related to a heat recovery equipment project in China that was substantially completed in December 2004. This led management to further review the revenue and cost recognition for this project as well as a separate auxiliary power equipment project that had also been sold" in 2004. Following that review, the Company "determined that gross profit was inadvertently overstated in total for these projects, and that a restatement is required." Global Power stated that the financial statements expected to be restated would be those for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and the interim financial statements for the first, second and third quarters of 2005. According to the March 8 Form 8-K, Global Power's management believes that the restatement "could cumulatively

decrease previously reported operating income in an amount that is not currently expected to exceed approximately $7 million." The Company further stated that financial statements issued for those periods should not be relied upon because they are expected to contain errors. In a press release dated March 8, 2006, the Company also stated that the restatement "could cumulatively decrease previously reported operating income by approximately $7 million."

17. The Company further disclosed in the March 8 Form 8-K, that it "did not maintain effective internal control over financial reporting as of December 31, 2004" because of a "material weakness." The Company explained that "[a] material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." According to the Company, "this control deficiency, until remediated, could result in a misstatement of the Company's revenue and cost of projects that would result in a material misstatement to the Company's interim or annual financial statements that would not be prevented or detected." The Company further disclosed that its management had yet to complete an assessment of the internal control over financial reporting as of December 31, 2005 and that it was "possible that management may identify one or more additional material weaknesses."

18. The Company also failed to file its 2005 Form 10-K as required under the Securities Exchange Act of 1934 (the "1934 Act"). On or about March 16, 2006, the Company extended its time to file the Form 10-K until March 31, 2006. In a press released dated March 30, 2006, the Company disclosed that it would not meet that deadline as a result of the restatement and a review of certain contract cost reporting issues. The same press release further stated, "the Company will be in technical default under its outstanding convertible notes, which will result in a higher rate of interest and other penalties under the convertible notes provisions."

The March 31, 2006 deadline was not met and, as of the date of this Complaint, the 2005 Form 10-K still has not been filed.

19.    The foregoing facts revealed by the Company establish that it has breached the representations, warranties and covenants found in the Securities Purchase Agreement and Registration Rights Agreement that are detailed above. Paragraph 4(a)(x) of the Note requires that such breaches be material in order to constitute an Event of Default, and they are material.

20.    The discovery of an overstatement of gross profit that could result in a decrease of previously-reported operating income by approximately $7 million is clearly material. The Company had previously reported cumulative operating income of $2.6 million over the second, third, and fourth quarters of 2004 and the first three quarters of 2005, the periods the Company expects to be restated. Decreasing the operating income for those periods by $7 million would result in an operating loss of $4.4 million over the periods. Restating the reported operating income to an operating loss nearly twice its magnitude is plainly material.

21.    As for the failure to maintain controls, the Company has conceded that this is material. In its March 8 Form 8-K, the Company expressly characterized the weakness in its accounting controls as "material," and stated that the material weakness "could result in a misstatement of the Company's revenue and cost of projects that would result in a *material* misstatement to the Company's interim or annual financial statements." (Emphasis added.)

22.    Moreover, the market plainly perceived the problems disclosed by the Company to be material inasmuch as the Company's stock price dropped over 17% on the day following the March 8 Form 8-K announcement. On March 8, 2006, Global Power closed at $4.85 per share. On that day, the Company issued a press release announcing the restatement

and its failure to maintain effective control over financial reporting as described above. The following day Global Power traded down to $3.99 per share. Global Power has continued to trade substantially below its pre-announcement levels.

23. On March 9, 2006 the Company hosted a conference call to address these issues. During that conference call, the Company made a number of statements conceding the significance of the problems disclosed in the March 8 Form 8-K. During the call, Reynolds A. Brousseau, the President and Chief Executive Officer of the Company stated:

> [W]e became aware of *substantial* cost overruns which caused us to reassess all of our major Heat Recovery projects. While some of the execution problems were industry-related, most should have been avoided. The question is what are we going to do to fix it? We've made *significant* management changes over the past six months.

(Emphasis added.) Mr. Brousseau also stated: "[L]et's be clear that there is no one that's pleased as an individual in our organization about what's happened as a result of 2004. The effect and resonation throughout the organization has been dramatic." During the same call, John M. Matheson, Executive Vice President and Chief Operating Officer for the Company, revealed that the Company had hired Ernst & Young's Transaction Advisory Services "to help us implement a program to literally reinvent [the] business unit" containing the two projects in China with overstated gross profit.

24. The Company also has acknowledged that the failure to file its Form 10-K in a timely fashion is sufficiently material to cause an Event of Default, inasmuch as it stated in its March 30, 2006 press release that the failure "will result in a higher rate of interest and other penalties under the convertible notes provisions." Those are consequences of the occurrence of an Event of Default. To the extent the breach of the Company's covenants to make the required filings under the 1934 Act was curable, the Company failed to cure it within 30 days from

knowledge of such failure by an executive officer of the Company, as provided in Paragraph 4(a)(x) of the Note.

The Event of Default Under Note Paragraph 4(a)(i)

25. Paragraph 2(a) of the Registration Rights Agreement provides that the Company is to file a Registration Statement covering the shares issuable pursuant to the Notes. The Registration Rights Agreement provides that the "Company shall keep each Registration Statement effective pursuant to Rule 415 [under the Securities Act of 1933] at all times." (Registration Rights Agreement ¶ 3(a).)

26. Pursuant to Paragraph 4(a)(i) of the Note, it shall be an Event of Default if "the effectiveness of the applicable Registration Statement lapses for any reason ... or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of 10 consecutive Trading Days."

27. As a result of the Company's failure to file its Form 10-K for 2005 when due, the Registration Statement has lapsed and been unavailable for at least ten consecutive trading days. Accordingly, an Event of Default has occurred under Paragraph 4(a)(i) of the Note.

The Note Holders Demand Redemption

28. On March 31, 2006, Note Holder Steelhead Investments Ltd. sent the Company an Event of Default Redemption Notice. On April 10, 2006, Note Holders D.B. Zwirn Special Opportunities Fund, L.P., D.B. Zwirn Special Opportunities Fund, Ltd., and HCM/Z Special Opportunities LLC collectively sent the Company an Event of Default Redemption Notice.

29. On April 13, 2006 Kings Road sent an Event of Default Redemption Notice, via facsimile and overnight courier, to Global Power specifying certain of the Events of Default specified herein that had occurred at that time and stating that it "exercises its right, pursuant to Section 4(b) of the Note, to require the Company to redeem all of the notes." On May 4, 2006, Kings Road sent another letter, also via facsimile and overnight courier, to the Company specifying additional Events of Default described herein that serve as additional bases for Kings Road's exercise of its redemption rights.

30. Accordingly, Note Holders representing 100% of the aggregate principal amount of the Notes outstanding have now demanded repayment of the Notes, thereby satisfying the requirement that "holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding" have made demand that the Company redeem the Notes.

Global Power Fails To Make Payment

31. Pursuant to the Note, the Company is obligated to deliver the redemption price to Kings Road within ten business days of its receipt of a demand for repayment. (Notes ¶ 13(a).) More than ten business days have passed since Kings Road sent its Event of Default Redemption Notice.

### CLAIM FOR RELIEF

Breach of Contract

32. Kings Road realleges and incorporates by reference the allegations contained in paragraphs 1 through 31 of this Complaint.

33. As described above, Global Power has breached its representations, warranties and covenants under the Transaction Documents, including without limitation its obligation to redeem the Note as demanded by Kings Road.

10134048.1

10

34.     As a result of the Company's breaches, Kings Road has been damaged in an amount to be determined at trial, but which is no less than $29,700,000, plus interest accruing thereon.

**WHEREFORE**, Kings Road prays for judgment in its favor and against Global Power as set forth below:

A.     Money damages of not less than $29,700,000, plus interest accruing thereon;

B.     Costs and reasonable attorneys' fees in enforcing its rights in bringing this action; and

C.     Such other and further relief as the Court my deem just and proper.

Dated: New York, New York
       May 4, 2006

SCHULTE ROTH & ZABEL LLP

By: _____
Alan R. Glickman (ARG-0927)
Gregory A. Kasper (GAK-6596)

919 Third Avenue
New York, New York  10022
(212) 756-2000

Attorneys for Kings Road Investments Ltd.