UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
KINGS ROAD INVESTMENTS LTD.,

Plaintiff, Civ. No.: 06 Civ. 3433 (BSJ) (ECF)

v.

GLOBAL POWER EQUIPMENT GROUP INC.,

Defendant.
------------------------------------------------------x

**AFFIRMATION OF GREGORY A. KASPER, ESQ.**

GREGORY A. KASPER, ESQ., affirms the following under the penalties of perjury:

1. I am a member of the bar of this Court and am associated with the law firm of Schulte Roth & Zabel LLP, attorneys for Kings Road Investments Ltd. ("Kings Road") in the above-captioned action. I am familiar with the facts and circumstances of this action and the matters set forth below. I make this affirmation in support of Kings Road's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

2. A true and correct copy of Amendment No. 1 to Securities and Exchange Commission ("SEC") Form S-3 Registration Statement filed by Global Power Equipment Group Inc. ("Global Power") on January 28, 2005 is attached hereto as Exhibit 1.

3. A true and correct copy of a Securities Purchase Agreement among Global Power, Kings Road and certain identified investors, dated November 23, 2004, is attached hereto as Exhibit 2.

4. A true and correct copy of a Convertible Senior Subordinated Note, issued on November 23, 2004 in the amount of $27,000,000 by Global Power to Kings Road (the "Note"), is attached hereto as Exhibit 3.

5. A true and correct copy of a Registration Rights Agreement among Global Power and certain undersigned buyers, dated November 23, 2004, is attached hereto as Exhibit 4.

6. The term "Event of Default Redemption Price" is defined in Section 4(b) of the Note which states:

> The portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company at a price equal to the greater of (i) the product of (x) the Conversion Amount to be redeemed plus accrued and unpaid interest and (y) the Event of Default Redemption Premium and (ii) the product of (A) the Conversion Rate with respect to such Conversion Amount in effect at such time as the Holder delivers an Event of Default Redemption Notice and (B) the Closing Sale Price of the Common Stock on the date immediately preceding such Event of Default (the "Event of Default Redemption Price").

Pursuant to that provision and the definition of the terms contained therein, the portion of the Note subject to redemption by the Company as a result of an Event of Default shall be redeemed by the Company at a price equal to the greater of (i) 110% of the amount being redeemed or (ii) the current market price if the Note was being converted to Global Power common stock pursuant to the terms of the Note. Accordingly, the amount to which holders are entitled upon redemption after occurrence of an Event of Default is, at a minimum, 110% of the principal and interest converted.

7. The term "Trading Day" is defined in Section 30(iii) of the Note which states:

> "Trading Day" means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded; provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time

of trading on such exchange or market, then during the hour ending
at 4:00:00 p.m., New York Time).

8.    The stock of Global Power is principally traded on the New York Stock

Exchange.  (*See* printout of daily prices for Global Power stock from March 8, 2006 to July 21,

2006, from the Yahoo Finance web site, attached hereto as Exhibit 9.)  Accordingly, pursuant to

Section 30(iii) of the Note and the definition of the terms contained therein, "Trading Day"

means days on which the common stock of Global Power was traded on the New York Stock

Exchange.  For purposes of the periods discussed in connection with this motion, that means

weekdays excluding holidays.

9.    A true and correct copy of SEC Form S-3 Registration Statement filed by

Global Power on December 23, 2004 is attached hereto as Exhibit 5.

10.    A true and correct copy of a Current Report on SEC Form 8-K filed by

Global Power on March 8, 2006 is attached hereto as Exhibit 6.

11.    A true and correct copy of a Current Report on SEC Form 8-K filed by

Global Power on March 14, 2006, including Exhibit 99.1, a press release titled "Global Power

Equipment Group Inc. Expects to Restate Fiscal 2004 and Quarterly 2005 Results Due To

Misreported Gross Profit on Two Completed Projects in China and Provides Preliminary Fourth

Quarter Earnings Estimate," dated March 8, 2004, and Exhibit 99.2, a transcript of Global

Power's March 9, 2006 telephone conference call, is attached hereto as Exhibit 7.

12.    The Company reported cumulative operating income of $2,552,000 over

the second, third, and fourth quarters of 2004 and the first three quarters of 2005.  Exhibit 8

contains the cover page and certain financial statement data from the SEC Forms 10-Q filed by

Global Power for the second and third quarters of 2004, the SEC Form 10-K filed by Global

Power for the year ended December 31, 2004, and the SEC Forms 10-Q for the first, second, and

third quarters of 2005. These documents reflect that Global Power's operating income for those

periods were as follows:

- 2nd quarter 2004      $588,000
- 3rd quarter 2004      $330,000
- 4th quarter 2004      ($2,375,000)
- 1st quarter 2005      $865,000
- 2nd quarter 2005      ($894,000)
- 3rd quarter 2005      $4,038,000

Global Power's total operating income for the foregoing period was $2,552,000. The documents

that are excerpted in Exhibit 8 can be found in their entirety on the SEC website at the following

web addresses:

      http://www.sec.gov/Archives/edgar/data/1136294/000119312504132201/d10q.htm
      (2nd quarter 2004 SEC Form 10-Q);

      http://www.sec.gov/Archives/edgar/data/1136294/000119312504186197/d10q.htm
      (3rd quarter 2004 SEC Form 10-Q);

      http://www.sec.gov/Archives/edgar/data/1136294/000119312505051183/d10k.htm
      (2004 SEC Form 10-K);

      http://www.sec.gov/Archives/edgar/data/1136294/000119312505102033/d10q.htm
      (1st quarter 2005 SEC Form 10-Q);

      http://www.sec.gov/Archives/edgar/data/1136294/000119312505161950/d10q.htm
      (2nd quarter 2005 SEC Form 10-Q); and

      http://www.sec.gov/Archives/edgar/data/1136294/000119312505219607/d10q.htm
      (3rd quarter 2005 SEC Form 10-Q).

      13.    A true and correct copy of a printout of daily prices for Global Power

stock from March 8, 2006 to July 21, 2006, from the Yahoo Finance web site, is attached hereto

as Exhibit 9.

      14.    A true and correct copy of SEC Form 12b-25 filed by Global Power on

March 16, 2006 is attached hereto as Exhibit 10.

15.     A true and correct copy of a Current Report on SEC Form 8-K filed by Global Power on March 31, 2006, including Exhibit 99, a press release titled "Global Power Equipment Group Inc. Provides Update on 2005 10-K Filing and Restatement," dated March 30, 2006, is attached hereto as Exhibit 11.

16.     A true and correct copy of a Current Report on SEC Form 8-K filed by Global Power on April 6, 2006 is attached hereto as Exhibit 12.

17.     A true and correct copy of an E-mail from Y Reed, Global Power, to "Operations," dated May 24, 2006, is attached hereto as Exhibit 13.  I understand from Polygon Investment Partners LP, manager to Kings Road, that (i) "Operations" designates a group of certain e-mail recipients within Polygon Investment Partners LP., which is the manager of Kings Road and thereby its agent; and (ii) Global Power in fact did pay interest at the default rate of 9.25% beginning after May 1, 2006, as Global Power indicated in Exhibit 13.

18.     A true and correct copy of a letter from Candice Cheeseman, Global Power, to Steelhead Investments Ltd., dated April 5, 2006, is attached hereto as Exhibit 14.

19.     A true and correct copy of a letter from David A. Proshan to Global Power, dated April 10, 2006, is attached hereto as Exhibit 15.

20.     A true and correct copy of a letter from Erik Caspersen, Kings Road, to Bank of America, US Bank National Association and Bank of Oklahoma, dated April 6, 2006, is attached hereto as Exhibit 16.

21.     A true and correct copy of excerpts of a Credit Agreement among Global Power, Bank of America, N.A., US Bank National Association, Bank of Oklahoma and other lenders, dated October 1, 2004, is attached hereto as Exhibit 17.  This document can be found in

its entirety on the SEC website at the following web address:

http://www.sec.gov/Archives/edgar/data/1136294/000119312504186197/dex101.htm.

22.    A true and correct copy of a letter from Brandon Jones, Kings Road, to Global Power, dated April 13, 2006, is attached hereto as Exhibit 18.

23.    A true and correct copy of a letter from Erik Caspersen, Kings Road, to Global Power, dated May 4, 2006, is attached hereto as Exhibit 19.

24.    A true and correct copy of a letter from Andrew W. Hammond, White & Case LLP (counsel for Global Power), to Erik W. Caspersen, Kings Road, dated May 5, 2006, is attached hereto as Exhibit 20.

25.    A true and correct copy of a letter from Candice L. Cheeseman, Global Power, to Polygon Investment Partners LP, manager to Kings Road, dated May 8, 2006, is attached hereto as Exhibit 21.

26.    A true and correct copy of the Complaint filed in this action on May 4, 2006 is attached hereto as Exhibit 22.

27.    A true and correct copy of portions of the SEC Form 10-K for the year ended December 31, 2004, filed by Global Power on March 15, 2005, is attached hereto as Exhibit 23.  This document can be found in its entirety on the SEC website at the following web address:  http://www.sec.gov/Archives/edgar/data/1136294/000119312505051183/d10k.htm.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   New York, New York
        July 24, 2006


                                   s/ Gregory A. Kasper
                                   Gregory A. Kasper

S-3/A 1 ds3a.htm AMENDMENT NO. 1 TO FORM S-3

**Table of Contents**

**As filed with the Securities and Exchange Commission on January 28, 2005**
**Registration No. 333-121585**

---

# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# AMENDMENT NO. 1 TO
# FORM S-3
# REGISTRATION STATEMENT
***UNDER***
***THE SECURITIES ACT OF 1933***

---

# GLOBAL POWER EQUIPMENT GROUP INC.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**6120 South Yale, Suite 1480**
**Tulsa, Oklahoma 74136**
**(918) 488-0828**
**(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)**

---

**Candice L. Cheeseman, Esq.**
**General Counsel and Secretary**
**6120 South Yale, Suite 1480**
**Tulsa, Oklahoma 74136**
**(918) 488-0828**
**(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent for Service)**

---

***WITH COPIES TO:***
**Robert J. Melgaard, Esq.**
**Mark D. Berman, Esq.**
**Conner & Winters, LLP**
**3700 First Place Tower**
**15 East Fifth Street**
**Tulsa, Oklahoma 74103**
**(918) 586-5711**
**(918) 586-8548 (Facsimile)**

---

**Approximate date of commencement of proposed sale of the securities to the public:** From time to time after this Registration Statement becomes effective.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans, please check the following box: ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, other than securities offered only in connection with dividend or interest reinvestment plans, please check the following box: ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. ☐

---

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until this Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**The information in this prospectus is not complete and may be changed. The selling stockholders may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED JANUARY 28, 2005**

# 7,803,959 SHARES

# GLOBAL POWER EQUIPMENT GROUP INC.

# COMMON STOCK

---

This prospectus relates to the offer and sale from time to time of up to an aggregate of 7,803,959 shares of our common stock for the account of the selling stockholders named in this prospectus. The selling stockholders, or their transferees, pledgees, donees or other successors in interest, may sell their shares of common stock by the methods described under "Plan of Distribution."

The shares of common stock being registered for resale consist of shares of common stock issuable upon the conversion of convertible notes sold in a private placement on November 23, 2004, which is more fully described under the heading "Global Power Equipment Group Inc.—Recent Events—Private Placement of Convertible Notes."

We will not receive any of the proceeds from the sale by the selling stockholders of the shares of common stock.

Our common stock is listed on the New York Stock Exchange under the symbol "GEG." On January 27, 2005, the last reported sales price for our common stock was $9.08.

**There are significant risks associated with an investment in our securities. See " Risk Factors" beginning on page 6. You should also read carefully the risks we describe in our periodic reports that we file with the Securities and Exchange Commission, for a better understanding of the risks and uncertainties that investors in our securities should consider.**

---

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is , 2005.

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| Global Power Equipment Group Inc. | 3 |
| Risk Factors | 6 |
| No Proceeds | 14 |
| Cautionary Notice Regarding Forward Looking Statements. | 14 |
| Description of Capital Stock | 15 |
| Selling Stockholders | 18 |
| Plan of Distribution | 21 |
| Legal Matters | 24 |
| Experts | 24 |
| Where You Can Find More Information | 24 |
| Incorporation of Certain Documents By Reference | 25 |

**You should rely only on the information contained in or specifically incorporated by reference into this prospectus. We have not authorized anyone to provide you with information that is different. This prospectus may only be used where it is legal to sell these securities. The information in this prospectus or incorporated by reference into this prospectus may only be accurate on the date of those documents.**

Table of Contents

**GLOBAL POWER EQUIPMENT GROUP INC.**

**Our Business**

We are a global designer, engineer and fabricator of a comprehensive portfolio of equipment for gas turbine power plants and power-related equipment for industrial operations, with over 30 years of power generation industry experience. We believe that we are a leader in our industry, offer one of the broadest ranges of gas turbine power plant and other power-related equipment in the world, and hold the number one or number two market position by sales in a majority of our product lines. Our equipment is installed in power plants and in industrial operations in more than 40 countries on six continents. We believe that we have one of the largest installed bases of equipment for power generation in the world. In addition, we provide our customers with value-added services including engineering, retrofit and upgrade, and maintenance and repair.

We sell our products to the gas turbine power generation market. Our products are critical to the efficient operation of gas turbine power plants and are highly engineered to meet customer-specific requirements. Our products include:

- heat recovery steam generators;
- filter houses;
- inlet systems;
- gas turbine, steam turbine and generator enclosures;
- exhaust systems;
- diverter dampers; and
- specialty boilers and related products.

We market and sell our products globally under the *Deltak, Braden* and *Consolidated Fabricators* brand names through our worldwide sales network.

We fabricate our equipment through a combination of in-house manufacturing and extensive outsourcing relationships. Our network of subcontractors, located throughout 17 countries, allows us to manufacture equipment for power plant projects and power-related equipment worldwide at competitive prices. Our subcontractors enable us to meet increasing demand without being restricted by internal manufacturing capacity limitations, thus limiting our capital expenditure requirements. Using subcontractors also allows us to limit our fixed costs, thereby providing a significant benefit during times of decreased demand.

We believe our design and engineering capabilities differentiate us from our competitors. By providing high-quality products on a timely basis and offering a broad range of equipment, we have forged longstanding relationships with the leading power industry participants, including General Electric, Mitsubishi Heavy Industries, Siemens-Westinghouse, Exxon Mobil, Southern Companies, Tenaska and Bechtel.

**Our Executive Offices**

Our headquarters and principal executive offices are located at 6120 South Yale, Suite 1480, Tulsa, Oklahoma 74136. Our telephone number is (918) 488-0828.

Table of Contents

**Recent Developments**

***Agreement to Acquire Williams Industrial Services Group***

On November 23, 2004, we entered into a Purchase Agreement with Williams Group International LLC, a Georgia limited liability company, to purchase all of the outstanding limited liability company interests of three Georgia limited liability companies, which we refer to collectively as Williams Industrial Services Group, or "WISG." Founded in 1958, Williams Industrial Services Group provides routine and specialty maintenance services to firms engaged in power generation, pulp and paper manufacturing and to government agencies, primarily the Department of Energy. Approximately 80% of WISG's annual revenue is derived from services provided to firms in power generation and includes work at nuclear power plants, coal-fired power plants and other fossil fuel plants as well as hydro-based generating facilities.

The purchase price will consist of an "Equity Purchase Price" payable at closing and a "Deferred Purchase Price." The Equity Purchase Price is $65.0 million, subject to certain customary adjustments. The Deferred Purchase Price will range from zero to $0.9 million and will be payable by us in cash in 2006. The Deferred Purchase Price is contingent on the attainment by WISG of certain gross profit targets for 2005.

The WISG Purchase Agreement is subject to customary closing conditions. We expect to close the acquisition in April of 2005. We will be required to escrow $7.65 million of the net proceeds from the sale of the convertible notes referred to under "—Private Placement of Convertible Notes," below, for future interest payments for the benefit of the convertible noteholders if the closing does not occur by April 30, 2005. If the acquisition is not consummated by June 30, 2005, we will be required to pay certain outstanding loans under our credit agreement with the net proceeds from the sale of the convertible notes.

***Private Placement of Convertible Notes***

On November 23, 2004, we completed a private placement of $69.0 million aggregate principal amount of our 4.25% convertible senior subordinated notes due 2011. We intend to use the net proceeds of the offering, together with borrowings under our credit facility and cash on hand, to fund the purchase of WISG described above. The convertible notes bear interest at a rate of 4.25% per year, payable semi-annually on May 23 and November 23 of each year, beginning on May 23, 2005. The convertible notes are convertible into shares of our common stock at an initial conversion price of $10.61 per share of common stock, which is equal to approximately 122% of the volume weighted average price of our common stock on November 22, 2004. The conversion price is subject to adjustment in certain circumstances.

Upon the occurrence of an "Event of Default," or a "Change of Control," the noteholders may require us to redeem all or any portion of the convertible notes. A "Triggering Event" will be deemed to occur if we incur any indebtedness in addition to "Permitted Indebtedness," and at the time of such incurrence, our trailing 12 months "Consolidated EBITDA" does not equal or exceed $30.0 million or, as a result of the incurrence, our "Consolidated Leverage Ratio" exceeds 4.75 to 1.0. Within 30 days of the occurrence of a Triggering Event, we will be required to offer to redeem all or any portion of the convertible notes then outstanding at a redemption price equal to the principal balance of the notes plus all accrued and unpaid interest. If at any time prior to the incurrence of a Triggering Event, the weighted average price of our common stock equals or exceeds 150% of the conversion price then in effect for a period of 15 out of 30 consecutive trading days, the restrictions on "Permitted Indebtedness" will be removed. We may redeem all or any portion of the convertible notes, at our option, at any time on or after

Table of Contents

November 23, 2007 if the weighted average price of our common stock exceeds 165% of the conversion price then in effect for a period of 20 out of 30 consecutive trading days. At any time beginning on May 23, 2005 and continuing until the date that is the six month anniversary of the date of this prospectus, the noteholders may, at their option, require us to redeem up to $9.0 million of the convertible notes. Beginning on November 23, 2009, the noteholders may, at their option, require us to redeem all or any portion of the convertible notes. In such event, we may elect, at our option and subject to certain conditions, to pay up to 50% of the redemption price in shares of our common stock valued at 94% of the weighted average price of the common stock for the 20-day trading period immediately preceding the redemption date.

We agreed, pursuant to a registration rights agreement entered into in connection with such transaction, to register for resale by the noteholders 120% of the number of shares of common stock issuable upon conversion of the convertible notes. This prospectus covers the resale by each of the noteholders of such shares.

Additional information about the convertible notes is available in our Current Report on Form 8-K filed with the SEC on November 30, 2004, which is incorporated by reference into this prospectus, as described in "Incorporation of Certain Documents by Reference."

Table of Contents

## RISK FACTORS

*Before you invest in our securities, you should be aware that there are various risks. You should carefully consider the risk factors set forth in this prospectus, the prospectus supplement with respect to a particular offering of securities and the reports we file with the SEC which are incorporated by reference into this prospectus, as well as other information we include or incorporate by reference in this prospectus, before you decide whether an investment in that security is suitable for you. These are not the only risks and uncertainties we face. Additional risks and uncertainties that we are presently unaware of or currently consider immaterial may also adversely affect our business operations.*

***Our pending acquisition of WISG might not be consummated. If the WISG acquisition is completed, we cannot assure you that our combined results will conform to our expectations. There may be additional risks associated with operating the WISG business.***

The consummation of the WISG acquisition is subject to the satisfaction of customary conditions, including the accuracy of the various representations and warranties of the parties contained in the purchase and sale agreement on the closing date. In addition, the purchase and sale agreement may be terminated by either party in most circumstances if the closing does not occur by April 30, 2005. Although we believe that the conditions to closing the WISG acquisition will be satisfied and that the closing will occur in April of 2005, we cannot assure you that the transaction will be consummated. If on or prior to April 30, 2005, the contemplated acquisition of WISG has not been consummated, we will be required to escrow $7.65 million of the net proceeds from the sale of the convertible notes for future interest payments for the benefit of the convertible note holders until the WISG acquisition is consummated. If the acquisition is not consummated by June 30, 2005, we will be required to pay certain outstanding loans under our credit agreement with the net proceeds from the sale of the convertible notes.

If the WISG acquisition is consummated, we cannot assure you that our actual results will match our expectations. Successful acquisitions require an assessment of a number of factors, many of which are beyond our control and are inherently uncertain. Factors which may cause our actual results to differ materially from our expected results include the curtailment of major maintenance projects by one or more of WISG's major customers or unanticipated difficulties or delays in integrating the operations of WISG with our own.

There may be additional risks associated with the operation of the WISG business if the acquisition is consummated, including:

- the loss of the services of certain of WISG's key management;
- environmental issues arising from certain services performed by WISG;
- potential liability stemming from work-related accidents involving WISG's contract employees; and
- labor issues resulting from WISG's heavy reliance on union contract employees.

***Substantially all of our revenues are from sales of equipment for gas turbine power plants. During periods of declining construction of new gas turbine power plants, the market for our products is significantly diminished.***

Table of Contents

The demand for our products and services depends on the continued construction of gas turbine power generation plants. In fiscal year 2003, approximately 87% of our revenues were from sales of equipment and provision of services for gas turbine power plants. The power generation equipment industry has experienced cyclical periods of slow growth or decline. In periods of decreased demand for new gas turbine power plants, our customers may be more likely to decrease expenditures on the types of products and systems that we supply and, as a result, our future revenues may decrease. In addition, the gas turbine power industry depends on natural gas. A rise in the price or a shortage of natural gas could affect the profitability or operations of gas turbine power plants, which could adversely affect our future revenues.

Environmental laws and regulations have played a part in the increased use of gas turbine technology in various jurisdictions. These laws and regulations may change or other jurisdictions may not adopt similar laws and regulations. Changes in existing laws and regulations could result in a reduction in the building and refurbishment of gas turbine power plants. In addition, stricter environmental regulation could result in our customers seeking new ways of generating electricity that do not require the use of our products. Furthermore, although gas turbine power plants have lower emissions than coal-fired power plants, emissions from gas turbine power plants remain a concern and attempts to reduce or regulate emissions could increase the cost of gas turbine power plants and result in our customers switching to alternative sources of power.

Other current power technologies, improvements to these technologies and new alternative power technologies that compete or may compete in the future with gas turbine power plants could affect our sales and profitability. Furthermore, in fiscal year 2003, approximately 45% of our revenues were from sales of heat recovery equipment used in combined-cycle power plants. Any change in the power generation industry which results in a decline in the construction of new combined-cycle power plants or a decline in the upgrading of existing simple-cycle power plants to combined-cycle power plants could materially adversely affect our sales.

Because some of our contracts stipulate that customer progress payments be made in advance of work performed, increases in overall sales volume allow us to finance a portion of our business through these payments. Conversely, a prolonged decline in new bookings of sales that provide for progress payments, or, if due to competitive market conditions we elect to extend progress payment schedules, our ability to finance our business from operating sources may be adversely affected and other financing sources may be required.

***A small number of major customers account for a significant portion of our revenues, and the loss of any of these customers could negatively impact our business.***

We depend on a relatively small number of customers for a significant portion of our revenues. In fiscal year 2001, three customers accounted for approximately 52% of our consolidated revenues. In fiscal year 2002, two customers accounted for approximately 49% of our consolidated revenues. In fiscal year 2003, two customers accounted for approximately 42% of our consolidated revenues and approximately 33% of our backlog at the end of the year. In addition, our five largest customers accounted for approximately 62% of our revenues in fiscal year 2003 and approximately 54% of our backlog at the end of the year. Other than their obligations under firm orders placed in our backlog, none of our customers has a long-term contractual obligation to purchase any material amounts of products from us. All of our firm orders contain cancellation provisions, which permit us to recover only our costs and a portion of our anticipated profit in the event a customer cancels its order. If a customer elects to cancel, we may not realize the full amount of future revenues included in our backlog. We expect to continue to depend upon a relatively small number of customers for a significant percentage of our revenues. Because our major customers represent a large part of our business, the loss of any of our major customers could negatively impact our business and results of operations.

Table of Contents

***If our costs exceed the estimates we use to set the fixed prices of our contracts, our earnings will be reduced.***

We enter into nearly all of our contracts on a fixed-price basis. As a result, we benefit from cost savings, but have limited ability to recover any cost overruns. Contract prices are established based in part on our projected costs, which are subject to a number of assumptions. The costs that we incur in connection with each contract can vary, sometimes substantially, from our original projections. Because of the large scale and long duration of our contracts, unanticipated changes may occur, such as customer budget decisions, design changes, delays in receiving permits and cost increases, which may delay delivery of our products. In addition, we often are contractually subject to liquidated damages for late delivery.

Unanticipated cost increases or delays may occur as a result of several factors, including:

- increases in the cost, or shortages, of components, materials or labor;
- unanticipated technical problems;
- required project modifications not initiated by the customer; and
- suppliers' or subcontractors' failure to perform.

Given the rapid economic growth in China and Southeast Asia, material prices, including primarily steel prices, have increased sharply and may continue to increase in the future. Our ability to recover these cost increases from our customers on our current and future orders may be limited.

Cost increases or overruns that we cannot pass on to our customers or our payment of liquidated damages under our contracts will lower our earnings.

***Competition could result in decreased sales or decreased prices for our products and services.***

We face and will continue to face significant competition for the sale of our products and services. Competition could result in a reduction in the demand for, or the prices that we can charge for, our products and services. Our success is dependent in large part on our ability to:

- anticipate or respond quickly to our customers' needs and enhance and upgrade our existing products and services to meet those needs;
- continue to price our products and services competitively and find low cost subcontractors that can produce quality products; and
- develop new products and systems that are accepted by our customers and differentiated from our competitors' offerings.

Our competitors may:

- develop more desirable, efficient, environmentally friendly or less expensive products;

Table of Contents

- be willing to accept lower prices to protect strategic marketing positions or increase market share;
- be better able to take advantage of acquisition opportunities; or
- adapt more quickly to changes in customer requirements.

As a result of our competitors' business practices, we may need to lower our prices and/or devote significant resources to marketing our products in order to remain competitive. Lower prices and/or higher costs would reduce our revenues, gross profit and net income.

***If we are unable to control the quality or timely production of products manufactured for us by subcontractors, our reputation could be adversely affected and we could lose customers. If we are unable to recover any advance progress payments made to subcontractors, our profitability would be adversely affected.***

We rely on subcontractors to manufacture and assemble a substantial portion of our products. In fiscal year 2003, we estimate that subcontractors accounted for approximately 83% of our manufacturing costs. Although we have on-site supervision of our subcontractors to review and monitor their quality control systems, the quality and timing of their production is not totally under our control. Our subcontractors may not always meet the level of quality control and the delivery schedules required by our customers. The failure of our subcontractors to produce quality products in a timely manner could adversely affect our reputation and result in the cancellation of orders for our products and the loss of customers.

In addition, we make advance progress payments to subcontractors in anticipation of their completion of our orders. We may be unable to recover those advance payments in the event a subcontractor fails to complete an order, which may adversely affect our profitability.

***The dollar amount of our backlog, as stated at any time, is not necessarily indicative of our future revenues.***

When we receive a firm order for a project from a customer, that order is added to our backlog. However, customers may cancel or delay projects for reasons beyond our control and we may be unable to replace any canceled orders with new orders. To the extent projects are delayed, the timing of our revenues could be affected. If a customer cancels an order, we may be reimbursed for the incurred costs. Typically, however, we have no contractual right to the full amount of the revenues reflected in our backlog that we would have received if the order had not been canceled. In addition, projects may remain in our backlog for extended periods of time. Revenue recognition occurs over extended periods of time and is subject to unanticipated delays. Fluctuations in our quarterly backlog levels also result from the fact that we may receive a small number of relatively large orders in any given quarter that may be included in our backlog. Because of these large orders, our backlog in that quarter may reach levels that may not be sustained in subsequent quarters. Our backlog, therefore, is not necessarily indicative of our future revenues.

***Our future revenues and operating results may vary significantly from quarter to quarter.***

Our quarterly revenues and earnings have varied in the past and are likely to vary in the future. Our contracts stipulate customer specific delivery terms which, coupled with other factors beyond our control that may occur at any time over a contract cycle of up to a year or more, may result in uneven realization of revenues and earnings over time. Customer-imposed delays can significantly impact the timing of revenue recognition. Due to our large average contract size, our sales volume during any given

Table of Contents

period may be concentrated in relatively few orders, intensifying the magnitude of these fluctuations. Consequently, our quarterly performance may not be indicative of our success in achieving year-over-year growth objectives. Furthermore, some of our operating costs are fixed. As a result, we may have limited ability to reduce our operating costs in response to unanticipated decreases in our revenues or the demand for our products in any given quarter. Therefore, our operating results in any quarter may not be indicative of our future performance. In addition, because we must make significant estimates related to the recognition of revenue on a percentage of completion basis, we may have difficulty accurately estimating revenues and profits from quarter to quarter.

***Compliance with environmental laws and regulations is costly, and our ongoing operations may expose us to environmental liabilities.***

Our operations are subject to laws and regulations governing the discharge of materials into the environment or otherwise relating to the protection of the environment or human health and safety. These laws include U.S. federal statutes such as the Resource Conservation and Recovery Act of 1976, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or CERCLA, the Clean Water Act and the Clean Air Act, and the regulations implementing them, as well as similar laws and regulations at the state and local levels and in other countries in which we operate.

Failure to comply with environmental laws or regulations could subject us to significant liabilities for fines, penalties or damages, or result in the denial or loss of significant operating permits. In addition, some environmental laws, including CERCLA, impose liability for the costs of investigating and remediating releases of hazardous substances without regard to fault and on a joint and several basis, so that in some circumstances we may be liable for costs attributable to hazardous substances released into the environment by others.

Our manufacturing facilities use and produce wastes containing various substances classified as hazardous or otherwise regulated under environment laws and regulations, and are subject to ongoing compliance costs and capital expenditure requirements. We believe we are in compliance with applicable environmental laws and regulations and that the costs of compliance are not material to us. However, any newly discovered environmental conditions could result in unanticipated expenses or liabilities that could be material. Moreover, the environmental laws and regulations to which we are subject are constantly changing, and it is impossible to predict the effect of these changes on us. We cannot give any assurances that our operations will comply with future laws and regulations or that these laws and regulations will not significantly adversely affect us.

***A defect in our products could result in unanticipated warranty costs or product liability not covered by our insurance, which could adversely affect our financial condition or results of operations.***

We generally provide warranties for terms of three years or less on our products. These warranties require us to repair or replace faulty products. Warranty claims could result in significant unanticipated costs. The need to repair or replace products with design or manufacturing defects could also temporarily delay the sale of new products and adversely affect our reputation.

In addition, we may be subject to product liability claims involving claims of personal injury or property damage. Because our products are used primarily in power plants, claims could arise in different contexts, including the following:

- fires, explosions and power surges that can result in significant property damage or personal injury; and

Table of Contents

- equipment failure that can result in personal injury or damage to other equipment in the power plant.

If a very large product liability claim were sustained, our insurance coverage might not be adequate to cover our defense costs and the amount awarded. Additionally, a well-publicized actual or perceived problem could adversely affect our reputation and reduce demand for our products.

***The restrictions and covenants contained in our senior credit facility and our convertible notes limit our ability to borrow additional money, sell assets and make acquisitions. Compliance with these restrictions and covenants may limit our ability to implement elements of our business strategy.***

Our senior credit facility contains a number of significant restrictions and covenants limiting our ability and that of our subsidiaries to:

- borrow more money or make capital expenditures;
- incur liens;
- pay dividends or make other restricted payments;
- merge or sell assets;
- enter into transactions with affiliates; and
- make acquisitions.

In addition, our senior credit facility contains other restrictive covenants, including covenants that require us to maintain specified financial ratios, including leverage, asset coverage and fixed charge ratios and mandatory repayment provisions that will require us to repay our indebtedness with proceeds from certain asset sales, certain debt issuances and certain insurance casualty events. Our convertible notes contain additional restrictions on our ability to borrow money and covenants which, in some circumstances, may require us to offer to redeem any of the convertible notes then outstanding. If we are unable to service our indebtedness or are required to redeem the convertible notes, we may be forced to reduce or delay capital expenditures, sell assets, restructure or refinance our indebtedness or seek additional equity capital. Also, compliance with the restrictive covenants of our senior credit facility and our convertible notes may limit our ability to operate our business or implement elements of our business strategy.

***Our revenues would be adversely affected if we are unable to protect the proprietary design software programs that we use in our business.***

We have developed several proprietary software programs to help us design our products. Our ability to protect our proprietary rights to these programs is important to our success. We protect these rights through the use of internal controls and confidentiality and nondisclosure agreements and other legal protections. The legal protections afforded to our proprietary rights and the precautions we have taken may not be adequate to prevent misappropriation of our proprietary rights. We generally enter into non-disclosure and confidentiality agreements with our employees and subcontractors with access to sensitive design software and technology. However, these contractual protections do not prevent independent third-parties from developing functionally equivalent or superior technologies, programs, products or professional services. Third-parties may also infringe upon or misappropriate our proprietary rights and use them to develop competing products. If we were required to commence legal actions to enforce our intellectual property or proprietary rights or to defend ourselves against claims that we are infringing on the intellectual property or proprietary rights of others, we could incur substantial costs and divert management's attention from operations.

Table of Contents

***The loss of the services of our key executive officers could have a negative effect on our business.***

Our success depends to a significant extent on the continued services of Larry Edwards, our chief executive officer and chairman of the board, Al Brousseau, our president and chief operating officer, Jim Wilson, our chief financial officer, and Monte Ness, Gene Schockemoehl, and John Matheson, three of our senior executives. Our failure to retain the services of Messrs. Edwards, Brousseau, Wilson, Ness, Schockemoehl, or Matheson, or attract highly qualified management in the future, could adversely affect our ability to grow and manage our operations. Although we have employment agreements containing non-competition clauses with the executives, courts are sometimes reluctant to enforce these agreements. In addition, although we carry key man life insurance for Messrs. Edwards and Schockemoehl, the loss of their services could disrupt our operations.

***A failure to attract and retain employees who fill key requirements of our business may make it difficult to sustain or expand operations.***

We must attract and retain highly qualified experienced mechanical, design, structural and software engineers, service technicians, marketing and sales personnel and other key personnel to expand our operations. If we are unable to attract and retain necessary personnel, we may not be able to sustain or expand our operations.

***We may not be able to maintain or expand our business outside the United States because of numerous risk factors outside our control.***

Our international operations are subject to a number of risks inherent in doing business outside the United States including:

- labor unrest;
- regional economic uncertainty;
- political instability;
- restrictions on the transfer of funds into or out of a country;
- currency exchange rate fluctuations;
- export duties and quotas;
- expropriations;
- domestic and foreign customs and tariffs;
- current and changing regulatory environments;
- potentially adverse tax consequences; and
- availability of financing.

These factors may result in a decline in revenues or profitability and could adversely affect our ability to expand our business outside the United States.

Table of Contents

*Increased operations in China and Southeast Asia could adversely impact our operating margins.*

We have commenced a strategic initiative to increase the amount of products and services that we sell in China and Southeast Asia. While the economic outlook for power generation projects in that region of the world appears more favorable than the current market in the United States, we have no assurance that our strategy will be successful in obtaining significant increases in revenue. In addition to the risks associated with operations outside the United States noted previously, there are numerous additional challenges to doing business in China, such as strict tax and operating regulations. In addition, the Chinese legal system is relatively new, and the Chinese central and local government authorities retain a greater degree of control over business operations than is customary in more developed countries, making the process of obtaining regulatory approval for business operations inherently unpredictable in some circumstances.

*If we were required to write-off our goodwill or long-lived assets or place a valuation allowance against our deferred tax assets, our results of operations and stockholders' equity could be materially adversely affected.*

As a result of our June 1998 acquisition of the power generation division of Jason Incorporated and our October 2000 acquisition of CFI Holdings, Inc. and its subsidiaries, we have approximately $45.0 million of goodwill recorded on our consolidated balance sheet as of September 25, 2004. Due to the implementation of Statement of Financial Accounting Standards (SFAS) 142, "Goodwill and Other Intangible Assets," goodwill is no longer amortized but must be tested for impairment at least annually based on a fair value concept.

Long-lived assets, such as property and equipment, are evaluated for impairment when events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable through the estimated undiscounted future cash flows from the use of these assets.

Realization of the deferred tax assets is based on our ability to generate enough future taxable income. At some point in the future, we may determine that our future taxable income will not be sufficient in order to utilize the deferred tax assets. If this determination were made, we would place a valuation allowance against our deferred tax assets.

If we were required to write-off our goodwill or long-lived assets or place a valuation allowance against our deferred tax assets, our results of operations and financial position could be materially adversely affected.

*We are exposed to market risks from changes in interest rates and foreign currency exchange rates.*

We are subject to market risks from changes in interest rates. Our senior credit facility's variable-rate debt bears interest, at our option, at either the Eurodollar rate or an alternate base rate plus, in each case, an applicable margin. Assuming our current level of borrowings as of September 25, 2004, a 100 basis point increase in interest rates under these borrowings would increase our interest expense for fiscal year 2005 by approximately $0.2 million.

We are also subject to market risks from fluctuations in foreign currency exchange rates. Portions of our operations are located in foreign jurisdictions and a portion of our billings are paid in foreign currencies. Changes in foreign currency exchange rates or weak economic conditions in foreign markets could therefore cause fluctuations in those revenues derived from foreign operations. In addition, sales of products and services are affected by the value of the U.S. dollar relative to other currencies. Changes in foreign currency rates can also affect the costs of our products purchased or manufactured outside the United States.

Table of Contents

## NO PROCEEDS

The common stock to be offered and sold using this prospectus will be offered and sold by the selling stockholders named in this prospectus. We will not receive any proceeds from those sales.

## CAUTIONARY NOTICE REGARDING FORWARD LOOKING STATEMENTS

A number of statements included or incorporated by reference in this prospectus are not historical or current facts, but concern future circumstances and developments. These statements are intended to be "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, Section 21E of the Securities Exchange Act 1934, and the Private Securities Litigation Reform Act of 1995. These forward-looking statements and other written and oral forward-looking statements made by us from time to time may relate to, among other things, our plans, strategies and business prospects. The words "believe," "intend," "expect," "anticipate," "plan," "project," "contemplate" and similar expressions are generally utilized to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. These factors include, among others, those matters discussed under "Risk Factors" in this prospectus and those described in our periodic filings with the SEC which are incorporated by reference into this prospectus, as described in "Incorporation of Certain Documents by Reference." All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements, risks and uncertainties included or incorporated by reference in this prospectus.

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

### General

Our authorized capital stock consists of (a) 100,000,000 shares of common stock, having a par value of $0.01 per share, and (b) 5,000,000 shares of preferred stock, having a par value of $0.01 per share. As of December 1, 2004, 46,366,148 shares of common stock and no shares of preferred stock were outstanding.

### Common Stock

The holders of common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of common stock do not have cumulative voting rights for the election of directors. Subject to preferences that may be applicable to any outstanding series of preferred stock, holders of common stock are entitled to receive equally dividends as they may be declared by our board of directors out of funds legally available for the payment of dividends. In the event of our liquidation or dissolution, holders of common stock are entitled to share equally in all assets remaining after payment of liabilities and the liquidation preference of any outstanding series of preferred stock.

Holders of common stock have no preemptive rights and have no rights to convert their common stock into any other securities. All of the outstanding shares of common stock are, and the shares of common stock the selling stockholders may sell under this prospectus will be, duly authorized, validly issued, fully paid and nonassessable.

### Registration Rights

Certain holders of shares of our common stock (other than the selling stockholders) are entitled to certain rights with respect to the registration of those shares under the Securities Act of 1933. If we propose to register under the Securities Act an underwritten public offering of our common stock for our account, or any public offering of our common stock for the account of others exercising their registration rights discussed below, the holders of these shares are entitled to notice of the registration and are entitled to include, at our expense, their shares of common stock in the registration and any related underwriting, provided, among other conditions, that the underwriters, if any, may limit the number of shares to be included in the registration. In addition, certain of the holders of these shares may require us, at our expense and subject to certain limitations, to file a registration statement under the Securities Act with respect to their shares of common stock, and we will be required to use our reasonable efforts to effect the registration.

In connection with the private placement of $69.0 million of convertible senior subordinated notes described under "Global Power Equipment Group Inc.—Recent Events—Private Placement of Convertible Notes," we entered into a registration rights agreement, pursuant to which we agreed to register 120% of the number of shares of common stock initially issuable upon conversion of the convertible notes. This prospectus covers the resale by each of the noteholders of such shares.

Table of Contents

**Anti-Takeover Effects of Delaware Law and Provisions of Our Charter and Bylaws**

Delaware law and our certificate of incorporation and bylaws contain certain provisions that might be characterized as anti-takeover provisions. These provisions may make it more difficult to acquire control of us or remove our management.

***Business Combinations***

We are subject to the provisions of Section 203 of the Delaware General Corporation Law. In general, Section 203, subject to specific exceptions, prohibits a publicly held Delaware corporation from engaging in any "business combination" with any "interested stockholder" for a period of three years following the date that the stockholder became an interested stockholder, unless:

- prior to that date, the board of directors approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;
- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned by directors, officers and specific employee stock plans; or
- on or after that date, the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

Section 203 defines "business combination" to include:

- any merger or consolidation involving the corporation and the interested stockholder;
- any sale, transfer, pledge or other disposition of 10% or more of our assets involving the interested stockholder;
- subject to limited exceptions, any transaction that results in the issuance or transfer by us of any of our stock to the interested stockholder;
- any transaction involving us that has the effect of increasing the proportionate share of the stock of any class or series beneficially owned by the interested stockholder; and
- the receipt by the "interested stockholder" of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation.

In general, Section 203 defines an "interested stockholder" as an entity or person beneficially owning 15% or more of our outstanding voting stock and any entity or person affiliated with or controlling or controlled by that entity or person. Neither Harvest Partners III, L.P. nor Harvest Partners III, GbR are an interested stockholder for purposes of Section 203, as each of them was an interested stockholder prior to our amending our certificate of incorporation electing to be governed by Section 203.

Table of Contents

The provisions of Section 203 may encourage companies interested in acquiring us to negotiate in advance with our board of directors since the stockholder approval requirement would be avoided if a majority of the directors then in office approve either the business combination or the transaction that results in the stockholder becoming an interested stockholder. These provisions also may have the effect of preventing changes in our management or may make it more difficult to accomplish transactions that stockholders may otherwise deem to be in their best interest.

***Classified Board of Directors***

Our certificate of incorporation and bylaws provide for our board of directors to be divided into three classes serving staggered three-year terms. As a result, approximately one-third of our directors are elected each year. This provision could prevent a party who acquires control of a majority of our outstanding voting stock from obtaining control of the board of directors until the second annual stockholders meeting following the date the acquiror obtains the controlling stock interest. It could also have the effect of discouraging a potential acquiror from making a tender offer or otherwise attempting to obtain control of Global Power, which increases the likelihood that incumbent directors will retain their positions.

***Authorized but Unissued Shares***

The authorized but unissued shares of our common stock and preferred stock are available for future issuance without stockholder approval. These additional shares may be used for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could also render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

Our board of directors has no present intention to issue any new series of preferred stock; however, our board has the authority, without further stockholder approval, to issue one or more series of preferred stock that could, depending on the terms of the series, either impede or facilitate the completion of a merger, tender offer or other takeover attempt. Although our board of directors is required to make any determination to issue such stock based on its judgment as to the best interest of our stockholders, our board could act in a manner that would discourage an acquisition attempt or other transaction that some, or a majority, of the stockholders might believe to be in their best interests or in which stockholders might receive a premium for their stock over the then market price of such stock. Our board of directors does not intend to seek stockholder approval prior to any issuance of stock, unless otherwise required by law or the rules of the stock exchange on which our common stock is listed.

***No Stockholder Action by Written Consent; Special Meetings***

Our certificate of incorporation and bylaws contain provisions that eliminate the ability of our stockholders to take action by written consent. Our bylaws require approval of at least 35% of our stockholders in order to call a special meeting of the stockholders or bring matters before a special meeting of stockholders. These provisions could delay a stockholder vote on certain matters, such as business combinations and removal of directors, and could have the effect of discouraging a potential acquiror from making a tender offer.

***Advance Notice for Raising Business or Making Nominations at Meetings***

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before a meeting of stockholders and for nominations by stockholders of candidates for election as directors at an

Table of Contents

annual meeting or a special meeting at which directors are to be elected. As more fully described in the bylaws, only such business may be conducted at a meeting of stockholders as has been brought before the meeting by, or at the direction of, our board of directors, or by a stockholder who has given the Corporate Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. The presiding officer at a stockholders meeting has the authority to make these determinations. Only persons who are nominated by, or at the direction of, our board of directors, or who are nominated by a stockholder who has given timely written notice, in proper form, to the Corporate Secretary prior to a meeting at which directors are to be elected will be eligible for election to our board of directors. These provisions could make it more difficult for stockholders to raise matters affecting control of Global Power, including tender offers, business combinations or the election or removal of directors, for a stockholder vote.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is EquiServe Trust Company, N.A.

## SELLING STOCKHOLDERS

The shares of common stock being offered by the selling stockholders are issuable upon conversion of the convertible notes. For additional information regarding the convertible notes, see "Global Power Equipment Group—Recent Events—Private Placement of Convertible Notes" above. We are registering the shares of common stock in order to permit the selling stockholders to offer the shares for resale from time to time. Except for the ownership of the convertible notes issued to the selling stockholders in a private placement on November 23, 2004, the selling stockholders have not had any material relationship with us within the past three years.

The table below lists the selling stockholders and other information regarding the beneficial ownership of the shares of common stock by each of the selling stockholders. The second column lists the number of shares of common stock beneficially owned by each selling stockholder, based on its ownership of the convertible notes, as of December 21, 2004, assuming conversion of all convertible notes held by the selling stockholders on that date, without regard to any limitations on conversions or exercise.

The third column lists the shares of common stock being offered by this prospectus by the selling stockholders.

In accordance with the terms of a registration rights agreement with the holders of the convertible notes, this prospectus generally covers the resale of at least that number of shares of common stock equal to 120% of the number of shares of common stock issuable upon conversion of the convertible notes, determined as if the outstanding convertible notes were converted in full as of the trading day immediately preceding the date this registration statement was initially filed with the SEC. Because the conversion price of the convertible notes may be adjusted pursuant to the terms of the convertible notes, the number of shares that will actually be issued may be more or less than the number of shares being offered by this prospectus. The fourth column assumes the sale of all of the shares offered by the selling stockholders pursuant to this prospectus.

Under the terms of the convertible notes, a selling stockholder may not convert the convertible notes, to the extent such conversion or exercise would cause such selling stockholder, together with its affiliates, to beneficially own a number of shares of common stock which would exceed 4.99% of our

Table of Contents

then outstanding shares of common stock following such conversion or exercise, excluding for purposes of such determination shares of common stock issuable upon conversion of the convertible notes which have not been converted. The number of shares in the second column does not reflect this limitation. The selling stockholders may sell all, some or none of their shares in this offering. See "Plan of Distribution."

For a more complete description of the convertible notes, please see the Form of Note set forth as Exhibit A to the Securities Purchase Agreement dated November 23, 2004, which was filed as Exhibit 10.1 to our Current Report on Form 8-K, filed with the Securities and Exchange Commission on November 30, 2004.

Table of Contents

| Name of Selling Stockholder | Number of Shares Beneficially Owned Prior to Offering | Maximum Number of Shares to be Sold Pursuant to this Prospectus (1) | Number of Shares Beneficially Owned After Offering(2) |
|---|---|---|---|
| Kings Road Investments Ltd. (3) | 2,544,769 | 3,053,722 | 0 |
| Steelhead Investments Ltd. (4)(5) | 2,544,769 | 3,053,722 | 0 |
| D.B. Zwirn Special Opportunities Fund, L.P. (6) | 282,752 | 339,302 | 0 |
| D.B. Zwirn Special Opportunities Fund, Ltd. (6) | 565,504 | 678,604 | 0 |
| HCM/Z Special Opportunities LLC (6) | 565,504 | 678,604 | 0 |

(1) Represents 120% of the maximum number of shares of common stock initially issuable to each selling stockholder upon conversion of the convertible notes at an initial conversion price of $10.61 per share.

(2) Assumes that each selling stockholder sells all shares of common stock being registered under this registration statement. However, to our knowledge, there are no agreements, arrangements or understandings with respect to the sale of any shares of our common stock, and each selling stockholder may decide to sell only a portion or none of its shares of our common stock that are registered under this registration statement.

(3) Polygon Investment Partners LLP and Polygon Investment Partners LP (the "Investment Managers") and Polygon Investments Ltd. (the "Manager") each has the right to vote and dispose of the securities held by Kings Road Investments Ltd. Alexander Jackson, Reade Griffith and Paddy Dear control the Investment Managers and the Manager. The Investment Managers, the Manager, Alexander Jackson, Reade Griffith and Paddy Dear disclaim beneficial ownership of the securities held by Kings Road Investments Ltd.

(4) HBK Investments L.P. may be deemed to have sole voting and investment power with respect to the shares beneficially owned by Steelhead Investments Ltd. pursuant to an investment management agreement. Additionally, the following individuals may have control over HBK Investments L.P.: Kenneth M. Hirsh, Laurence H. Lebowitz, William E. Rose, Richard L. Booth, David C. Haley and Jamiel A. Akhtar.

(5) This selling stockholder has identified itself as an affiliate of a registered broker-dealer and has represented to us that such selling stockholder acquired its convertible notes in the ordinary course of business and, at the time of the purchase of the convertible notes, such selling stockholder had no agreements or understandings, directly or indirectly, with any person to distribute the common stock. To the extent we become aware that such selling stockholder did not acquire its convertible notes in the ordinary course of business or did have such an agreement or understanding, we will file a post-effective amendment to the registration statement of which this prospectus forms a part to designate such affiliate an "underwriter" within the meaning of the Securities Act of 1933.

(6) D.B. Zwirn & Co., L.P. is the trading manager of each of D.B. Zwirn Special Opportunities Fund, Ltd., D.B. Zwirn Special Opportunities Fund, L.P. and HCM/Z Special Opportunities LLC and consequently has voting control and investment discretion over securities held by each of D.B. Zwirn Special Opportunities Fund, Ltd., D.B. Zwirn Special Opportunities Fund, L.P. and HCM/Z Special Opportunities LLC. Daniel B. Zwirn controls Zwirn Holdings, LLC, which in turn is the managing member of and thereby controls DBZ GP, LLC, which in turn is the general partner of and thereby controls D.B. Zwirn & Co., L.P. Each of Daniel B. Zwirn, Zwirn Holdings, LLC, DBZ GP, LLC and D.B. Zwirn & Co., L.P. disclaims beneficial ownership of securities held by each of D.B. Zwirn Special Opportunities Fund, Ltd., D.B. Zwirn Special Opportunities Fund, L.P. and HCM/Z Special Opportunities LLC.

Table of Contents

## PLAN OF DISTRIBUTION

We are registering the shares of common stock issuable upon conversion of the convertible notes to permit the resale of these shares of common stock by the holders of the convertible notes from time to time after the date of this prospectus. We will not receive any of the proceeds from the sale by the selling stockholders of the shares of common stock. We will bear all fees and expenses incident to our obligation to register the shares of common stock.

The selling stockholders may sell all or a portion of the shares of common stock beneficially owned by them and offered hereby from time to time directly or through one or more underwriters, broker-dealers or agents. If the shares of common stock are sold through underwriters or broker-dealers, the selling stockholders will be responsible for underwriting discounts or commissions or agent's commissions. The shares of common stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale, or at negotiated prices. These sales may be effected in transactions, which may involve crosses or block transactions,

- on any national securities exchange or quotation service on which the common stock may be listed or quoted at the time of sale;
- in the over-the-counter market;
- otherwise than on these exchanges or systems or in the over-the-counter market;
- through the writing of options, whether such options are listed on an options exchange or otherwise;
- in ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;
- pursuant to block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;
- through purchases by a broker-dealer as principal and resale by the broker-dealer for its account;
- which constitute an exchange distribution in accordance with the rules of the applicable exchange;
- which are privately negotiated;
- involving short sales;
- in which broker-dealers may agree with the selling securityholders to sell a specified number of such shares at a stipulated price per share;
- which include a combination of any such methods of sale; and
- which are effectuated through any other method permitted pursuant to applicable law.

**Table of Contents**

If the selling stockholders effect such transactions by selling shares of common stock to or through underwriters, broker-dealers or agents, such underwriters, broker-dealers or agents may receive commissions in the form of discounts, concessions or commissions from the selling stockholders or commissions from purchasers of the shares of common stock for whom they may act as agent or to whom they may sell as principal (which discounts, concessions or commissions as to particular underwriters, broker-dealers or agents may be in excess of those customary in the types of transactions involved). In connection with sales of the shares of common stock or otherwise, the selling stockholders may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of common stock in the course of hedging in positions they assume. The selling stockholders may also sell shares of common stock short and deliver shares of common stock covered by this prospectus to close out short positions. The selling stockholders may also loan or pledge shares of common stock to broker-dealers that in turn may sell such shares.

The selling stockholders may pledge or grant a security interest in some or all of the convertible notes or shares of common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time pursuant to this prospectus or any amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933, as amended, amending, if necessary, the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus. The selling stockholders also may transfer and donate the shares of common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The selling stockholders and any broker-dealer participating in the distribution of the shares of common stock may be deemed to be "underwriters" within the meaning of the Securities Act, and any commission paid, or any discounts or concessions allowed to, any such broker-dealer may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of common stock is made, a prospectus supplement, if required, will be distributed which will set forth the aggregate amount of shares of common stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling stockholders and any discounts, commissions or concessions allowed or reallowed or paid to broker-dealers.

One of the selling stockholders who is an affiliate of a broker-dealer has confirmed that it purchased the convertible notes in the ordinary course of business and, at the time of purchase, had no agreement or understanding, directly or indirectly with any person to distribute the common stock.

Under the securities laws of some states, the shares of common stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of common stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with.

There can be no assurance that any selling stockholder will sell any or all of the shares of common stock registered pursuant to the shelf registration statement, of which this prospectus forms a part.

The selling stockholders and any other person participating in such distribution will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including, without limitation, Regulation M of the Exchange Act, which may limit the timing of purchases and sales of any of the shares of common stock by the selling stockholders and any other participating person. Regulation M may also restrict the ability of any person engaged in the distribution of the shares of common stock to engage in market-making activities with respect to the shares of common stock. All of the foregoing may affect the marketability of the shares of common stock and the ability of any person or entity to engage in market-making activities with respect to the shares of common stock.

Table of Contents

We will pay all expenses of the registration of the shares of common stock pursuant to the registration rights agreement, estimated to be $40,000 in total, including, without limitation, Securities and Exchange Commission filing fees and expenses of compliance with state securities or "blue sky" laws; provided, however, that a selling stockholder will pay all underwriting discounts and selling commissions, if any. We will indemnify the selling stockholders against liabilities, including some liabilities under the Securities Act, in accordance with the registration rights agreements, or the selling stockholders will be entitled to contribution. We may be indemnified by the selling stockholders against civil liabilities, including liabilities under the Securities Act, that may arise from any written information furnished to us by the selling stockholder specifically for use in this prospectus, in accordance with the related registration rights agreement, or we may be entitled to contribution.

Once sold under the shelf registration statement, of which this prospectus forms a part, the shares of common stock will be freely tradable in the hands of persons other than our affiliates.

Table of Contents

## LEGAL MATTERS

The validity of the shares of common stock offered hereby has been passed upon by Conner & Winters, P.C., Tulsa, Oklahoma. As of the date of this prospectus, attorneys of Conner & Winters, P.C. indirectly owned options to acquire 45,000 shares of our common stock, in the aggregate.

## EXPERTS

Our consolidated financial statements as of December 27, 2003 and December 28, 2002, and for each of the two fiscal years in the period ended December 27, 2003, incorporated in this prospectus and in the registration statement by reference to the Annual Report on Form 10-K/A for the fiscal year ended December 27, 2003 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent registered public accounting firm, given on the authority of said firm as experts in accounting and auditing.

Our consolidated financial statements for the fiscal year ended December 29, 2001, incorporated by reference in this prospectus and in the registration statement have been audited by Arthur Andersen LLP, our previous independent public accountants, as stated in their report with respect thereto, and are incorporated by reference upon the authority of said firm as experts in accounting and auditing.

On June 15, 2002, Arthur Andersen LLP was convicted of obstruction of justice for activities relating to its previous work for Enron Corp., and Arthur Andersen LLP has since ceased conducting business. Arthur Andersen LLP has thus not consented to the incorporation by reference of their report in this prospectus or in the registration statement, and we have dispensed with the requirement to file their consent in reliance on Rule 437a under the Securities Act of 1933. As a result, you may not be able to recover against Arthur Andersen LLP under Section 11 of the Securities Act of 1933 for any untrue statement of a material fact contained in the financial statements audited by Arthur Andersen LLP or any omissions to state a material fact required to be stated in those financial statements.

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 (together with all amendments, supplements, schedules and exhibits to the registration statement, referred to as the registration statement) that we have filed with the SEC under the Securities Act of 1933 with respect to the securities offered by this prospectus. This prospectus does not contain all the information which is in the registration statement. Certain parts of the registration statement are omitted as allowed by the rules and regulations of the SEC. We refer you to the registration statement for further information about our company and the securities offered by this prospectus. Statements contained in this prospectus concerning the provisions of documents are not necessarily complete, and each statement is qualified in its entirety by reference to the copy of the applicable document filed with the SEC.

We also file annual, quarterly and special reports, proxy statements and other information with the SEC. You can inspect and copy the registration statement and the reports and other information we file with the SEC at the Public Reference Room maintained by the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates. You can obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a Web site which provides online access to reports, proxy and information statements and other information regarding companies that file electronically with the SEC at the address *http://www.sec.gov.*

Table of Contents

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" into this prospectus the information we file with them, which means we can disclose important business and financial information about us to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus, except for any information that is superseded by information included directly in this prospectus and any prospectus supplement. Information that we file later with the SEC will also automatically update and supersede the information in this prospectus. We incorporate by reference the documents listed below that we previously filed with the SEC and all documents that we subsequently file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (other than Current Reports or portions thereof furnished under Items 2.02 or 7.01 of Form 8-K) until the termination of the offering made under this prospectus:

- Our Annual Report on Form 10-K for the fiscal year ended December 27, 2003, as amended by our Form 10-K/A filed with the SEC on May 14, 2004;
- Our Quarterly Reports on Form 10-Q for the quarters ended March 27, 2004, June 26, 2004, and September 25, 2004;
- Our Current Reports on Form 8-K filed on October 7, 2004, October 27, 2004, November 24, 2004, November 30, 2004, December 15, 2004 and December 21, 2004; and
- The description of our common stock contained in our registration statement on Form 8-A, filed with the SEC on May 18, 2001 (SEC File No. 1-16501), including any amendment or report filed before or after the date of this prospectus for the purpose of updating the description.

In addition, any filings we make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act (other than Current Reports or portions thereof furnished under Items 2.02 or 7.01 of Form 8-K) after the date of the initial filing of the registration statement and prior to the effectiveness of the registration statement will be incorporated by reference in this prospectus.

These filings have not been included in or delivered with this prospectus. We will provide to each person, including any beneficial owner to whom this prospectus is delivered, a copy of any or all information that has been incorporated by reference in this prospectus but not delivered with this prospectus. You may request a copy of these filings and the registration rights agreement at no cost, by writing or telephoning us at the following address:

Global Power Equipment Group Inc.
6120 S. Yale, Suite 1480
Tulsa, Oklahoma 74136
Attention: Investor Relations
(918) 488-0828

The reports, proxy statements and other information we file with the SEC can also be inspected and copied at the New York Stock Exchange, 20 Broad Street, New York, New York 10002. For more information on obtaining copies of our public filings at the New York Stock Exchange, you should call (212) 656-5060.

Table of Contents

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

### Item 14. Other Expenses of Issuance and Distribution.

All amounts, which are payable by the Registrant, are estimates, except the SEC registration fee.

| | |
|---|---|
| SEC registration fee | $ 8,505 |
| Legal fees and expenses | 25,000 |
| Accounting fees and expenses | 5,000 |
| Miscellaneous | 1,495 |
| Total | $40,000 |

### Item 15. Indemnification of Directors and Officers.

The information below briefly outlines the provisions of Sections 102(b)(7) and 145 of the General Corporation Law of the State of Delaware, Article IX of our Amended and Restated Certificate of Incorporation ("Certificate of Incorporation") and Article IV of our Amended and Restated By-Laws ("By-Laws"). For more information, you may review the provisions of our Certificate of Incorporation and By-Laws filed with the SEC.

**Elimination of Liability**

Section 102(b)(7) of Delaware's corporation law gives each Delaware corporation the power to eliminate or limit its directors' personal liability to the corporation or its stockholders for monetary damages for certain breaches of fiduciary duty as a director, except:

- for any breach of the director's duty of loyalty to the corporation or its stockholders;
- for acts or omissions not in good faith, or which involve intentional misconduct or a knowing violation of the law;
- under Section 174 of Delaware's corporation law (providing for liability of directors for the unlawful payment of dividends or unlawful stock purchases or redemptions); or
- for any transaction from which a director derived an improper personal benefit.

Our Certificate of Incorporation eliminates the personal liability of our directors to the fullest extent permitted by Section 102(b)(7) of Delaware's corporation law.

**Indemnification**

Section 145 of Delaware's corporation law grants each Delaware corporation the power to indemnify its directors and officers against liability for certain of their acts.

Article IV of our By-Laws provides that we shall, to the full extent permitted by law, indemnify each person who is or was a director, officer, employee or agent of our company and may indemnify each person who is or was serving at our request as a director, officer, employee or agent of or participant in another corporation or of a partnership, joint venture, trust or other enterprise.

Table of Contents

As permitted by Section 102(b)(7) of Delaware's corporation law, Article IX of our certificate of incorporation provides that a director of our company will not be personally liable to us or our stockholders for monetary damages for breach of fiduciary duty as a director, except (i) for any breach of the director's duty of loyalty to us or our stockholders, (ii) for act or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of Delaware's corporation law or (iv) for any transaction from which the director derived an improper personal benefit. Article IX also provides that we will indemnify officers, directors, employees and agents of our company to the fullest extent permitted under Delaware's corporation law and advance expenses incurred by such directors, officers, employees and agents in relation to any action, suit or proceeding.

We carry directors' and officers' liability insurance to insure our directors and officers against liability for certain errors and omissions and to defray costs of a suit or proceeding against an officer or director.

The Registration Rights Agreement included as Exhibit 4.4 to this Registration Statement provides for indemnification of us and our controlling persons in certain circumstances, including liabilities under the Securities Act of 1933.

**Item 16. Exhibits.**

The following is a list of all exhibits filed as a part of this Registration Statement on Form S-3, including those incorporated by reference herein.

| Exhibit Number | Description |
|---|---|
| 4.1 | Amended and Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1(b) to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001). |
| 4.2 | Amended and Restated Bylaws of the Registrant (incorporated by reference to Exhibit 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2003). |
| 4.3 | Form of Specimen Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1 filed May 16, 2001 (No. 333-56832). |
| 4.4 | Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed November 30, 2004). |
| 5* | Opinion of Conner & Winters, P.C., regarding the legality of the securities. |
| 23.1* | Consent of Conner & Winters, P.C. (included in Exhibit 5). |
| 23.2** | Consent of PricewaterhouseCoopers LLP. |
| 24* | Power of Attorney. |

* Previously filed with this Registration Statement

**Included herewith

**Item 17. Undertakings.**

(a) The undersigned Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

**Table of Contents**

(ii) To reflect in the prospectus any facts or events arising after the effective date of this Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in this effective Registration Statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in this Registration Statement or any material change to such information in this Registration Statement;

*provided, however,* that paragraphs (a)(1)(i) and (a)(1)(ii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this Registration Statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b) The undersigned Registrant hereby undertakes that, for the purposes of determining any liability under the Securities Act of 1933, each filing of the Registrant's Annual Report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in this Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(h) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the provisions referred to in Item 15 of this Registration Statement, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being

**Table of Contents**

registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this Amendment No. 1 to Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Tulsa, State of Oklahoma, on the 28th day of January, 2005.

GLOBAL POWER EQUIPMENT GROUP INC.

By: /s/ LARRY D. EDWARDS*

Larry D. Edwards
Chairman of the Board and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, this Amendment No. 1 to Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ LARRY D. EDWARDS*<br>Larry D. Edwards | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | January 28, 2005 |
| /s/ JAMES P. WILSON<br>James P. Wilson | Vice President of Finance and Chief Financial Officer (Principal Financial and Accounting Officer) | January 28, 2005 |
| /s/ ADRIAN DOHERTY JR.*<br>Adrian Doherty Jr. | Director | January 28, 2005 |
| /s/ STEPHEN EISENSTEIN*<br>Stephen Eisenstein | Director | January 28, 2005 |

Amendment No. 1 to Form S-3 Page 33 of 34

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ EDGAR HOTARD*<br>Edgar Hotard | Director | January 28, 2005 |
| /s/ IRA KLEINMAN*<br>Ira Kleinman | Director | January 28, 2005 |
| /s/ JERRY RYAN*<br>Jerry Ryan | Director | January 28, 2005 |
| /s/ BENGT SOHLÉN*<br>Bengt Sohlén | Director | January 28, 2005 |
| *By /s/ CANDICE L. CHEESEMAN<br>Candice L. Cheeseman<br>Attorney-in-Fact | | January 28, 2005 |

Table of Contents

## INDEX TO EXHIBITS

| Exhibit Number | Description |
|---|---|
| 4.1 | Amended and Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1(b) to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001). |
| 4.2 | Amended and Restated Bylaws of the Registrant (incorporated by reference to Exhibit 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2003). |
| 4.3 | Form of Specimen Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1 filed May 16, 2001 (No. 333-56832). |
| 4.4 | Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed November 30, 2004). |
| 5* | Opinion of Conner & Winters, P.C., regarding the legality of the securities. |
| 23.1* | Consent of Conner & Winters, P.C. (included in Exhibit 5). |
| 23.2** | Consent of PricewaterhouseCoopers LLP. |
| 24* | Power of Attorney. |

* Previously filed with this Registration Statement

**Filed herewith

# SECURITIES PURCHASE AGREEMENT

**SECURITIES PURCHASE AGREEMENT** (the "**Agreement**"), dated as of November 23, 2004, by and among Global Power Equipment Group Inc., a Delaware corporation, with headquarters located at 6120 South Yale Street, Suite 1480, Tulsa, Oklahoma 74136 (the "**Company**"), the investors listed on the Schedule of Buyers attached hereto (individually, a "**Buyer**", and collectively, the "**Buyers**"), and Kings Road Investments Ltd., a Cayman Islands organized limited company, in its capacity as Collateral Agent for the Buyers.

**WHEREAS:**

A. The Company and each Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(2) of the Securities Act of 1933, as amended (the "**1933 Act**"), and Rule 506 of Regulation D ("**Regulation D**") and as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the 1933 Act;

B. The Company has authorized the subordinated convertible notes of the Company in the form attached hereto as Exhibit A (together with any subordinated convertible notes issued in replacement thereof in accordance with the terms thereof, the "**Notes**"), which Notes shall be convertible into shares of the Company's Common Stock, par value $0.01 per share (the "**Common Stock**") (as converted, the "**Conversion Shares**"), in accordance with the terms of the Notes;

C. Each Buyer wishes to purchase, and the Company wishes to sell, upon the terms and conditions stated in this Agreement, that aggregate principal amount of Notes set forth opposite such Buyer's name in column (3) on the Schedule of Buyers (which aggregate principal amount for all Buyers shall be $69,000,000);

D. Contemporaneously with the execution and delivery of this Agreement, the parties hereto are executing and delivering a Registration Rights Agreement, substantially in the form attached hereto as Exhibit B (the "**Registration Rights Agreement**"), pursuant to which the Company has agreed to provide certain registration rights with respect to the Conversion Shares under the 1933 Act and the rules and regulations promulgated thereunder, and applicable state securities laws;

E. The Notes are to be secured by any balances contained in the Redemption Collateral Account and the Williams Acquisition Collateral Account (as such terms are defined in Section 4(p) below); and

F. The Notes and the Conversion Shares collectively are referred to herein as the

"**Securities**".

**NOW, THEREFORE**, the Company and each Buyer hereby agree as follows:

1. PURCHASE AND SALE OF NOTES.

(a) Purchase of Notes.

(i) Notes. Subject to the satisfaction (or waiver) of the conditions set forth in Sections 6 and 7 below, the Company shall issue and sell to each Buyer, and each Buyer severally, but not jointly, agrees to purchase from the Company on the Closing Date (as defined below), a principal amount of Notes, as is set forth opposite such Buyer's name in column (3) on the Schedule of Buyers (the "**Closing**").

(ii) Closing. The Closing shall occur on the Closing Date at the offices of Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022.

(iii) Purchase Price. The purchase price for each Buyer (the "**Purchase Price**") of the Notes to be purchased by each such Buyer at the Closing shall be equal to $1.00 for each $1.00 of principal amount of Notes being purchased by such Buyer at the Closing.

(b) Closing Date. The date and time of the Closing (the "**Closing Date**") shall be 10:00 a.m., New York Time, November 23, 2004, subject to notification of satisfaction (or waiver) of the conditions to the Closing set forth in Sections 6 and 7 below (or such later date as is mutually agreed to by the Company and each Buyer).

(c) Form of Payment. On the Closing Date, (i) each Buyer shall pay its Purchase Price to the Company for the Notes to be issued and sold to such Buyer at the Closing, by wire transfer of immediately available funds in accordance with the Company's written wire instructions, and (ii) the Company shall deliver to each Buyer the Notes (in the principal amounts as such Buyer shall request or, if no such request is made, a single Note with a principal amount equal to the aggregate principal amount of Notes to be purchased by such Buyer) which such Buyer is then purchasing, duly executed on behalf of the Company and registered in the name of such Buyer or its designee.

2. BUYER'S REPRESENTATIONS AND WARRANTIES.

Each Buyer represents and warrants with respect to only itself that:

(a) No Public Sale or Distribution. Such Buyer is (i) acquiring the Notes and (ii) upon conversion of the Notes will acquire the Conversion Shares issuable upon conversion of the Notes, in the ordinary course of business for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof; provided, however, that by

making the representations herein, such Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption from the registration requirements of the 1933 Act and applicable state securities laws. Such Buyer is acquiring the Securities hereunder in the ordinary course of its business. Such Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the Securities.

(b) Accredited Investor Status. Such Buyer is an institutional "accredited investor" as that term is defined in Rule 501(a) (1), (2), (3) or (7) of Regulation D.

(c) Reliance on Exemptions. Such Buyer understands that the Securities are being offered and sold to it in reliance on specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying in part upon the truth and accuracy of, and such Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of such Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of such Buyer to acquire the Securities.

(d) Information. Such Buyer and its advisors, if any, have been furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by such Buyer. Such Buyer and its advisors, if any, have been afforded the opportunity to ask questions of the Company. Neither such inquiries nor any other due diligence investigations conducted by such Buyer or its advisors, if any, or its representatives shall modify, amend or affect such Buyer's right to rely on the Company's representations and warranties contained herein. Such Buyer understands that its investment in the Securities involves a high degree of risk. Each Buyer is able to bear the risk of an investment in the Securities including, without limitation, the risk of total loss of its investment. Such Buyer has sought such accounting, legal and tax advice as it has considered necessary to make an informed investment decision with respect to its acquisition of the Securities.

(e) No Governmental Review. Such Buyer understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the Securities or the fairness or suitability of the investment in the Securities nor have such authorities passed upon or endorsed the merits of the offering of the Securities.

(f) Transfer or Resale. Such Buyer understands that except as provided in this Agreement and the Registration Rights Agreement: (i) the Securities have not been and are not being registered under the 1933 Act or any state securities laws, and may not be offered for sale, sold, assigned or transferred unless (A) subsequently registered thereunder, (B) such Buyer shall have delivered to the Company an opinion of counsel of recognized standing, in form and

substance reasonably acceptable to the Company, to the effect that such Securities to be sold, assigned or transferred may be sold, assigned or transferred pursuant to an exemption from such registration, or (C) such Buyer provides the Company with assurance reasonably acceptable to the Company (which may, at the Company's option include an opinion of counsel of recognized standing in form and substance reasonably acceptable to the Company) that such Securities can be sold, assigned or transferred pursuant to Rule 144 or Rule 144A promulgated under the 1933 Act, as amended, (or a successor rule thereto) (collectively, "**Rule 144**"); (ii) any sale of the Securities made in reliance on Rule 144 may be made only in accordance with the terms of Rule 144 and further, if Rule 144 is not applicable, any resale of the Securities under circumstances in which the seller (or the Person (as defined in Section 3(s)) through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other Person is under any obligation to register the Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder. Each Buyer represents that it understands that the Notes (but not the Conversion Shares) are subject to certain restrictions on transfer set forth in Section 19 of the Notes. Subject to Section 19 of the Notes, the Securities may be pledged in connection with a bona fide margin account or other loan secured by the Securities and such pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Buyer effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document, including, without limitation, this Section 2(f); provided, that in order to make any sale, transfer or assignment of Securities, such Buyer and its pledgee makes such disposition in accordance with Section 19 of the Notes and in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

(g) Legends.

(i) Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the 1933 Act (or any successor provision), any certificate evidencing such Note (and all securities issued in exchange therefor or substitution thereof, other than Conversion Shares, if any, issued upon conversion thereof, which shall bear the legend set forth in (ii) below, if applicable) shall bear a legend in substantially the following form, unless such Note has been sold pursuant to a registration statement that has been declared effective under the 1933 Act (and which continues to be effective at the time of such transfer) or pursuant to Rule 144 under the 1933 Act or any similar provision then in force, or unless otherwise agreed by the Company in writing, with written notice thereof to the transfer agent:

> THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY AGREES FOR THE BENEFIT OF GLOBAL POWER EQUIPMENT GROUP INC. THAT THIS SECURITY

MAY NOT BE RESOLD OR OTHERWISE TRANSFERRED OTHER THAN (1) TO GLOBAL POWER EQUIPMENT GROUP INC. OR ANY AFFILIATE THEREOF, (2) IN A TRANSACTION ENTITLED TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (3) SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE RESALE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (4) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, SUBJECT, IN THE CASE OF CLAUSES (2) OR (4), TO THE RECEIPT BY GLOBAL POWER EQUIPMENT GROUP INC. OF AN OPINION OF COUNSEL OF RECOGNIZED STANDING OR SUCH OTHER EVIDENCE REASONABLY ACCEPTABLE TO GLOBAL POWER EQUIPMENT GROUP INC. THAT SUCH RESALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT. THIS LEGEND WILL BE REMOVED UPON THE EARLIER OF THE TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (5) ABOVE OR UPON SATISFACTION OF THE HOLDING PERIOD UNDER RULE 144(K) UNDER THE SECURITIES ACT (OR ANY SUCCESSOR PROVISION).

THE NOTE REPRESENTED BY THIS CERTIFICATE (BUT NOT THE COMMON STOCK INTO WHICH THIS NOTE MAY BE CONVERTED) IS ALSO SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER SET FORTH IN SECTION 19 OF THIS NOTE.

THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THIS SECURITY; PROVIDED, HOWEVER, THAT IN ORDER TO MAKE ANY SALE, TRANSFER OR ASSIGNMENT OF THIS SECURITY, THE HOLDER AND ITS PLEDGEE MUST MAKE SUCH DISPOSITION IN ACCORDANCE WITH SECTION 19 OF THIS NOTE, IF APPLICABLE, AND IN ACCORDANCE WITH THE CONDITIONS SET FORTH ABOVE.

ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 3 AND 19 HEREOF. THE

PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE COMMON STOCK ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 3(c)(iii) OF THIS NOTE.

THE HOLDER OF THIS SECURITY IS ENTITLED TO THE BENEFITS OF A REGISTRATION RIGHTS AGREEMENT DATED NOVEMBER 23, 2004 AND, BY ITS ACCEPTANCE HEREOF, AGREES TO BE BOUND BY AND TO COMPLY WITH THE PROVISIONS OF SUCH REGISTRATION RIGHTS AGREEMENT.

(ii) Until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision), any stock certificate representing Conversion Shares issued upon conversion of any Note shall bear a legend in substantially the following form, unless such Conversion Shares have been sold pursuant to a registration statement that has been declared effective under the 1933 Act (and which continues to be effective at the time of such transfer) or pursuant to Rule 144 under the 1933 Act or any similar provision then in force, or unless otherwise agreed by the Company in writing, with written notice thereof to the transfer agent:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY AGREES FOR THE BENEFIT OF GLOBAL POWER EQUIPMENT GROUP INC. THAT THIS SECURITY MAY NOT BE RESOLD OR OTHERWISE TRANSFERRED OTHER THAN (1) TO GLOBAL POWER EQUIPMENT GROUP INC. OR ANY AFFILIATE THEREOF, (2) IN A TRANSACTION ENTITLED TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (3) SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE RESALE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (4) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, SUBJECT, IN THE CASE OF CLAUSES (2) OR (4), TO THE RECEIPT BY GLOBAL POWER EQUIPMENT GROUP INC. OF AN OPINION OF COUNSEL OF RECOGNIZED STANDING OR SUCH OTHER EVIDENCE REASONABLY ACCEPTABLE TO GLOBAL POWER EQUIPMENT GROUP INC. THAT

SUCH RESALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT. THIS LEGEND WILL BE REMOVED UPON THE EARLIER OF THE TRANSFER OF THIS SECURITY PURSUANT TO CLAUSE (5) ABOVE OR UPON SATISFACTION OF THE HOLDING PERIOD UNDER RULE 144(K) UNDER THE SECURITIES ACT (OR ANY SUCCESSOR PROVISION).

THE HOLDER OF THIS SECURITY IS ENTITLED TO THE BENEFITS OF A REGISTRATION RIGHTS AGREEMENT DATED NOVEMBER 23, 2004 AND, BY ITS ACCEPTANCE HEREOF, AGREES TO BE BOUND BY AND TO COMPLY WITH THE PROVISIONS OF SUCH REGISTRATION RIGHTS AGREEMENT.

BECAUSE OF THE FOREGOING RESTRICTIONS, PURCHASERS ARE ADVISED TO CONSULT LEGAL COUNSEL PRIOR TO MAKING ANY RESALE, PLEDGE OR TRANSFER OF ANY OF THE SECURITIES.

(j) Organization; Authorization. Such Buyer is duly organized, validly existing and in good standing (to the extent such concept is applicable) under the laws of the jurisdiction in which it is organized and has the requisite organizational power and authority to carry on its business as now being conducted. Such Buyer has the requisite organizational power and authority to enter into and perform its obligations under this Agreement and the Transaction Documents (as defined in Section 3(b)) to which it is a party.

(k) Validity; Enforcement. This Agreement and the Registration Rights Agreement have been duly and validly authorized, executed and delivered on behalf of such Buyer and shall constitute the legal, valid and binding obligations of such Buyer enforceable against such Buyer in accordance with their respective terms, except as such enforceability may be limited by general principles of equity and subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation and other similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(l) No Conflicts. The execution, delivery and performance by such Buyer of this Agreement and the Registration Rights Agreement and the consummation by such Buyer of the transactions contemplated hereby and thereby will not (i) result in a violation of the organizational documents of such Buyer or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Buyer is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws) applicable to such Buyer, except in the case of clauses (ii) and (iii) above, for such conflicts, defaults, rights or violations which would not, individually or in the aggregate, reasonably be expected to have a

material adverse effect on the ability of such Buyer to perform its obligations hereunder.

(m) Residency. Such Buyer is a resident of that jurisdiction specified below its address on the Schedule of Buyers.

(n) Certain Trading Activities. Such Buyer has not directly or indirectly, nor has any Person acting on behalf of or pursuant to any understanding with such Buyer, engaged in any transactions in the securities of the Company (including, without limitation, any Short Sales (as defined below) involving the Company's securities) since the date that such Buyer has executed a confidentiality agreement with Banc of America Securities LLC regarding an investment in the Company. For purposes of this Section, "**Short Sales**" include, without limitation, all "short sales" as defined in Rule 200 of Regulation SHO adopted under the Exchange Act (as defined in Section 3(f) below) and all types of direct and indirect stock pledges, forward sale contracts, options, puts, calls, short sales, swaps and similar arrangements (including on a total return basis), and sales and other transactions through non-US broker-dealers or foreign regulated brokers having the effect of hedging the securities of the Company or the investment contemplated under this Agreement. Such Buyer covenants that neither it, nor any person acting on its behalf or pursuant to any understanding with it, will engage in any transactions in the securities of the Company (including Short Sales) (a) prior to the time that the transactions contemplated by this Agreement are publicly disclosed, or (b) in violation of any laws or any rules or regulations of the SEC.

(o) Source of Funds. Either (i) the funds to be used by such Buyer to purchase or hold the Notes to be acquired and held by such Buyer do not constitute assets of any employee benefit plan which is subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or any "plan" which is subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or (ii) the purchase and holdings of the Notes by such Buyer are exempt from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code pursuant to one or more applicable statutory or administrative exemptions. Such Buyer, and each subsequent holder of any Note, covenants that it will not dispose of the Notes to be purchased by it or any interest therein (including, without limitation, any transfer by a change in the capacity in which such Buyer holds in its investment in such Notes) to any person unless such person shall (1) make all warranties and representations of such Buyer contained in this Section 2(o) and (2) assume all covenants of such Buyer contained in this Section 2(o).

3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY.

The Company represents and warrants to each of the Buyers that:

(a) Organization and Qualification. The Company and its "**Subsidiaries**" (which for purposes of this Agreement means any entity in which the Company, directly or indirectly, owns a majority of the equity interests entitled to vote in the election of directors in

the ordinary course without the occurrence of any contingency) are duly organized, validly existing and in good standing (to the extent such concept is applicable) under the laws of the jurisdiction in which they are organized, and have the requisite organizational power and authority to own their properties and to carry on their business as now being conducted. Each of the Company and its Subsidiaries which is a corporation is duly qualified as a foreign corporation to do business and is in good standing (to the extent such concept is applicable) in every jurisdiction in which its ownership of property or the nature of the business conducted by it makes such qualification necessary, except to the extent that the failure to be so qualified or be in good standing would not have a Material Adverse Effect. As used in this Agreement, "**Material Adverse Effect**" means any material adverse effect on (i) the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, (ii) on the transactions contemplated hereby or by the other Transaction Documents or (iii) on the authority or ability of the Company to perform its obligations under the Transaction Documents (as defined below). The Company has no Subsidiaries except as set forth on Schedule 3(a).

(b) Authorization; Enforcement; Validity. The Company has the requisite organizational power and authority to enter into and perform its obligations under this Agreement, the Notes, the Registration Rights Agreement, the Account Control Agreements (as defined in Section 4(n)), the Irrevocable Transfer Agent Instructions (as defined in Section 5(b)) and each of the other agreements entered into by the parties hereto in connection with the transactions contemplated by this Agreement (collectively, the "**Transaction Documents**") and to issue the Securities in accordance with the terms hereof and thereof. The execution and delivery of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby, including, without limitation, the issuance of the Notes and the reservation for issuance and the issuance of the Conversion Shares issuable upon conversion thereof, have been duly authorized by the Company's Board of Directors and, except for such filings as may be required after the closing date pursuant to the Registration Rights Agreement, required under any "Blue Sky" laws or by the requirements of the Principal Market (as defined below), no further filing, consent or authorization is required by the Company, its Board of Directors or its stockholders. This Agreement and the other Transaction Documents of even date herewith have been duly executed and delivered by the Company, and constitute the legal, valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as such enforceability may be limited by general principles of equity and subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies.

(c) Issuance of Securities. The issuance of the Notes is duly authorized and, upon issuance in accordance with the terms hereof, the Notes shall be free from all taxes, liens and charges with respect to the issue thereof. As of the Closing, a number of shares of Common Stock shall have been duly authorized and reserved for issuance which equals 120% of the

maximum number of shares of Common Stock issuable upon conversion of the Notes to be issued at such Closing. Upon conversion or issuance in accordance with the Notes, the Conversion Shares will be validly issued, fully paid and nonassessable and free from all taxes, liens and charges with respect to the issue thereof, with the holders being entitled to all rights accorded to a holder of Common Stock. Assuming the accuracy of each of the representations and warranties of each of the Buyers contained in Section 2, the issuance by the Company of the Securities is exempt from registration under the 1933 Act.

(d) No Conflicts. The execution, delivery and performance of the Transaction Documents by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance of the Notes and reservation for issuance and issuance of the Conversion Shares) will not (i) result in a violation of the certificate of incorporation, any certificate of designations, preferences and rights of any outstanding series of preferred stock or bylaws of the Company or any of its Subsidiaries or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party except which are the subject of written waivers or consents which have been obtained or effected on or prior to the Closing Date or would not have a Material Adverse Effect or (iii) except as would not have a Material Adverse Effect result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and the rules and regulations of The New York Stock Exchange, Inc. (the "**Principal Market**")) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected.

(e) Consents. Except for (i) a supplemental listing application with the Principal Market with respect to the Conversion Shares, (ii) the 8-K Filing (as defined in Section 4(i)) and (iii) the registration statement, the reports required under Regulation D and any related state "Blue Sky" filings required to be filed with respect to the Conversion Shares pursuant to the Registration Rights Agreement and the receipt of a declaration of the effectiveness thereof, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency or any regulatory or self-regulatory agency or any other Person in order for it to execute, deliver or perform any of its obligations under the Transaction Documents, in each case in accordance with the terms hereof or thereof. All consents, authorizations, orders, filings and registrations which the Company is required to obtain or effect pursuant to the preceding sentence have been obtained or effected on or prior to the Closing Date (except for (x) the 8-K Filing (as defined in Section 4(i)) and (y) the registration statement, the reports required under Regulation D and any related state "Blue Sky" filings required to be filed with respect to the Conversion Shares pursuant to the Registration Rights Agreement and the receipt of a declaration of the effectiveness thereof), and the Company and its Subsidiaries are unaware of any facts or circumstances which might prevent the Company from obtaining or effecting any of the registration, application or filings pursuant to the

preceding sentence required to be obtained or effected. The Company is not in violation of the listing requirements of the Principal Market and has no knowledge of any facts which would reasonably lead to delisting or suspension of the Common Stock in the foreseeable future.

(f) Acknowledgment Regarding Buyer's Purchase of Securities. The Company acknowledges and agrees that each Buyer is acting solely in the capacity of an arm's length purchaser with respect to the Transaction Documents and the transactions contemplated hereby and thereby and that no Buyer is (i) an officer or director of the Company, (ii) an "affiliate" of the Company (as defined in Rule 144) (an "**Affiliate**") or (iii) to the knowledge of the Company based solely on a review of available public filings on Schedule 13D or Schedule 13G, a "beneficial owner" of more than 10% of the Common Stock (as defined for purposes of Rule 13d-3 of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")). The Company further acknowledges that no Buyer is acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to the Transaction Documents and the transactions contemplated hereby and thereby, and any advice given by a Buyer or any of its representatives or agents in connection with the Transaction Documents and the transactions contemplated hereby and thereby is merely incidental to such Buyer's purchase of the Securities. The Company further represents to each Buyer that the Company's decision to enter into the Transaction Documents has been based solely on an independent evaluation by the Company and its representatives.

(g) No General Solicitation; Placement Agent's Fees. Neither the Company, nor any of its affiliates, nor any Person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D) in connection with the offer or sale of the Securities. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or brokers' commissions (other than fees or commissions of persons engaged by any Buyer or its investment advisor) relating to or arising out of the transactions contemplated hereby. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, attorney's fees and out-of-pocket expenses) arising in connection with any such claim for fees or commissions. The Company acknowledges that is has engaged Banc of America Securities LLC as placement agent (the "**Agent**") in connection with the sale of the Notes. Other than the Agent, the Company has not engaged any placement agent or other agent in connection with the sale of the Notes.

(h) No Integrated Offering. None of the Company, its Subsidiaries, any of their affiliates, and any Person acting on their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would require registration of any of the Securities under the 1933 Act or cause this offering of the Securities to be integrated with prior offerings by the Company for purposes of the 1933 Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of any exchange or automated quotation system on which any of the securities of the Company are listed or designated. None of the Company, its Subsidiaries, their affiliates and

any Person acting on their behalf will take any action or steps referred to in the preceding sentence that would require registration of any of the Securities under the 1933 Act or cause the offering of the Securities to be integrated with other offerings.

(i) Dilutive Effect. The Company understands and acknowledges that the number of Conversion Shares issuable upon conversion of the Notes will increase in certain circumstances. The Company further acknowledges that its obligation to issue Conversion Shares upon conversion of the Notes is absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other stockholders of the Company.

(j) Application of Takeover Protections; Rights Agreement. Except as disclosed on Schedule 3(j), the Company and its board of directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under the Certificate of Incorporation (as defined in Section 3(r)) or the laws of the jurisdiction of its formation which is or could become applicable to any Buyer as a result of the transactions contemplated by this Agreement, including, without limitation, the Company's issuance of the Securities and any Buyer's ownership of the Securities. The Company has not adopted a stockholder rights plan or similar arrangement relating to accumulations of beneficial ownership of Common Stock or a change in control of the Company.

(k) SEC Documents; Financial Statements. The Company has filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Exchange Act (all of the foregoing filed prior to the date hereof, and all exhibits included therein and financial statements, notes and schedules thereto and documents incorporated by reference therein being hereinafter referred to as the "**SEC Documents**"). As of their respective dates, the SEC Documents complied as to form in all material respects with the requirements of the Exchange Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with generally accepted accounting principles, consistently applied, during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto, or (ii) in the case of unaudited interim statements, to the extent they may exclude footnotes, may be subject to customary year-end adjustments or may be condensed or summary statements) and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of its

operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

(l) Absence of Certain Changes. Except as disclosed in Schedule 3(l), since December 27, 2003, there has been no material adverse change and no material adverse development in the business, properties, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole. Except as disclosed in Schedule 3(l), since December 27, 2003, the Company has not (i) declared or paid any dividends, (ii) sold any assets, individually or in the aggregate, in excess of $3,000,000 outside of the ordinary course of business or (iii) had capital expenditures, individually or in the aggregate, in excess of $3,000,000. The Company has not taken any steps to seek protection pursuant to any bankruptcy law nor does the Company have any knowledge or reason to believe that its creditors intend to initiate involuntary bankruptcy proceedings or any actual knowledge of any fact which would reasonably lead a creditor to do so. The Company is not as of the date hereof, and after giving effect to the transactions contemplated hereby to occur at the Closing, will not be Insolvent (as defined below). For purposes of this Section 3(l), "**Insolvent**" means (i) the present fair saleable value of the Company's assets is less than the amount required to pay the Company's total Indebtedness (as defined in Section 3(s)), (ii) the Company is unable to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured, (iii) the Company intends to incur or believes that it will incur debts that would be beyond its ability to pay as such debts mature or (iv) the Company has unreasonably small capital with which to conduct the business in which it is engaged as such business is now conducted and is proposed to be conducted.

(m) No Undisclosed Events, Liabilities, Developments or Circumstances. Except for (i) the offering and sale of the Securities and (ii) the Williams Acquisition (as defined in Section 4(p)), no event, liability, development or circumstance has occurred or exists, or is expected to occur with respect to the Company or its Subsidiaries or their respective business, properties, results of operations or financial condition, that would be required to be disclosed by the Company under applicable securities laws on a registration statement on Form S-3 filed with the SEC relating to an issuance and sale by the Company of its Common Stock and which has not been publicly announced.

(n) Conduct of Business; Regulatory Permits. Except as would not have a Material Adverse Effect, neither the Company nor its Subsidiaries is in violation of any term of or in default under its Certificate of Incorporation, any Certificate of Designations, Preferences and Rights of any outstanding series of preferred stock of the Company or Bylaws or their organizational charter or bylaws, respectively. Neither the Company nor any of its Subsidiaries is in violation of any judgment, decree or order or any statute, ordinance, rule or regulation applicable to the Company or its Subsidiaries, except for violations which would not, individually or in the aggregate, have a Material Adverse Effect. Without limiting the generality of the foregoing, the Company is not in violation of any of the rules, regulations or requirements

of the Principal Market and has no knowledge of any facts or circumstances which would reasonably lead to delisting or suspension of the Common Stock by the Principal Market in the foreseeable future. Except as disclosed on Schedule 3(n), since January 1, 2003 (i) the Common Stock has been designated for quotation on the Principal Market, (ii) trading in the Common Stock has not been suspended by the SEC or the Principal Market and (iii) the Company has received no communication, written or oral, from the SEC or the Principal Market regarding the suspension or delisting of the Common Stock from the Principal Market. The Company and its Subsidiaries possess all certificates, authorizations and permits issued by the appropriate federal, state or foreign regulatory authorities necessary to conduct their respective businesses, except where the failure to possess such certificates, authorizations or permits would not have, individually or in the aggregate, a Material Adverse Effect, and except as would not reasonably be expected to have a Material Adverse Effect, neither the Company nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such certificate, authorization or permit.

(o) Foreign Corrupt Practices. Except as would not reasonably be expected to have a Material Adverse Effect, neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other Person acting on behalf of the Company or any of its Subsidiaries has, in the course of its actions for, or on behalf of, the Company (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

(p) Sarbanes-Oxley Act. The Company is in compliance with any and all applicable requirements of the Sarbanes-Oxley Act of 2002 that are effective as of the date hereof, and any and all applicable rules and regulations promulgated by the SEC thereunder that are effective as of the date hereof, except where such noncompliance would not have, individually or in the aggregate, a Material Adverse Effect.

(q) Transactions With Affiliates. Except as set forth on Schedule 3(q) and in the SEC Documents filed at least ten days prior to the date hereof and other than the grant of stock options disclosed on Schedule 3(r), none of the officers, directors or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for ordinary course services as employees, officers or directors) which is, taken individually or in the aggregate with other unreported transactions, material, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any such officer, director or employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any such officer, director, or employee has

a substantial interest or is an officer, director, trustee or partner.

(r) Equity Capitalization. As of the date hereof, the authorized capital stock of the Company consists of (x) 100,000,000 shares of Common Stock, of which as of the date hereof, 46,366,148 shares of Common Stock are issued and outstanding, 2,527,449 shares of Common Stock are reserved for issuance pursuant to the Company's stock option and purchase plans and 0 shares of Common Stock are reserved for issuance pursuant to securities (other than the Notes) exercisable or exchangeable for, or convertible into, shares of Common Stock, and (y) 0 shares of preferred stock, of which as of the date hereof, none are issued and outstanding. All of such outstanding shares have been, or upon issuance will be, validly issued and are fully paid and nonassessable. Except as disclosed in Schedule 3(r): (i) no shares of the Company's capital stock are subject to preemptive rights or any other similar rights or any liens or encumbrances suffered or permitted by the Company; (ii) there are no outstanding options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any shares of capital stock of the Company or any of its Subsidiaries, or contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries or options, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, any shares of capital stock of the Company or any of its Subsidiaries; (iii) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of their securities under the 1933 Act (except the Registration Rights Agreement); (iv) there are no outstanding securities or instruments of the Company or any of its Subsidiaries which contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which the Company or any of its Subsidiaries is or may become bound to redeem a security of the Company or any of its Subsidiaries; (v) there are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of the Securities; and (vi) the Company does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. The Company has filed as exhibits to the SEC Documents true, correct and complete copies of the Company's Certificate of Incorporation, as amended and as in effect on the date hereof (the "**Certificate of Incorporation**"), and the Company's Bylaws, as amended and as in effect on the date hereof (the "**Bylaws**"), and the terms of all securities convertible into, or exercisable or exchangeable for, Common Stock and the material rights of the holders thereof in respect thereto.

(s) Indebtedness and Other Contracts. Except as disclosed in Schedule 3(s), neither the Company nor any of its Subsidiaries (i) has any outstanding Indebtedness (as defined herein), (ii) is a party to any contract, agreement or instrument, the violation of which, or default under which, by the other party(ies) to such contract, agreement or instrument would result in a Material Adverse Effect, (iii) is in violation of any term of or in default under any contract, agreement or instrument relating to any Indebtedness, except where such violations and defaults

9759280.11

would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect. For purposes of this Agreement: (x) "**Indebtedness**" shall have the meaning ascribed to such term in the Notes, a form of which is included as Exhibit A hereto, and (y) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

(t) Absence of Litigation. Except as would not reasonably be expected to have a Material Adverse Effect, there is no action, suit, proceeding, inquiry or investigation before or by the Principal Market, any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company, threatened against or affecting the Company, the Common Stock or any of the Company's Subsidiaries or any of the Company's or the Company's Subsidiaries' officers or directors in their capacities as such, except as set forth in Schedule 3(t).

(u) Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has been refused any insurance coverage sought or applied for and neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

(v) Employee Relations. Except as disclosed in Schedule 3(v), neither the Company nor any of its Subsidiaries is a party to any collective bargaining agreement or employs any member of a union. The Company and its Subsidiaries believe that their relations with their employees are generally good. No executive officer of the Company (as defined in Rule 501(f) of the 1933 Act) has notified the Company that such officer intends to leave the Company or otherwise terminate such officer's employment with the Company. To the knowledge of the Company, no executive officer of the Company is (i) in violation of any material term of any employment contract, non-competition agreement, or any other agreement containing restrictive covenants with respect to his or her employment and (ii) the continued employment of each such executive officer does not subject the Company or any of its Subsidiaries to any liability with respect to any of the matters in clause (i) above.

(w) Title. Except as would not reasonably be expected to have a Material Adverse Effect, the Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(w) or such as do not

materially affect the value of such property and do not interfere with the use made and proposed to be made of such property by the Company and any of its Subsidiaries. Any real property and facilities held under lease by the Company and any of its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as are not material and do not interfere with the use made and proposed to be made of such property and buildings by the Company and its Subsidiaries.

(x) Intellectual Property Rights. Except as set forth on Schedule 3(x) or as would not reasonably be expected to have a Material Adverse Effect, the Company and its Subsidiaries own or possess adequate rights or licenses to use all trademarks, service marks and all applications and registrations therefor, trade names, service marks, patents, patent rights, copyrights, original works of authorship, inventions, trade secrets and other intellectual property rights ("**Intellectual Property Rights**") necessary to conduct their respective businesses as now conducted. Except as set forth on Schedule 3(x) or as would not reasonably be expected to have a Material Adverse Effect, none of the Company's Intellectual Property Rights have expired or terminated or have been abandoned. Except as set forth on Schedule 3(x), the Company does not have any knowledge of any infringement by the Company or its Subsidiaries of Intellectual Property Rights of others. Except as set forth on Schedule 3(x) or as would not reasonably be expected to have a Material Adverse Effect, the Company has not received notice of any claim being made or brought, or to the knowledge of the Company, being threatened, against the Company or its Subsidiaries regarding its Intellectual Property Rights. The Company is unaware of any facts or circumstances which might give rise to any of the foregoing claims. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their trade secrets.

(y) Environmental Laws. The Company and its Subsidiaries (i) are in compliance with any and all Environmental Laws (as hereinafter defined), (ii) have received all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses and (iii) are in compliance with all terms and conditions of any such permit, license or approval where, in each of the foregoing clauses (i), (ii) and (iii), the failure to so comply could be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect. The term "**Environmental Laws**" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants, contaminants, or toxic or hazardous substances or wastes (collectively, "**Hazardous Materials**") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(z) Subsidiary Rights. The Company or one of its Subsidiaries has the unrestricted right to vote, and (subject to limitations imposed by applicable law) to receive dividends and distributions on, all capital securities of its material Subsidiaries as owned by the Company or such Subsidiary.

(aa) Tax Status. The Company and each of its Subsidiaries (i) has made or filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject, (ii) has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and (iii) has set aside on its books provision reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim.

(bb) Internal Accounting Controls. Except as would not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability, (iii) access to assets or incurrence of liabilities is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for assets and liabilities is compared with the existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any difference.

(cc) Ranking of Notes. Except as contemplated in Section 16 of the Note or as set forth on Schedule 3(cc), no Indebtedness of the Company is senior to or ranks *pari passu* with the notes in right of payment, whether with respect of payment of redemptions, interest, damages or upon liquidation or dissolution or otherwise.

(dd) Disclosure. The Company confirms that neither it nor any Person acting on its behalf has provided any of the Buyers or their respective agents or counsel with any information that constitutes material, nonpublic information. The Company understands and confirms that each of the Buyers will rely on the foregoing representations in effecting transactions in securities of the Company. All disclosure provided to the Buyers regarding the Company, its business and the transactions contemplated hereby, including the Schedules to this Agreement, furnished by or on behalf of the Company when taken as whole, together with all other information provided or available in the SEC Documents, do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading. The Company acknowledges and agrees that no Buyer makes or has made any

representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 2.

(ee) Form S-3 Eligibility. The Company is eligible to register the Conversion Shares for resale by the Buyers using Form S-3 promulgated under the 1933 Act.

(ff) Manipulation of Price. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in, or that has constituted or which might reasonably be expected to constitute, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid anyone any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

(gg) Collateral. The Company is and will be at all times the owner of the Collateral (as defined in Section 4(p)) free and clear of any lien, except for the security interest created by this Agreement and the subordinated lien of the Company's creditors under its Senior Credit Agreement and the related security agreement. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office, except such as may have been filed in favor of the Collateral Agent relating to this Agreement or under the Senior Credit Agreement and the related security agreement.

(hh) Security Interest. This Agreement creates a valid security interest in favor of the Collateral Agent (as defined in Section 4(o)) in the Collateral, as security for the Obligations (as defined in Section 4(p)). Assuming the Collateral Agent is at all times in control (as such term is defined in the New York Uniform Commercial Code) of the Collateral, such security interest is, or in the case of Collateral in which the Company obtain rights after the date hereof, will be, a perfected, first priority security interest.

4. COVENANTS.

(a) Commercially Reasonable Efforts. Each party shall use its commercially reasonable efforts timely to satisfy each of the conditions to be satisfied by it as provided in Sections 6 and 7 of this Agreement.

(b) Form D and Blue Sky. The Company agrees to file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof to each Buyer promptly after such filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the Securities for sale to the Buyers at the Closing pursuant to this Agreement under applicable securities or "Blue Sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to the Buyers on or prior to the Closing Date. The Company shall make all filings and reports relating

to the offer and sale of the Securities required under applicable securities or "Blue Sky" laws of the states of the United States following the Closing Date.

(c) Reporting Status. Until the date on which the Investors (as defined in the Registration Rights Agreement) shall have sold all the Conversion Shares and none of the Notes are outstanding (the "**Reporting Period**"), the Company shall file all reports required to be filed with the SEC pursuant to the 1934 Act, and the Company shall not voluntarily terminate its status as an issuer required to file reports under the 1934 Act even if the 1934 Act or the rules and regulations thereunder would otherwise permit such termination.

(d) Use of Proceeds. The Company will use the proceeds from the sale of the Securities for working capital purposes and/or to fund the Williams Acquisition and not for the redemption or repurchase of any of its equity securities; provided, however, that if the Williams Acquisition is not consummated on or before June 30, 2005, proceeds from the sale of the Securities may be used for mandatory prepayment as provided under the terms of Section 2.06(b) of the Senior Credit Agreement (as defined in the Notes).

(e) Financial Information. The Company agrees to send the following to each Investor during the Reporting Period unless the following are filed with the SEC through EDGAR and are available to the public through the EDGAR system, (i) within three (3) Business Days after the filing thereof with the SEC, a copy of its Annual Reports on Form 10-K, its Quarterly Reports on Form 10-Q, any Current Reports on Form 8-K and any registration statements (other than on Form S-8) or amendments filed pursuant to the 1933 Act, (ii) within three (3) Business Days after the release thereof, facsimile copies of all press releases issued by the Company or any of its Subsidiaries, and (iii) copies of any notices and other information made available or given to the stockholders of the Company generally, substantially contemporaneously with the making available or giving thereof to the stockholders.

(f) Listing. The Company shall use commercially reasonable efforts to promptly secure the listing of all of the Registrable Securities (as defined in the Registration Rights Agreement) upon each national securities exchange and automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and shall maintain, such listing of all Registrable Securities from time to time issuable under the terms of the Transaction Documents. The Company shall use commercially reasonable efforts to maintain the Common Stock's authorization for listing on the Principal Market. Neither the Company nor any of its Subsidiaries shall take any action which would be reasonably expected to result in the delisting or suspension of the Common Stock on the Principal Market. The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 4(f).

(g) Fees. The Company shall reimburse the Buyers in the aggregate amount of $100,000 for the Buyers' reasonable expenses incurred in connection with the preparation, execution and performance of this Agreement and the transactions contemplated hereunder,

which amount will be net funded from the Purchase Price payable by Kings Road Investments Ltd. at the Closing. The Company shall be responsible for the payment of any placement agent's fees, financial advisory fees, or broker's commissions (other than fees or commissions of persons engaged by any Buyer or its investment advisor) relating to or arising out of the transactions contemplated hereby, including, without limitation, any fees or commissions payable to the Agent. The Company shall pay, and hold each Buyer harmless against, any liability, loss or expense (including, without limitation, reasonable attorney's fees and out-of-pocket expenses) arising in connection with any claim for fees or commissions. Except as otherwise set forth or in the Transaction Documents, each party to this Agreement shall bear its own expenses in connection with the sale of the Securities to the Buyers.

(h) Pledge of Securities. The Company acknowledges and agrees that the Securities may be pledged by an Investor (as defined in the Registration Rights Agreement) in connection with a bona fide margin agreement or other loan or financing arrangement that is secured by the Securities. The pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and no Investor effecting a pledge of Securities shall be required to provide the Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or any other Transaction Document, including, without limitation, Section 2(f) hereof; provided that an Investor and its pledgee shall be required to comply with the provisions of Section 2(f) hereof in order to effect a sale, transfer or assignment of Securities to such pledgee. The Company hereby agrees to execute and deliver such documentation as a pledgee of the Securities may reasonably request in connection with a pledge of the Securities to such pledgee by an Investor.

(i) Disclosure of Transactions and Other Material Information. On or before 8:30 a.m., New York Time, on the fourth Business Day following the date hereof, the Company shall file a Current Report on Form 8-K describing the terms of the transactions contemplated by the Transaction Documents in the form required by the Exchange Act, and attaching the material Transaction Documents (including, without limitation, this Agreement, the form of Note, and the Registration Rights Agreement) as exhibits to such filing (including all attachments, the "**8-K Filing**"). From and after the filing of the 8-K Filing with the SEC, no Buyer shall be in possession of any material, nonpublic information received from the Company, any of its Subsidiaries or any of its respective officers, directors, employees or agents, that is not disclosed in the 8-K Filing. The Company shall not, and shall cause each of its Subsidiaries and its and each of their respective officers, directors, employees and agents, not to, provide any Buyer with any material, nonpublic information regarding the Company or any of its Subsidiaries from and after the filing of the 8-K Filing with the SEC without the express written consent of such Buyer. In the event of a breach of the foregoing covenant by the Company, any of its Subsidiaries, or any of its or their respective officers, directors, employees and agents, in addition to any other remedy provided herein or in the Transaction Documents, a Buyer shall have the right to require the Company to make prompt public disclosure of such material non-public information and, if the Company fails to do so within one (1) Business Day of such request to make a public

disclosure, in the form of a press release, public advertisement or otherwise, of such material, nonpublic information without the prior approval by the Company, its Subsidiaries, or any of its or their respective officers, directors, employees or agents. No Buyer shall have any liability to the Company, its Subsidiaries, or any of its or their respective officers, directors, employees, stockholders or agents for any such disclosure. Subject to the foregoing, neither the Company nor any Buyer shall issue any press releases or any other public statements with respect to the transactions contemplated hereby; provided, however, that the Company shall be entitled, without the prior approval of any Buyer, to make any press release or other public disclosure with respect to such transactions (i) in substantial conformity with the 8-K Filing and contemporaneously therewith and (ii) as is required by applicable law and regulations (provided that in the case of clause (i) each Buyer shall be consulted by the Company in connection with any such press release or other public disclosure prior to its release). Notwithstanding the foregoing, the Company shall not publicly disclose the name of any Buyer, or include the name of any Buyer in any filing with the SEC or any regulatory agency or the Principal Market, without the prior written consent of such Buyer, except to the extent such disclosure (but not any disclosure as to the controlling Persons thereof) is required by law or the Principal Market regulations, in which case the Company shall provide the Buyers with prior notice of such disclosure.

(j) Additional Notes; Variable Securities; Dilutive Issuances. For so long as any Buyer beneficially owns any Securities, the Company will not issue any securities that would cause a breach or default under the Notes. For so long as any Notes remain outstanding, the Company shall not, in any manner, issue or sell any rights, warrants or options to subscribe for or purchase Common Stock or directly or indirectly convertible into or exchangeable or exercisable for Common Stock (other than Excluded Securities (as defined in the Notes)) at a price which varies or may vary with the market price of the Common Stock, including by way of one or more reset(s) to any fixed price unless the conversion, exchange or exercise price of any such security cannot be less than the then applicable Conversion Price (as defined in the Notes) with respect to the Common Stock under any into which any Note is convertible. For so long as any Notes remain outstanding, the Company shall not, in any manner, enter into or affect any Dilutive Issuance (as defined in the Notes) if the effect of such Dilutive Issuance is to cause the Company to be required to issued upon conversion of any Note any shares of Common Stock in excess of that number of shares of Common Stock which the Company may issue upon conversion of the Notes without breaching the Company's obligations under the rules or regulations of the Principal Market.

(k) Corporate Existence. So long as any Buyer beneficially owns any Notes, the Company shall maintain its corporate existence.

(l) Reservation of Shares. The Company shall take all action necessary to at all times have authorized, and reserved for the purpose of issuance, 120% of the number of shares of Common Stock issuable upon conversion of the Notes being issued at the Closing.

(m) Redemption Collateral Account.

(i) On or prior to the Closing, the Company shall establish with Banc of America Securities LLC (the "**Collateral Bank**") the Redemption Collateral Account (as defined in Section 4(p)) and deposit in the Redemption Collateral Account the amount of $9,000,000 (the "**Redemption Collateral**"). On or prior to the Closing, the Company shall also cause the Collateral Bank to enter to an account control agreement with the Collateral Agent with respect to the Redemption Collateral Account, substantially in the form of Exhibit G (the "**Closing Account Control Agreement**"). Upon the reasonable request of the Collateral Agent, the Company shall also execute and deliver such other customary agreements and instruments necessary to grant the Buyers a first priority perfected security interest in the Redemption Collateral Account to secure the Notes. The Company agrees that it shall not permit the Redemption Collateral Account to be subject to any lien, pledge, charge, security interest or other encumbrance other than as provided in Section 4(p) and the immediately preceding sentence or the subordinated lien of the Company's creditors under its Senior Credit Agreement.

(ii) The funds in the Redemption Collateral Account shall be distributed as follows: (A) upon delivery by any holder or holders of Notes (each a "**Redeeming Holder**") of one or more Holder Collateral Redemption Notices (as defined in the Notes), the Collateral Agent shall deliver written notice to the Collateral Bank to disburse to such Redeeming Holders funds in an aggregate amount equal to the aggregate principal amount of Notes that are the subject of such Holder Collateral Redemption Notices; and (B) on the date (the "**Permitted Termination Notice Date**") which is six (6) months after the date on which a registration statement under the 1933 Act with respect to the Common Stock underlying the Notes is declared effective, the Collateral Agent shall serve the Collateral Bank a notice (a "**Redemption Collateral Termination Notice**") terminating its security interest in the Redemption Collateral Account, provided that (i) the Collateral Agent is reasonably satisfied that the Company has redeemed all Notes which are the subject of validly delivered Holder Collateral Redemption Notices and (ii) the Collateral Agent has not delivered to the Collateral Bank prior to such date a "Notice of Exclusive Control" as defined in the Closing Account Control Agreement, and such notice is then in effect and has not been waived, rescinded or otherwise terminated. Upon delivery of the Redemption Collateral Termination Notice to the Collateral Bank, the Closing Account Control Agreement and any Lien created hereby and thereby shall terminate.

(n) Williams Acquisition Collateral Account; Sufficient Cash Balance.

(i) On or prior to the Closing, the Company shall establish with the Collateral Bank the Williams Acquisition Collateral Account (as defined in Section 4(p)). If on or prior to April 30, 2005, the contemplated acquisition by the Company of Williams Industries Services Group (the "**Williams Acquisition**") has not been consummated, then the Company shall deposit in the Williams Acquisition Collateral Account the amount of $7,650,000 (the

"**Williams Acquisition Collateral**"). On or prior to the Closing, the Company shall cause the Collateral Bank to enter into an account control agreement with the Collateral Agent with respect to the Williams Acquisition Collateral Account, substantially in the form of Exhibit H (the "**Williams Acquisition Account Control Agreement**", together with the Redemption Account Control Agreement, the "**Account Control Agreements**"). Upon the reasonable request of the Collateral Agent, the Company shall also execute and deliver such other customary agreements and instruments necessary to grant the Buyers a first priority perfected security interest in the Williams Acquisition Collateral Account to secure the Notes. The Company agrees that it shall not permit the Williams Acquisition Collateral Account to be subject to any lien, pledge, charge, security interest or other encumbrance other than as provided in Section 4(p) and in the immediately preceding sentence or the unperfected lien of the Company's creditors under the Senior Credit Agreement.

(ii) The funds in the Williams Acquisition Collateral Account shall be disbursed as follows: (A) on each Interest Date (as defined in the Notes) the Collateral Agent shall deliver written notice to the Collateral Bank to disburse to each holder of Notes from the Williams Acquisition Collateral held in the Williams Acquisition Collateral Account an amount equal to the accrued and unpaid interest on such Notes; and (B) two Business Days prior to the date (the "**Williams Acquisition Date**") on which the Company intends to consummate the acquisition of Williams Industrial Services Group (the "**Williams Acquisition**"), the Collateral Agent upon the written instructions of the Company, shall direct the Collateral Bank to disburse any funds remaining in the Williams Acquisition Collateral Account on the Williams Acquisition Date in accordance with the written instructions of the Company to pay a portion of the purchase price of the Williams Acquisition or any related fees and expenses an ("**Acquisition Notice**"). Upon the receipt by the Collateral Bank and the disbursement of the funds in the Williams Acquisition Collateral Account on the Williams Acquisition Date in accordance with the Acquisition Notice, the Williams Account Control Agreement and any Lien created hereby or thereby shall terminate.

(iii) From the date of this Agreement until the earlier of (A) the date the Williams Acquisition is consummated or (B) the first business day of May 2005, the Company shall at all times keep available unrestricted cash sufficient to ensure that it has the funds necessary for deposit of the Williams Acquisition Collateral into the Williams Acquisition Collateral Account in accordance with the provisions of this Section 4(n).

(o) Collateral Agent. Kings Road Investments Ltd. (the "**Collateral Agent**") is hereby appointed as the collateral agent for the Buyers hereunder, and each Buyer hereby authorizes the Collateral Agent (and its officers, directors, employees and agents) to take any and all such actions on behalf of the Buyers with respect to the Collateral and the Obligations in accordance with the terms of this Agreement. The Collateral Agent shall not have, by reason hereof or any of the other Transaction Documents, a fiduciary relationship in respect of any Buyer. Neither the Collateral Agent nor any of its officers, directors, employees and agents shall

have any liability to any Buyer for any action taken or omitted to be taken in connection hereof except to the extent caused by its own gross negligence or willful misconduct, and each Buyer agrees to defend, protect, indemnify and hold harmless the Collateral Agent and all of its officers, directors, employees and agents (collectively, the "**Indemnitees**") from and against any losses, damages, liabilities, obligations, penalties, actions, judgments, suits, fees, costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitee, whether direct, indirect or consequential, arising from or in connection with the performance by such Indemnitee of the duties and obligations of Collateral Agent pursuant hereto.

(p) Security Interests Relating to Redemption Collateral Account and Williams Acquisition Collateral Account.

(i) Grant of Security Interest. As collateral for the prompt payment and performance of all of the Obligations (as hereinafter defined), the Company hereby pledges and assigns to the Collateral Agent, and grants to the Collateral Agent a continuing security interest in, the following, whether now existing or hereafter acquired or arising (collectively, the "**Collateral**"): (A) all of the Company's rights, titles, interests, remedies, powers and privileges relating to (1) Account Nos. BAS 24900382 and BANA 279368, established and maintained by the Company with the Collateral Bank (the "**Redemption Collateral Account**"), and (2) Account Nos. BAS 24900383 and BANA 279370, established and maintained by the Company with the Collateral Bank (the "**Williams Acquisition Collateral Account**", and together with the Redemption Collateral Account, and all financial assets, investment property, securities, cash and other property held in each such account, and the proceeds thereof, and all certificates and instruments, if any, representing or evidencing each such account, the "**Collateral Accounts**"), together with all of the Company's right, title and interest in and to the Collateral Accounts, all financial assets, investment property, securities, cash and other property, now or at any time thereafter held therein, credited thereto or payable thereon, and all instruments, documents and other writings evidencing the Collateral Accounts; and (B) any and all cash and non-cash proceeds and products of any of the foregoing, including without limitation, any and all dividends payable in cash or stock or other proceeds of conversions or splits of any securities held in the Collateral Accounts or proceeds of any insurance, indemnity, instruments, warranty or guaranty payable to the Company from time to time with respect to the Collateral and any and all other amounts from time to time paid or payable under or in connection with any of the Collateral, whether any of the foregoing take the form of investment property, accounts, inventory, chattel paper, instruments, documents, general intangibles, equipment or any other form.

(ii) Security for Obligations. The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (collectively, the "**Obligations**"): the obligation of the Company to pay, as and when due and payable (at scheduled maturity or by required

prepayment or redemption, acceleration, demand or otherwise), all amounts from time to time owing by it in respect of the Notes, whether for principal, interest, fees or otherwise (including, without limitation, amounts that but for the operation of Section 362(a) of the Bankruptcy Code would become due). Without limiting the generality of the foregoing, this Agreement secures the payment of all amounts that constitute part of the Obligations and would be owed by the Company to the Collateral Agent under any of the Notes but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Company.

(iii) Collateral Covenants. The Company shall: (A) at the expense of the Company, take all action that may be necessary in the reasonable judgment of the Collateral Agent, in order to (1) perfect and protect any security interest created or purported to be created hereby, (2) enable the Collateral Agent to exercise and enforce its rights and remedies hereunder with respect to the Collateral, or (3) otherwise effect the purposes of this Agreement, including, without limitation, (x) authorizing the Collateral Agent to file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Collateral Agent may request, in order to perfect and preserve the security interests created or purported to be created hereby, and (y) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail; (B) not sell, assign, exchange or otherwise dispose of any of the Collateral except as permitted hereby; (C) not create or suffer to exist any lien upon or with respect to any of the Collateral except for the security interests created hereunder and the subordinated lien of the Company's creditors under its Senior Credit Agreement; and (D) not take or fail to take any action which would in any manner impair the amount or value of the Collateral.

(iv) Additional Provisions Concerning the Collateral; Power of Attorney.

(A) The Company hereby authorizes the Collateral Agent to file, without the signature of the Company where permitted by law, one or more financing or continuation statements, and amendments thereto, relating to the Collateral.

(B) The Company hereby irrevocably appoints the Collateral Agent the Company's attorney-in-fact and proxy, with full authority in the place and stead of the Company and in the name of the Company or otherwise, from time to time in the Collateral Agent's reasonable discretion, to take any action and to execute any instrument which the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation: (1) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (2) to receive, endorse, and collect any drafts or other

9759280.11

instruments, documents and chattel paper in connection with clause (1) above; and (3) to file any claims or take any action or institute any proceedings which the Collateral Agent may reasonably deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral; provided, however, that so long as no Event of Default shall have occurred and be continuing, the Collateral Agent will not exercise its power as the Company's attorney-in-fact or proxy. This power is coupled with an interest and is irrevocable until all of the Obligations are paid in full or the security interest granted hereby terminates in accordance with its terms.

(C) If the Company fails to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement or obligation, and the reasonable out-of-pocket expenses of the Collateral Agent incurred in connection therewith shall be payable by the Company under Section 9(k) hereof.

(D) The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

(iv) Remedies. If any Event of Default shall have occurred and be continuing, the Collateral Agent may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party on default under the Uniform Commercial Code (the "**UCC**") currently in effect in the State of New York (whether or not the UCC applies to the affected Collateral). Any cash held by the Collateral Agent as Collateral and all cash proceeds received by the Collateral Agent in respect of any collection from, or other realization upon, all or any part of the Collateral may, in the discretion of the Collateral Agent, be held by the Collateral Agent as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 9(k) hereof) in whole or in part by the Collateral Agent against, all or any part of the Obligations. Any surplus of such cash or cash proceeds held by the Collateral Agent and remaining after payment in full of all of the Obligations shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(v) Termination. The security interest created hereby will automatically terminate at such time as (i) all funds in the Collateral Accounts are disbursed in accordance with Section 4(m) or Section 4(n), as the case may be, or (ii), in the case of the Williams Acquisition Collateral, upon consummation of the Williams Acquisition, if earlier.

5. REGISTER; TRANSFER AGENT INSTRUCTIONS.

(a) Register. The Company shall maintain at its principal executive offices (or such other office or agency of the Company as it may designate by notice to each holder of Notes), a register for the Notes, in which the Company shall record the name and address of the Person in whose name the Notes have been issued (including the name and address of each transferee), the principal amount of Notes held by such Person. The Company shall keep the register open and available at all times during business hours for inspection of any Buyer or its legal representatives.

(b) Transfer Agent Instructions. The Company shall issue irrevocable instructions to its transfer agent, and any subsequent transfer agent, to issue certificates or credit shares to the applicable balance accounts at The Depository Trust Company ("**DTC**"), registered in the name of each Buyer or its respective nominee(s), for the Conversion Shares in such amounts as specified from time to time by each Buyer to the Company upon conversion of the Notes in the form of Exhibit C attached hereto (the "**Irrevocable Transfer Agent Instructions**"). The Company warrants that no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5(b), and stop transfer instructions to give effect to Section 2(g) hereof, will be given by the Company to its transfer agent, and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent and subject to the limitations provided in this Agreement and the other Transaction Documents. If a Buyer effects a sale, assignment or transfer of the Securities in accordance with Section 2(f) and Section 19 of the Note, if applicable, the Company shall permit the transfer and shall promptly instruct its transfer agent to issue one or more certificates, or credit shares to the applicable balance accounts at DTC, in such name and in such denominations as specified by such Buyer to effect such sale, transfer or assignment. In the event that such sale, assignment or transfer involves Conversion Shares sold, assigned or transferred pursuant to an effective registration statement or pursuant to Rule 144, the transfer agent shall issue such Securities to the Buyer, assignee or transferee, as the case may be, without any restrictive legend. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to a Buyer. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5(b) will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section 5(b), that a Buyer shall be entitled, in addition to all other available remedies, to an order and/or injunction restraining any breach and requiring immediate issuance and transfer, without the necessity of showing economic loss and without any bond or other security being required.

6. CONDITIONS TO THE COMPANY'S OBLIGATION TO SELL.

Closing Date. The obligation of the Company hereunder to issue and sell the Notes to each Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion by providing each Buyer with prior written notice thereof:

9759280.11

(a) Each Buyer shall have executed each of the Transaction Documents to which it is a party and delivered the same to the Company.

(b) Such Buyer and each other Buyer shall have delivered to the Company the Purchase Price (less, in the case of Kings Road Investment Ltd., the amount to be withheld pursuant to Section 4(g)) for the Notes being purchased by such Buyer and each other Buyer at the Closing by wire transfer of immediately available funds pursuant to the wire instructions provided by the Company.

(c) The representations and warranties of each Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date), and each Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by each Buyer at or prior to the Closing Date.

(d) No order of any court, arbitrator, or governmental or regulatory authority shall be in effect which purports to enjoin or restrain any of the transactions contemplated by this Agreement or the other Transaction Documents.

(e) The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Notes.

7. CONDITIONS TO EACH BUYER'S OBLIGATION TO PURCHASE.

Closing Date. The obligation of each Buyer hereunder to purchase the Notes at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for each Buyer's sole benefit and may be waived by such Buyer at any time in its sole discretion by providing the Company with prior written notice thereof:

(a) The Company shall have executed and delivered to such Buyer (i) each of the Transaction Documents and (ii) the Notes (in such principal amounts as such Buyer shall request or, if no such request is made, a single Note with a principal amount equal to the aggregate principal amount of Notes to be purchased by such Buyer) being purchased by such Buyer at the Closing pursuant to this Agreement.

(b) Such Buyer shall have received the opinion of White & Case LLP, the Company's counsel, dated as of the Closing Date, in substantially the form of Exhibit D-1 attached hereto, and the opinion of Connors & Winters P.C., the Company's special securities counsel, dated as of the Closing Date in substantially the form of Exhibit D-2.

(c) The Company shall have delivered to such Buyer a copy of the

Irrevocable Transfer Agent Instructions, in the form of Exhibit C attached hereto, which instructions shall have been delivered to and acknowledged in writing by the Company's transfer agent.

(d) The Company shall have delivered to such Buyer a certificate evidencing the incorporation and good standing of the Company and each of its domestic Subsidiaries in such corporation's state of incorporation issued by the Secretary of State (or comparable office) of such state of incorporation, as of a date within 10 days of the Closing Date.

(e) The Company shall have delivered to such Buyer a certified copy of the Certificate of Incorporation as certified by the Secretary of State of the State of Delaware within 10 days of the Closing Date.

(f) The Company shall have delivered to such Buyer a certificate, executed by the Secretary of the Company and dated as of the Closing Date, as to (i) the resolutions consistent with Section 3(b) as adopted by the Company's Board of Directors in a form reasonably acceptable to such Buyer (the "**Resolutions**"), (ii) the Certificate of Incorporation and (iii) the Bylaws, each as in effect at the Closing, in the form attached hereto as Exhibit E.

(g) The representations and warranties of the Company shall be true and correct as of the date when made and as of the Closing Date as though made at that time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all respects with the covenants, agreements and conditions required by the Transaction Documents to be performed, satisfied or complied with by the Company at or prior to the Closing Date. Such Buyer shall have received a certificate, executed by the Chief Executive Officer of the Company, dated as of the Closing Date, to the foregoing effect in the form attached hereto as Exhibit F.

(h) The Company shall have delivered to such Buyer a letter from the Company's transfer agent certifying the number of shares of Common Stock outstanding as of a date within five days of the Closing Date.

(i) The Common Stock (I) shall be designated for quotation or listed on the Principal Market and (II) shall not have been suspended, as of the Closing Date, by the SEC or the Principal Market from trading on the Principal Market nor shall suspension by the SEC or the Principal Market have been threatened, as of the Closing Date, either (A) in writing by the SEC or the Principal Market or (B) by falling below the minimum listing maintenance requirements of the Principal Market.

(j) The Company shall have obtained all governmental, regulatory or third party consents and approvals, if any, necessary for the sale of the Notes.

(k) No order of any court, arbitrator, or governmental or regulatory authority shall be in effect which purports to enjoin or restrain any of the transactions contemplated by this Agreement or the other Transaction Documents.

(l) Such Buyer shall have received a guaranty, in the form attached hereto as Exhibit I, executed by all domestic Subsidiaries that are borrowers or guarantors under the Senior Credit Agreement.

(m) The lenders under the Senior Credit Agreement shall have validly consented to (i) the creation of the Redemption Collateral Account and the Williams Acquisition Collateral Account, (ii) the transfer of the Redemption Collateral into the Redemption Collateral Account and the Williams Acquisition Collateral into the Williams Acquisition Collateral Account and (iii) the creation of a first priority security interest in such accounts as provided herein.

8. TERMINATION. In the event that the Closing shall not have occurred with respect to a Buyer on or before five (5) Business Days from the date hereof due to the Company's or such Buyer's failure to satisfy the conditions set forth in Sections 6 and 7 above (and the nonbreaching party's failure to waive such unsatisfied condition(s)), the nonbreaching party shall have the option to terminate this Agreement with respect to such breaching party at the close of business on such date without liability of any party to any other party; provided, however, this if this Agreement is terminated by Buyers pursuant to this Section 8, the Company shall remain obligated to reimburse the non-breaching Buyers for the expenses described in Section 4(g) above.

9. MISCELLANEOUS.

(a) Governing Law; Jurisdiction; Jury Trial. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner

permitted by law. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

(b) Counterparts. This Agreement may be executed in two or more identical counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party; provided that a facsimile signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile signature.

(c) Headings. The headings of this Agreement are for convenience of reference and shall not form part of, or affect the interpretation of, this Agreement.

(d) Severability. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction.

(e) Entire Agreement; Amendments. This Agreement supersedes all other prior oral or written agreements between the Buyers, the Company, their affiliates and Persons acting on their behalf with respect to the matters discussed herein, and this Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor any Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be amended other than by an instrument in writing signed by the Company and the Required Holders, and any amendment to this Agreement made in conformity with the provisions of this Section 9(e) shall be binding on all Buyers and holders of Notes, as applicable; provided, however, that no such amendment shall (i) extend the maturity of the Note, reduce the interest rate, extend the time of payment of interest thereon, or reduce the principal amount thereof or premium, if any, thereon, or reduce any amount payable on redemption or repurchase thereof or affect any amounts due to any holder or (ii) reduce the aforesaid percentage of Notes, the holders of which are required to consent to any such amendment, without the consent of the holders of all Notes then outstanding. No provision hereof may be waived other than by an instrument in writing signed by the party against whom enforcement is sought. No such amendment shall be effective to the extent that it applies to less than all of the holders of the Notes then outstanding. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of the Transaction Documents unless the same consideration also is offered on identical terms to all of the parties to the Transaction Documents that are holders of Notes. The Company

9759280.11

has not, directly or indirectly, made any agreements with any Buyers relating to the terms or conditions of the transactions contemplated by the Transaction Documents except as set forth in the Transaction Documents.

(f) Notices. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with an overnight courier service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

Global Power Equipment Group Inc.
6120 South Yale Street
Suite 1480
Tulsa, Oklahoma 74136
Telephone: (918) 488-0828
Facsimile: (918) 274-2367
Attention: General Counsel

with a copy (which shall not constitute notice) to:

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8331
Facsimile: (212) 354-8113
Attention: S. Ward Atterbury, Esq.

For notices sent to all Buyers, a copy (for informational purposes only) shall be sent to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Tel: (212) 756-2000
Fax: (212) 593-5955
Attention: Christian H. Mittweg, Esq.

If to the Transfer Agent:

EquiServe Trust Company, N.A.
250 Royall Street
Canton, Massachusetts 02021
Telephone: (781) 575-2000
Facsimile: (781) 575-4812
Attention: Monique Hughes
Account Manager

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers, with copies to such Buyer's representatives as set forth on the Schedule of Buyers, or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

(g) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, including any purchasers of the Notes. The Company shall not assign this Agreement or any rights or obligations hereunder without the prior written consent of the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding, including by way of a Fundamental Transaction (unless the Company is in compliance with the applicable provisions governing Fundamental Transactions set forth in the Notes). A Buyer may assign some or all of its rights hereunder without the consent of the Company, in which event such assignee shall be deemed to be a Buyer hereunder with respect to such assigned rights.

(h) No Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

(i) Survival. Unless this Agreement is terminated under Section 8, the representations and warranties of the Company and the Buyers contained in Sections 2 and 3 and the agreements and covenants set forth in Sections 4, 5 and 9 shall survive the Closing. Each Buyer shall be responsible only for its own representations, warranties, agreements and covenants hereunder.

rights and remedies set forth in the Transaction Documents and all rights and remedies which such holders have been granted at any time under any other agreement or contract and all of the rights which such holders have under any law. Any Person having any rights under any provision of this Agreement shall be entitled to enforce such rights specifically (without posting a bond or other security), to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. Furthermore, the Company recognizes that in the event that it fails to perform, observe, or discharge any or all of its obligations under the Transaction Documents, any remedy at law may prove to be inadequate relief to the Buyers. The Company therefore agrees that the Buyers shall be entitled to seek temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without posting a bond or other security.

(n) Payment Set Aside. To the extent that the Company makes a payment or payments to the Buyers hereunder or pursuant to any of the other Transaction Documents or the Buyers enforce or exercise their rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other Person under any law (including, without limitation, any bankruptcy law, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

(o) Independent Nature of Buyers' Obligations and Rights. The obligations of each Buyer under any Transaction Document are several and not joint with the obligations of any other Buyer, and no Buyer shall be responsible in any way for the performance of the obligations of any other Buyer under any Transaction Document. Nothing contained herein or in any other Transaction Document, and no action taken by any Buyer pursuant hereto or thereto, shall be deemed to constitute the Buyers as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Buyers are in any way acting in concert or as a group with respect to such obligations or the transactions contemplated by the Transaction Documents. Each Buyer confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors. Each Buyer shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement or out of any other Transaction Documents, and it shall not be necessary for any other Buyer to be joined as an additional party in any proceeding for such purpose.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** each Buyer, the Company and the Collateral Agent have caused their respective signature pages to this Securities Purchase Agreement to be duly executed as of the date first written above.

**COMPANY:**
**GLOBAL POWER EQUIPMENT GROUP INC.**

By: James P. Wilson
Name: James P. Wilson
Title: CFO and V.P. of Finance

**BUYERS:**
**KINGS ROAD INVESTMENTS LTD., in its capacity, as Buyer and Collateral Agent**

By: ______________________________
Name: ALEXANDER E. JACKSON
Title: PRINCIPAL

**[Signature Page to Securities Purchase Agreement]**

**STEELHEAD INVESTMENTS LTD.**
**By: HBK Investments L.P.**
**Title: Investment Advisor**

By: ______________________
Name: DAVID C HALEY
Title: Authorized Signatory

**[Signature Page to Securities Purchase Agreement]**

**D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.**

**By: D.B. Zwirn and Co., LP**

By:____________________________
Name: Perry A. Gruss
Title: Chief Financial Officer

**[Signature Page to Securities Purchase Agreement]**

**D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, LTD.**

**By: D.B. Zwirn and Co., LP**

By:______________________________
Name: Perry A. Gruss
Title: Chief Financial Officer

[Signature Page to Securities Purchase Agreement]

**HCM/Z SPECIAL OPPORTUNITIES LLC**

**By: D.B. Zwirn and Co., LP**

By:______________________________
Name: Perry A. Gruss
Title: Authorized Signatory

**[Signature Page to Securities Purchase Agreement]**

# SCHEDULE OF BUYERS

| (1) Buyer | (2) Address and Facsimile Number | (3) Aggregate Principal Amount of Notes | (4) Legal Representative's Address and Facsimile Number |
|---|---|---|---|
| Kings Road Investments Ltd. | c/o Polygon Investment Partners LLP<br>598 Madison Avenue, 14th Floor<br>New York, NY 10022<br>Attn: Brandon Jones<br>Telephone: (212) 359-7330<br>Facsimile: (212) 359-7303<br>Residence: Cayman Islands | $27,000,000 | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attention: Christian H. Mittweg, Esq.<br>Facsimile: (212) 593-5955<br>Telephone: (212) 756-2000 |
| Steelhead Investments Ltd. | c/o HBK Investments L.P.<br>300 Crescent Court, Suite 700<br>Dallas, Texas 75201<br>Attn: Legal Department<br>Facsimile: 214-758-1207<br>Residence: Cayman Islands | $27,000,000 | |
| D.B. Zwirn Special Opportunities Fund, L.P. | c/o D.B. Zwirn & Co., L.P.<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>Phone: (646) 720-9100<br>Fax: (646) 720-9000<br>Attention: Daniel B. Zwirn<br>Perry A. Gruss<br>Residence: Delaware | $3,000,000 | |

**[Signature Page to Securities Purchase Agreement]**

| (1) | (2) | (3) | (4) |
|---|---|---|---|
| **Buyer** | **Address and Facsimile Number** | **Aggregate Principal Amount of Notes** | **Legal Representative's Address and Facsimile Number** |
| D.B. Zwirn Special Opportunities Fund, Ltd. | c/o D.B. Zwirn & Co., L.P.<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>Phone: (646) 720-9100<br>Fax: (646) 720-9000<br>Attention: Daniel B. Zwirn<br>Perry A. Gruss<br>Residence: Cayman Islands | $6,000,000 | |
| HCM/Z Special Opportunities LLC | c/o D.B. Zwirn & Co., L.P.<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>Phone: (646) 720-9100<br>Fax: (646) 720-9000<br>Attention: Daniel B. Zwirn<br>Perry A. Gruss<br>Residence: Cayman Islands | $6,000,000 | |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Note |
| Exhibit B | Form of Registration Rights Agreement |
| Exhibit C | Form of Irrevocable Transfer Agent Instructions |
| Exhibit D | Form of Company Counsel Opinion |
| Exhibit E | Form of Secretary's Certificate |
| Exhibit F | Form of Officer's Certificate |
| Exhibit G | Form of Redemption Account Control Agreement |
| Exhibit H | Form of Williams Acquisition Account Control Agreement |
| Exhibit I | Form of Subsidiary Guaranty |

## SCHEDULES

| | |
|---|---|
| Schedule 3(a) | Subsidiaries |
| Schedule 3(j) | Application of Takeover Protections; Rights Agreement |
| Schedule 3(l) | Absence of Certain Changes |
| Schedule 3(n) | Conduct of Business; Regulatory Permits |
| Schedule 3(q) | Transactions with Affiliates |
| Schedule 3(r) | Equity Capitalization |
| Schedule 3(s) | Indebtedness and Other Contracts |
| Schedule 3(t) | Litigation |
| Schedule 3(v) | Employee Relations |
| Schedule 3(w) | Title |
| Schedule 3(x) | Intellectual Property |
| Schedule 3(cc) | Ranking of Notes |

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE HOLDER HEREOF, BY PURCHASING THIS SECURITY AGREES FOR THE BENEFIT OF GLOBAL POWER EQUIPMENT GROUP INC. THAT THIS SECURITY MAY NOT BE RESOLD OR OTHERWISE TRANSFERRED OTHER THAN (1) TO GLOBAL POWER EQUIPMENT GROUP INC. OR ANY AFFILIATE THEREOF, (2) IN A TRANSACTION ENTITLED TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF AVAILABLE), (3) SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE RESALE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (4) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT, SUBJECT, IN THE CASE OF CLAUSES (2) OR (4), TO THE RECEIPT BY GLOBAL POWER EQUIPMENT GROUP INC. OF AN OPINION OF COUNSEL OF RECOGNIZED STANDING OR SUCH OTHER EVIDENCE REASONABLY ACCEPTABLE TO GLOBAL POWER EQUIPMENT GROUP INC. THAT SUCH RESALE OR TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT. THIS LEGEND WILL BE REMOVED UPON THE EARLIER OF THE TRANSFER OF THIS NOTE PURSUANT TO CLAUSE (5) ABOVE OR UPON SATISFACTION OF THE HOLDING PERIOD UNDER RULE 144(K) UNDER THE SECURITIES ACT (OR ANY SUCCESSOR PROVISION).

THE NOTE REPRESENTED BY THIS CERTIFICATE (BUT NOT THE COMMON STOCK INTO WHICH THIS NOTE MAY BE CONVERTED) IS ALSO SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER SET FORTH IN SECTION 19 OF THIS NOTE.

THIS SECURITY MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THIS SECURITY; PROVIDED, HOWEVER, THAT IN ORDER TO MAKE ANY SALE, TRANSFER OR ASSIGNMENT OF THIS SECURITY, THE HOLDER AND ITS PLEDGEE MUST MAKE SUCH DISPOSITION IN ACCORDANCE WITH SECTION 19 OF THIS NOTE, IF APPLICABLE, AND IN ACCORDANCE WITH THE CONDITIONS SET FORTH ABOVE.

ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE, INCLUDING SECTIONS 3 AND 19 HEREOF. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE COMMON STOCK ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE

AMOUNTS SET FORTH ON THE FACE HEREOF PURSUANT TO SECTION 3(c)(iii) OF THIS NOTE.

THE HOLDER OF THIS SECURITY IS ENTITLED TO THE BENEFITS OF A REGISTRATION RIGHTS AGREEMENT DATED NOVEMBER 23, 2004 AND, BY ITS ACCEPTANCE HEREOF, AGREES TO BE BOUND BY AND TO COMPLY WITH THE PROVISIONS OF SUCH REGISTRATION RIGHTS AGREEMENT.

# GLOBAL POWER EQUIPMENT GROUP INC.

# CONVERTIBLE SENIOR SUBORDINATED NOTE

Issuance Date: November 23, 2004 Principal: U.S. $27,000,000

**FOR VALUE RECEIVED,** GLOBAL POWER EQUIPMENT GROUP INC., a Delaware corporation (the "**Company**"), hereby promises to pay to the order of KINGS ROAD INVESTMENTS LTD. or registered assigns ("**Holder**") the amount set out above as the Principal (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**") when due, whether upon the Maturity Date (as defined below), acceleration, redemption or otherwise (in each case in accordance with the terms hereof) and to pay interest ("**Interest**") on any outstanding Principal at the rate of 4.25% per annum, subject to periodic adjustment pursuant to Section 2 (the "**Interest Rate**"), from the date set out above as the Issuance Date (the "**Issuance Date**") until the same becomes due and payable, whether upon an Interest Date (as defined below), the Maturity Date, acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). This Convertible Senior Subordinated Note (including all Convertible Senior Subordinated Notes issued in exchange, transfer or replacement hereof, this "**Note**") is one of an issue of Convertible Senior Subordinated Notes (collectively, the "**Notes**" **and such other Convertible Senior Subordinated Notes, the "Other Notes"**) issued on the Issuance Date pursuant to the Securities Purchase Agreement (as defined below). Certain capitalized terms are defined in Section 30.

(1) MATURITY. On the Maturity Date, the Holder shall surrender this Note to the Company and the Company shall pay to the Holder an amount in cash representing all outstanding Principal and accrued and unpaid Interest, if any. The "**Original Maturity Date**" shall be November 23, 2011, as may be adjusted at the option of the Holder (i) in the event that, and for so long as, an Event of Default (as defined in Section 4(a)) shall have occurred and be continuing or any event shall have occurred and be continuing which with the passage of time and the failure to cure would result in a Conversion Failure, (ii) through the date that is ten days after the consummation of a Change of Control (as defined in Section 5(a)) in the event that a Change of Control is publicly announced or a Change of Control Notice (as defined in Section 5(a)) is delivered prior to the Maturity Date and (iii) in the event that a Payment Blockage Notice (as defined in Section 14(c)) is received from the Agent, until the Payment Blockage Termination Date (as defined in Section 14(c)) (the Original Maturity Date as may be adjusted, the "**Maturity Date**").

(2) INTEREST; INTEREST RATE. Interest on this Note shall commence accruing on the Issuance Date and shall be computed on the basis of a 365-day year and actual days elapsed and shall be payable in arrears semi-annually and on the Maturity Date during the period beginning on the Issuance Date and ending on, and including, the Maturity Date (each, an "**Interest Date**") with the first Interest Date being May 23, 2005. Interest shall be payable on

each Interest Date in cash. Prior to the payment of Interest on an Interest Date, Interest on this Note shall accrue at the Interest Rate. From and after the occurrence of an Event of Default, the Interest Rate shall be increased to 9.25%. In the event that such Event of Default is subsequently cured, the adjustment referred to in the preceding sentence shall cease to be effective as of the date of such cure; provided that the Interest as calculated at such increased rate during the continuance of such Event of Default shall continue to apply to the extent relating to the days after the occurrence of such Event of Default through and including the date of cure of such Event of Default.

(3)    CONVERSION OF NOTES. This Note shall be convertible into shares of the Company's common stock, par value $0.01 per share (the "**Common Stock**"), on the terms and conditions set forth in this Section 3.

(a)    Conversion Right. Subject to the provisions of Section 3(d), at any time or times on or after the Issuance Date, the Holder shall be entitled to convert any portion of the outstanding and unpaid Conversion Amount (as defined below) into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall pay to the Holder an amount in cash equal to the value of such fractional share. The Company shall pay any and all documentary, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Company shall not, however, be required to pay any such tax which may be payable in respect of any transfer of Securities involved in the issue and delivery of the Common Stock in any name other than that of the Holder. Upon conversion, the Company shall pay all accrued and unpaid Interest on the Conversion Amount being converted.

(b)    Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i)    "**Conversion Amount**" means the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii)    "**Conversion Price**" means, as of any Conversion Date (as defined below) or other date of determination, and subject to adjustment as provided herein, $10.61.

(c)    Mechanics of Conversion.

(i)    Optional Conversion. To convert any Conversion Amount into shares of  Common Stock on any date (a "**Conversion Date**"), the Holder

shall (A) transmit by facsimile (or otherwise deliver), for receipt on or prior to 11:59 p.m., New York Time, on such date, a copy of an executed notice of conversion in the form attached hereto as Exhibit I (the "**Conversion Notice**") to the Company and (B) if required by Section 3(c)(iii), deliver this Note to a common carrier for delivery to the Company as soon as practicable on or following such date (or an indemnification undertaking with respect to this Note in the case of its loss, theft or destruction). On or before the close of the business on first Business Day following the date of receipt of a Conversion Notice, the Company shall transmit by facsimile a confirmation of receipt of such Conversion Notice to the Holder and the Company's transfer agent (the "**Transfer Agent**"). On or before the second Business Day following the date of receipt of a Conversion Notice (the "**Share Delivery Date**"), the Company shall (X) credit such aggregate number of shares of Common Stock to which the Holder shall be entitled to the Holder's or its designee's balance account with Depository Trust Company ("**DTC**") through its Deposit Withdrawal Agent Commission system or (Y) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to the address as specified in the Conversion Notice, a certificate, registered in the name of the Holder or its designee, for the number of shares of Common Stock to which the Holder shall be entitled. If this Note is physically surrendered for conversion as required by Section 3(c)(iii) and the outstanding Principal of this Note is greater than the Principal portion of the Conversion Amount being converted, then the Company shall as soon as practicable and in no event later than three Business Days after receipt of this Note and at its own expense, issue and deliver to the holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal not converted. The Person or Persons entitled to receive the shares of Common Stock issuable upon a conversion of this Note shall be treated for all purposes as the record holder or holders of such shares of Common Stock on the Conversion Date.

(ii)     Company's Failure to Timely Convert. If the Company shall fail (other then by operation of Section 3(d)) to issue a certificate to the Holder or credit the Holder's balance account with DTC for the number of shares of Common Stock to which the Holder is entitled upon conversion of any Conversion Amount on or prior to the date which is five (5) Business Days after the Conversion Date (a "**Conversion Failure**"), then (A) the Company shall pay damages to the Holder for each date of such Conversion Failure in an amount equal to 1.5% of the product of (I) the sum of the number of shares of Common Stock not issued to the Holder on or prior to the Share Delivery Date and to which the Holder is entitled, and (II) the Closing Sale Price of the Common Stock on the Share Delivery Date and (B) the Holder, upon written notice to the Company, may void its Conversion Notice with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Conversion Notice; provided that the voiding of any conversion notice shall halt

the accrual of any claims for damages pursuant to this Section 3(c)(ii); provided, further, that the voiding of a Conversion Notice shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice pursuant to this Section 3(c)(ii) or otherwise.

(iii)    Book-Entry. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless (A) the full Conversion Amount represented by this Note is being converted or (B) the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting physical surrender and reissue of this Note. The Holder and the Company shall maintain records showing the Principal converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(iv)    Pro Rata Conversion; Disputes. In the event that the Company receives a Conversion Notice from more than one holder of Notes for the same Conversion Date and the Company can convert some, but not all, of such portions of the Notes submitted for conversion, the Company, subject to Section 3(d), shall convert from each holder of Notes electing to have Notes converted on such date a pro rata amount of such holder's portion of its Notes submitted for conversion based on the principal amount of Notes submitted for conversion on such date by such holder relative to the aggregate principal amount of all Notes submitted for conversion on such date. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 25.

(d)    Limitations on Conversions.

(i)    Beneficial Ownership. The Company shall not effect any conversion of this Note, and the Holder of this Note shall not have the right to convert any portion of this Note pursuant to Section 3(a), to the extent that after giving effect to such conversion, the Holder (together with the Holder's affiliates) would beneficially own in excess of 4.99% of the number of shares of Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Holder and its affiliates shall include the number of shares of Common Stock issuable upon conversion of this Note with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted portion of this Note beneficially

owned by the Holder or any of its affiliates and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including, without limitation, any Other Notes or warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Holder or any of its affiliates. Except as set forth in the preceding sentence, for purposes of this Section 3(d)(i), beneficial ownership shall be calculated in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended. For purposes of this Section 3(d)(i), in determining the number of outstanding shares of Common Stock, the Holder may rely on the number of outstanding shares of Common Stock as reflected in (x) the Company's most recent Form 10-Q or Form 10-K, as the case may be, (y) a more recent public announcement by the Company or (z) any other notice by the Company or the Transfer Agent setting forth the number of shares of Common Stock outstanding. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including this Note, by the Holder or its affiliates since the date as of which such number of outstanding shares of Common Stock was reported.

(ii)     Principal Market Regulation. The Company shall not be obligated to issue any shares of Common Stock upon conversion of this Note if the issuance of such shares of Common Stock would exceed that number of shares of Common Stock which the Company may issue upon conversion of the Notes without breaching the Company's obligations under the rules or regulations of the Principal Market (the "**Exchange Cap**"), except that such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the holders of the Notes representing at least a majority of the principal amounts of the Notes then outstanding. Until such approval or written opinion is obtained, no purchaser of the Notes pursuant to the Securities Purchase Agreement (the "**Purchasers**") shall be issued, upon conversion of Notes, shares of Common Stock in an amount greater than the product of the Exchange Cap multiplied by a fraction, the numerator of which is the principal amount of Notes issued to such Purchaser pursuant to the Securities Purchase Agreement on the Issuance Date and the denominator of which is the aggregate principal amount of all Notes issued to the Purchasers pursuant to the Securities Purchase Agreement on the Issuance Date (with respect to each Purchaser, the "**Exchange Cap Allocation**"). In the event that any Purchaser shall sell or otherwise transfer any of such Purchaser's Notes, the transferee shall be allocated a pro rata portion of such Purchaser's Exchange

Cap Allocation, and the restrictions of the prior sentence shall apply to such transferee with respect to the portion of the Exchange Cap Allocation allocated to such transferee. In the event that any holder of Notes shall convert all of such holder's Notes into a number of shares of Common Stock which, in the aggregate, is less than such holder's Exchange Cap Allocation, then the difference between such holder's Exchange Cap Allocation and the number of shares of Common Stock actually issued to such holder shall be allocated to the respective Exchange Cap Allocations of the remaining holders of Notes on a pro rata basis in proportion to the aggregate principal amount of the Notes then held by each such holder.

(4) RIGHTS UPON EVENT OF DEFAULT.

(a) Event of Default. Each of the following events shall constitute an **"Event of Default"**:

(i) the failure of the applicable Registration Statement required to be filed pursuant to the Registration Rights Agreement to be declared effective by the SEC on or prior to the date that is 60 days (or in the event the SEC determines to review the Registration Statement, 150 days) after the Effectiveness Deadline (as defined in the Registration Rights Agreement), or, while the applicable Registration Statement is required to be maintained effective pursuant to the terms of the Registration Rights Agreement, the effectiveness of the applicable Registration Statement lapses for any reason (including, without limitation, the issuance of a stop order) or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of 10 consecutive Trading Days or for more than an aggregate of 30 Trading Days in any 365-day period (other than days during an Allowable Grace Period (as defined in the Registration Rights Agreement));

(ii) the suspension from trading or failure of the Common Stock to be listed on the Principal Market or an Eligible Market for a period of five consecutive Trading Days or for more than an aggregate of seven Trading Days in any 365-day period;

(iii) the Company's (A) failure to cure a Conversion Failure by delivery of the required number of shares of Common Stock within ten (10) Business Days after the applicable Conversion Date or (B) notice, written or oral, to any holder of the Notes, including by way of public announcement or through any of its agents, at any time, of its intention not to comply with a request for conversion of any Notes into shares of Common Stock that is tendered in accordance with the provisions of the Notes;

(iv)    at any time following the twentieth consecutive Business Day that the Holder's Authorized Share Allocation (as defined in Section 12) is less than the number of shares of Common Stock that the Holder would be entitled to receive upon a conversion of the full Conversion Amount of this Note (without regard to any limitations on conversion set forth in Section 3(d) or otherwise);

(v)    the Company's failure to pay to the Holder any amount of Principal, Interest or other amounts when and as due under this Note or any other Transaction Document (as defined in the Securities Purchase Agreement) to which the Holder is a party, except, in the case of a failure to pay Interest when and as due, in which case only if such failure continues for a period of at least five days;

(vi)    any payment default or non-payment default, provided such non-payment default continues for a period of at least thirty (30) consecutive days after the earlier to occur of (i) any executive officer of the Company becoming aware of such default and (ii) the receipt of written notice from the Holder of such default, under or acceleration prior to maturity of any Indebtedness (as defined below) of the Company or any of its Subsidiaries (as defined in Section 3(a) of the Securities Purchase Agreement) with an unpaid principal amount in excess of $5,000,000 at the time of such default or acceleration other than with respect to any Other Notes;

(vii)    the Company or any of its Subsidiaries (other than an "Immaterial Subsidiary" as defined in the Senior Credit Agreement), pursuant to or within the meaning of Title 11, U.S. Code (the "**Bankruptcy Code**"), or any similar Federal or state law for the relief of debtors (collectively, "**Bankruptcy Law**"), (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a receiver, trustee, assignee, liquidator or similar official (a "**Custodian**") for all or a material portion of its property, (D) makes a general assignment for the benefit of its creditors or (E) admits in writing that it is generally unable to pay its debts as they become due;

(viii)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that (A) is for relief against the Company or any of its Subsidiaries in an involuntary case which remains undischarged and unstayed for sixty (60) calendar days, (B) appoints a Custodian of the Company or any of its Subsidiaries or (C) orders the liquidation of the Company or any of its Subsidiaries;

(ix)    a final judgment or judgments for the payment of money aggregating in excess of $5,000,000 are rendered against the Company or any of

its Subsidiaries (other than any Immaterial Subsidiary) and which judgments are not, within 60 days after the entry thereof, bonded, discharged, vacated or stayed pending appeal, or are not discharged within 60 days after the expiration of such stay; provided, however, that any judgment which is covered by insurance or an indemnity from a credit worthy party shall not be included in calculating the $5,000,000 amount set forth above so long as the Company provides the Holder a written statement from such insurer or indemnity provider (which written statement shall be reasonably satisfactory to the Holder) to the effect that such judgment is covered by insurance or an indemnity and the Company will receive the proceeds of such insurance or indemnity within 30 days of the issuance of such judgment;

(x) the Company materially breaches any representation, warranty, covenant or other term or condition of this Note, the Other Notes, or any other Transaction Document to which the Holder is a party, except, in the case of a breach of a covenant or other term or condition which is curable, only if such breach continues for a period of at least thirty (30) consecutive days after the earlier to occur of (i) any executive officer of the Company becoming aware of such breach and (ii) the receipt of written notice from the Holder of such breach;

(xi) any breach or failure in any respect to comply with Section 16 of this Note; or

(xii) any Event of Default (as defined in the Other Notes) occurs with respect to any Other Notes.

(b) Redemption Right Upon Event of Default. Promptly after the occurrence of an Event of Default with respect to this Note or any Other Note, the Company shall deliver written notice thereof via facsimile and overnight courier (an "**Event of Default Notice**") to the Holder and the holders of the Other Notes. At any time after the earlier of the Holder's receipt of an Event of Default Notice and the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of the Notes that the Required Holders are electing to cause to be redeemed. The portion of this Note subject to redemption by the Company pursuant to this Section 4(b) shall be redeemed by the Company at a price equal to the greater of (i) the product of (x) the Conversion Amount to be redeemed plus accrued and unpaid interest and (y) the Event of Default Redemption Premium and (ii) the product of (A) the Conversion Rate with respect to such Conversion Amount in effect at such time as the Holder delivers an Event of Default Redemption Notice and (B) the Closing Sale Price of the Common Stock on the date immediately preceding such Event of Default (the "**Event of Default Redemption Price**"). Redemptions required by this Section 4(b) shall be made in accordance with the provisions of Section 13.

(5) RIGHTS UPON CHANGE OF CONTROL.

(a) Change of Control. Each of the following events shall constitute a "**Change of Control**":

(i) any sale of all or substantially all of the assets of the Company to a third party;

(ii) any merger of the Company with or into another corporation in which holders of Common Stock immediately prior to the consummation of the merger do not control 50% of the common stock of the surviving corporation; or

(iii) the acquisition by any "person" or "group" of persons (as such terms are used in Section 13(d) and 14(d) of the Securities and Exchange Act of 1934, as amended, and the related regulations) who have an expressed intent to control the affairs of the Company of more than 50% of the outstanding Common Stock of the Company.

No sooner than 15 days nor later than 10 days prior to the consummation of a Change of Control of which the Company is aware, but not prior to the public announcement of such Change of Control, the Company shall deliver written notice thereof via facsimile and overnight courier to the Holder (a "**Change of Control Notice**"); provided that the Company shall not at any time be obligated to deliver a Change of Control Notice if the delivery of such notice would, in the Company's reasonable judgment, require the premature disclosure of a potential Change of Control transaction or material non-public information with respect to such Change of Control; and provided further that the Company shall deliver a Change of Control Notice no later than three Business Days after it becomes aware of the occurrence of a Change of Control.

(b) Assumption. On or prior to the consummation of any Change of Control, the Company will secure from any Person purchasing the Company's assets or Common Stock or any successor resulting from such Change of Control (in each case, an "**Acquiring Entity**") a written agreement to guaranty the obligations of the Company under the Notes and the Other Notes or assume the obligations of the Company under this Note and the Other Notes. In addition if the common stock of the Acquiring Entity is not listed or traded on an Eligible Market (a "Public Acquiring Entity"), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon a conversion of this Note, in lieu of the shares of Common Stock which would have been otherwise receivable upon such conversion, such securities or other assets received by the holders of Common Stock in connection with the consummation of such Change of Control in such amounts as the Holder would have been entitled to receive had this Note initially been issued with conversion rights for the form of such consideration (as opposed to shares of Common Stock) at a conversion rate for such consideration commensurate with the Conversion Rate as in effect immediately prior to the Change of Control. In the event that the Acquiring Entity is a Public Acquiring Entity, then in

addition to the guaranty provided for in the first sentence of this Section 5(b), the Company will ensure that such Public Acquiring Entity delivers to each holder of Notes in exchange for such Notes, a security of the Public Acquiring Entity evidenced by a written instrument substantially similar in form and substance to the Notes, including, without limitation, having a principal amount, interest rate, rank, security interest, conversion price and conversion rights equivalent to those governing the Notes held by such holder, such that this Note shall thereafter be convertible into such common stock at an initial conversion rate equal to the product of (x) the Conversion Rate then in effect and (y) a fraction the numerator of which is the closing price of the Common Stock on the day immediately preceding the consummation of the Change of Control and the denominator of which is the closing price of such Public Acquiring Entity's common stock on the day immediately prior to the consummation of the Change of Control. In the event that an Acquiring Entity is directly or indirectly controlled by a company or entity whose common stock is listed, designated or quoted on a securities exchange or trading market, then such Person shall be deemed to be the Public Acquiring Entity for all purposes hereof. The provisions of this Section shall apply similarly and equally to successive Changes of Control and shall be applied without regard to any limitations on the conversion or redemption of this Note.

(c)    Redemption Right Upon Change of Control. At any time during the period beginning after the Holder's receipt of a Change of Control Notice and ending on the date of the consummation of such Change of Control (or, in the event a Change of Control Notice is not delivered at least 10 days prior to the occurrence of a Change of Control, at any time on or after the date on which such Change of Control Notice is delivered and ending 10 days after the delivery of such Change of Control Notice), the Holder may require the Company to redeem all or any portion of this Note by delivering written notice thereof ("**Change of Control Redemption Notice**") to the Company, which Change of Control Redemption Notice shall indicate the Conversion Amount the Holder is electing to redeem; provided, however, that the Company shall not be under any obligation to redeem all or any portion of this Note or to deliver the applicable Change of Control Redemption Price unless and until the applicable Change of Control is consummated; provided, further, that the Company will effect any redemption in compliance with applicable securities laws, including, without limitation, Section 14(e) of the Securities Exchange Act of 1934, as amended. If the Change of Control transaction is terminated prior to its effective date, the surrender for redemption and the right to redeem pursuant to this Section 5(c) will be revoked and the Notes tendered pursuant to this Section 5(c) and Section 13 will be returned to the Holder. The portion of this Note subject to redemption pursuant to this Section 5(c) shall be redeemed by the Company at a price equal to the greater of (i) the product of (x) the Change of Control Amount and (y) the quotient determined by dividing (A) the Closing Sale Price of the Common Stock immediately following the public announcement of such proposed Change of Control by (B) the Conversion Price and (ii) the product of (A) the Change of Control Redemption Premium and (B) the Conversion Amount being redeemed, in the case of each of clause (i) and clause (ii) plus accrued and unpaid interest (the "**Change of Control Redemption Price**"). Redemptions required by this Section 5(c) shall be made in accordance with the provisions of Section 13 and shall have priority to payments to stockholders in connection with a Change of Control. "**Change of Control Amount**" means (x) in the case that the common stock of the Acquiring Entity is not listed or traded on an Eligible

Market, the product of (A) the Conversion Amount being redeemed and (B) the Change of Control Redemption Premium and (y) in all other cases, the Conversion Amount being redeemed. "**Eligible Market**" means the Principal Market, The New York Stock Exchange, Inc., the Nasdaq National Market, The Nasdaq SmallCap Market, the American Stock Exchange, Inc., the London Stock Exchange plc or the Tokyo Stock Exchange.

(6)     RIGHTS UPON TRIGGERING EVENT.

(a)     Triggering Event.  If the Company incurs any indebtedness for borrowed money other than Permitted Indebtedness and (a) at the time of such incurrence, the trailing twelve months' Consolidated EBITDA is not greater than or equal to $30,000,000, or (b) as a result of such incurrence, the Consolidated Leverage Ratio exceeds 4.75 to 1.0, then a "**Triggering Event**" shall be deemed to have occurred.

(b)     Removal of Restriction.  If at any time after the Issuance Date and prior to the occurrence of a Triggering Event, the Weighted Average Price of the Common Stock equals or exceeds 150% of the Conversion Price as adjusted from time to time hereunder for each of 15 out of 30 consecutive Trading Days, then the provisions of this Section 6, will cease to be applicable and have no further effect.

(c)     Holder's Redemption Right Upon Triggering Event.  Promptly after the occurrence of a Triggering Event, but in no event later than 30 days thereafter, the Company shall deliver written notice thereof via facsimile and overnight courier (a "**Triggering Event Notice**") to the Holder.  At any time during the 30 days following receipt of a Triggering Event Notice, the Holder may require the Company to redeem all or any portion of this Note by delivering written notice thereof (a "**Triggering Event Redemption Notice**") to the Company, which Triggering Event Redemption Notice shall indicate the portion of this Note the Holder is electing to redeem.  The portion of this Note subject to redemption by the Company pursuant to this Section 6(c) shall be redeemed by the Company at a price equal to the Conversion Amount plus accrued and unpaid interest ("**Triggering Event Redemption Price**").  Redemptions required by this Section 6(c) shall be made in accordance with the provisions of Section 13.

(7)     RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a)     Purchase Rights.  If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate securities or other property which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately before the date on which a record is taken for the grant, issuance or sale of such

Purchase Rights, or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(b) Other Corporate Events. Prior to the consummation of any recapitalization, reorganization, consolidation, merger, spin-off or other business combination (other than a Change of Control) pursuant to which holders of Common Stock are entitled to receive securities or other assets with respect to or in exchange for Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to insure that the Holder will thereafter have the right to receive upon a conversion of this Note, (i) in addition to the shares of Common Stock receivable upon such conversion, such securities or other assets to which the Holder would have been entitled with respect to such shares of Common Stock had such shares of Common Stock been held by the Holder upon the consummation of such Corporate Event (without taking into account any limitations or restrictions on the convertibility of this Note) or (ii) in lieu of the shares of Common Stock otherwise receivable upon such conversion, such securities or other assets received by the holders of Common Stock in connection with the consummation of such Corporate Event in such amounts as the Holder would have been entitled to receive had this Note initially been issued with conversion rights for the form of such consideration (as opposed to shares of Common Stock) at a conversion rate for such consideration commensurate with the Conversion Rate. Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Required Holders. The provisions of this Section shall apply similarly and equally to successive Corporate Events and shall be applied without regard to any limitations on the conversion or redemption of this Note.

(8) RIGHTS UPON ISSUANCE OF OTHER SECURITIES.

(a) Adjustment of Conversion Price upon Issuance of Common Stock. If and whenever prior to the first anniversary of the Issuance Date, the Company issues or sells, or in accordance with this Section 8(a) is deemed to have issued or sold, any shares of Common Stock (including the issuance or sale of shares of Common Stock owned or held by or for the account of the Company, but excluding shares of Common Stock deemed to have been issued or sold by the Company in connection with any Excluded Security) for a consideration per share (the "**New Securities Issuance Price**") less than a price (the "**Applicable Price**") equal to the Conversion Price in effect immediately prior to such issue or sale (the foregoing a "**Dilutive Issuance**"), then immediately after such Dilutive Issuance, the Conversion Price then in effect shall be reduced to an amount (rounded to the nearest cent) equal to the product of (A) the Conversion Price in effect immediately prior to such Dilutive Issuance and (B) the quotient determined by dividing (1) the sum of (I) the product derived by multiplying the Conversion Price in effect immediately prior to such Dilutive Issuance and the number of shares of Common Stock Deemed Outstanding immediately prior to such Dilutive Issuance plus (II) the consideration, if any, received or deemed received by the Company upon such Dilutive Issuance, by (2) the product derived by multiplying (I) the Conversion Price in effect immediately prior to such Dilutive Issuance by (II) the number of shares of Common Stock Deemed Outstanding immediately after such Dilutive Issuance. For purposes of determining the adjusted Conversion Price under this Section 8(a), the following shall be applicable:

(i) Issuance of Options. If the Company in any manner grants or sells any Option and the lowest price per share for which one share of Common Stock is issuable upon the exercise of such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the granting or sale of such Option for such price per share. For purposes of this Section 8(a)(i), the "lowest price per share for which one share of Common Stock is issuable upon the exercise of any such Option or upon conversion or exchange or exercise of any Convertible Securities issuable upon exercise of such Option" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon granting or sale of the Option, upon exercise of the Option and upon conversion or exchange or exercise of any Convertible Security issuable upon exercise of such Option. No further adjustment of the Conversion Price shall be made upon the actual issuance of such Common Stock or of such Convertible Securities upon the exercise of such Options or upon the actual issuance of such Common Stock upon conversion or exchange or exercise of such Convertible Securities.

(ii) Issuance of Convertible Securities. If the Company in any manner issues or sells any Convertible Securities and the lowest price per share for which one share of Common Stock is issuable upon such conversion or exchange or exercise thereof is less than the Applicable Price, then such share of Common Stock shall be deemed to be outstanding and to have been issued and sold by the Company at the time of the issuance of sale of such Convertible Securities for such price per share. For the purposes of this Section 8(a)(ii), the "price per share for which one share of Common Stock is issuable upon such conversion or exchange or exercise" shall be equal to the sum of the lowest amounts of consideration (if any) received or receivable by the Company with respect to any one share of Common Stock upon the issuance or sale of the Convertible Securities and upon the conversion or exchange or exercise of such Convertible Securities. No further adjustment of the Conversion Price shall be made upon the actual issuance of such Common Stock upon conversion or exchange or exercise of such Convertible Securities, and if any such issue or sale of such Convertible Securities is made upon exercise of any Options for which adjustment of the Conversion Price had been or are to be made pursuant to other provisions of this Section 8(a), no further adjustment of the Conversion Price shall be made by reason of such issue or sale.

(iii) Change in Option Price or Rate of Conversion. If the purchase price provided for in any Options, the additional consideration, if any, payable upon the issue, conversion, exchange or exercise of any Convertible Securities, or the rate at which any Convertible Securities are convertible into or

exchangeable or exercisable for Common Stock changes at any time, the Conversion Price in effect at the time of such change shall be adjusted to the Conversion Price which would have been in effect at such time had such Options or Convertible Securities provided for such changed purchase price, additional consideration or changed conversion rate, as the case may be, at the time initially granted, issued or sold. For purposes of this Section 8(a)(iii), if the terms of any Option or Convertible Security that was outstanding as of the Issuance Date are changed in the manner described in the immediately preceding sentence, then such Option or Convertible Security and the Common Stock deemed issuable upon exercise, conversion or exchange thereof shall be deemed to have been issued as of the date of such change. No adjustment shall be made if such adjustment would result in an increase of the Conversion Price then in effect.

(iv) Calculation of Consideration Received. In case any Option is issued in connection with the issue or sale of other securities of the Company, together comprising one integrated transaction in which no specific consideration is allocated to such Options by the parties thereto, the Options will be deemed to have been issued for a consideration of $.01. If any Common Stock, Options or Convertible Securities are issued or sold or deemed to have been issued or sold for cash, the consideration received therefor will be deemed to be the gross amount received by the Company therefor. If any Common Stock, Options or Convertible Securities are issued or sold for a consideration other than cash, the amount of the consideration other than cash received by the Company will be the fair value of such consideration, except where such consideration consists of securities, in which case the amount of consideration received by the Company will be the Closing Sale Price of such securities on the date of receipt. If any Common Stock, Options or Convertible Securities are issued to the owners of the non-surviving entity in connection with any merger in which the Company is the surviving entity, the amount of consideration therefor will be deemed to be the fair value of such portion of the net assets and business of the non-surviving entity as is attributable to such Common Stock, Options or Convertible Securities, as the case may be. The fair value of any consideration other than cash or securities will be determined jointly by the Company and the Required Holders. If such parties are unable to reach agreement within ten days after the occurrence of an event requiring valuation (the "**Valuation Event**"), the fair value of such consideration will be determined within five Business Days after the tenth day following the Valuation Event by an independent, reputable appraiser jointly selected by the Company and the Required Holders. The determination of such appraiser shall be deemed binding upon all parties absent manifest error and the fees and expenses of such appraiser shall be borne by the Company.

(v) Record Date. If the Company takes a record of the holders of Common Stock for the purpose of entitling them (A) to receive a dividend or other distribution payable in Common Stock, Options or in Convertible Securities

or (B) to subscribe for or purchase Common Stock, Options or Convertible Securities, then such record date will be deemed to be the date of the issue or sale of the shares of Common Stock deemed to have been issued or sold upon the declaration of such dividend or the making of such other distribution or the date of the granting of such right of subscription or purchase, as the case may be; provided that if, after the occurrence of the record date, the Company increases or reduces the number of shares of Common Stock issued or deemed issued or fails to consummate the actual or deemed issuance that was the subject of the record date, the Conversion Price will thereafter be readjusted up or down to reflect the actual number of shares of Common Stock issued or deemed issued in connection with such record date.

(b)     Adjustment of Conversion Price upon Subdivision or Combination of Common Stock. If the Company at any time on or after the Subscription Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Subscription Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(c)     Other Events. If any event occurs of the type contemplated by the provisions of this Section 8 but not expressly provided for by such provisions (including, without limitation, the granting of stock appreciation rights, phantom stock rights or other rights with equity features), then the Company's Board of Directors will make an appropriate adjustment in the Conversion Price so as to protect the rights of the Holder under this Note; provided that no such adjustment will increase the Conversion Price as otherwise determined pursuant to this Section 8.

(9)     COMPANY'S RIGHT OF OPTIONAL REDEMPTION.

(a)     Company Optional Redemption. If at any time from and after the 3rd anniversary of the Issuance Date, the Weighted Average Price of the Common Stock exceeds 165% of the Conversion Price then in effect for each of 20 out of 30 consecutive Trading Days (the "**Company Optional Redemption Measuring Period**"), the Company shall have the right to redeem for cash any portion of the Notes then outstanding (a "**Company Optional Redemption**"). The Company may exercise its right of redemption under this Section 9 by delivering a written notice thereof by facsimile and overnight courier to all of the holders of Notes and the Transfer Agent (the "**Company Optional Redemption Notice**"). The Company Optional Redemption Notice shall be irrevocable; provided, that, a Company Optional Redemption Notice which conditions the Company Optional Redemption upon the consummation of a related transaction or refinancing may be revoked at the discretion of the Company if such transaction is not consummated within the time period provided by such notice.

This Note shall be redeemed by the Company pursuant to this Section 9 at a price equal to the Conversion Amount plus accrued and unpaid interest (the "**Company Optional Redemption Price**"). Notwithstanding the foregoing, the Holder may continue to convert this Note or portion thereof that is called for redemption into Common Stock pursuant to Section 3(a) on or prior to the Business Day immediately preceding the Company Optional Redemption Date (as defined below).

(b) Company Optional Redemption Notice. If the Company elects to cause a redemption of all or any portion of this Note pursuant to Section 9(a), then it must make simultaneously a pro rata redemption in respect of all Other Notes. The Company Optional Redemption Notice shall state (A) the Trading Day selected for the Company Optional Redemption in accordance with this Section 9, which Trading Day shall be at least 20 Business Days but not more than 60 Business Days following receipt of the Company Optional Redemption Notice (the "**Company Optional Redemption Date**"), (B) that all or a portion of the outstanding Notes have been called for optional redemption pursuant to this Section 9 (and analogous provisions under the Other Notes), and (C) the Company Optional Redemption Price to be paid to such Holder as of the Company Optional Redemption Date. All Conversion Amounts converted by the Holder after delivery of the Company Optional Redemption Notice Date shall reduce the Conversion Amount of this Note required to be redeemed on the Company Optional Redemption Date.

(10) HOLDER'S RIGHT OF OPTIONAL REDEMPTION.

(a) Holder Redemption Option. From and after the 5th anniversary of the Issuance Date, the Holder shall have the right, in its sole discretion, to require that the Company redeem all or any portion of this Note (a "**Holder Optional Redemption**") by delivering written notice thereof (a "**Holder Optional Redemption Notice**"). The Holder Optional Redemption Notice shall indicate the Conversion Amount the Holder is electing to redeem. The portion of this Note subject to redemption pursuant to this Section 10(a) shall be redeemed by the Company at a price equal to the Conversion Amount being redeemed plus accrued and unpaid interest (the "**Holder Optional Redemption Price**"). The Holder Optional Redemption Price shall be paid on the twenty-fifth (25th) Business Day after the date of the Holder Optional Redemption Notice (the "**Holder Optional Redemption Date**"). Within one business Day of receipt of a Holder Optional Redemption Notice, the Company shall inform in writing all holders of Other Notes that such a Holder Optional Redemption Notice has been received by the Company. The Company may elect, by written notice (the "**Company Redemption Share Notice**") delivered to the Holder, to pay up to 50% of the Holder Optional Redemption Price in shares of Common Stock (the "**Optional Redemption Shares**") by dividing the amount to be paid in shares of Common Stock set forth in the Company Redemption Share Notice by the product of 94% and the Weighted Average Price of the Common Stock for the 20 Trading Day period immediately preceding the Holder Optional Redemption Date. The Company Redemption Share Notice must be delivered to the Holder within three (3) Business Days of receipt of a Holder Optional Redemption Notice. If the Company receives Holder Optional Redemption Notices from one or more holders of Other Notes under analogous

provisions of the Other Notes, the Company shall redeem the same percentage of the Holder Optional Redemption Price in Optional Redemption Shares with respect to such Other Notes as designated in any Company Redemption Share Notice delivered under this Note. If any of the Holder Optional Redemption Price is to be paid in Optional Redemption Shares, then, on the Holder Optional Redemption Date, the Company shall (X) credit such aggregate number of Optional Redemption Shares to which the Holder shall be entitled to the Holder's or its designee's balance account with DTC through its Deposit Withdrawal Agent Commission system or (Y) if the Transfer Agent is not participating in the DTC Fast Automated Securities Transfer Program, issue and deliver to such address of the Holder as is set forth in the Securities Purchase Agreement or such other address as specified by the Holder in writing to the Company at least two (2) Business Days prior to the Holder Optional Redemption Date, a certificate, registered in the name of the Holder or its designee, for the number of Optional Redemption Shares to which the Holder shall be entitled hereunder. Notwithstanding the foregoing, the Company shall not be entitled to pay any of the Holder Optional Redemption Price in Optional Redemption Shares and shall be required to pay such Holder Optional Redemption Price entirely in cash if the Equity Conditions (as defined in Section 30) are not satisfied (or waived by the Holder). Redemptions required by this Section 10(a) shall be made in accordance with the provisions of Section 13.

(b)     Holder Collateral Redemption Option.  At any time during the period beginning six months after the Issuance Date and until the date that is the six month anniversary of the Effective Date (as defined in the Registration Rights Agreement), the Holder shall have the right to require that the Company redeem up to that portion of the Conversion Amount equal to the product of (x) $9,000,000 and (y) (1) the Conversion Amount divided by (2) the sum of the Conversion Amount of this Note on the Issuance Date and the aggregate of all Conversion Amounts (as defined in the Other Notes) of all Other Notes on their respective Issuance Dates (as defined in the Other Notes) plus accrued and unpaid interest on this Note (the "**Holder Collateral Redemption Price**") by delivering written notice of such election (the "**Holder Collateral Redemption Notice**") to the Company. Within five (5) Business Days after the date of the Holders Collateral Redemption Notice (the "**Holder Collateral Redemption Date**"), the Company shall deliver by wire transfer of immediately available funds to the account of the Holder the Holder Collateral Redemption Price. Redemptions required by this Section 10(b) shall be made in accordance with the provisions of Section 13.

(11)     NONCIRCUMVENTION.  The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(12)     RESERVATION OF AUTHORIZED SHARES.

(a)     Reservation.  The Company shall initially reserve out of its authorized and unissued Common Stock a number of shares of Common Stock for each of the

Notes equal to 120% of the Conversion Rate with respect to the Conversion Amount of each such Note as of the Issuance Date. Thereafter, the Company, so long as any of the Notes are outstanding, shall take all action necessary to reserve and keep available out of its authorized and unissued Common Stock, solely for the purpose of effecting the conversion of the Notes, 105% of the number of shares of Common Stock as shall from time to time be necessary to effect the conversion of all of the Notes then outstanding; provided that at no time shall the number of shares of Common Stock so reserved be less than the number of shares required to be reserved by the previous sentence (without regard to any limitations on conversions) (the "**Required Reserve Amount**"). The initial number of shares of Common Stock reserved for conversion of the Notes and each increase in the number of shares of Common Stock so reserved shall be allocated pro rata among the holders of the Notes based on the principal amount of the Notes held by each holder at the time of the Issuance Date or increase in the number of reserved shares, as the case may be (the "**Authorized Share Allocation**"). In the event that a holder shall sell or otherwise transfer any of such holder's Notes, each transferee shall be allocated a pro rata portion of such holder's Authorized Share Allocation. Any shares of Common Stock reserved and allocated to any Person which ceases to hold any Notes shall be allocated to the remaining holders of Notes, pro rata based on the principal amount of the Notes then held by such holders.

(b) Insufficient Authorized Shares. If at any time while any of the Notes remain outstanding the Company does not have a sufficient number of authorized and unreserved shares of Common Stock to satisfy its obligation to reserve for issuance upon conversion of the Notes at least a number of shares of Common Stock equal to the Required Reserve Amount (an "**Authorized Share Failure**"), then the Company shall immediately use commercially reasonable efforts take all action necessary to increase the Company's authorized shares of Common Stock to an amount sufficient to allow the Company to reserve the Required Reserve Amount for the Notes then outstanding. Without limiting the generality of the foregoing sentence, as soon as practicable after the date of the occurrence of an Authorized Share Failure, but in no event later than 60 days after the occurrence of such Authorized Share Failure, the Company shall hold a meeting of its stockholders for the approval of an increase in the number of authorized shares of Common Stock. In connection with such meeting, the Company shall provide each stockholder with a proxy statement and shall use its commercially reasonable efforts to solicit its stockholders' approval of such increase in authorized shares of Common Stock and to cause its Board of Directors to recommend to the stockholders that they approve such proposal.

(13) HOLDER'S REDEMPTIONS.

(a) Mechanics. In the event that the Holder has sent an Event of Default Redemption Notice, a Change of Control Redemption Notice, a Triggering Event Redemption Notice, a Holder Optional Redemption Notice or a Holder Collateral Redemption Notice to the Company pursuant to Section 4(b), Section 5(c), Section 6(c), Section 10(a) or Section 10(b), respectively (each, a "**Redemption Notice**"), the Holder shall promptly submit this Note to the Company. The Company shall deliver the applicable Event of Default Redemption Price, Change of Control Redemption Price, Triggering Event Redemption Price,

Holder Optional Redemption Price or Holder Collateral Redemption Price to the Holder within ten (10) Business Days after the Company's receipt of the Holder's Event of Default Redemption Notice, Change of Control Redemption Notice, Triggering Event Redemption Notice, Holder Optional Redemption Notice or Holder Collateral Redemption Notice. If the Holder has submitted a Change of Control Redemption Notice in accordance with Section 5(c), the Company shall deliver the applicable Change of Control Redemption Price to the Holder concurrently with the consummation of such Change of Control if such notice is received prior to the consummation of such Change of Control and within five Business Days after the Company's receipt of such notice otherwise. In the event of a redemption of less than all of the Conversion Amount of this Note, the Company shall promptly cause to be issued and delivered to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal which has not been redeemed. In the event that the Company does not pay the Event of Default Redemption Price, the Change of Control Redemption Price, Triggering Event Redemption Price, Holder Optional Redemption Price or Holder Collateral Redemption Price (each, a "**Redemption Price**"), as applicable, to the Holder (or deliver any Common Stock to be issued pursuant to a Redemption Notice) within the time period required, at any time thereafter and until the Company pays such unpaid Redemption Price (and issues any Common Stock required pursuant to a Redemption Notice) in full, the Holder shall have the option, in lieu of redemption, to require the Company to promptly return to the Holder all or any portion of this Note representing the Conversion Amount that was submitted for redemption and for which the applicable Redemption Price (or any Common Stock required to be issued pursuant to a Redemption Notice) has not been paid. Upon the Company's receipt of such notice, (x) the Redemption Notice shall be null and void with respect to such Conversion Amount and (y) the Company shall immediately return this Note, or issue a new Note (in accordance with Section 20(d)) to the Holder representing such Conversion Amount.

(b) Redemption by Other Holders. Upon the Company's receipt of notice from any of the holders of the Other Notes for redemption or repayment as a result of an event or occurrence substantially similar to the events or occurrences described in Section 4(b), Section 5(c), Section 6(c), Section 10(a) or Section 10(b) (each, an "**Other Redemption Notice**"), the Company shall immediately forward to the Holder by facsimile a copy of such notice. If the Company receives a Redemption Notice and one or more Other Redemption Notices during the seven Business Day period beginning on and including the date which is three Business Days prior to the Company's receipt of the Holder's Redemption Notice and ending on and including the date which is three Business Days after the Company's receipt of the Holder's Redemption Notice and the Company is unable to redeem all principal, interest and other amounts designated in such Redemption Notice and such Other Redemption Notices received during such seven Business Day period, then the Company shall redeem a pro rata amount from each holder of the Notes (including the Holder) based on the aggregate principal amount of the Notes submitted for redemption pursuant to such Redemption Notice and such Other Redemption Notices received by the Company during such seven Business Day period.

(14) SUBORDINATION TO SENIOR BANK INDEBTEDNESS.

(a) Agreement to Subordinate. By issuing this Note, the Company for itself and its successors and assigns, and for its Subsidiaries and the successors and assigns of such Subsidiaries, agrees, and the Holder, by its acceptance of this Note, shall be deemed to have agreed, that this Note shall be subject to the provisions of this Section 14 and, to the extent and in the manner hereinafter set forth in this Section 14, (i) the indebtedness represented by this Note and the payment of the Principal and Interest, any redemption amount, liquidated damages, fees, expenses or any other amounts in respect of this Note and (ii) the obligations, including the Guaranteed Obligations (as defined in the Subsidiary Guaranty Agreement), of certain Subsidiaries of the Company under the Subsidiary Guaranty Agreement (collectively, the "**Subordinated Indebtedness**") are subordinate in right of payment to the prior payment in full in cash of all Senior Bank Indebtedness now outstanding or hereinafter incurred. The Holder agrees not to initiate, prosecute or participate in any claim, action or other proceeding challenging the enforceability, validity, perfection or priority of the Senior Bank Indebtedness or any liens and security interests securing the Senior Bank Indebtedness.

(b) Liquidation; Dissolution; Bankruptcy.

(i) The holders of Senior Bank Indebtedness shall be entitled to receive payment in full in cash of all Senior Bank Indebtedness (including interest after the commencement of any proceeding under any Bankruptcy Law at the rate specified in the documentation for the applicable Senior Bank Indebtedness) before the Holder shall be entitled to receive any payment with respect to the Subordinated Indebtedness (other than a distribution of Reorganization Subordinated Securities), in the event of any distribution to creditors of any of the Company or its subsidiaries which are parties to the Subsidiary Guaranty (as defined in the Securities Purchase Agreement) (each, a "**Credit Party**") in (A) any sale, liquidation, winding-up or dissolution of such Credit Party; (B) any bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to such Credit Party or its property; (C) any assignment by such Credit Party for the benefit of its creditors; or (D) any marshaling of any Credit Party's assets and liabilities (each a "Bankruptcy Event").

(ii) In the event of any distribution, division or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of any Credit Party or the proceeds thereof to creditors of any Credit Party upon any Indebtedness of such Credit Party, by reason of any Bankruptcy Event, then and in any such event, any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable to the Holder upon or with respect to any or all Subordinated Indebtedness (other than a distribution of Reorganization Subordinated Securities) shall be paid or delivered directly to the Agent for

application against the Senior Bank Indebtedness, whether due or not due, in a manner which the Agent, in its sole discretion, shall determine, until such Senior Bank Indebtedness shall have been fully paid in cash and all commitments thereunder have terminated. The Holder hereby irrevocably authorizes and empowers the Agent to ask for, demand, sue for, collect, and receive for every such payment or distribution and give acquittance therefor, and to file claims (and proofs of claims) and take such other actions in the Agent's own name or in the name of the Holder as the Agent may deem necessary or advisable for the enforcement of the terms of this Section 14.

(iii) Each Holder agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Indebtedness requested by the Agent in connection with any Bankruptcy Event and hereby irrevocably authorizes, empowers and appoints Agent as its agent and attorney-in-fact to (i) execute, verify, deliver and file such proofs of claim upon the failure of the Holder promptly to do so prior to 5 days before the expiration of the time to file any such proof of claim and (ii) vote such claim in any such Bankruptcy Event upon the failure of the Holder to do so prior to 5 days before the expiration of the time to vote any such claim; provided the Agent shall have no obligation to execute, verify, deliver, file and/or vote any such proof of claim. In the event that the Agent votes any claim in accordance with the authority granted hereby, the Holder shall not be entitled to change or withdraw such vote.

(c) Default on Senior Bank Indebtedness.

(i) No Credit Party shall make, nor shall the Holder ask for, demand or accept, any direct or indirect payment in respect of the Subordinated Indebtedness, including in respect of any sinking fund therefore, or redemption, retirement or repurchase thereof, if:

(A) a default in payment of any principal and, interest due and payable on any Senior Bank Indebtedness of the Company (a "**Senior Payment Default**") occurs and is continuing past any grace or cure period, if any, applicable thereto; or

(B) any other default (a "**Senior Non-Payment Default**") occurs and is continuing past any grace or cure period, if any, applicable thereto with respect to the Senior Bank Indebtedness that permits holders of such Senior Bank Indebtedness to accelerate its maturity and the Holder receives a notice of such default (a "**Payment Blockage Notice**") from the Agent.

(ii) Payments in respect of the Subordinated Indebtedness may and shall be resumed (the "**Payment Blockage Termination Date**"), including any payments not made as a result of such payment blockage;

(A) in the case of a Senior Payment Default, upon the date on which such default is waived; and

(B) in case of a Senior Non-Payment Default, upon the earliest of (x) the date on which such default is waived, (y) 179 days after the date on which the applicable Payment Blockage Notice is received or (z) the date the Holder receives notice from the Agent rescinding the Payment Blockage Notice.

(iii) No new Payment Blockage Notice may be delivered unless and until:

(A) 360 days have elapsed since the delivery of the immediately prior Payment Blockage Notice; and

(B) all scheduled payments of the Subordinated Indebtedness that have come due have been paid in full in cash.

(iv) No Senior Non-Payment Default that existed or was continuing on the date of delivery of any Payment Blockage Notice to the Buyer Agent shall be the basis for a subsequent Payment Blockage Notice.

(v) If the Holder receives a payment in respect of the Subordinated Indebtedness when (i) the payment is prohibited by this Section 14(c) and (ii) the Holder has actual knowledge that the payment is prohibited, *provided* that such actual knowledge shall not be required in the case of any payment default, the Holder shall hold the payment in trust for the benefit of the holders of Senior Bank Indebtedness. Upon the proper written request of the Agent or if any Senior Payment Default has occurred and is continuing, the Holder shall deliver the amounts in trust to the Agent.

(d) Standstill.

(i) After the occurrence and during the continuance of any Senior Payment Default or if a Payment Blockage Notice has been delivered to the Holder, no action may be taken by the Holder to accelerate or redeem the Subordinated Indebtedness or to enforce or collect payment on the Subordinated Indebtedness or to commence, or join with any other creditor (other than the Agent and, at the direction of the Agent, the Lenders and the holders of the Other Notes) in commencing, any bankruptcy, receivership, reorganization, liquidation

or insolvency proceeding, until the earlier to occur of any of the following (a "**Standstill Termination Date**"):

(A) the date of termination of the Senior Credit Agreement and payment in full of all Senior Bank Indebtedness;

(B) the date on which the Senior Bank Indebtedness is accelerated and due and payable in full;

(C) the Payment Blockage Termination Date; or

(D) the date on which the standstill imposed by this Section 14(d) has been continuously in effect for a period of 360 days by reason of one or more Senior Payment Defaults, provided that any amounts recovered as a result of the exercise of any remedy shall be subject to any applicable provisions of Sections 14(b) and 14(c) above; or

(E) the commencement of any proceeding against the Company under the Bankruptcy Code by any Person other than the Holder or the holders of the Other Notes.

(ii) Following the occurrence of the Standstill Termination Date, the Holder may take any action available to it under the terms of the Securities Purchase Documents or otherwise available under applicable law to enforce any Credit Party's obligations of payment with respect to the Subordinated Indebtedness that shall then exist under the terms of the Securities Purchase Documents.

(e) Redemption upon Event of Default. The Holder shall give the Agent at least 3 Business Days' prior notice of its intention to exercise its redemption rights upon the occurrence of an Event of Default, a Change of Control or a Triggering Event.

(f) No Amendment of Subordinated Indebtedness. Neither the Holder nor any Credit Party will, without the prior written consent of the Agent, amend or modify (i) this Section 14 or the definition of any capitalized term used in this Section 14 or (ii) any provision of the Securities Purchase Agreement or the other Securities Purchase Documents if such amendment or modification would (A) move forward the date of any redemption or payment or increase the principal amount of or the rate of interest applicable to the Subordinated Indebtedness or (B) result in the covenants contained therein being materially more restrictive in the aggregate on any Credit Party prior to the effectiveness of such amendment or modification.

(g) No Impairment of Subordination. No right of the Agent, any Lender or any future holder of any Senior Bank Indebtedness to enforce the subordination as provided in this Section 14 shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Credit Party or any act or failure to act by the Agent, any Lender

or any such holder, or by any noncompliance by any Credit Party with the terms of this Section 14, regardless of any knowledge thereof which the Agent or any Lender may have or with which it may otherwise be charged.

(h)     Subrogation.   Subject to payment in full in cash of all Senior Bank Indebtedness and the termination of all commitments thereunder, the rights of the Holder shall be subrogated to the rights of the holders of Senior Bank Indebtedness to receive payments or distributions of the assets of any Credit Party made on such Senior Bank Indebtedness until all principal and interest on this Note shall be paid in full in cash; and for purposes of such subrogation, no payments or distributions to the holders of Senior Bank Indebtedness of any cash, property or securities to which the Holder would be entitled except for the subordination provisions of this Section 14 shall, as between the Holder and the Company and/or its creditors other than the holders of the Senior Bank Indebtedness, be deemed to be a payment on account of the Senior Bank Indebtedness.

(i)     Conversion Rights.   Nothing contained in this Section 14 or elsewhere in this Note is intended to or shall impair, as among the Company, its creditors, including the holders of Senior Bank Indebtedness, and the Holder, the right, which is absolute and unconditional, of the Holder to convert this Note into shares of Common Stock or rights to acquire shares of Common Stock in accordance with the terms hereof.

(j)     Rights of Holder Unimpaired. The provisions of this Section 14 are and are intended solely for the purposes of defining the relative rights of the Holder and the holders of Senior Bank Indebtedness and nothing in this Section 14 shall impair, as between the Company and the Holder, the obligation of the Company, which is unconditional and absolute, to pay to the Holder the Principal (and premium, if any) and Interest, in accordance with the terms of this Note.

(k)     Subordination May Not Be Impaired by any Credit Party.   No right of any holder of Permitted Indebtedness to enforce the subordination of the Subordinated Indebtedness shall be impaired by any act or failure to act by any Credit Party or the Holder or by the failure of any Credit Party or the Holder to comply with the terms of this Section 14.

(l)     Reliance by Holder.   Upon any payment or distribution of assets of any Credit Party referred to in this Section 14, the Holder shall be entitled to rely upon any order or decree made by any court of competent jurisdiction or upon any certificate of the Agent or of the liquidating trustee or agent or other Person making any distribution to the Holder for the purpose of ascertaining the Persons entitled to participate in such distribution, the holders of the Permitted Indebtedness and other Indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Section 14.

(m) Reliance by Holders of Senior Debt. The Holder acknowledges and agrees that (i) each holder of Senior Bank Indebtedness is an intended third-party beneficiary of the terms of the Section 14 and (ii) the foregoing provisions of this Section 14 are, and are intended to be, an inducement and consideration to each holder of Senior Debt, whether such Senior Debt was created or acquired before or after the date hereof, to acquire or continue to hold such Senior Debt and such holder of Senior Debt shall be deemed conclusively to have relied on such provisions in acquiring or continuing to hold such Senior Debt.

(n) Exception to Subordination. Notwithstanding any provision in this Section 14 to the contrary, the rights of the Holder with respect to payments from the Closing Cash Collateral Account (as such term is defined in the Securities Purchase Agreement) and, if established, the Williams Acquisition Cash Collateral Account (as such term is defined in the Securities Purchase Agreement) shall not be subordinated in right of payment to the prior payment of Senior Bank Indebtedness.

(o) Applicability. The terms of this Section 14 shall be applicable both before and after the filing of any petition by or against any Credit Party under any Bankruptcy Law, and all allocations of payments between the holders of the Senior Bank Indebtedness, on the one hand, and the Holder, on the other hand, shall continue to be made after the filing thereof in accordance with this Section 14.

(15) VOTING RIGHTS. The Holder shall have no voting rights as the holder of this Note, except as required by law, including but not limited to the General Corporation Law of the State of Delaware, and as expressly provided in this Note.

(16) RANK; ADDITIONAL INDEBTEDNESS; LIENS.

(a) Rank. All payments due under this Note (i) shall rank *pari passu* with all Other Notes and Indebtedness described in Section 7.03(b), (c) (except with respect to Guarantees of Senior Indebtedness, to which the Guarantees the Notes will be subordinated), (f), (h), (i), (j), (k), (m), and (o), of the Senior Credit Agreement, (ii) shall be subordinate in right of payment to the prior payment of all existing and future Senior Indebtedness and, without duplication, Indebtedness described in Sections 7.03(a), (c) (to the extent constituting Guarantees of Senior Indebtedness), (d), (e), (g) and (n) of the Senior Credit Agreement and (iii) shall be senior to all other Indebtedness of the Company and its Subsidiaries, other than Senior Indebtedness; provided that any Indebtedness incurred to any Affiliate (as defined in Section 30) (other than a direct or indirect Subsidiary) of the Company after the date hereof shall be subordinate in right of payment to the Notes. The Holder acknowledges and agrees that (i) all Indebtedness of the Subsidiaries of the Company which are not guarantors of the Notes may be structurally senior in right of payment to the Notes and (ii) that certain Indebtedness which ranks *pari passu* with the Notes may be secured by Permitted Liens and, to the extent so secured, may effectively rank senior to the Notes to the extent of any security for such Indebtedness.

(b)     Incurrence of Senior Indebtedness.  So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness which shall rank senior to the Notes other than Senior Indebtedness.

(c)     Existence of Liens.  So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property and any financing lease having substantially the same economic effect as any of the foregoing) (collectively, "**Liens**") other than Permitted Liens.

(d)     Restricted Payments.  The Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness, other than Senior Indebtedness or Indebtedness that ranks *pari passu* with this Note, whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness if at the time such payment is due or is otherwise made, after giving effect to such payment, an event constituting, or that with the passage of time and without being cured would constitute, an Event of Default has occurred and is continuing.

(17)    PARTICIPATION.  The Holder, as the holder of this Note, shall be entitled to such dividends paid and distributions made to the holders of Common Stock to the same extent as if the Holder had converted this Note into Common Stock (without regard to any limitations on conversion herein or elsewhere) and had held such shares of Common Stock on the record date for such dividends and distributions.  Payments (if any) under the preceding sentence shall be made concurrently with the dividend or distribution to the holders of Common Stock.

(18)    VOTE TO ISSUE, OR CHANGE THE TERMS OF, NOTES.  The affirmative vote at a meeting duly called for such purpose or the written consent without a meeting, of the Required Holders, shall be required for any change or amendment to this Note or the Other Notes; provided, however, that no such amendment, as applied to any particular holder of Notes, shall, without the consent of that particular holder, (i) extend the maturity of the Note, reduce the interest rate, extend the time of payment of interest thereon, or reduce the principal amount thereof or premium, if any, thereon, or reduce any amount payable on redemption or repurchase thereof or affect any amounts due to any holder or (ii) reduce the aforesaid percentage of Notes, the holders of which are required to consent to any such amendment, without the consent of the holders of all Notes then outstanding.

(19) TRANSFER. This Note may be offered, sold, assigned or transferred by the Holder in minimum denominations of $1,000,000 without the consent of the Company, subject only to the provisions of Section 2(f) of the Securities Purchase Agreement; provided however that this Note may not be transferred to any person who (a) is a competitor of the Company or (b) is engaged in or has threatened material litigation against the Company, in each case as determined by the Board of Directors of the Company in good faith. Notwithstanding the foregoing, in case of an Event of Default, this Note may be transferred without regard to any of the foregoing limitations.

(20) REISSUANCE OF THIS NOTE.

(a) Transfer. If this Note is to be transferred, the Holder shall surrender this Note to the Company, whereupon the Company will forthwith issue and deliver upon the order of the Holder a new Note (in accordance with Section 20(d)), registered as the Holder may request, representing the outstanding Principal being transferred by the Holder and, if less then the entire outstanding Principal is being transferred, a new Note (in accordance with Section 20(d)) to the Holder representing the outstanding Principal not being transferred. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of Section 3(c)(iii) and this Section 20(a), following conversion or redemption of any portion of this Note, the outstanding Principal represented by this Note may be less than the Principal stated on the face of this Note. The Company shall not be obligated to pay any documentary, stamp or similar taxes that may be payable with respect to any transfer under this Section 20(a).

(b) Lost, Stolen or Mutilated Note. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of an indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 20(d)) representing the outstanding Principal.

(c) Note Exchangeable for Different Denominations. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 20(d) and in principal amounts of at least $100,000) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) Issuance of New Notes. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 20(a) or Section 20(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal

remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued Interest on the Principal and Interest of this Note, from the Issuance Date.

(21) REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note, the Securities Purchase Agreement and the Registration Rights Agreement, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(22) PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(23) CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Company and all the Buyers (as defined in the Securities Purchase Agreement) and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(24) FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(25) DISPUTE RESOLUTION. In the case of a dispute as to the determination of the Closing Bid Price, the Closing Sale Price or the Weighted Average Price or the arithmetic calculation of the Conversion Rate or the Redemption Price, the Company shall submit the

disputed determinations or arithmetic calculations via facsimile within one Business Day of receipt of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within one Business Day of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within one Business Day submit via facsimile (a) the disputed determination of the Closing Bid Price, the Closing Sale Price or the Weighted Average Price to an independent, reputable investment bank selected by the Company and approved by the Holder or (b) the disputed arithmetic calculation of the Conversion Rate or the Redemption Price an independent, outside accountant mutually acceptable to the Company and the Required Holders. The Company, at the Company's expense, shall cause the investment bank or the accountant, as the case may be, to perform the determinations or calculations and notify the Company and the Holder of the results no later than five Business Days from the time it receives the disputed determinations or calculations. Such investment bank's or accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

(26)    NOTICES; PAYMENTS.

(a)    Notices. Whenever notice is required to be given under this Note, unless otherwise provided herein, such notice shall be given in accordance with Section 9(f) of the Securities Purchase Agreement. The Company shall provide the Holder with prompt written notice of all actions taken pursuant to this Note, including in reasonable detail a description of such action and the reason therefore. Without limiting the generality of the foregoing, the Company will give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Change of Control, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder. Notwithstanding the foregoing, Section 9(f) of the Securities Purchase Agreement shall apply to all notices given pursuant to this Note.

(b)    Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing (which address, in the case of each of the Buyers, shall initially be as set forth on the Schedule of Buyers attached to the Securities Purchase Agreement); provided that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a Business Day, the same shall instead be due on the next succeeding

day which is a Business Day and, in the case of any Interest Date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of Interest due on such date.

(27) CANCELLATION. After all Principal, accrued Interest and other amounts at any time owed on this Note has been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(28) WAIVER OF NOTICE. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Securities Purchase Agreement.

(29) GOVERNING LAW. This Note shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Note shall be governed by, the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York.

(30) CERTAIN DEFINITIONS. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" has the meaning ascribed to such term in the Securities Purchase Agreement.

(b) "**Agent**" has the meaning ascribed to such term in the Senior Credit Agreement.

(c) "**Approved Stock Plan**" means any employee benefit, option or incentive plan (including, without limitation, any stock appreciation rights plan or phantom stock plan) which has been approved by the Board of Directors of the Company, pursuant to which the Company's securities may be issued to any employee, consultant, officer or director for services provided to the Company.

(d) "**Attributable Indebtedness**" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Off-Balance Sheet Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capitalized Lease.

(e) "**Available Cash**" means (a) for the period from the Closing Date (as defined in the Senior Credit Agreement) of the Senior Credit Agreement until the first to

occur of (x) the closing of the Williams Acquisition and (y) June 30, 2005, without duplication, the sum of (i) the lesser of (A) the sum of (1) cash and Cash Equivalents (as defined in the Senior Credit Agreement) of the Domestic Loan Parties (as defined in the Senior Credit Agreement) and (2) Available Foreign Subsidiary Cash (as defined in the Senior Credit Agreement), all to the extent such cash and Cash Equivalents are not subject to any Lien (other than Liens in favor of the Administrative Agent under the Senior Credit Agreement granted pursuant to the Loan Documents (as defined in the Senior Credit Agreement)) or any restriction as to its use or disposition and are included in "cash and cash equivalents" and not "restricted cash" on the consolidated balance sheet of the Company and its Consolidated Subsidiaries (as defined in the Senior Credit Agreement), and (B) $25,000,000, and (ii) proceeds from the issuance of the Notes (including, without limitation, the reserve and/or escrow account for up to $9,000,000 established in accordance with the terms of the Securities Purchase Agreement), and (b) thereafter, the lesser of (i) the amount, if any, of the reserve and/or escrow account established for the redemption of up to $9,000,000 in securities established in accordance with the Securities Purchase Agreement plus the sum of (x) cash and Cash Equivalents of the Domestic Loan Parties and (y) Available Foreign Subsidiary Cash, all to the extent such cash and Cash Equivalents are not subject to any Lien (other than Liens in favor of the Administrative Agent under the Senior Credit Agreement granted pursuant to the Loan Documents) or any restriction as to its use or disposition and are included in "cash and cash equivalents" and not "restricted cash" on the consolidated balance sheet of the Company and its Consolidated Subsidiaries (as defined in the Senior Credit Agreement), and (ii) the amount, if any, of the reserve and/or escrow account established for the redemption of up to $9,000,000 in securities established in accordance with the Securities Purchase Agreement plus $25,000,000; provided, however, that for purposes of Section 30(bbb), Available Cash shall exclude (i) the amount of the reserve and/or escrow account established for the redemption of up to $9,000,000 in principal amount of the Notes and (ii), without duplication of any other deduction from Available Cash, the amount of the reserve and/or escrow account established for the payment of interest of up to $7,650,000, each established in accordance with the Securities Purchase Agreement.

(f)    "**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. 101 et seq.), as amended from time to time (including any successor statute) and all rules and regulations promulgated thereunder.

(g)    "**Bankruptcy Law**" means the Bankruptcy Code of the United States and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, fraudulent conveyance or transfer, reorganization, or similar state or Federal debtor relief laws, statutes, rules, regulations, orders, or ordinances of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

(h)    "**Bloomberg**" means Bloomberg Financial Markets.

(i)     "**Business Day**" means any day other than Saturday, Sunday or other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

(j)     "**Capitalized Lease**" means, as applied to any Person, any lease of any Property (whether real, personal or mixed) by that Person as lessee which, in accordance with GAAP, is or should be accounted for as a capital lease on the balance sheet of such Person.

(k)     "**Change of Control Redemption Premium**" means during each of the first, second and third years after the Issuance Date, 120%, 116% and 112%, respectively, and thereafter 110%.

(l)     "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or traded as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

(m)     "**Common Stock Deemed Outstanding**" means, at any given time, the number of shares of Common Stock actually outstanding at such time, plus (i) the number of shares of Common Stock deemed to be outstanding pursuant to Sections 8(a)(i) and 8(a)(ii) hereof regardless of whether the Options or Convertible Securities are actually exercisable at such time and (ii) plus the number of shares of Common Stock underlying Options or Convertible Securities issued pursuant to the Approved Stock Plans that are actually exercisable or convertible at such time at an exercise price or conversion price that is less than or equal to the per share fair market value of such underlying shares of Common Stock, but

excluding any shares of Common Stock owned or held by or for the account of the Company or issuable upon conversion of the Notes or the Other Notes.

(n) "**Consolidated EBITDA**" means, for any period for any Person and its Subsidiaries determined on a consolidated basis, an amount equal to Consolidated Net Income for such period, plus (a) the following to the extent deducted in calculating such Consolidated Net Income: (i) Consolidated Interest Charges for such period; (ii) the provision for federal, state, local and foreign income taxes for such period; (iii) depreciation and amortization expense; (iv) certain restructuring expenses and estimated transaction expenses in the amounts and as described on Schedule 1.03 in the Senior Credit Agreement, (v) other transaction expenses in an aggregate amount of up to $1,250,000 to the extent such expenses are not capitalized due to the failure of the Company to consummate the Williams Acquisition, (vi) other non-recurring non-cash expenses, (vii) any other non-cash write-downs or non-cash write-offs including, but not limited to, fixed asset impairments or write-downs, intangible asset impairments, deferred tax asset write-offs or reserves, variable stock option expenses and debt issuance cost write-offs, (viii) any non-cash losses or deductions arising from the cumulative effect of a change in accounting principles, and (ix) non-cash losses relating to foreign currency and hedging transactions, and minus (b) the following to the extent included in calculating such Consolidated Net Income: (i) Federal, state, local and foreign income tax benefits recorded by the Company and its Subsidiaries for such period and (ii) all extraordinary, non-recurring, non-cash items increasing Consolidated Net Income for such period.

(o) "**Consolidated Funded Indebtedness**" means, for any Person and its Subsidiaries determined on a consolidated basis, as of any date of determination, without duplication, the sum of (a) the outstanding principal amount of all obligations, whether current or long-term, for borrowed money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (b) all purchase money Indebtedness (except as provided in clause (d) below), (c) all direct obligations arising under unreimbursed amounts of drawings under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments, (d) all obligations in respect of the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business), (e) Attributable Indebtedness in respect of Capitalized Leases and Off-Balance Sheet Obligations, (f) all Guarantees with respect to outstanding Indebtedness of the types specified in clauses (a) through (e) above, and (g) all Indebtedness of the types referred to in clauses (a) through (f) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or any such Subsidiary.

(p) "**Consolidated Interest Charges**" means, for any period, for any Person and its Subsidiaries determined on a consolidated basis, the sum of all interest, premium payments, debt discount, fees, charges and related expenses in connection with Indebtedness (including capitalized interest) or in connection with the deferred purchase price of assets, in each case to the extent treated as interest in accordance with GAAP, including the portion of rent

expense with respect to such period under Capitalized Leases that is treated as interest in accordance with GAAP.

(q)    "**Consolidated Leverage Ratio**" means, as of any date of determination, the ratio of (a) Consolidated Funded Indebtedness as of such date less Available Cash as of such date to (b) Consolidated EBITDA for the Four-Quarter Period most recently ended.

(r)    "**Consolidated Net Income**" means, for any period, for any Person and its Subsidiaries determined on a consolidated basis, the Net Income of such Person for that period.

(s)    "**Consolidated Subsidiary**" means with respect to any Person at any date any Subsidiary of such person or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements if such statements were prepared as of such date in accordance with GAAP.

(t)    "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for Common Stock.

(u)    "**Credit Party**" means the Company and each Subsidiary party to the Subsidiary Guaranty Agreement.

(v)    "**Designated Borrower**" has the meaning ascribed to such term in the Senior Credit Agreement.

(w)    "**Eligible Market**" means the Principal Market, the American Stock Exchange, the Nasdaq National Market or the Nasdaq Small Cap Market.

(x)    "**Equity Conditions**" means (i) on each day during the period beginning six months prior to the applicable date of determination and ending on and including the applicable date of determination (the "**Equity Conditions Measuring Period**"), either (x) the Registration Statement filed pursuant to the Registration Rights Agreement shall be effective and available for the resale of all remaining Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement and there shall not have been any Grace Periods (as defined in the Registration Rights Agreement) (other than a Grace Period in connection with a Fundamental Transaction) during the Equity Conditions Measuring Period or (y) all shares of Common Stock issuable upon conversion of the Notes shall be eligible for sale without restriction and without the need for registration under any applicable federal or state securities laws; (ii) on each day during the Equity Conditions Measuring Period, the Common Stock is designated for quotation on the Principal Market and shall not have been suspended from trading on such exchange or market (other than suspensions of not more than two days and occurring prior to the applicable date of determination due to business announcements by the Company) nor shall delisting or suspension by such exchange or market

been threatened or pending either (A) in writing by such exchange or market or (B) by falling below the minimum listing maintenance requirements of such exchange or market; (iii) any applicable shares of Common Stock to be issued in connection with such issuance may be issued in full without violating Section 3(d) hereof and the rules or regulations of the Principal Market; (iv) during the Equity Conditions Measuring Period, the Company shall not have failed to timely make any payments within ten (10) Business Days of when such payment is due pursuant to any Transaction Document; (v) there shall not have occurred since the date of the Holder Optional Redemption Notice either (A) the public announcement of a pending, proposed or intended Change of Control which has not been abandoned, terminated or consummated or (B) an Event of Default or an event that with the passage of time or giving of notice would constitute an Event of Default; and (vi) the Company shall have no knowledge of any fact that would cause (x) the Registration Statements required pursuant to the Registration Rights Agreement not to be effective and available for the resale of all remaining Registrable Securities in accordance with the terms of the Registration Rights Agreement or (y) any shares of Common Stock issuable upon conversion of the Notes not to be eligible for sale without restriction pursuant to Rule 144(k) and any applicable state securities laws.

(y)    "**Equity Interests**" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

(z)    "**Eligible Market**" means the Principal Market, the American Stock Exchange, the Nasdaq National Market or the Nasdaq Small Cap Market.

(aa)    "**Event of Default Redemption Premium**" means 110%.

(bb)    "**Excluded Securities**" means any shares of Common Stock issued or issuable: (i) in connection with any Approved Stock Plan or any dividend reinvestment plan; (ii) upon conversion, redemption or exchange of the Notes and the Other Notes; (iii) pursuant to a bona fide firm commitment underwritten public offering with a nationally recognized underwriter which generates gross proceeds to the Company in excess of $25,000,000 (iv) in connection with a Strategic Acquisition and (v) in connection with any adjustment of any outstanding security (including without limitation the Notes) pursuant to any antidilution or similar adjustment.

(cc)    "**Four-Quarter Period**" means a period of four consecutive fiscal quarters of the Company and its Consolidated Subsidiaries taken as one accounting period.

(dd)    "**Fundamental Transaction**" means that the Company shall, directly or indirectly, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Person, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company to another Person, or (iii) allow another Person to make a purchase, tender or exchange offer that is accepted by the holders of more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the Person or Persons making or party to, or associated or affiliated with the Persons making or party to, such purchase, tender or exchange offer), or (iv) consummate a stock purchase agreement or other business combination (including,  without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires more than the 50% of the outstanding shares of Common Stock (not including any shares of Common Stock held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock purchase agreement or other business combination), or (v) reorganize, recapitalize or reclassify its Common Stock, or (vi) any offering of debt or equity securities of the Company or any Subsidiary.

(ee)    "**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

(ff)    "**Guarantee**" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

(gg) "**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(i) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(ii) all direct or contingent obligations of such Person arising under letters of credit, bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(iii) net obligations of such Person under any Swap Contract;

(iv) all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(v) indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(vi) Capitalized Leases and Off-Balance Sheet Obligations;

(vii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(viii) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer in an amount proportionate to such Person's interest therein, unless such Indebtedness is expressly made non-recourse to such Person or except to the extent such Indebtedness is owed by such partnership or joint venture to such Person; provided that the pledge of any Equity Interest in such joint venture shall not constitute recourse to such Person for the purposes of this definition. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any

Capitalized Lease or Off-Balance Sheet Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

(hh) "**Issuance Date**" means November 23, 2004.

(ii) "**Lender**" has the meaning ascribed to such term in the Senior Credit Agreement.

(jj) "**Net Income**" means, for any period, net income of any Person and its Subsidiaries (excluding extraordinary gains and extraordinary losses) for that period.

(kk) "**Off-Balance Sheet Obligation**" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment). No monetary obligations under true operating leases shall be included in Off-Balance Sheet Obligations.

(ll) "**Options**" means any rights, warrants or options to subscribe for or purchase Common Stock or Convertible Securities.

(mm) "**Permitted Acquisitions**" means (a) the Williams Acquisition, (b) any other acquisition by any Loan Party (as defined in the Senior Credit Agreement) permitted by the Senior Credit Agreement.

(nn) "**Permitted Indebtedness**" means (i) this Note and the Other Notes, (ii) the Senior Bank Indebtedness and (iii) without duplication, Indebtedness permitted pursuant to Section 7.03 of the Senior Credit Agreement.

(oo) "**Permitted Lien**" means:

(i) Liens pursuant to any Loan Document (as defined in the Senior Credit Agreement);

(ii) Liens existing on the date of the Senior Credit Agreement and listed on Schedule 7.01 thereto and any renewals or extensions thereof in connection with any refunding, refinancing or renewal of the obligations secured thereby; provided that (i) the property covered thereby is not broadened, (ii) the amount secured or benefited thereby is not increased, (iii) the direct or any contingent obligor with respect thereto is not changed, and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.03(b) of the Senior Credit Agreement;

(iii)     Liens for taxes, fees, assessments or other governmental charges, not yet due or which are not delinquent or remain payable without penalty, or to the extent non-payment thereof is permitted by Section 6.04 of the Senior Credit Agreement; provided, that a stay of enforcement of any such Lien is in effect;

(iv)     Liens securing the rights or claims of carriers, warehousemen, mechanics, materialmen, repairmen, landlords or other like Liens in favor of similar Persons arising in the ordinary course of business which are not delinquent or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto and for which adequate reserves with respect thereto are maintained on the books of the applicable person in accordance with GAAP; provided, that a stay of enforcement of any such Lien is in effect;

(v)     Liens consisting of  pledges or deposits made by the Company or any of its Subsidiaries in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation or public liability laws or similar legislation, other than any Lien imposed by the Employee Retirement Income Security Act of 1974;

(vi)     easements, rights-of-way, restrictions and other similar encumbrances affecting real property of the Company or any of its Subsidiaries which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(vii)     Liens securing judgments for the payment of money not constituting an Event of Default under this Note or securing appeal or other surety bonds related to such judgments; provided that enforcement of such Liens is effectively stayed;

(viii)     Liens securing purchase money Indebtedness, Indebtedness of foreign Subsidiaries and assumed Indebtedness of an acquired Person permitted under Section 7.03(e), (g) or (h) of the Senior Credit Agreement, respectively, provided such Liens attach only to the property specified therein;

(ix)     Liens incurred or deposits made to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business;

(x)     restrictions imposed in the ordinary course of business on the sale or distribution of designated inventory that arise from the sale of such inventory to one or more customers;

(xi) deposits in escrow accounts for customary purchase price adjustments, earn-outs and indemnities in connection with Permitted Acquisitions;

(xii) licenses, leases or subleases granted in the ordinary course of business not interfering in any material respect with the business of the Company or any of its Subsidiaries;

(xiii) restrictions imposed in the ordinary course of business on the sale or distribution of designated inventory that arise from the sale of such inventory to one or more customers;

(xiv) Liens in favor of customs or revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods;

(xv) deposits in escrow accounts for customary purchase price adjustments, earn-outs and indemnities in connection with Permitted Acquisitions; and

(xvi) Liens on the assets of any Designated Borrower organized in the Netherlands arising under clause 18 of the general terms and conditions (*algemene voorwaarden*) of any member of the Dutch Bankers' Association *(Nederlandse Vereniging van Banken)* or any similar term applied by a financial institution in the Netherlands pursuant to its general terms and conditions.

(pp) "**Permitted Refinancing**" means any amendment, modification, restatement, refinancing, extension, refunding, renewal or replacement of the Senior Indebtedness which amendment, modification, restatement, refinancing, extension, refunding, renewal or replacement does not cause the Senior Indebtedness to exceed the Senior Indebtedness Cap.

(qq) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, any other entity and a government or any department or agency thereof.

(rr) "**Principal Market**" means The New York Stock Exchange, Inc.

(ss) "**Registration Rights Agreement**" means that certain registration rights agreement between the Company and the initial holders of the Notes relating to the registration of the resale of the shares of Common Stock issuable upon conversion of the Notes.

(tt) "**Reorganization Subordinated Securities**" shall mean any debt or equity securities of any of the Credit Parties or any other Person that are distributed to the Holder in respect of the Subordinated Indebtedness pursuant to a confirmed plan of

reorganization or adjustment that (a) are subordinated, including in right of payment, to the Senior Bank Indebtedness (or any debt or equity securities issued in substitution of all or any portion of the Senior Bank Indebtedness) to at least the same extent as the Subordinated Indebtedness is subordinated to the Senior Bank Indebtedness and (b) do not have terms better for the holders thereof than the terms of the Subordinated Indebtedness.

(uu) "**Required Holders**" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding; provided however that if and for so long as one of the Buyers (as defined in the Securities Purchase Agreement) together with its Affiliates holds more than 50% of the aggregate principal amount of Notes outstanding then "Required Holders" shall mean holders of Notes representing at least 66 ⅔% of the principal amount of Notes outstanding. For purposes of determining the principal amount of Notes outstanding, any Notes purchased or held for the account of the Company or any of its Affiliates will be excluded.

(vv) "**SEC**" means the United States Securities and Exchange Commission.

(ww) "**Securities Purchase Agreement**" means that certain securities purchase agreement between the Company and the initial holders of the Notes pursuant to which the Company issued the Notes.

(xx) "**Securities Purchase Documents**" means that the Securities Purchase Agreement, this Note, the Registration Rights Agreement, the Subsidiary Guaranty Agreement and all other agreements, documents and instruments executed from time to time in connection therewith, as the same may be amended, restated, supplemented or otherwise modified from time to time.

(yy) "**Senior Credit Agreement**" means (a) that certain Credit Agreement, dated as of October 1, 2004 by and among the Company, certain subsidiaries of the Company party thereto, as borrowers, the Agent, the Lenders, US Bank National Association, as Syndication Agent, and Bank of Oklahoma, N.A., as Managing Agent, as amended by the First Amendment to Credit Agreement, dated as of November 23, 2004 as in effect on the date hereof and as may be further amended, restated, modified or supplemented from time to time with the written consent of the Required Holders pursuant to the terms hereof and (b) any Permitted Refinancing thereof; provided, that for the purpose of Section 16 hereof and the related definitions, all references to the Senior Credit Agreement shall mean the Senior Credit Agreement in effect as of the date hereof.

(zz) "**Senior Bank Indebtedness Documents**" means the Senior Credit Agreement and all other Loan Documents (as such term is defined in the Senior Credit Agreement), as the same may be amended, restated, supplemented or otherwise modified from time to time and any replacement thereof in connection with a Permitted Refinancing.

(aaa) "**Senior Bank Indebtedness**" means all obligations, liabilities and indebtedness of every nature of the Company from time to time owed to the Agent or any Lender under the Senior Bank Indebtedness Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a bankruptcy, reorganization, insolvency, receivership or similar proceeding under the Bankruptcy Code together with any interest accruing thereon after the commencement of such proceeding, without regard to whether or not such interest is an allowed claim; *provided*, however, that at no time shall the principal amount of the Senior Bank Indebtedness exceed the greater of (i) the sum of $100,000,000 plus Available Cash and (ii) the product of (x) 3.0 and (y) Consolidated EBITDA for the prior four calendar quarters.

(bbb) "**Senior Indebtedness**" means all obligations, liabilities and indebtedness of every nature of the Company from time to time owed to the Agent or any Lender under (i) the Senior Bank Indebtedness Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a bankruptcy, reorganization, insolvency, receivership or similar proceeding under the Bankruptcy Code together with any interest accruing thereon after the commencement of such proceeding, without regard to whether or not such interest is an allowed claim and (ii) Indebtedness permitted under Section 7.03(a), (c) (to the extent constituting Guarantees of Senior Indebtedness), (d), (e), (g) and (n) of the Senior Credit Agreement (and any Permitted Refinancing thereof); *provided*, however, that at no time shall the principal amount of the Senior Indebtedness exceed the greater of (i) the sum of (x) $100,000,000 plus Available Cash and (y) Indebtedness permitted under the terms of Section 7.03(a), (c) (to the extent constituting Guarantees of Senior Indebtedness), (d), (e), (g) and (n) of the Senior Credit Agreement (and any Permitted Refinancing thereof) and (ii) the product of (x) 3.0 and (y) Consolidated EBITDA for the prior four calendar quarters (the "**Senior Indebtedness Cap**"). Senior Indebtedness under the Senor Credit Agreement shall be considered to be outstanding whenever any loan commitment under the Senior Bank Indebtedness Documents is outstanding.

(ccc) "**Strategic Acquisition**" means any acquisition by the Company, whether through an acquisition of stock or merger of any business, assets or technologies the primary purpose of which is not to raise equity capital.

(ddd) "**Subscription Date**" means November 23, 2004.

(eee) "**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person.

(fff) "**Subsidiary Guaranty Agreement**" means the Subsidiary Guaranty Agreement, dated as of November 23, 2004, by the parties signatory thereto in favor of the Buyers.

(ggg) "**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, rate hedging agreements, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any such obligations or liabilities under any Master Agreement.

(hhh) "**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any affiliate of a Lender).

(iii) "**Trading Day**" means any day on which the Common Stock is traded on the Principal Market, or, if the Principal Market is not the principal trading market for the Common Stock, then on the principal securities exchange or securities market on which the Common Stock is then traded; provided that "Trading Day" shall not include any day on which the Common Stock is scheduled to trade on such exchange or market for less than 4.5 hours or any day that the Common Stock is suspended from trading during the final hour of trading on such exchange or market (or if such exchange or market does not designate in advance the closing time of trading on such exchange or market, then during the hour ending at 4:00:00 p.m., New York Time).

(jjj) "**Weighted Average Price**" means, for any security as of any date, the dollar volume-weighted average price for such security on the Principal Market during the period beginning at 9:30:01 a.m., New York Time (or such other time as the Principal Market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as the Principal Market publicly announces is the official close of trading) as reported by Bloomberg through its "Volume at Price" functions, or, if the foregoing does not

apply, the dollar volume-weighted average price of such security in the over-the-counter market on the electronic bulletin board for such security during the period beginning at 9:30:01 a.m., New York Time (or such other time as such market publicly announces is the official open of trading), and ending at 4:00:00 p.m., New York Time (or such other time as such market publicly announces is the official close of trading) as reported by Bloomberg, or, if no dollar volume-weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.). If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as determined by a written resolution of the Board of Directors of the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 25. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination or other similar transaction during the applicable calculation period.

(kkk) "**Williams Acquisition**" means the acquisition of the membership interests in each of Williams Specialty Services LLC, Williams Plan Services LLC and Williams Industrial Services LLC for an aggregate consideration not in excess of $65,900,000 pursuant to the Acquisition Agreement (as defined in the Senior Credit Agreement).

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** the Company has caused this Note to be duly executed as of the Issuance Date set out above.

**GLOBAL POWER EQUIPMENT GROUP INC.**

By: ______________________________
Name:
Title:

**EXHIBIT I**

**GLOBAL POWER EQUIPMENT GROUP INC.**
**CONVERSION NOTICE**

Reference is made to the Convertible Senior Subordinated Note (the "**Note**") issued to the undersigned by Global Power Equipment Group Inc. (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock, par value $0.01 per share (the "**Common Stock**"), of the Company as of the date specified below.

Date of Conversion: ______________________________

Aggregate Conversion Amount to be converted: ____________________

Please confirm the following information:

Conversion Price: ______________________________

Number of shares of Common Stock to be issued: ____________________

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: ______________________________

______________________________

______________________________

Facsimile Number: ______________________________

Authorization: ______________________________

By: ______________________________

Title: ______________________________

Dated: ______________________________

DTC Participant Number: ______________________________

Account Number: ____________________

(if electronic book entry transfer)

Transaction Code Number: ____________________

(if electronic book entry transfer)

**ACKNOWLEDGMENT**

The Company hereby acknowledges this Conversion Notice and hereby directs EquiServe Trust Company, N.A. to issue the above indicated number of shares of Common Stock in accordance with the Transfer Agent Instructions, dated November 23, 2004, from the Company and acknowledged and agreed to by EquiServe Trust Company, N.A.

**GLOBAL POWER EQUIPMENT GROUP INC.**

By:________________________________
Name:
Title:

**IN WITNESS WHEREOF,** the Company has caused this Note to be duly executed as of the Issuance Date set out above.

**GLOBAL POWER EQUIPMENT GROUP INC.**

By: James P. Wilson
Name:
Title:

# REGISTRATION RIGHTS AGREEMENT

**REGISTRATION RIGHTS AGREEMENT** (this "**Agreement**"), dated as of November 23, 2004, by and among Global Power Equipment Group Inc., a Delaware corporation, with headquarters located at 6120 South Yale, Suite 1480, Tulsa, Oklahoma 74136 (the "**Company**"), and the undersigned buyers (individually, a "**Buyer**", and collectively, the "**Buyers**").

**WHEREAS:**

A. In connection with the Securities Purchase Agreement, by and among the parties hereto of even date herewith (the "**Securities Purchase Agreement**"), the Company has agreed, upon the terms and subject to the conditions set forth in the Securities Purchase Agreement, to issue and sell to each Buyer convertible senior subordinated notes of the Company (the "**Notes**"), which will be convertible into the Company's common stock, par value $.01 per share (the "**Common Stock**") (as converted, the "**Conversion Shares**"), in accordance with the terms of the Notes.

B. To induce the Buyers to execute and deliver the Securities Purchase Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder, or any similar successor statute (collectively, the "**1933 Act**"), and applicable state securities laws.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Buyers hereby agree as follows:

1. Definitions.

As used in this Agreement, the following terms shall have the following meanings:

a. "**Affiliate**" has the meaning ascribed to such term in the Securities Purchase Agreement.

b. "**Business Day**" means any day other than Saturday, Sunday or any other day on which commercial banks in The City of New York are authorized or required by law to remain closed.

c. "**Effective Date**" means the date the Registration Statement has been declared effective by the SEC.

      d. "**Investor**" means a Buyer or any transferee or assignee thereof to whom a Buyer assigns its rights under this Agreement and who agrees to become bound by the provisions of this Agreement in accordance with Section 9 and any transferee or assignee thereof to whom a transferee or assignee assigns its rights under this Agreement and who agrees to become bound by the provisions of this Agreement in accordance with Section 9.

e. "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization and a government or any department or agency thereof.

f. "**register**," "**registered**," and "**registration**" refer to a registration effected by preparing and filing one or more Registration Statements (as defined below) in compliance with the 1933 Act and pursuant to Rule 415 and the declaration or ordering of effectiveness of such Registration Statement(s) by the SEC.

g. "**Registrable Securities**" means (i) the Conversion Shares issued or issuable upon conversion of the Notes and (ii) any share capital of the Company issued or issuable with respect to the Conversion Shares or the Notes as a result of any share split, share dividend, recapitalization, exchange or similar event or otherwise, without regard to any limitations on conversions of the Notes.

h. "**Registration Statement**" means a registration statement or registration statements of the Company filed under the 1933 Act covering the Registrable Securities.

i. "**Required Holders**" means the holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding; provided however that if and for so long as one of the Buyers (as defined in the Securities Purchase Agreement) together with its Affiliates holds more than 50% of the aggregate principal amount of Notes outstanding then "Required Holders" shall mean holders of Notes representing at least 66 ⅔% of the principal amount of Notes outstanding.

j. "**Rule 415**" means Rule 415 under the 1933 Act or any successor rule providing for offering securities on a continuous or delayed basis.

k. "**SEC**" means the United States Securities and Exchange Commission.

Capitalized terms used herein and not otherwise defined herein shall have the respective meanings set forth in the Securities Purchase Agreement.

2. <u>Registration</u>.

a. <u>Mandatory Registration</u>. The Company shall prepare, and, as soon as practicable but in no event later than 30 days after the Closing Date (as defined in the Securities Purchase Agreement) (the "**Filing Deadline**"), file with the SEC the Registration

Statement on Form S-3 covering the resale of all of the Registrable Securities. In the event that Form S-3 is unavailable for such a registration, the Company shall use such other form as is available for such a registration, subject to the provisions of Section 2(e). The Registration Statement prepared pursuant hereto shall register for resale at least the number of Common Stock equal to 120% of the maximum number of Registrable Securities issued or issuable as of the trading day immediately preceding the date the Registration Statement is initially filed with the SEC, subject to adjustment as provided in Section 2(e). The Registration Statement shall contain (except if otherwise directed by the Required Holders) the "Selling Shareholders" section in substantially the form attached hereto as Exhibit B and the "Plan of Distribution" attached hereto as Exhibit B. The Company shall use its commercially reasonable efforts to have the Registration Statement declared effective by the SEC as promptly as reasonably practicable, but in no event later than the date which is 120 days after the Closing Date (the "**Effectiveness Deadline**").

b.    Allocation of Registrable Securities.    The initial number of Registrable Securities included in any Registration Statement and each increase in the number of Registrable Securities included therein shall be allocated pro rata among the Investors based on the number of Registrable Securities held by each Investor at the time the Registration Statement covering such initial number of Registrable Securities or increase thereof is declared effective by the SEC. In the event that an Investor sells or otherwise transfers any of such Investor's Registrable Securities, each transferee shall be allocated a pro rata portion of the then remaining number of Registrable Securities included in such Registration Statement for such transferor. Any Common Stock included in a Registration Statement and which remain allocated to any Person which ceases to hold any Registrable Securities covered by such Registration Statement shall be allocated to the remaining Investors, pro rata based on the number of Registrable Securities then held by such Investors which are covered by such Registration Statement. In no event shall the Company include any securities other than Registrable Securities on any Registration Statement without the prior written consent of the Required Holders, other than any Registration Statement on behalf of the Buyers that relates to an underwritten offering.

c.    Legal Counsel.    Subject to Section 5 hereof, the Buyers holding at least a majority of the Registrable Securities shall have the right to select one legal counsel to review and oversee any registration pursuant to this Section 2 ("**Legal Counsel**"), which shall be Schulte Roth & Zabel LLP or such other counsel as thereafter designated by the Required Holders. The Company and Legal Counsel shall reasonably cooperate with each other in performing the Company's obligations under this Agreement.

d.    Ineligibility for Form S-3.    In the event that Form S-3 is not available for the registration of the resale of Registrable Securities hereunder, the Company shall (i) register the resale of the Registrable Securities on another appropriate form reasonably acceptable to the Required Holders and (ii) undertake to register the Registrable Securities on Form S-3 as soon as such form is available, provided that the Company shall maintain the effectiveness of the Registration Statement then in effect until such time as a Registration

Statement on Form S-3 covering the Registrable Securities has been declared effective by the SEC.

e. Sufficient Number of Shares Registered. In the event the number of shares available under a Registration Statement filed pursuant to Section 2(a) is insufficient to cover all of the Registrable Securities required to be covered by such Registration Statement or an Investor's allocated portion of the Registrable Securities pursuant to Section 2(b), the Company shall amend the applicable Registration Statement, or file a new Registration Statement (on the short form available therefor, if applicable), or both, so as to cover at least 120% of the number of such Registrable Securities as of the trading day immediately preceding the date of the filing of such amendment or new Registration Statement, in each case, as soon as practicable, but in any event not later than thirty (30) days after the necessity therefor arises. The Company shall use its reasonable best efforts to cause such amendment and/or new Registration Statement to become effective as promptly as reasonably practicable following the filing thereof. For purposes of the foregoing provision, the number of shares available under a Registration Statement shall be deemed "insufficient to cover all of the Registrable Securities" if at any time the number of Registrable Securities issued or issuable upon conversion of the Notes covered by such Registration Statement is greater than 105% of Common Stock available for resale under the Registration Statement. The calculation set forth in the foregoing sentence shall be made without regard to any limitations on the conversion of the Notes and such calculation shall assume that the Notes are then convertible into Common Stock at the then prevailing Conversion Rate (as defined in the Notes).

f. Effect of Failure to File and Obtain and Maintain Effectiveness of Registration Statement. If (i) a Registration Statement covering all of the Registrable Securities required to be covered thereby and required to be filed by the Company pursuant to this Agreement is (A) not filed with the SEC on or before the Filing Deadline (a "**Filing Failure**") or (B) not declared effective by the SEC on or before the Effectiveness Deadline (an "**Effectiveness Failure**") or (ii) on any day after the Effective Date sales of all of the Registrable Securities required to be included on such Registration Statement cannot be made (other than during an Allowable Grace Period (as defined in Section 3(r)) pursuant to such Registration Statement (including, without limitation, because of a failure to keep such Registration Statement effective, to disclose such information as is necessary for sales to be made pursuant to such Registration Statement or to register a sufficient number of shares of Common Stock) (a "**Maintenance Failure**") then, as partial relief for the damages to any holder by reason of any such delay in or reduction of its ability to sell the underlying shares of Common Stock (which remedy shall not be exclusive of any other remedies available at law or in equity), the Company shall pay to each holder of Registrable Securities relating to such Registration Statement an amount (the "**Liquidated Damages Amount**") in cash equal to (A) one-quarter of one percent (0.25%) of the aggregate Purchase Price (as such term is defined in the Securities Purchase Agreement) of the Notes relating to such Investor's Registrable Securities included in such Registration Statement for the first 90 day period following a Filing Failure, Effectiveness Failure or Maintenance Failure, (B) one-half of one percent (0.50%) of the aggregate Purchase Price of the Notes relating to such Investor's Registrable Securities included in such Registration Statement for the

following 60 day period, and (C) three-quarters of one percent (0.75%) of the aggregate Purchase Price of the Notes relating to such Investor's Registrable Securities included in such Registration Statement for each subsequent 30 day period. Liquidated Damages Amounts will accrue for each of the following dates: (i) the day of a Filing Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) thereafter until such Filing Failure is cured; (ii) the day of an Effectiveness Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) thereafter until such Effectiveness Failure is cured; (iii) the initial day of a Maintenance Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) thereafter until such Maintenance Failure is cured. The rate of accrual of the Liquidated Damages Amount with respect to any period will not exceed the rate provided in this paragraph notwithstanding the occurrence of multiple concurrent events giving rise to the Liquidated Damages Amount. The payments to which a holder shall be entitled pursuant to this Section 2(f) are referred to herein as "**Registration Delay Payments**." Registration Delay Payments shall be paid on the earlier of (I) the last day of the calendar month during which such Registration Delay Payments are incurred and (II) the third Business Day after the event or failure giving rise to the Registration Delay Payments is cured. In the event the Company fails to make Registration Delay Payments in a timely manner, such Registration Delay Payments shall bear interest at a rate per annum equal to the default rate under the Notes until paid in full. Notwithstanding anything to the foregoing, Liquidated Damages Amounts will not be payable by the Company pursuant to the terms hereof to the extent that such delays are caused by an Investor's failure to provide the information required by Section 4(a).

3.    Related Obligations.

At such time as the Company is obligated to file a Registration Statement with the SEC pursuant to Section 2(a), 2(d) or 2(e), the Company will use its commercially reasonable efforts to effect the registration of the Registrable Securities in accordance with the intended method of disposition thereof and, pursuant thereto, the Company shall have the following obligations:

a.    The Company shall submit to the SEC, within three (3) Business Days after the Company learns that no review of a particular Registration Statement will be made by the staff of the SEC or that the staff has no further comments on a particular Registration Statement, as the case may be, a request for acceleration of effectiveness of such Registration Statement to a time and date not later than 48 hours after the submission of such request. The Company shall keep each Registration Statement effective pursuant to Rule 415 at all times until the earlier of (i) the date as of which the Investors may sell all of the Registrable Securities covered by such Registration Statement without restriction pursuant to Rule 144(k) (or any successor thereto) promulgated under the 1933 Act or (ii) the date on which the Investors shall have sold all of the Registrable Securities covered by such Registration Statement (the "**Registration Period**"). The Company shall ensure that each Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall not contain any untrue statement of a material fact or omit to state a material fact required to be stated

therein, or necessary to make the statements therein (in the case of prospectuses, in the light of the circumstances in which they were made) not misleading.

b.    The Company shall prepare and file with the SEC such amendments (including post-effective amendments) and supplements to a Registration Statement and the prospectus used in connection with such Registration Statement, which prospectus is to be filed pursuant to Rule 424 promulgated under the 1933 Act, as may be reasonably necessary to keep such Registration Statement effective at all times during the Registration Period, and, during such period, comply with the provisions of the 1933 Act with respect to the disposition of all Registrable Securities of the Company covered by such Registration Statement. In the case of amendments and supplements to a Registration Statement which are required to be filed pursuant to this Agreement (including pursuant to this Section 3(b)) by reason of the Company filing a report on Form 10-Q, Form 10-K or any analogous report under the Securities Exchange Act of 1934, as amended (the "**1934 Act**"), the Company shall have incorporated such report by reference into such Registration Statement, if applicable, or shall file such amendments or supplements with the SEC on the same day on which the 1934 Act report is filed which created the requirement for the Company to amend or supplement such Registration Statement.

c.    The Company shall permit Legal Counsel to review and comment upon (i) a Registration Statement at least three (3) Business Days prior to its filing with the SEC and (ii) all amendments and supplements to all Registration Statements (except for Annual Reports on Form 10-K, Reports on Form 10-Q and Reports on Form 8-K and any similar or successor reports) within a reasonable number of days prior to their filing with the SEC. The Company shall furnish to Legal Counsel, without charge, (i) copies of any correspondence from the SEC or the staff of the SEC to the Company or its representatives relating to any Registration Statement, (ii) promptly after the same is prepared and filed with the SEC, one copy of any Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, and all exhibits and (iii) upon the effectiveness of any Registration Statement, one copy of the prospectus included in such Registration Statement and all amendments and supplements thereto. The Company shall reasonably cooperate with Legal Counsel in performing the Company's obligations pursuant to this Section 3(c).

d.    The Company shall furnish to each Investor whose Registrable Securities are included in any Registration Statement, without charge, (i) promptly after the same is prepared and filed with the SEC, at least one copy of such Registration Statement and any amendment(s) thereto, including financial statements and schedules, all documents incorporated therein by reference, if requested by an Investor, all exhibits and each preliminary prospectus, (ii) upon the effectiveness of any Registration Statement, ten (10) copies of the prospectus included in such Registration Statement and all amendments and supplements thereto (or such other number of copies as such Investor may reasonably request) and (iii) such other documents, including copies of any preliminary or final prospectus, as such Investor may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities owned by such Investor.

e.     The Company shall use its commercially reasonable efforts to (i) register and qualify, unless an exemption from registration and qualification applies, the resale by Investors of the Registrable Securities covered by a Registration Statement under such other securities or "blue sky" laws of all applicable jurisdictions in the United States, (ii) prepare and file in those jurisdictions, such amendments (including post-effective amendments) and supplements to such registrations and qualifications as may be reasonably necessary to maintain the effectiveness thereof during the Registration Period, (iii) take such other actions as may be necessary to maintain such registrations and qualifications in effect at all times during the Registration Period, and (iv) take all other actions reasonably necessary or advisable to qualify the Registrable Securities for sale in such jurisdictions; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to (x) qualify to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 3(e), (y) subject itself to taxation in any such jurisdiction, or (z) file a general consent to service of process in any such jurisdiction. The Company shall promptly notify Legal Counsel and each Investor who holds Registrable Securities of the receipt by the Company of any notification with respect to the suspension of the registration or qualification of any of the Registrable Securities for sale under the securities or "blue sky" laws of any jurisdiction in the United States or its receipt of actual notice of the initiation or threatening of any proceeding for such purpose.

f.     The Company shall notify Legal Counsel and each Investor in writing of the happening of any event, as promptly as practicable after becoming aware of such event, as a result of which the prospectus included in a Registration Statement, as then in effect, includes an untrue statement of a material fact or omission to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (provided that in no event shall such notice contain any material, nonpublic information), and, subject to Section 3(r), promptly prepare a supplement or amendment to such Registration Statement to correct such untrue statement or omission, and deliver ten (10) copies of such supplement or amendment to Legal Counsel and each Investor (or such other number of copies as Legal Counsel or such Investor may reasonably request). The Company shall also promptly notify Legal Counsel and each Investor in writing (i) when a prospectus or any prospectus supplement or post-effective amendment has been filed, and when a Registration Statement or any post-effective amendment has become effective (notification of such effectiveness shall be delivered to Legal Counsel and each Investor by facsimile on the as promptly as practicable of such effectiveness and by overnight mail), (ii) of any request by the SEC for amendments or supplements to a Registration Statement or related prospectus or related information, and (iii) of the Company's reasonable determination that a post-effective amendment to a Registration Statement would be appropriate.

g.     The Company shall use its commercially reasonable efforts to prevent the issuance of any stop order or other suspension of effectiveness of a Registration Statement, or the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest as promptly as reasonably practicable and to notify Legal

Counsel and each Investor who holds Registrable Securities being sold of the issuance of such order and the resolution thereof or its receipt of actual notice of the initiation or threat of any proceeding for such purpose.

h. At the reasonable request of any Investor, the Company shall furnish to such Investor, on the date of the effectiveness of the Registration Statement and thereafter from time to time on such dates as the Required Holders may reasonably request (but not more than once in any twelve month period) (i) a letter, dated such date, from the Company's independent certified public accountants in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the Investors, and (ii) an opinion, dated as of such date, of counsel representing the Company for purposes of such Registration Statement, in form, scope and substance as is customarily given in an underwritten public offering, addressed to the Investors.

i. Solely in connection with the need to establish a due diligence defense, the Company shall make available for inspection by (i) any Investor, (ii) Legal Counsel and (iii) one firm of accountants or other agents retained by the Investors (collectively, the "**Inspectors**"), all pertinent financial and other records, and pertinent corporate documents and properties of the Company (collectively, the "**Records**"), as shall be reasonably deemed necessary by each Inspector, and cause the Company's officers, directors and employees to supply all information which any Inspector may reasonably request; provided, however, that each Inspector shall agree to hold in strict confidence and shall not make any disclosure (except to an Investor) or use of any Records or other information which the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, unless (a) the release of such Records is ordered pursuant to a final, non-appealable subpoena or order from a court or government body of competent jurisdiction, or (b) the information in such Records has been made generally available to the public other than by disclosure in violation of this or any other agreement or obligation of which the Inspector has knowledge. Each Investor agrees that it shall, upon learning that disclosure of such Records is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt notice to the Company and allow the Company, at its expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, the Records deemed confidential. Nothing herein (or in any other confidentiality agreement between the Company and any Investor) shall be deemed to limit the Investors' ability to sell Registrable Securities in a manner which is otherwise consistent with applicable laws and regulations.

j. The Company shall hold in confidence and not make any disclosure of information concerning an Investor provided to the Company unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement. The Company agrees that it shall, upon

learning that disclosure of such information concerning an Investor is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to such Investor and allow such Investor, at the Investor's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

k.    The Company shall use its reasonable best efforts to cause all shares of Common Stock issuable upon conversion of the Notes to be reserved for listing on each securities exchange or quotation system on which the Common Stock is then listed no later than the date the applicable Registration Statement is declared effective and, shall cause all Common Stock to be so listed when issued, and, in connection therewith, to make such filings as may be required under the 1934 Act and to have such filings declared effective as and when required thereunder.

l.    The Company shall cooperate with the Investors who hold Registrable Securities being offered and, to the extent applicable, facilitate the timely preparation and delivery of certificates (not bearing any restrictive legend) representing the Registrable Securities to be offered pursuant to a Registration Statement and enable such certificates to be in such denominations or amounts, as the case may be, as the Investors may reasonably request and registered in such names as the Investors may request.

m.    If requested by an Investor and required by applicable securities laws, the Company shall (i) as soon as reasonably practicable incorporate in a prospectus supplement or post-effective amendment such information as an Investor reasonably requests to be included therein relating to the sale and distribution of Registrable Securities, including, without limitation, information with respect to the number of Registrable Securities being offered or sold, the purchase price being paid therefor and any other terms of the offering of the Registrable Securities to be sold in such offering; (ii) as soon as reasonably practicable make all required filings of such prospectus supplement or post-effective amendment after being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment; and (iii) as soon as reasonably practicable, supplement or make amendments to any Registration Statement if reasonably requested by an Investor holding any Registrable Securities.

n.    The Company shall use its commercially reasonable efforts to cause the Registrable Securities covered by a Registration Statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Registrable Securities.

o.    The Company shall make generally available to its security holders as soon as practical, but not later than ninety (90) days after the close of the period covered thereby, an earnings statement (in form complying with, and in the manner provided by, the provisions of Rule 158 under the 1933 Act) covering a twelve-month period beginning not later than the first day of the Company's fiscal quarter next following the effective date of a Registration Statement.

p. Within two (2) Business Days after a Registration Statement which covers Registrable Securities is ordered effective by the SEC, the Company shall deliver, and shall cause legal counsel for the Company to deliver, to the transfer agent for such Registrable Securities (with copies to the Investors whose Registrable Securities are included in such Registration Statement) confirmation that such Registration Statement has been declared effective by the SEC in the form attached hereto as Exhibit A.

q. Notwithstanding anything to the contrary herein, at any time after the Registration Statement has been declared effective by the SEC, the Company may delay the disclosure of material, non-public information concerning the Company the disclosure of which at the time is not, in the good faith opinion of the Board of Directors of the Company in the best interest of the Company and, in the opinion of counsel to the Company, otherwise required (a "**Grace Period**"); provided, that the Company shall promptly (i) notify the Investors in writing of the existence of material, non-public information giving rise to a Grace Period (provided that in each notice the Company will not disclose the content of such material, non-public information to the Investors) and the date on which the Grace Period will begin, and (ii) notify the Investors in writing of the date on which the Grace Period ends; and, provided further, that no Grace Period shall exceed thirty (30) consecutive days and during any three hundred sixty five (365) day period such Grace Periods shall not exceed an aggregate of sixty (60) days and the first day of any Grace Period must be at least two (2) trading days after the last day of any prior Grace Period (each, an "**Allowable Grace Period**"); provided that in the case of a Grace Period caused by an acquisition or probable acquisition or financing, recapitalization, business combination with similar transaction, the Company may upon a second notice to Investors extend the Grace Period by an additional thirty (30) days without incurring liquidated damages pursuant to Section 2(f). For purposes of determining the length of a Grace Period above, the Grace Period shall begin on and include the date the Investors receive the notice referred to in clause (i) and shall end on and include the latter of the date the Investors receive the notice referred to in clause (ii) and the date referred to in such notice. The provisions of Section 3(g) hereof shall not be applicable during the period of any Allowable Grace Period. Upon expiration of the Grace Period, the Company shall again be bound by the first sentence of Section 3(f) with respect to the information giving rise thereto unless such material, non-public information is no longer applicable. Notwithstanding anything to the contrary, the Company shall cause its transfer agent to deliver unlegended Common Stock to a transferee of an Investor in accordance with the terms of the Securities Purchase Agreement in connection with any sale of Registrable Securities with respect to which an Investor has entered into a contract for sale, and delivered a copy of the prospectus included as part of the applicable Registration Statement, prior to the Investor's receipt of the notice of a Grace Period and for which the Investor has not yet settled.

4. Obligations of the Investors.

a. At least ten (10) Business Days prior to the first anticipated filing date of a Registration Statement, the Company shall notify each Investor in writing of the information the Company requires from each such Investor if such Investor elects to have any of such Investor's Registrable Securities included in such Registration Statement. It shall be a

condition precedent to the obligations of the Company to complete the registration pursuant to this Agreement with respect to the Registrable Securities of a particular Investor that such Investor shall furnish to the Company at least two (2) Business Days prior to the filing of a Regulation Statement (or any amendment or supplement thereto) such information regarding itself, the Registrable Securities held by it and to be sold and the intended method of disposition of the Registrable Securities held by it as shall be reasonably required to effect and maintain the effectiveness of the registration of such Registrable Securities and shall execute such documents in connection with such registration as the Company may reasonably request.

b. Each Investor, by such Investor's acceptance of the Registrable Securities, agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of any Registration Statement hereunder, unless such Investor has notified the Company in writing of such Investor's election to exclude all of such Investor's Registrable Securities from such Registration Statement.

c. Each Investor agrees promptly to furnish to the Company, to the extent required by applicable law, all information required to be disclosed in order to make the information previously furnished to the Company by such Investor not misleading and any other information regarding such Investor and the distribution of such Registrable Securities as the Company may from time to time reasonably request.

d. Each Investor agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(g), the first sentence of 3(f) or 3(q), such Investor will immediately discontinue the disposition of Registrable Securities pursuant to any Registration Statement(s) covering such Registrable Securities until such Investor's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(g), the first sentence of 3(f) or 3(q) or receipt of notice that no supplement or amendment is required. Notwithstanding anything to the contrary, the Company shall cause its transfer agent to deliver unlegended Common Stock to a transferee of an Investor in accordance with the terms of the Securities Purchase Agreement in connection with any sale of Registrable Securities with respect to which an Investor has entered into a contract for sale prior to the Investor's receipt of a notice from the Company of the happening of any event of the kind described in Section 3(g), the first sentence of 3(f) or 3(q) and for which the Investor has not yet settled.

5. <u>Expenses of Registration</u>.

All reasonable expenses, other than as set forth below, incurred in connection with registrations, filings or qualifications pursuant to Sections 2 and 3, including, without limitation, (i) all registration and filing fees, (ii) printing expenses, (iii) fees and disbursements of counsel for the Company and Legal Counsel in accordance with the provisions of Section 2(c) hereof (plus up to one local counsel agreed upon by a majority in amount of the Registrable Securities), (iv) fees and disbursements of the Company's independent certified public accountants, (v) fees and expenses incurred in connection with the listing of the securities on the

New York Stock Exchange, and (vi) fees and expenses of all other persons retained by the Company. Notwithstanding the foregoing or anything in this Agreement to the contrary, each holder of the Registrable Securities being registered shall pay all commissions, placement agent fees and underwriting discounts and commissions with respect to any Registrable Securities sold by it and the fees and disbursements of any counsel or other advisors or experts retained by such holders, other than fees of Legal Counsel set forth in the preceding sentence.

6. Indemnification.

In the event any Registrable Securities are included in a Registration Statement under this Agreement:

a. To the fullest extent permitted by law, the Company will, and hereby does, indemnify, hold harmless and defend each Investor, the directors, officers, members, partners, employees, agents, representatives of, and each Person, if any, who controls any Investor within the meaning of the 1933 Act or the 1934 Act (each, an "**Indemnified Person**") and each Affiliate of any Holder, against any losses, claims, damages, liabilities, judgments, fines, penalties, charges, costs, reasonable attorneys' fees, amounts paid in settlement or expenses, joint or several, (collectively, "**Claims**") incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnified party is or may be a party thereto ("**Indemnified Damages**"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) caused by: (i) any untrue statement or alleged untrue statement of a material fact in a Registration Statement or any post-effective amendment thereto or in any filing made in connection with the qualification of the offering under the securities or other "blue sky" laws of any jurisdiction in which Registrable Securities are offered ("**Blue Sky Filing**"), or the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in any preliminary prospectus if used prior to the effective date of such Registration Statement, or contained in the final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in the light of the circumstances under which the statements therein were made, not misleading, (iii) any violation or alleged violation by the Company of the 1933 Act, the 1934 Act, any other law, including, without limitation, any state securities law, or any rule or regulation thereunder relating to the offer or sale of the Registrable Securities pursuant to a Registration Statement or (iv) any material violation of this Agreement (the matters in the foregoing clauses (i) through (iv) (together, the "**Violations**"). Subject to Section 6(c), the Company shall reimburse the Indemnified Persons, promptly as such expenses are incurred and are due and payable, for any legal fees of one counsel for all Indemnified Persons or other reasonable expenses incurred by them in connection with investigating or defending any such Claim. Notwithstanding anything to the contrary contained herein, the indemnification

agreement contained in this Section 6(a): (i) shall not apply to a Claim by an Indemnified Person arising out of or based upon a Violation which occurs in reliance upon and in conformity with information furnished in writing to the Company by such Indemnified Person for such Indemnified Person expressly for use in connection with the preparation of the Registration Statement or any such amendment thereof or supplement thereto, if such prospectus was timely made available by the Company pursuant to Section 3(d); (ii) with respect to any preliminary prospectus, shall not inure to the benefit of any such Person from whom the Person asserting any such Claim purchased the Registrable Securities that are the subject thereof (or to the benefit of any Person controlling such Person) if the untrue statement or omission of material fact contained in the preliminary prospectus was corrected in the prospectus, as then amended or supplemented, if such prospectus was timely made available by the Company pursuant to Section 3(d), and the Indemnified Person was promptly advised in writing not to use the incorrect prospectus prior to the use giving rise to a Violation and such Indemnified Person, notwithstanding such advice, used it or failed to deliver the correct prospectus as required by the 1933 Act and such correct prospectus was timely made available pursuant to Section 3(d); (iii) shall not be available to the extent such Claim is based on a failure of the Investor to deliver or to cause to be delivered the prospectus made available by the Company, including a corrected prospectus, if such prospectus or corrected prospectus was timely made available by the Company pursuant to Section 3(d); and (iv) shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld or delayed. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Indemnified Person and shall survive the transfer of the Registrable Securities by the Investors pursuant to Section 9.

b. In connection with any Registration Statement in which an Investor is participating, each such Investor agrees to severally and not jointly indemnify, hold harmless and defend, to the same extent and in the same manner as is set forth in Section 6(a), the Company, each of its directors, its officers and each Person, if any, who controls the Company within the meaning of the 1933 Act or the 1934 Act and each Affiliate of the Company (each, an "**Indemnified Party**"), against any Claim or Indemnified Damages to which any of them may become subject, under the 1933 Act, the 1934 Act or otherwise, insofar as such Claim or Indemnified Damages arise out of or are based upon any Violation, in each case to the extent, and only to the extent, that such Violation occurs in reliance upon and in conformity with written information furnished to the Company by such Investor expressly for use in connection with such Registration Statement; and, subject to Section 6(c), such Investor will reimburse any legal fees of one counsel for all Indemnified Persons or other expenses reasonably incurred by an Indemnified Party in connection with investigating or defending any such Claim; provided, however, that the indemnity agreement contained in this Section 6(b) and the agreement with respect to contribution contained in Section 7 shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of such Investor, which consent shall not be unreasonably withheld or delayed; provided, further, however, that the Investor shall be liable under this Section 6(b) for only that amount of a Claim or Indemnified Damages as does not exceed the net proceeds to such Investor as a result of the sale of Registrable Securities pursuant to such Registration Statement. Such indemnity shall remain in

full force and effect regardless of any investigation made by or on behalf of such Indemnified Party and shall survive the transfer of the Registrable Securities by the Investors pursuant to Section 9. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this Section 6(b) with respect to any preliminary prospectus shall not inure to the benefit of any Indemnified Party if the untrue statement or omission of material fact contained in the preliminary prospectus was corrected on a timely basis in the prospectus, as then amended or supplemented.

c. Promptly after receipt by an Indemnified Person or Indemnified Party under this Section 6 of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof; provided, however, that an Indemnified Person or Indemnified Party shall have the right to retain its own counsel with the fees and expenses of not more than one counsel for all such Indemnified Persons or Indemnified Parties to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the indemnifying party, the representation by such counsel of the Indemnified Persons or Indemnified Parties and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding. In the case of an Indemnified Person, legal counsel referred to in the immediately preceding sentence shall be selected by the Investors holding at least a majority in interest of the Registrable Securities included in the Registration Statement to which the Claim relates. The Indemnified Party or Indemnified Person shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or Claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or Claim. The indemnifying party shall keep the Indemnified Party or Indemnified Person reasonably apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any settlement of any action, claim or proceeding effected without its prior written consent; provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the prior written consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in respect to such Claim or litigation. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability

to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is prejudiced in its ability to defend such action.

d. The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

e. The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others, and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

7. Contribution.

To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under Section 6 to the fullest extent permitted by law; provided, however, that: (i) no Person involved in the sale of Registrable Securities which Person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) in connection with such sale shall be entitled to contribution from any Person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any seller of Registrable Securities shall be limited in amount to the net amount of proceeds received by such seller from the sale of such Registrable Securities pursuant to such Registration Statement.

8. Reports Under the 1934 Act.

With a view to making available to the Investors the benefits of Rule 144 promulgated under the 1933 Act or any other similar rule or regulation of the SEC that may at any time permit the Investors to sell securities of the Company to the public without registration ("**Rule 144**"), the Company agrees to:

a. make and keep public information available, as those terms are understood and defined in Rule 144;

b. file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act so long as the Company remains subject to such requirements and the filing of such reports and other documents is required for the applicable provisions of Rule 144; and

c. furnish to each Investor so long as such Investor owns Registrable Securities, promptly upon request, (i) a written statement by the Company, if true, that it has complied with the reporting requirements of Rule 144, the 1933 Act and the 1934 Act, (ii) a copy of the most recent annual report of the Company and such other reports and documents so filed

by the Company, and (iii) such other information as may be reasonably requested to permit the Investors to sell such securities pursuant to Rule 144 without registration.

9. Assignment of Registration Rights.

The rights under this Agreement shall be automatically assignable by the Investors to any transferee of all or any portion of such Investor's Registrable Securities if: (i) the Investor notifies the Company after such assignment; (ii) the Company is, within a reasonable time after such transfer or assignment, furnished with written notice of (a) the name and address of such transferee or assignee, and (b) the securities with respect to which such registration rights are being transferred or assigned; (iii) immediately following such transfer or assignment the further disposition of such securities by the transferee or assignee is restricted under the 1933 Act and applicable state securities laws; (iv) at or before the time the Company receives the written notice contemplated by clause (ii) of this sentence the transferee or assignee agrees in writing with the Company to be bound by all of the provisions contained herein; and (v) such transfer shall have been made in accordance with the applicable requirements of the Securities Purchase Agreement.

10. Amendment of Registration Rights.

Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Required Holders. Any amendment or waiver effected in accordance with this Section 10 shall be binding upon each Investor and the Company. No such amendment shall be effective to the extent that it applies to less than all of the holders of the Registrable Securities. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration also is offered to all of the parties to this Agreement.

11. Miscellaneous.

a. A Person is deemed to be a holder of Registrable Securities whenever such Person owns or is deemed to own of record such Registrable Securities. If the Company receives conflicting instructions, notices or elections from two or more Persons with respect to the same Registrable Securities, the Company shall act upon the basis of instructions, notice or election received from the such record owner of such Registrable Securities.

b. Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); or (iii) one Business Day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to the Company:

Global Power Equipment Group Inc.
6120 South Yale, Suite 1480
Tulsa, Oklahoma 74136
Telephone: (918) 488-0828
Facsimile: (918) 274-2367
Attention: General Counsel

If to Legal Counsel:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955
Attention: Christian H. Mittweg, Esq.

If to a Buyer, to its address and facsimile number set forth on the Schedule of Buyers attached hereto, with copies to such Buyer's representatives as set forth on the Schedule of Buyers, or to such other address and/or facsimile number and/or to the attention of such other Person as the recipient party has specified by written notice given to each other party five (5) days prior to the effectiveness of such change. Written confirmation of receipt (A) given by the recipient of such notice, consent, waiver or other communication, (B) mechanically or electronically generated by the sender's facsimile machine containing the time, date, recipient facsimile number and an image of the first page of such transmission or (C) provided by a courier or overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from a nationally recognized overnight delivery service in accordance with clause (i), (ii) or (iii) above, respectively.

c. Failure of any party to exercise any right or remedy under this Agreement or otherwise, or delay by a party in exercising such right or remedy, shall not operate as a waiver thereof.

d. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by the internal laws of the State of New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of New York. Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees

not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper. Each party hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address for such notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by law. If any provision of this Agreement shall be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect the validity or enforceability of the remainder of this Agreement in that jurisdiction or the validity or enforceability of any provision of this Agreement in any other jurisdiction. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION HEREWITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY.**

e. This Agreement, the other Transaction Documents (as defined in the Securities Purchase Agreement) and the instruments referenced herein and therein constitute the entire agreement among the parties hereto with respect to the subject matter hereof and thereof. There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein and therein. This Agreement, the other Transaction Documents and the instruments referenced herein and therein supersede all prior agreements and understandings among the parties hereto with respect to the subject matter hereof and thereof.

f. Subject to the requirements of Section 9, this Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of each of the parties hereto.

g. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

h. This Agreement may be executed in identical counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

i. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

j.    All consents and other determinations required to be made by the Investors pursuant to this Agreement shall be made, unless otherwise specified in this Agreement, by Investors holding at least a majority of the Registrable Securities, determined as if all of the Notes held by Investors then outstanding have been converted into Registrable Securities without regard to any limitations on conversion of the Notes.

k.    The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent and no rules of strict construction will be applied against any party.

l.    This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person.

* * * * * *

**IN WITNESS WHEREOF,** each Buyer and the Company have caused this Registration Rights Agreement to be duly executed as of the date first written above.

**COMPANY:**
**GLOBAL POWER EQUIPMENT GROUP INC.**

By: James P. Wilson
Name: James P. Wilson
Title: CFO and V.P. of Finance

**IN WITNESS WHEREOF**, each Buyer and the Company have caused this Registration Rights Agreement to be duly executed as of the date first written above.

**BUYERS:**

**KINGSROAD INVESTMENTS LTD.**

By: [signature]
Name: ALEXANDER E. JACKSON
Title: PRINCIPAL

**IN WITNESS WHEREOF**, each Buyer and the Company have caused this Registration Rights Agreement to be duly executed as of the date first written above.

**BUYERS:**

**STEELHEAD INVESTMENTS LTD.**
**By: HBK Investments L.P.**
**Title: Investment Advisor**

By: David C Haley
Name: DAVID C HALEY
Title: Authorized Signatory

**IN WITNESS WHEREOF,** each Buyer and the Company have caused this Registration Rights Agreement to be duly executed as of the date first written above.

**BUYERS:**

**D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.**

**By: D.B. Zwirn and Co., LP**

By:______________________________
Name: Perry A. Gruss
Title: Chief Financial Officer

**IN WITNESS WHEREOF**, each Buyer and the Company have caused this Registration Rights Agreement to be duly executed as of the date first written above.

**BUYERS:**

**D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, LTD.**

**By: D.B. Zwirn and Co., LP**

By:______________________________
Name: Perry A. Gruss
Title: Chief Financial Officer

**IN WITNESS WHEREOF**, each Buyer and the Company have caused this Registration Rights Agreement to be duly executed as of the date first written above.

**BUYERS:**

**HCM/Z SPECIAL OPPORTUNITIES LLC**

**By: D.B. Zwirn and Co., LP**

By:________________________
Name: Perry A. Gruss
Title: Authorized Signatory

# SCHEDULE OF BUYERS

| Buyer | Buyer's Address and Facsimile Number | Buyer's Representative's Address and Facsimile Number |
|---|---|---|
| Kings Road Investments Ltd. | c/o Polygon Investment Partners LP<br>598 Madison Avenue<br>New York, NY 10022<br>Facsimile: (212) 359-7303<br>Telephone: (212) 359-7333<br>Attention: Brandon Jones<br>Erik Caspersen | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn: Christian Mittweg, Esq.<br>Facsimile: (212) 593-5955<br>Telephone: (212) 756-2000 |
| Steelhead Investments Ltd. | c/o HBK Investments L.P.<br>300 Crescent Court, Suite 700<br>Dallas, Texas 75201<br>Attention: Legal Department<br>Facsimile: 214-758-1207 | |
| D.B. Zwirn Special Opportunities Fund, L.P. | c/o D.B. Zwirn & Co., L.P.<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>Phone: (646) 720-9100<br>Fax: (646) 720-9000<br>Attention: Daniel B. Zwirn<br>Perry A. Gruss | |
| D.B. Zwirn Special Opportunities Fund, Ltd. | c/o D.B. Zwirn & Co., L.P.<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>Phone: (646) 720-9100<br>Fax: (646) 720-9000<br>Attention: Daniel B. Zwirn<br>Perry A. Gruss | |
| HCM/Z Special Opportunities LLC | c/o D.B. Zwirn & Co., L.P.<br>745 Fifth Avenue, 18th Floor<br>New York, New York 10151<br>Phone: (646) 720-9100<br>Fax: (646) 720-9000<br>Attention: Daniel B. Zwirn<br>Perry A. Gruss | |

**EXHIBIT A**

**FORM OF NOTICE OF EFFECTIVENESS OF REGISTRATION STATEMENT**

EquiServe Trust Company, N.A.
250 Royall Street
Canton, MA 02021
Attention: Monique Hughes
Facsimile: 781-575-4812

Re: Global Power Equipment Group Inc.

Ladies and Gentlemen:

[We are][I am] counsel to Global Power Equipment Group Inc., a Delaware corporation (the "**Company**"), and have represented the Company in connection with that certain Securities Purchase Agreement (the "**Securities Purchase Agreement**") entered into by and among the Company and the buyers named therein (collectively, the "**Holders**") pursuant to which the Company issued to the Holders convertible notes (the "**Notes**") convertible into the Company's common stock, par value $.01 per share (the "**Common Stock**"). Pursuant to the Securities Purchase Agreement, the Company also has entered into a Registration Rights Agreement with the Holders (the "**Registration Rights Agreement**") pursuant to which the Company agreed, among other things, to register the Registrable Securities (as defined in the Registration Rights Agreement), including the Common Stock issuable upon conversion of the Notes, under the Securities Act of 1933, as amended (the "**1933 Act**"). In connection with the Company's obligations under the Registration Rights Agreement, on ____________ ___, 200_, the Company filed a Registration Statement on Form S-3 (File No. 333-_____________) (the "**Registration Statement**") with the Securities and Exchange Commission (the "**SEC**") relating to the Registrable Securities which names each of the Holders as a selling shareholder thereunder.

In connection with the foregoing, [we][I] advise you that a member of the SEC's staff has advised [us][me] by telephone that the SEC has entered an order declaring the Registration Statement effective under the 1933 Act at [ENTER TIME OF EFFECTIVENESS] on [ENTER DATE OF EFFECTIVENESS] and [we][I] have no knowledge, after telephonic inquiry of a member of the SEC's staff, that any stop order suspending its effectiveness has been issued or that any proceedings for that purpose are pending before, or threatened by, the SEC and the Registrable Securities are available for resale under the 1933 Act pursuant to the Registration Statement.

This letter shall serve as our standing opinion to you that the Common Stock are freely transferable by the Holders pursuant to the Registration Statement. You need not require further letters from us to effect any future legend-free issuance or reissuance of Common Stock to the Holders as contemplated by the Company's Irrevocable Transfer Agent Instructions dated November 23, 2004. This letter shall serve as our standing opinion with regard to this matter.

Very truly yours,

[ISSUER'S COUNSEL]

By:______________________

CC: **[LIST NAMES OF HOLDERS]**

**EXHIBIT B**

## SELLING SHAREHOLDERS

The shares of Common Stock being offered by the selling shareholders are issuable upon conversion of the convertible notes. For additional information regarding the convertible notes, see "Private Placement of Convertible Notes " above. We are registering the shares of Common Stock in order to permit the selling shareholders to offer the shares for resale from time to time. Except for the ownership of the convertible notes, the selling shareholders have not had any material relationship with us within the past three years.

The table below lists the selling shareholders and other information regarding the beneficial ownership of the shares of Common Stock by each of the selling shareholders. The second column lists the number of shares of Common Stock beneficially owned by each selling shareholder, based on its ownership of the convertible notes, as of ________, 200_, assuming conversion of all convertible notes held by the selling shareholders on that date, without regard to any limitations on conversions or exercise.

The third column lists the shares of Common Stock being offered by this prospectus by the selling shareholders.

In accordance with the terms of registration rights agreements with the holders of the convertible notes, this prospectus generally covers the resale of at least 120% of that number of shares of Common Stock equal to the number of shares of Common Stock issuable upon conversion of the convertible notes, determined as if the outstanding convertible notes were converted or exercised, as applicable, in full, in each case, as of the trading day immediately preceding the date this registration statement was initially filed with the SEC. Because the conversion price of the convertible notes may be adjusted, the number of shares that will actually be issued may be more or less than the number of shares being offered by this prospectus. The fourth column assumes the sale of all of the shares offered by the selling shareholders pursuant to this prospectus.

Under the terms of the convertible notes, a selling shareholder may not convert the convertible notes, to the extent such conversion or exercise would cause such selling shareholder, together with its Affiliates, to beneficially own a number of shares of Common Stock which would exceed 4.99% of our then outstanding shares of Common Stock following such conversion or exercise, excluding for purposes of such determination shares of Common Stock issuable upon conversion of the convertible notes which have not been converted. The number of shares in the second column does not reflect this limitation. The selling shareholders may sell all, some or none of their shares in this offering. See "Plan of Distribution."

| Name of Selling Shareholder | Number of Shares Owned Prior to Offering | Maximum Number of Shares to be Sold Pursuant to this Prospectus | Number of Shares Owned After Offering |
|---|---|---|---|
| Kings Road Investments Ltd. (1) | [___] | [___] | [0] |
| Steelhead Investments Ltd. (2) | [___] | [___] | [0] |
| D.B. Zwirn Special Opportunities Fund, L.P. (3) | | | |
| D.B. Zwirn Special Opportunities Fund, Ltd. (4) | | | |
| HCM/Z Special Opportunities LLC (5) | | | |

(1)

(2)

(3)

(4)

(5)

## PLAN OF DISTRIBUTION

We are registering the shares of Common Stock issuable upon conversion of the convertible notes to permit the resale of these shares of Common Stock by the holders of the convertible notes from time to time after the date of this prospectus. We will not receive any of the proceeds from the sale by the selling shareholders of the shares of Common Stock. We will bear all fees and expenses incident to our obligation to register the shares of Common Stock.

The selling shareholders may sell all or a portion of the shares of Common Stock beneficially owned by them and offered hereby from time to time directly or through one or more underwriters, broker-dealers or agents. If the shares of Common Stock are sold through underwriters or broker-dealers, the selling shareholders will be responsible for underwriting discounts or commissions or agent's commissions. The shares of Common Stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale, or at negotiated prices. These sales may be effected in transactions, which may involve crosses or block transactions,

- on any national securities exchange or quotation service on which the securities may be listed or quoted at the time of sale;
- in the over-the-counter market;
- in transactions otherwise than on these exchanges or systems or in the over-the-counter market;
- through the writing of options, whether such options are listed on an options exchange or otherwise;
- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;
- block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;
- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;
- an exchange distribution in accordance with the rules of the applicable exchange;
- privately negotiated transactions;
- short sales;
- broker-dealers may agree with the selling securityholders to sell a specified number of such shares at a stipulated price per share;
- a combination of any such methods of sale; and

- any other method permitted pursuant to applicable law.

If the selling shareholders effect such transactions by selling shares of Common Stock to or through underwriters, broker-dealers or agents, such underwriters, broker-dealers or agents may receive commissions in the form of discounts, concessions or commissions from the selling shareholders or commissions from purchasers of the shares of Common Stock for whom they may act as agent or to whom they may sell as principal (which discounts, concessions or commissions as to particular underwriters, broker-dealers or agents may be in excess of those customary in the types of transactions involved). In connection with sales of the shares of Common Stock or otherwise, the selling shareholders may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of Common Stock in the course of hedging in positions they assume. The selling shareholders may also sell shares of Common Stock short and deliver shares of Common Stock covered by this prospectus to close out short positions. The selling shareholders may also loan or pledge shares of Common Stock to broker-dealers that in turn may sell such shares.

The selling shareholders may pledge or grant a security interest in some or all of the convertible notes or shares of Common Stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of Common Stock from time to time pursuant to this prospectus or any amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933, as amended, amending, if necessary, the list of selling shareholders to include the pledgee, transferee or other successors in interest as selling shareholders under this prospectus. The selling shareholders also may transfer and donate the shares of Common Stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The selling shareholders and any broker-dealer participating in the distribution of the shares of Common Stock may be deemed to be "underwriters" within the meaning of the Securities Act, and any commission paid, or any discounts or concessions allowed to, any such broker-dealer may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of Common Stock is made, a prospectus supplement, if required, will be distributed which will set forth the aggregate amount of shares of Common Stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling shareholders and any discounts, commissions or concessions allowed or reallowed or paid to broker-dealers.

Under the securities laws of some states, the shares of Common Stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of Common Stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with.

There can be no assurance that any selling shareholder will sell any or all of the shares of Common Stock registered pursuant to the shelf registration statement, of which this prospectus forms a part.

The selling shareholders and any other person participating in such distribution will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including, without limitation, Regulation M of the Exchange Act, which may limit the timing of purchases and sales of any of the shares of Common Stock by the selling shareholders and any other participating person.  Regulation M may also restrict the ability of any person engaged in the distribution of the shares of Common Stock to engage in market-making activities with respect to the shares of Common Stock.  All of the foregoing may affect the marketability of the shares of Common Stock and the ability of any person or entity to engage in market-making activities with respect to the shares of Common Stock.

We will pay all expenses of the registration of the shares of Common Stock pursuant to the registration rights agreement, estimated to be $[    ] in total, including, without limitation, Securities and Exchange Commission filing fees and expenses of compliance with state securities or "blue sky" laws; provided, however, that a selling shareholder will pay all underwriting discounts and selling commissions, if any.  We will indemnify the selling shareholders against liabilities, including some liabilities under the Securities Act, in accordance with the registration rights agreements, or the selling shareholders will be entitled to contribution.  We may be indemnified by the selling shareholders against civil liabilities, including liabilities under the Securities Act, that may arise from any written information furnished to us by the selling shareholder specifically for use in this prospectus, in accordance with the related registration rights agreements, or we may be entitled to contribution.

Once sold under the shelf registration statement, of which this prospectus forms a part, the shares of Common Stock will be freely tradable in the hands of persons other than our affiliates.

S-3 1 ds3.htm FORM S-3

Table of Contents

As filed with the Securities and Exchange Commission on December 23, 2004
Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM S-3
# REGISTRATION STATEMENT

*UNDER*
*THE SECURITIES ACT OF 1933*

# GLOBAL POWER EQUIPMENT GROUP INC.

(Exact name of registrant as specified in its charter)

| Delaware | 73-1541378 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**6120 South Yale, Suite 1480**
**Tulsa, Oklahoma 74136**
**(918) 488-0828**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Candice L. Cheeseman, Esq.**
**General Counsel and Secretary**
**6120 South Yale, Suite 1480**
**Tulsa, Oklahoma 74136**
**(918) 488-0828**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent for Service)

*WITH COPIES TO:*
**Robert J. Melgaard, Esq.**
**Mark D. Berman, Esq.**
**Conner & Winters, P.C.**
**3700 First Place Tower**
**15 East Fifth Street**
**Tulsa, Oklahoma 74103**
**(918) 586-5711**
**(918) 586-8548 (Facsimile)**

**Approximate date of commencement of proposed sale of the securities to the public:** From time to time after this Registration Statement becomes effective.

If the only securities being registered on this Form are being offered pursuant to dividend or interest reinvestment plans,

please check the following box: ☐

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act, other than securities offered only in connection with dividend or interest reinvestment plans, please check the following box: ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, check the following box. ☐

**CALCULATION OF REGISTRATION FEE**

| Title Of Each Class Of Securities To Be Registered | Amount To Be Registered | Proposed Maximum Offering Price Per Share (1) | Proposed Maximum Aggregate Offering Price | Amount Of Registration Fee |
|---|---|---|---|---|
| Common stock ($0.01 par value) | 7,803,959(2) | $9.33 | $72,810,937 | $8,569.85 |

(1) Estimated solely for purposes of calculating the registration fee, pursuant to Rule 457(c) of the Securities Act of 1933, as amended, on the basis of $9.33 per share, the average of the high and low sales prices of the common stock as reported on the New York Stock Exchange for December 16, 2004, which was five business days prior to this filing.

(2) Represents 120% of the maximum number of shares of common stock initially issuable upon conversion of $69.0 million in principal amount of our 4.25% convertible senior subordinated notes due 2011 at an initial conversion price of $10.61 per share. In addition to the shares of common stock set forth in the table above, pursuant to Rule 416 under the Securities Act, we are registering an indeterminate number of shares of common stock issuable upon conversion of the convertible notes in connection with an adjustment of the conversion price pursuant to the terms of the convertible notes, or in exchange or replacement of such shares of common stock.

---

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until this Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**The information in this prospectus is not complete and may be changed. The selling stockholders may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.**

**SUBJECT TO COMPLETION, DATED DECEMBER 23, 2004**

# 7,803,959

# GLOBAL POWER EQUIPMENT GROUP INC.

# COMMON STOCK

This prospectus relates to the offer and sale from time to time of up to an aggregate of 7,803,959 shares of our common stock for the account of the selling stockholders named in this prospectus. The selling stockholders, or their transferees, pledgees, donees or other successors in interest, may sell their shares of common stock by the methods described under "Plan of Distribution."

The shares of common stock being registered for resale consist of shares of common stock issuable upon the conversion of convertible notes sold in a private placement on November 23, 2004, which is more fully described under the heading "Global Power Equipment Group Inc.—Recent Events—Private Placement of Convertible Notes."

We will not receive any of the proceeds from the sale by the selling stockholders of the shares of common stock.

Our common stock is listed on the New York Stock Exchange under the symbol "GEG." On December 21, 2004, the last reported sales price for our common stock was $9.76.

**There are significant risks associated with an investment in our securities. See "Risk Factors" beginning on page 6. You should also read carefully the risks we describe in our periodic reports that we file with the Securities and Exchange Commission, for a better understanding of the risks and uncertainties that investors in our securities should consider.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

The date of this prospectus is , .

Table of Contents

## TABLE OF CONTENTS

| | Page |
|---|---|
| Global Power Equipment Group Inc. | 3 |
| Risk Factors | 6 |
| No Proceeds | 14 |
| Cautionary Notice Regarding Forward Looking Statements. | 14 |
| Description of Capital Stock | 15 |
| Selling Stockholders | 18 |
| Plan of Distribution | 21 |
| Legal Matters | 24 |
| Experts | 24 |
| Where You Can Find More Information | 24 |
| Incorporation of Certain Documents By Reference | 25 |

**You should rely only on the information contained in or specifically incorporated by reference into this prospectus. We have not authorized anyone to provide you with information that is different. This prospectus may only be used where it is legal to sell these securities. The information in this prospectus or incorporated by reference into this prospectus may only be accurate on the date of those documents.**

Table of Contents

## GLOBAL POWER EQUIPMENT GROUP INC.

### Our Business

We are a global designer, engineer and fabricator of a comprehensive portfolio of equipment for gas turbine power plants and power-related equipment for industrial operations, with over 30 years of power generation industry experience. We believe that we are a leader in our industry, offer one of the broadest ranges of gas turbine power plant and other power-related equipment in the world, and hold the number one or number two market position by sales in a majority of our product lines. Our equipment is installed in power plants and in industrial operations in more than 40 countries on six continents. We believe that we have one of the largest installed bases of equipment for power generation in the world. In addition, we provide our customers with value-added services including engineering, retrofit and upgrade, and maintenance and repair.

We sell our products to the gas turbine power generation market. Our products are critical to the efficient operation of gas turbine power plants and are highly engineered to meet customer-specific requirements. Our products include:

- heat recovery steam generators;
- filter houses;
- inlet systems;
- gas turbine, steam turbine and generator enclosures;
- exhaust systems;
- diverter dampers; and
- specialty boilers and related products.

We market and sell our products globally under the *Deltak, Braden* and *Consolidated Fabricators* brand names through our worldwide sales network.

We fabricate our equipment through a combination of in-house manufacturing and extensive outsourcing relationships. Our network of subcontractors, located throughout 17 countries, allows us to manufacture equipment for power plant projects and power-related equipment worldwide at competitive prices. Our subcontractors enable us to meet increasing demand without being restricted by internal manufacturing capacity limitations, thus limiting our capital expenditure requirements. Using subcontractors also allows us to limit our fixed costs, thereby providing a significant benefit during times of decreased demand.

We believe our design and engineering capabilities differentiate us from our competitors. By providing high-quality products on a timely basis and offering a broad range of equipment, we have forged longstanding relationships with the leading power industry participants, including General Electric, Mitsubishi Heavy Industries, Siemens-Westinghouse, Exxon Mobil, Southern Companies, Tenaska and Bechtel.

### Our Executive Offices

Our headquarters and principal executive offices are located at 6120 South Yale, Suite 1480, Tulsa, Oklahoma 74136. Our telephone number is (918) 488-0828.

Table of Contents

**Recent Developments**

***Agreement to Acquire Williams Industrial Services Group***

On November 23, 2004, we entered into a Purchase Agreement with Williams Group International LLC, a Georgia limited liability company, to purchase all of the outstanding limited liability company interests of three Georgia limited liability companies, which we refer to collectively as Williams Industrial Services Group, or "WISG." Founded in 1958, Williams Industrial Services Group provides routine and specialty maintenance services to firms engaged in power generation, pulp and paper manufacturing and to government agencies, primarily the Department of Energy. Approximately 80% of WISG's annual revenue is derived from services provided to firms in power generation and includes work at nuclear power plants, coal-fired power plants and other fossil fuel plants as well as hydro-based generating facilities.

The purchase price will consist of an "Equity Purchase Price" payable at closing and a "Deferred Purchase Price." The Equity Purchase Price is $65.0 million, subject to certain customary adjustments. The Deferred Purchase Price will range from zero to $0.9 million and will be payable by us in cash in 2006. The Deferred Purchase Price is contingent on the attainment by WISG of certain gross profit targets for 2005.

The WISG Purchase Agreement is subject to customary closing conditions. We expect to close the acquisition in April of 2005. We will be required to escrow $7.65 million of the net proceeds from the sale of the convertible notes referred to under "—Private Placement of Convertible Notes," below, for future interest payments for the benefit of the convertible noteholders if the closing does not occur by April 30, 2005. If the acquisition is not consummated by June 30, 2005, we will be required to pay certain outstanding loans under our credit agreement with the net proceeds from the sale of the convertible notes.

***Private Placement of Convertible Notes***

On November 23, 2004, we completed a private placement of $69.0 million aggregate principal amount of our 4.25% convertible senior subordinated notes due 2011. We intend to use the net proceeds of the offering, together with borrowings under our credit facility and cash on hand, to fund the purchase of WISG described above. The convertible notes bear interest at a rate of 4.25% per year, payable semi-annually on May 23 and November 23 of each year, beginning on May 23, 2005. The convertible notes are convertible into shares of our common stock at an initial conversion price of $10.61 per share of common stock, which is equal to approximately 122% of the volume weighted average price of our common stock on November 22, 2004. The conversion price is subject to adjustment in certain circumstances.

Upon the occurrence of an "Event of Default," or a "Change of Control," the noteholders may require us to redeem all or any portion of the convertible notes. A "Triggering Event" will be deemed to occur if we incur any indebtedness in addition to "Permitted Indebtedness," and at the time of such incurrence, our trailing 12 months "Consolidated EBITDA" does not equal or exceed $30.0 million or, as a result of the incurrence, our "Consolidated Leverage Ratio" exceeds 4.75 to 1.0. Within 30 days of the occurrence of a Triggering Event, we will be required to offer to redeem all or any portion of the convertible notes then outstanding at a redemption price equal to the principal balance of the notes plus all accrued and unpaid interest. If at any time prior to the incurrence of a Triggering Event, the weighted average price of our common stock equals or exceeds 150% of the conversion price then in effect for a period of 15 out of 30 consecutive trading days, the restrictions on "Permitted Indebtedness" will be removed. We may redeem all or any portion of the convertible notes, at our option, at any time on or after

**Table of Contents**

November 23, 2007 if the weighted average price of our common stock exceeds 165% of the conversion price then in effect for a period of 20 out of 30 consecutive trading days. At any time beginning on May 23, 2005 and continuing until the date that is the six month anniversary of the date of this prospectus, the noteholders may, at their option, require us to redeem up to $9.0 million of the convertible notes. Beginning on November 23, 2009, the noteholders may, at their option, require us to redeem all or any portion of the convertible notes. In such event, we may elect, at our option and subject to certain conditions, to pay up to 50% of the redemption price in shares of our common stock valued at 94% of the weighted average price of the common stock for the 20-day trading period immediately preceding the redemption date.

We agreed, pursuant to a registration rights agreement entered into in connection with such transaction, to register for resale by the noteholders 120% of the number of shares of common stock issuable upon conversion of the convertible notes. This prospectus covers the resale by each of the noteholders of such shares.

Additional information about the convertible notes is available in our Current Report on Form 8-K filed with the SEC on November 30, 2004, which is incorporated by reference into this prospectus, as described in "Incorporation of Certain Documents by Reference."

Table of Contents

## RISK FACTORS

*Before you invest in our securities, you should be aware that there are various risks. You should carefully consider the risk factors set forth in this prospectus, the prospectus supplement with respect to a particular offering of securities and the reports we file with the SEC which are incorporated by reference into this prospectus, as well as other information we include or incorporate by reference in this prospectus, before you decide whether an investment in that security is suitable for you. These are not the only risks and uncertainties we face. Additional risks and uncertainties that we are presently unaware of or currently consider immaterial may also adversely affect our business operations.*

***Our pending acquisition of WISG might not be consummated. If the WISG acquisition is completed, we cannot assure you that our combined results will conform to our expectations. There may be additional risks associated with operating the WISG business.***

The consummation of the WISG acquisition is subject to the satisfaction of customary conditions, including the accuracy of the various representations and warranties of the parties contained in the purchase and sale agreement on the closing date. In addition, the purchase and sale agreement may be terminated by either party in most circumstances if the closing does not occur by April 30, 2005. Although we believe that the conditions to closing the WISG acquisition will be satisfied and that the closing will occur in April of 2005, we cannot assure you that the transaction will be consummated. If on or prior to April 30, 2005, the contemplated acquisition of WISG has not been consummated, we will be required to escrow $7.65 million of the net proceeds from the sale of the convertible notes for future interest payments for the benefit of the convertible note holders until the WISG acquisition is consummated. If the acquisition is not consummated by June 30, 2005, we will be required to pay certain outstanding loans under our credit agreement with the net proceeds from the sale of the convertible notes.

If the WISG acquisition is consummated, we cannot assure you that our actual results will match our expectations. Successful acquisitions require an assessment of a number of factors, many of which are beyond our control and are inherently uncertain. Factors which may cause our actual results to differ materially from our expected results include the curtailment of major maintenance projects by one or more of WISG's major customers or unanticipated difficulties or delays in integrating the operations of WISG with our own.

There may be additional risks associated with the operation of the WISG business if the acquisition is consummated, including:

- the loss of the services of certain of WISG's key management;
- environmental issues arising from certain services performed by WISG;
- potential liability stemming from work-related accidents involving WISG's contract employees; and
- labor issues resulting from WISG's heavy reliance on union contract employees.

***Substantially all of our revenues are from sales of equipment for gas turbine power plants. During periods of declining construction of new gas turbine power plants, the market for our products is significantly diminished.***

Table of Contents

The demand for our products and services depends on the continued construction of gas turbine power generation plants. In fiscal year 2003, approximately 87% of our revenues were from sales of equipment and provision of services for gas turbine power plants. The power generation equipment industry has experienced cyclical periods of slow growth or decline. In periods of decreased demand for new gas turbine power plants, our customers may be more likely to decrease expenditures on the types of products and systems that we supply and, as a result, our future revenues may decrease. In addition, the gas turbine power industry depends on natural gas. A rise in the price or a shortage of natural gas could affect the profitability or operations of gas turbine power plants, which could adversely affect our future revenues.

Environmental laws and regulations have played a part in the increased use of gas turbine technology in various jurisdictions. These laws and regulations may change or other jurisdictions may not adopt similar laws and regulations. Changes in existing laws and regulations could result in a reduction in the building and refurbishment of gas turbine power plants. In addition, stricter environmental regulation could result in our customers seeking new ways of generating electricity that do not require the use of our products. Furthermore, although gas turbine power plants have lower emissions than coal-fired power plants, emissions from gas turbine power plants remain a concern and attempts to reduce or regulate emissions could increase the cost of gas turbine power plants and result in our customers switching to alternative sources of power.

Other current power technologies, improvements to these technologies and new alternative power technologies that compete or may compete in the future with gas turbine power plants could affect our sales and profitability. Furthermore, in fiscal year 2003, approximately 45% of our revenues were from sales of heat recovery equipment used in combined-cycle power plants. Any change in the power generation industry which results in a decline in the construction of new combined-cycle power plants or a decline in the upgrading of existing simple-cycle power plants to combined-cycle power plants could materially adversely affect our sales.

Because some of our contracts stipulate that customer progress payments be made in advance of work performed, increases in overall sales volume allow us to finance a portion of our business through these payments. Conversely, a prolonged decline in new bookings of sales that provide for progress payments, or, if due to competitive market conditions we elect to extend progress payment schedules, our ability to finance our business from operating sources may be adversely affected and other financing sources may be required.

***A small number of major customers account for a significant portion of our revenues, and the loss of any of these customers could negatively impact our business.***

We depend on a relatively small number of customers for a significant portion of our revenues. In fiscal year 2001, three customers accounted for approximately 52% of our consolidated revenues. In fiscal year 2002, two customers accounted for approximately 49% of our consolidated revenues. In fiscal year 2003, two customers accounted for approximately 42% of our consolidated revenues and approximately 33% of our backlog at the end of the year. In addition, our five largest customers accounted for approximately 62% of our revenues in fiscal year 2003 and approximately 54% of our backlog at the end of the year. Other than their obligations under firm orders placed in our backlog, none of our customers has a long-term contractual obligation to purchase any material amounts of products from us. All of our firm orders contain cancellation provisions, which permit us to recover only our costs and a portion of our anticipated profit in the event a customer cancels its order. If a customer elects to cancel, we may not realize the full amount of future revenues included in our backlog. We expect to continue to depend upon a relatively small number of customers for a significant percentage of our revenues. Because our major customers represent a large part of our business, the loss of any of our major customers could negatively impact our business and results of operations.

Table of Contents

***If our costs exceed the estimates we use to set the fixed prices of our contracts, our earnings will be reduced.***

We enter into nearly all of our contracts on a fixed-price basis. As a result, we benefit from cost savings, but have limited ability to recover any cost overruns. Contract prices are established based in part on our projected costs, which are subject to a number of assumptions. The costs that we incur in connection with each contract can vary, sometimes substantially, from our original projections. Because of the large scale and long duration of our contracts, unanticipated changes may occur, such as customer budget decisions, design changes, delays in receiving permits and cost increases, which may delay delivery of our products. In addition, we often are contractually subject to liquidated damages for late delivery.

Unanticipated cost increases or delays may occur as a result of several factors, including:

- increases in the cost, or shortages, of components, materials or labor;
- unanticipated technical problems;
- required project modifications not initiated by the customer; and
- suppliers' or subcontractors' failure to perform.

Given the rapid economic growth in China and Southeast Asia, material prices, including primarily steel prices, have increased sharply and may continue to increase in the future. Our ability to recover these cost increases from our customers on our current and future orders may be limited.

Cost increases or overruns that we cannot pass on to our customers or our payment of liquidated damages under our contracts will lower our earnings.

***Competition could result in decreased sales or decreased prices for our products and services.***

We face and will continue to face significant competition for the sale of our products and services. Competition could result in a reduction in the demand for, or the prices that we can charge for, our products and services. Our success is dependent in large part on our ability to:

- anticipate or respond quickly to our customers' needs and enhance and upgrade our existing products and services to meet those needs;
- continue to price our products and services competitively and find low cost subcontractors that can produce quality products; and
- develop new products and systems that are accepted by our customers and differentiated from our competitors' offerings.

Our competitors may:

- develop more desirable, efficient, environmentally friendly or less expensive products;

Table of Contents

- be willing to accept lower prices to protect strategic marketing positions or increase market share;
- be better able to take advantage of acquisition opportunities; or
- adapt more quickly to changes in customer requirements.

As a result of our competitors' business practices, we may need to lower our prices and/or devote significant resources to marketing our products in order to remain competitive. Lower prices and/or higher costs would reduce our revenues, gross profit and net income.

***If we are unable to control the quality or timely production of products manufactured for us by subcontractors, our reputation could be adversely affected and we could lose customers. If we are unable to recover any advance progress payments made to subcontractors, our profitability would be adversely affected.***

We rely on subcontractors to manufacture and assemble a substantial portion of our products. In fiscal year 2003, we estimate that subcontractors accounted for approximately 83% of our manufacturing costs. Although we have on-site supervision of our subcontractors to review and monitor their quality control systems, the quality and timing of their production is not totally under our control. Our subcontractors may not always meet the level of quality control and the delivery schedules required by our customers. The failure of our subcontractors to produce quality products in a timely manner could adversely affect our reputation and result in the cancellation of orders for our products and the loss of customers.

In addition, we make advance progress payments to subcontractors in anticipation of their completion of our orders. We may be unable to recover those advance payments in the event a subcontractor fails to complete an order, which may adversely affect our profitability.

***The dollar amount of our backlog, as stated at any time, is not necessarily indicative of our future revenues.***

When we receive a firm order for a project from a customer, that order is added to our backlog. However, customers may cancel or delay projects for reasons beyond our control and we may be unable to replace any canceled orders with new orders. To the extent projects are delayed, the timing of our revenues could be affected. If a customer cancels an order, we may be reimbursed for the incurred costs. Typically, however, we have no contractual right to the full amount of the revenues reflected in our backlog that we would have received if the order had not been canceled. In addition, projects may remain in our backlog for extended periods of time. Revenue recognition occurs over extended periods of time and is subject to unanticipated delays. Fluctuations in our quarterly backlog levels also result from the fact that we may receive a small number of relatively large orders in any given quarter that may be included in our backlog. Because of these large orders, our backlog in that quarter may reach levels that may not be sustained in subsequent quarters. Our backlog, therefore, is not necessarily indicative of our future revenues.

***Our future revenues and operating results may vary significantly from quarter to quarter.***

Our quarterly revenues and earnings have varied in the past and are likely to vary in the future. Our contracts stipulate customer specific delivery terms which, coupled with other factors beyond our control that may occur at any time over a contract cycle of up to a year or more, may result in uneven realization of revenues and earnings over time. Customer-imposed delays can significantly impact the timing of revenue recognition. Due to our large average contract size, our sales volume during any given

Table of Contents

period may be concentrated in relatively few orders, intensifying the magnitude of these fluctuations. Consequently, our quarterly performance may not be indicative of our success in achieving year-over-year growth objectives. Furthermore, some of our operating costs are fixed. As a result, we may have limited ability to reduce our operating costs in response to unanticipated decreases in our revenues or the demand for our products in any given quarter. Therefore, our operating results in any quarter may not be indicative of our future performance. In addition, because we must make significant estimates related to the recognition of revenue on a percentage of completion basis, we may have difficulty accurately estimating revenues and profits from quarter to quarter.

***Compliance with environmental laws and regulations is costly, and our ongoing operations may expose us to environmental liabilities.***

Our operations are subject to laws and regulations governing the discharge of materials into the environment or otherwise relating to the protection of the environment or human health and safety. These laws include U.S. federal statutes such as the Resource Conservation and Recovery Act of 1976, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or CERCLA, the Clean Water Act and the Clean Air Act, and the regulations implementing them, as well as similar laws and regulations at the state and local levels and in other countries in which we operate.

Failure to comply with environmental laws or regulations could subject us to significant liabilities for fines, penalties or damages, or result in the denial or loss of significant operating permits. In addition, some environmental laws, including CERCLA, impose liability for the costs of investigating and remediating releases of hazardous substances without regard to fault and on a joint and several basis, so that in some circumstances we may be liable for costs attributable to hazardous substances released into the environment by others.

Our manufacturing facilities use and produce wastes containing various substances classified as hazardous or otherwise regulated under environment laws and regulations, and are subject to ongoing compliance costs and capital expenditure requirements. We believe we are in compliance with applicable environmental laws and regulations and that the costs of compliance are not material to us. However, any newly discovered environmental conditions could result in unanticipated expenses or liabilities that could be material. Moreover, the environmental laws and regulations to which we are subject are constantly changing, and it is impossible to predict the effect of these changes on us. We cannot give any assurances that our operations will comply with future laws and regulations or that these laws and regulations will not significantly adversely affect us.

***A defect in our products could result in unanticipated warranty costs or product liability not covered by our insurance, which could adversely affect our financial condition or results of operations.***

We generally provide warranties for terms of three years or less on our products. These warranties require us to repair or replace faulty products. Warranty claims could result in significant unanticipated costs. The need to repair or replace products with design or manufacturing defects could also temporarily delay the sale of new products and adversely affect our reputation.

In addition, we may be subject to product liability claims involving claims of personal injury or property damage. Because our products are used primarily in power plants, claims could arise in different contexts, including the following:

- fires, explosions and power surges that can result in significant property damage or personal injury; and

Table of Contents

- equipment failure that can result in personal injury or damage to other equipment in the power plant.

If a very large product liability claim were sustained, our insurance coverage might not be adequate to cover our defense costs and the amount awarded. Additionally, a well-publicized actual or perceived problem could adversely affect our reputation and reduce demand for our products.

***The restrictions and covenants contained in our senior credit facility and our convertible notes limit our ability to borrow additional money, sell assets and make acquisitions. Compliance with these restrictions and covenants may limit our ability to implement elements of our business strategy.***

Our senior credit facility contains a number of significant restrictions and covenants limiting our ability and that of our subsidiaries to:

- borrow more money or make capital expenditures;
- incur liens;
- pay dividends or make other restricted payments;
- merge or sell assets;
- enter into transactions with affiliates; and
- make acquisitions.

In addition, our senior credit facility contains other restrictive covenants, including covenants that require us to maintain specified financial ratios, including leverage, asset coverage and fixed charge ratios and mandatory repayment provisions that will require us to repay our indebtedness with proceeds from certain asset sales, certain debt issuances and certain insurance casualty events. Our convertible notes contain additional restrictions on our ability to borrow money and covenants which, in some circumstances, may require us to offer to redeem any of the convertible notes then outstanding. If we are unable to service our indebtedness or are required to redeem the convertible notes, we may be forced to reduce or delay capital expenditures, sell assets, restructure or refinance our indebtedness or seek additional equity capital. Also, compliance with the restrictive covenants of our senior credit facility and our convertible notes may limit our ability to operate our business or implement elements of our business strategy.

***Our revenues would be adversely affected if we are unable to protect the proprietary design software programs that we use in our business.***

We have developed several proprietary software programs to help us design our products. Our ability to protect our proprietary rights to these programs is important to our success. We protect these rights through the use of internal controls and confidentiality and nondisclosure agreements and other legal protections. The legal protections afforded to our proprietary rights and the precautions we have taken may not be adequate to prevent misappropriation of our proprietary rights. We generally enter into non-disclosure and confidentiality agreements with our employees and subcontractors with access to sensitive design software and technology. However, these contractual protections do not prevent independent third-parties from developing functionally equivalent or superior technologies, programs, products or professional services. Third-parties may also infringe upon or misappropriate our proprietary rights and use them to develop competing products. If we were required to commence legal actions to enforce our intellectual property or proprietary rights or to defend ourselves against claims that we are infringing on the intellectual property or proprietary rights of others, we could incur substantial costs and divert management's attention from operations.

Table of Contents

***The loss of the services of our key executive officers could have a negative effect on our business.***

Our success depends to a significant extent on the continued services of Larry Edwards, our chief executive officer and chairman of the board, Al Brousseau, our president and chief operating officer, Jim Wilson, our chief financial officer, and Monte Ness, Gene Schockemoehl, and John Matheson, three of our senior executives. Our failure to retain the services of Messrs. Edwards, Brousseau, Wilson, Ness, Schockemoehl, or Matheson, or attract highly qualified management in the future, could adversely affect our ability to grow and manage our operations. Although we have employment agreements containing non-competition clauses with the executives, courts are sometimes reluctant to enforce these agreements. In addition, although we carry key man life insurance for Messrs. Edwards and Schockemoehl, the loss of their services could disrupt our operations.

***A failure to attract and retain employees who fill key requirements of our business may make it difficult to sustain or expand operations.***

We must attract and retain highly qualified experienced mechanical, design, structural and software engineers, service technicians, marketing and sales personnel and other key personnel to expand our operations. If we are unable to attract and retain necessary personnel, we may not be able to sustain or expand our operations.

***We may not be able to maintain or expand our business outside the United States because of numerous risk factors outside our control.***

Our international operations are subject to a number of risks inherent in doing business outside the United States including:

- labor unrest;
- regional economic uncertainty;
- political instability;
- restrictions on the transfer of funds into or out of a country;
- currency exchange rate fluctuations;
- export duties and quotas;
- expropriations;
- domestic and foreign customs and tariffs;
- current and changing regulatory environments;
- potentially adverse tax consequences; and
- availability of financing.

These factors may result in a decline in revenues or profitability and could adversely affect our ability to expand our business outside the United States.

Table of Contents

***Increased operations in China and Southeast Asia could adversely impact our operating margins.***

We have commenced a strategic initiative to increase the amount of products and services that we sell in China and Southeast Asia. While the economic outlook for power generation projects in that region of the world appears more favorable than the current market in the United States, we have no assurance that our strategy will be successful in obtaining significant increases in revenue. In addition to the risks associated with operations outside the United States noted previously, there are numerous additional challenges to doing business in China, such as strict tax and operating regulations. In addition, the Chinese legal system is relatively new, and the Chinese central and local government authorities retain a greater degree of control over business operations than is customary in more developed countries, making the process of obtaining regulatory approval for business operations inherently unpredictable in some circumstances.

***If we were required to write-off our goodwill or long-lived assets or place a valuation allowance against our deferred tax assets, our results of operations and stockholders' equity could be materially adversely affected.***

As a result of our June 1998 acquisition of the power generation division of Jason Incorporated and our October 2000 acquisition of CFI Holdings, Inc. and its subsidiaries, we have approximately $45.0 million of goodwill recorded on our consolidated balance sheet as of September 25, 2004. Due to the implementation of Statement of Financial Accounting Standards (SFAS) 142, "Goodwill and Other Intangible Assets," goodwill is no longer amortized but must be tested for impairment at least annually based on a fair value concept.

Long-lived assets, such as property and equipment, are evaluated for impairment when events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable through the estimated undiscounted future cash flows from the use of these assets.

Realization of the deferred tax assets is based on our ability to generate enough future taxable income. At some point in the future, we may determine that our future taxable income will not be sufficient in order to utilize the deferred tax assets. If this determination were made, we would place a valuation allowance against our deferred tax assets.

If we were required to write-off our goodwill or long-lived assets or place a valuation allowance against our deferred tax assets, our results of operations and financial position could be materially adversely affected.

***We are exposed to market risks from changes in interest rates and foreign currency exchange rates.***

We are subject to market risks from changes in interest rates. Our senior credit facility's variable-rate debt bears interest, at our option, at either the Eurodollar rate or an alternate base rate plus, in each case, an applicable margin. Assuming our current level of borrowings as of September 25, 2004, a 100 basis point increase in interest rates under these borrowings would increase our interest expense for fiscal year 2005 by approximately $0.2 million.

We are also subject to market risks from fluctuations in foreign currency exchange rates. Portions of our operations are located in foreign jurisdictions and a portion of our billings are paid in foreign currencies. Changes in foreign currency exchange rates or weak economic conditions in foreign markets could therefore cause fluctuations in those revenues derived from foreign operations. In addition, sales of products and services are affected by the value of the U.S. dollar relative to other currencies. Changes in foreign currency rates can also affect the costs of our products purchased or manufactured outside the United States.

Table of Contents

## NO PROCEEDS

The common stock to be offered and sold using this prospectus will be offered and sold by the selling stockholders named in this prospectus. We will not receive any proceeds from those sales.

## CAUTIONARY NOTICE REGARDING FORWARD LOOKING STATEMENTS

A number of statements included or incorporated by reference in this prospectus are not historical or current facts, but concern future circumstances and developments. These statements are intended to be "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, Section 21E of the Securities Exchange Act 1934, and the Private Securities Litigation Reform Act of 1995. These forward-looking statements and other written and oral forward-looking statements made by us from time to time may relate to, among other things, our plans, strategies and business prospects. The words "believe," "intend," "expect," "anticipate," "plan," "project," "contemplate" and similar expressions are generally utilized to identify forward-looking statements. These forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. These factors include, among others, those matters discussed under "Risk Factors" in this prospectus and those described in our periodic filings with the SEC which are incorporated by reference into this prospectus, as described in "Incorporation of Certain Documents by Reference." All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements, risks and uncertainties included or incorporated by reference in this prospectus.

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

### General

Our authorized capital stock consists of (a) 100,000,000 shares of common stock, having a par value of $0.01 per share, and (b) 5,000,000 shares of preferred stock, having a par value of $0.01 per share. As of December 1, 2004, 46,366,148 shares of common stock and no shares of preferred stock were outstanding.

### Common Stock

The holders of common stock are entitled to one vote for each share held of record on all matters submitted to a vote of stockholders. Holders of common stock do not have cumulative voting rights for the election of directors. Subject to preferences that may be applicable to any outstanding series of preferred stock, holders of common stock are entitled to receive equally dividends as they may be declared by our board of directors out of funds legally available for the payment of dividends. In the event of our liquidation or dissolution, holders of common stock are entitled to share equally in all assets remaining after payment of liabilities and the liquidation preference of any outstanding series of preferred stock.

Holders of common stock have no preemptive rights and have no rights to convert their common stock into any other securities. All of the outstanding shares of common stock are, and the shares of common stock the selling stockholders may sell under this prospectus will be, duly authorized, validly issued, fully paid and nonassessable.

### RegistrationRights

Certain holders of shares of our common stock (other than the selling stockholders) are entitled to certain rights with respect to the registration of those shares under the Securities Act of 1933. If we propose to register under the Securities Act an underwritten public offering of our common stock for our account, or any public offering of our common stock for the account of others exercising their registration rights discussed below, the holders of these shares are entitled to notice of the registration and are entitled to include, at our expense, their shares of common stock in the registration and any related underwriting, provided, among other conditions, that the underwriters, if any, may limit the number of shares to be included in the registration. In addition, certain of the holders of these shares may require us, at our expense and subject to certain limitations, to file a registration statement under the Securities Act with respect to their shares of common stock, and we will be required to use our reasonable efforts to effect the registration.

In connection with the private placement of $69.0 million of convertible senior subordinated notes described under "Global Power Equipment Group Inc.—Recent Events—Private Placement of Convertible Notes," we entered into a registration rights agreement, pursuant to which we agreed to register 120% of the number of shares of common stock initially issuable upon conversion of the convertible notes. This prospectus covers the resale by each of the noteholders of such shares.

Table of Contents

### Anti-Takeover Effects of Delaware Law and Provisions of Our Charter and Bylaws

Delaware law and our certificate of incorporation and bylaws contain certain provisions that might be characterized as anti-takeover provisions. These provisions may make it more difficult to acquire control of us or remove our management.

***Business Combinations***

We are subject to the provisions of Section 203 of the Delaware General Corporation Law. In general, Section 203, subject to specific exceptions, prohibits a publicly held Delaware corporation from engaging in any "business combination" with any "interested stockholder" for a period of three years following the date that the stockholder became an interested stockholder, unless:

- prior to that date, the board of directors approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;
- upon consummation of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned by directors, officers and specific employee stock plans; or
- on or after that date, the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

Section 203 defines "business combination" to include:

- any merger or consolidation involving the corporation and the interested stockholder;
- any sale, transfer, pledge or other disposition of 10% or more of our assets involving the interested stockholder;
- subject to limited exceptions, any transaction that results in the issuance or transfer by us of any of our stock to the interested stockholder;
- any transaction involving us that has the effect of increasing the proportionate share of the stock of any class or series beneficially owned by the interested stockholder; and
- the receipt by the "interested stockholder" of the benefit of any loans, advances, guarantees, pledges or other financial benefits provided by or through the corporation.

In general, Section 203 defines an "interested stockholder" as an entity or person beneficially owning 15% or more of our outstanding voting stock and any entity or person affiliated with or controlling or controlled by that entity or person. Neither Harvest Partners III, L.P. nor Harvest Partners III, GbR are an interested stockholder for purposes of Section 203, as each of them was an interested stockholder prior to our amending our certificate of incorporation electing to be governed by Section 203.

Table of Contents

The provisions of Section 203 may encourage companies interested in acquiring us to negotiate in advance with our board of directors since the stockholder approval requirement would be avoided if a majority of the directors then in office approve either the business combination or the transaction that results in the stockholder becoming an interested stockholder. These provisions also may have the effect of preventing changes in our management or may make it more difficult to accomplish transactions that stockholders may otherwise deem to be in their best interest.

*Classified Board of Directors*

Our certificate of incorporation and bylaws provide for our board of directors to be divided into three classes serving staggered three-year terms. As a result, approximately one-third of our directors are elected each year. This provision could prevent a party who acquires control of a majority of our outstanding voting stock from obtaining control of the board of directors until the second annual stockholders meeting following the date the acquiror obtains the controlling stock interest. It could also have the effect of discouraging a potential acquiror from making a tender offer or otherwise attempting to obtain control of Global Power, which increases the likelihood that incumbent directors will retain their positions.

*Authorized but Unissued Shares*

The authorized but unissued shares of our common stock and preferred stock are available for future issuance without stockholder approval. These additional shares may be used for a variety of corporate purposes, including future public offerings to raise additional capital, corporate acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could also render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

Our board of directors has no present intention to issue any new series of preferred stock; however, our board has the authority, without further stockholder approval, to issue one or more series of preferred stock that could, depending on the terms of the series, either impede or facilitate the completion of a merger, tender offer or other takeover attempt. Although our board of directors is required to make any determination to issue such stock based on its judgment as to the best interest of our stockholders, our board could act in a manner that would discourage an acquisition attempt or other transaction that some, or a majority, of the stockholders might believe to be in their best interests or in which stockholders might receive a premium for their stock over the then market price of such stock. Our board of directors does not intend to seek stockholder approval prior to any issuance of stock, unless otherwise required by law or the rules of the stock exchange on which our common stock is listed.

*No Stockholder Action by Written Consent; Special Meetings*

Our certificate of incorporation and bylaws contain provisions that eliminate the ability of our stockholders to take action by written consent. Our bylaws require approval of at least 35% of our stockholders in order to call a special meeting of the stockholders or bring matters before a special meeting of stockholders. These provisions could delay a stockholder vote on certain matters, such as business combinations and removal of directors, and could have the effect of discouraging a potential acquiror from making a tender offer.

*Advance Notice for Raising Business or Making Nominations at Meetings*

Our bylaws establish an advance notice procedure for stockholder proposals to be brought before a meeting of stockholders and for nominations by stockholders of candidates for election as directors at an

Table of Contents

annual meeting or a special meeting at which directors are to be elected. As more fully described in the bylaws, only such business may be conducted at a meeting of stockholders as has been brought before the meeting by, or at the direction of, our board of directors, or by a stockholder who has given the Corporate Secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the meeting. The presiding officer at a stockholders meeting has the authority to make these determinations. Only persons who are nominated by, or at the direction of, our board of directors, or who are nominated by a stockholder who has given timely written notice, in proper form, to the Corporate Secretary prior to a meeting at which directors are to be elected will be eligible for election to our board of directors. These provisions could make it more difficult for stockholders to raise matters affecting control of Global Power, including tender offers, business combinations or the election or removal of directors, for a stockholder vote.

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is EquiServe Trust Company, N.A.

## SELLING STOCKHOLDERS

The shares of common stock being offered by the selling stockholders are issuable upon conversion of the convertible notes. For additional information regarding the convertible notes, see "Global Power Equipment Group—Recent Events—Private Placement of Convertible Notes" above. We are registering the shares of common stock in order to permit the selling stockholders to offer the shares for resale from time to time. Except for the ownership of the convertible notes issued to the selling stockholders in a private placement on November 23, 2004, the selling stockholders have not had any material relationship with us within the past three years.

The table below lists the selling stockholders and other information regarding the beneficial ownership of the shares of common stock by each of the selling stockholders. The second column lists the number of shares of common stock beneficially owned by each selling stockholder, based on its ownership of the convertible notes, as of December 21, 2004, assuming conversion of all convertible notes held by the selling stockholders on that date, without regard to any limitations on conversions or exercise.

The third column lists the shares of common stock being offered by this prospectus by the selling stockholders.

In accordance with the terms of a registration rights agreement with the holders of the convertible notes, this prospectus generally covers the resale of at least that number of shares of common stock equal to 120% of the number of shares of common stock issuable upon conversion of the convertible notes, determined as if the outstanding convertible notes were converted in full as of the trading day immediately preceding the date this registration statement was initially filed with the SEC. Because the conversion price of the convertible notes may be adjusted pursuant to the terms of the convertible notes, the number of shares that will actually be issued may be more or less than the number of shares being offered by this prospectus. The fourth column assumes the sale of all of the shares offered by the selling stockholders pursuant to this prospectus.

Under the terms of the convertible notes, a selling stockholder may not convert the convertible notes, to the extent such conversion or exercise would cause such selling stockholder, together with its affiliates, to beneficially own a number of shares of common stock which would exceed 4.99% of our

Table of Contents

then outstanding shares of common stock following such conversion or exercise, excluding for purposes of such determination shares of common stock issuable upon conversion of the convertible notes which have not been converted. The number of shares in the second column does not reflect this limitation. The selling stockholders may sell all, some or none of their shares in this offering. See "Plan of Distribution."

For a more complete description of the convertible notes, please see the Form of Note set forth as Exhibit A to the Securities Purchase Agreement dated November 23, 2004, which was filed as Exhibit 10.1 to our Current Report on Form 8-K, filed with the Securities and Exchange Commission on November 30, 2004.

Table of Contents

| Name of Selling Stockholder | Number of Shares Beneficially Owned Prior to Offering | Maximum Number of Shares to be Sold Pursuant to this Prospectus (1) | Number of Shares Beneficially Owned After Offering(2) |
|---|---|---|---|
| Kings Road Investments Ltd. (3) | 2,544,769 | 3,053,722 | 0 |
| Steelhead Investments Ltd. (4) | 2,544,769 | 3,053,722 | 0 |
| D.B. Zwirn Special Opportunities Fund, L.P. (5) | 282,752 | 339,302 | 0 |
| D.B. Zwirn Special Opportunities Fund, Ltd. (5) | 565,504 | 678,604 | 0 |
| HCM/Z Special Opportunities LLC (5) | 565,504 | 678,604 | 0 |

(1) Represents 120% of the maximum number of shares of common stock initially issuable to each selling stockholder upon conversion of the convertible notes at an initial conversion price of $10.61 per share.

(2) Assumes that each selling stockholder sells all shares of common stock being registered under this registration statement. However, to our knowledge, there are no agreements, arrangements or understandings with respect to the sale of any shares of our common stock, and each selling stockholder may decide to sell only a portion or none of its shares of our common stock that are registered under this registration statement.

(3) Polygon Investment Partners LLP and Polygon Investment Partners LP (the "Investment Managers") and Polygon Investments Ltd. (the "Manager") each has the right to vote and dispose of the securities held by Kings Road Investments Ltd. Alexander Jackson, Reade Griffith and Paddy Dear control the Investment Managers and the Manager. The Investment Managers, the Manager, Alexander Jackson, Reade Griffith and Paddy Dear disclaim beneficial ownership of the securities held by Kings Road Investments Ltd.

(4) HBK Investments L.P. may be deemed to have sole voting and investment power with respect to the shares beneficially owned by Steelhead Investments Ltd. pursuant to an investment management agreement. Additionally, the following individuals may have control over HBK Investments L.P.: Kenneth M. Hirsh, Laurence H. Lebowitz, William E. Rose, Richard L. Booth, David C. Haley and Jamiel A. Akhtar.

(5) D.B. Zwirn & Co., L.P. is the trading manager of each of D.B. Zwirn Special Opportunities Fund, Ltd., D.B. Zwirn Special Opportunities Fund, L.P. and HCM/Z Special Opportunities LLC and consequently has voting control and investment discretion over securities held by each of D.B. Zwirn Special Opportunities Fund, Ltd., D.B. Zwirn Special Opportunities Fund, L.P. and HCM/Z Special Opportunities LLC. Daniel B. Zwirn controls Zwirn Holdings, LLC, which in turn is the managing member of and thereby controls DBZ GP, LLC, which in turn is the general partner of and thereby controls D.B. Zwirn & Co., L.P. Each of Daniel B. Zwirn, Zwirn Holdings, LLC, DBZ GP, LLC and D.B. Zwirn & Co., L.P. disclaims beneficial ownership of securities held by each of D.B. Zwirn Special Opportunities Fund, Ltd., D.B. Zwirn Special Opportunities Fund, L.P. and HCM/Z Special Opportunities LLC.

Table of Contents

## PLAN OF DISTRIBUTION

We are registering the shares of common stock issuable upon conversion of the convertible notes to permit the resale of these shares of common stock by the holders of the convertible notes from time to time after the date of this prospectus. We will not receive any of the proceeds from the sale by the selling stockholders of the shares of common stock. We will bear all fees and expenses incident to our obligation to register the shares of common stock.

The selling stockholders may sell all or a portion of the shares of common stock beneficially owned by them and offered hereby from time to time directly or through one or more underwriters, broker-dealers or agents. If the shares of common stock are sold through underwriters or broker-dealers, the selling stockholders will be responsible for underwriting discounts or commissions or agent's commissions. The shares of common stock may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of the sale, at varying prices determined at the time of sale, or at negotiated prices. These sales may be effected in transactions, which may involve crosses or block transactions,

- on any national securities exchange or quotation service on which the common stock may be listed or quoted at the time of sale;
- in the over-the-counter market;
- otherwise than on these exchanges or systems or in the over-the-counter market;
- through the writing of options, whether such options are listed on an options exchange or otherwise;
- in ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;
- pursuant to block trades in which the broker-dealer will attempt to sell the shares as agent but may position and resell a portion of the block as principal to facilitate the transaction;
- through purchases by a broker-dealer as principal and resale by the broker-dealer for its account;
- which constitute an exchange distribution in accordance with the rules of the applicable exchange;
- which are privately negotiated;
- involving short sales;
- in which broker-dealers may agree with the selling securityholders to sell a specified number of such shares at a stipulated price per share;
- which include a combination of any such methods of sale; and
- which are effectuated through any other method permitted pursuant to applicable law.

Table of Contents

If the selling stockholders effect such transactions by selling shares of common stock to or through underwriters, broker-dealers or agents, such underwriters, broker-dealers or agents may receive commissions in the form of discounts, concessions or commissions from the selling stockholders or commissions from purchasers of the shares of common stock for whom they may act as agent or to whom they may sell as principal (which discounts, concessions or commissions as to particular underwriters, broker-dealers or agents may be in excess of those customary in the types of transactions involved). In connection with sales of the shares of common stock or otherwise, the selling stockholders may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the shares of common stock in the course of hedging in positions they assume. The selling stockholders may also sell shares of common stock short and deliver shares of common stock covered by this prospectus to close out short positions. The selling stockholders may also loan or pledge shares of common stock to broker-dealers that in turn may sell such shares.

The selling stockholders may pledge or grant a security interest in some or all of the convertible notes or shares of common stock owned by them and, if they default in the performance of their secured obligations, the pledgees or secured parties may offer and sell the shares of common stock from time to time pursuant to this prospectus or any amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act of 1933, as amended, amending, if necessary, the list of selling stockholders to include the pledgee, transferee or other successors in interest as selling stockholders under this prospectus. The selling stockholders also may transfer and donate the shares of common stock in other circumstances in which case the transferees, donees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

The selling stockholders and any broker-dealer participating in the distribution of the shares of common stock may be deemed to be "underwriters" within the meaning of the Securities Act, and any commission paid, or any discounts or concessions allowed to, any such broker-dealer may be deemed to be underwriting commissions or discounts under the Securities Act. At the time a particular offering of the shares of common stock is made, a prospectus supplement, if required, will be distributed which will set forth the aggregate amount of shares of common stock being offered and the terms of the offering, including the name or names of any broker-dealers or agents, any discounts, commissions and other terms constituting compensation from the selling stockholders and any discounts, commissions or concessions allowed or reallowed or paid to broker-dealers.

Under the securities laws of some states, the shares of common stock may be sold in such states only through registered or licensed brokers or dealers. In addition, in some states the shares of common stock may not be sold unless such shares have been registered or qualified for sale in such state or an exemption from registration or qualification is available and is complied with.

There can be no assurance that any selling stockholder will sell any or all of the shares of common stock registered pursuant to the shelf registration statement, of which this prospectus forms a part.

The selling stockholders and any other person participating in such distribution will be subject to applicable provisions of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder, including, without limitation, Regulation M of the Exchange Act, which may limit the timing of purchases and sales of any of the shares of common stock by the selling stockholders and any other participating person. Regulation M may also restrict the ability of any person engaged in the distribution of the shares of common stock to engage in market-making activities with respect to the shares of common stock. All of the foregoing may affect the marketability of the shares of common stock and the ability of any person or entity to engage in market-making activities with respect to the shares of common stock.

Table of Contents

We will pay all expenses of the registration of the shares of common stock pursuant to the registration rights agreement, estimated to be $40,000 in total, including, without limitation, Securities and Exchange Commission filing fees and expenses of compliance with state securities or "blue sky" laws; provided, however, that a selling stockholder will pay all underwriting discounts and selling commissions, if any. We will indemnify the selling stockholders against liabilities, including some liabilities under the Securities Act, in accordance with the registration rights agreements, or the selling stockholders will be entitled to contribution. We may be indemnified by the selling stockholders against civil liabilities, including liabilities under the Securities Act, that may arise from any written information furnished to us by the selling stockholder specifically for use in this prospectus, in accordance with the related registration rights agreement, or we may be entitled to contribution.

Once sold under the shelf registration statement, of which this prospectus forms a part, the shares of common stock will be freely tradable in the hands of persons other than our affiliates.

Table of Contents

## LEGAL MATTERS

The validity of the shares of common stock offered hereby has been passed upon by Conner & Winters, P.C., Tulsa, Oklahoma. As of the date of this prospectus, attorneys of Conner & Winters, P.C. indirectly owned options to acquire 45,000 shares of our common stock, in the aggregate.

## EXPERTS

Our consolidated financial statements as of December 27, 2003 and December 28, 2002, and for each of the two fiscal years in the period ended December 27, 2003, incorporated in this prospectus and in the registration statement by reference to the Annual Report on Form 10-K/A for the fiscal year ended December 27, 2003 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent registered public accounting firm, given on the authority of said firm as experts in accounting and auditing.

Our consolidated financial statements for the fiscal year ended December 29, 2001, incorporated by reference in this prospectus and in the registration statement have been audited by Arthur Andersen LLP, our previous independent public accountants, as stated in their report with respect thereto, and are incorporated by reference upon the authority of said firm as experts in accounting and auditing.

On June 15, 2002, Arthur Andersen LLP was convicted of obstruction of justice for activities relating to its previous work for Enron Corp., and Arthur Andersen LLP has since ceased conducting business. Arthur Andersen LLP has thus not consented to the incorporation by reference of their report in this prospectus or in the registration statement, and we have dispensed with the requirement to file their consent in reliance on Rule 437a under the Securities Act of 1933. As a result, you may not be able to recover against Arthur Andersen LLP under Section 11 of the Securities Act of 1933 for any untrue statement of a material fact contained in the financial statements audited by Arthur Andersen LLP or any omissions to state a material fact required to be stated in those financial statements.

## WHERE YOU CAN FIND MORE INFORMATION

This prospectus constitutes a part of a registration statement on Form S-3 (together with all amendments, supplements, schedules and exhibits to the registration statement, referred to as the registration statement) that we have filed with the SEC under the Securities Act of 1933 with respect to the securities offered by this prospectus. This prospectus does not contain all the information which is in the registration statement. Certain parts of the registration statement are omitted as allowed by the rules and regulations of the SEC. We refer you to the registration statement for further information about our company and the securities offered by this prospectus. Statements contained in this prospectus concerning the provisions of documents are not necessarily complete, and each statement is qualified in its entirety by reference to the copy of the applicable document filed with the SEC.

We also file annual, quarterly and special reports, proxy statements and other information with the SEC. You can inspect and copy the registration statement and the reports and other information we file with the SEC at the Public Reference Room maintained by the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549, at prescribed rates. You can obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a Web site which provides online access to reports, proxy and information statements and other information regarding companies that file electronically with the SEC at the address *http://www.sec.gov.*

Table of Contents

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

The SEC allows us to "incorporate by reference" into this prospectus the information we file with them, which means we can disclose important business and financial information about us to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus, except for any information that is superseded by information included directly in this prospectus and any prospectus supplement. Information that we file later with the SEC will also automatically update and supersede the information in this prospectus. We incorporate by reference the documents listed below that we previously filed with the SEC and all documents that we subsequently file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 (other than Current Reports or portions thereof furnished under Items 2.02 or 7.01 of Form 8-K) until the termination of the offering made under this prospectus:

- Our Annual Report on Form 10-K for the fiscal year ended December 27, 2003, as amended by our Form 10-K/A filed with the SEC on May 14, 2004;
- Our Quarterly Reports on Form 10-Q for the quarters ended March 27, 2004, June 26, 2004, and September 25, 2004;
- Our Current Reports on Form 8-K filed on October 7, 2004, October 27, 2004, November 24, 2004, November 30, 2004, December 15, 2004 and December 21, 2004; and
- The description of our common stock contained in our registration statement on Form 8-A, filed with the SEC on May 18, 2001 (SEC File No. 1-16501), including any amendment or report filed before or after the date of this prospectus for the purpose of updating the description.

In addition, any filings we make with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act (other than Current Reports or portions thereof furnished under Items 2.02 or 7.01 of Form 8-K) after the date of the initial filing of the registration statement and prior to the effectiveness of the registration statement will be incorporated by reference in this prospectus.

These filings have not been included in or delivered with this prospectus. We will provide to each person, including any beneficial owner to whom this prospectus is delivered, a copy of any or all information that has been incorporated by reference in this prospectus but not delivered with this prospectus. You may request a copy of these filings and the registration rights agreement at no cost, by writing or telephoning us at the following address:

Global Power Equipment Group Inc.<br>
6120 S. Yale, Suite 1480<br>
Tulsa, Oklahoma 74136<br>
Attention: Investor Relations<br>
(918) 488-0828

The reports, proxy statements and other information we file with the SEC can also be inspected and copied at the New York Stock Exchange, 20 Broad Street, New York, New York 10002. For more information on obtaining copies of our public filings at the New York Stock Exchange, you should call (212) 656-5060.

Table of Contents

PART II

INFORMATION NOT REQUIRED IN PROSPECTUS

**Item 14. Other Expenses of Issuance and Distribution.**

All amounts, which are payable by the Registrant, are estimates, except the SEC registration fee.

| | |
|---|---|
| SEC registration fee | $ 8,505 |
| Legal fees and expenses | 25,000 |
| Accounting fees and expenses | 5,000 |
| Miscellaneous | 1,495 |
| Total | $40,000 |

**Item 15. Indemnification of Directors and Officers.**

The information below briefly outlines the provisions of Sections 102(b)(7) and 145 of the General Corporation Law of the State of Delaware, Article IX of our Amended and Restated Certificate of Incorporation ("Certificate of Incorporation") and Article IV of our Amended and Restated By-Laws ("By-Laws"). For more information, you may review the provisions of our Certificate of Incorporation and By-Laws filed with the SEC.

**Elimination of Liability**

Section 102(b)(7) of Delaware's corporation law gives each Delaware corporation the power to eliminate or limit its directors' personal liability to the corporation or its stockholders for monetary damages for certain breaches of fiduciary duty as a director, except:

- for any breach of the director's duty of loyalty to the corporation or its stockholders;
- for acts or omissions not in good faith, or which involve intentional misconduct or a knowing violation of the law;
- under Section 174 of Delaware's corporation law (providing for liability of directors for the unlawful payment of dividends or unlawful stock purchases or redemptions); or
- for any transaction from which a director derived an improper personal benefit.

Our Certificate of Incorporation eliminates the personal liability of our directors to the fullest extent permitted by Section 102(b)(7) of Delaware's corporation law.

**Indemnification**

Section 145 of Delaware's corporation law grants each Delaware corporation the power to indemnify its directors and officers against liability for certain of their acts.

Article IV of our By-Laws provides that we shall, to the full extent permitted by law, indemnify each person who is or was a director, officer, employee or agent of our company and may indemnify each person who is or was serving at our request as a director, officer, employee or agent of or participant in another corporation or of a partnership, joint venture, trust or other enterprise.

Table of Contents

As permitted by Section 102(b)(7) of Delaware's corporation law, Article IX of our certificate of incorporation provides that a director of our company will not be personally liable to us or our stockholders for monetary damages for breach of fiduciary duty as a director, except (i) for any breach of the director's duty of loyalty to us or our stockholders, (ii) for act or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of Delaware's corporation law or (iv) for any transaction from which the director derived an improper personal benefit. Article IX also provides that we will indemnify officers, directors, employees and agents of our company to the fullest extent permitted under Delaware's corporation law and advance expenses incurred by such directors, officers, employees and agents in relation to any action, suit or proceeding.

We carry directors' and officers' liability insurance to insure our directors and officers against liability for certain errors and omissions and to defray costs of a suit or proceeding against an officer or director.

The Registration Rights Agreement included as Exhibit 4.4 to this Registration Statement provides for indemnification of us and our controlling persons in certain circumstances, including liabilities under the Securities Act of 1933.

**Item 16. Exhibits.**

The following is a list of all exhibits filed as a part of this Registration Statement on Form S-3, including those incorporated by reference herein.

| Exhibit Number | Description |
|---|---|
| 4.1 | Amended and Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1(b) to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001). |
| 4.2 | Amended and Restated Bylaws of the Registrant (incorporated by reference to Exhibit 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2003). |
| 4.3 | Form of Specimen Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1 filed May 16, 2001 (No. 333-56832). |
| 4.4 | Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed November 30, 2004). |
| 5* | Opinion of Conner & Winters, P.C., regarding the legality of the securities. |
| 23.1* | Consent of Conner & Winters, P.C. (included in Exhibit 5). |
| 23.2* | Consent of PricewaterhouseCoopers LLP. |
| 24* | Power of Attorney (included on the signature page to this Registration Statement). |

* Included herewith

**Item 17. Undertakings.**

(a) The undersigned Registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

**Table of Contents**

(ii) To reflect in the prospectus any facts or events arising after the effective date of this Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in this Registration Statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in this effective Registration Statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in this Registration Statement or any material change to such information in this Registration Statement;

*provided, however,* that paragraphs (a)(1)(i) and (a)(1)(ii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed with or furnished to the Commission by the Registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in this Registration Statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b) The undersigned Registrant hereby undertakes that, for the purposes of determining any liability under the Securities Act of 1933, each filing of the Registrant's Annual Report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 that is incorporated by reference in this Registration Statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(h) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the Registrant pursuant to the provisions referred to in Item 15 of this Registration Statement, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being

Table of Contents

registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3 and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Tulsa, State of Oklahoma, on the 23rd day of December, 2004.

GLOBAL POWER EQUIPMENT GROUP INC.

By: /s/ LARRY D. EDWARDS

Larry D. Edwards
Chairman of the Board and Chief Executive Officer

KNOW ALL MEN BY THESE PRESENTS, that each individual whose signature appears below constitutes and appoints Larry D. Edwards, James P. Wilson and Candice L. Cheeseman and each of them, his true and lawful attorneys-in-fact and agents with full power of substitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this Registration Statement, and to file the same, with all exhibits thereto, and all documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or his or their substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ LARRY D. EDWARDS<br>Larry D. Edwards | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | December 23, 2004 |
| /s/ JAMES P. WILSON<br>James P. Wilson | Vice President of Finance and Chief Financial Officer (Principal Financial and Accounting Officer) | December 23, 2004 |
| /s/ ADRIAN DOHERTY JR.<br>Adrian Doherty Jr. | Director | December 23, 2004 |
| /s/ STEPHEN EISENSTEIN<br>Stephen Eisenstein | Director | December 23, 2004 |

Table of Contents

| Signature | Title | Date |
|---|---|---|
| /s/ EDGAR HOTARD<br>Edgar Hotard | Director | December 16, 2004 |
| /s/ IRA KLEINMAN<br>Ira Kleinman | Director | December 23, 2004 |
| /s/ JERRY RYAN<br>Jerry Ryan | Director | December 23, 2004 |
| /s/ BENGT SOHLÉN<br>Bengt Sohlén | Director | December 23, 2004 |

Table of Contents

**INDEX TO EXHIBITS**

| Exhibit Number | Description |
|---|---|
| 4.1 | Amended and Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1(b) to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001). |
| 4.2 | Amended and Restated Bylaws of the Registrant (incorporated by reference to Exhibit 3.2 to the Registrant's Annual Report on Form 10-K for the year ended December 27, 2003). |
| 4.3 | Form of Specimen Stock Certificate (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1 filed May 16, 2001 (No. 333-56832). |
| 4.4 | Registration Rights Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed November 30, 2004). |
| 5* | Opinion of Conner & Winters, P.C., regarding the legality of the securities. |
| 23.1* | Consent of Conner & Winters, P.C. (included in Exhibit 5). |
| 23.2* | Consent of PricewaterhouseCoopers LLP. |
| 24* | Power of Attorney (included on the signature page to this Registration Statement |

* Filed herewith

8-K 1 d8k.htm FORM 8-K

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

# FORM 8-K

## CURRENT REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of report (Date of earliest event reported) March 6, 2006**

# GLOBAL POWER EQUIPMENT GROUP INC.

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| **001-16501** | **73-1541378** |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |
| **6120 S. Yale, Suite 1480, Tulsa, Oklahoma** | **74136** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(918) 488-0828**
(Registrant's Telephone Number, Including Area Code)

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01. Entry into a Material Definitive Agreement.**

On March 7, 2006, the Company entered into a waiver and amendment (the "Fourth Amendment") to the Credit Agreement, dated as of October 1, 2004, by and among the Company, certain of its subsidiaries, the lenders from time to time party thereto (the "Lenders"), Bank of America, N.A. ("Bank of America"), as Administrative Agent, Swing Line Lender and L/C Issuer, US Bank National Association, as Syndication Agent, and Bank of Oklahoma, N.A, as Managing Agent (the "Credit Agreement").

The Fourth Amendment modifies and waives various terms of the Credit Agreement, as previously amended, and adds additional terms, including the following:

- Compliance with the Consolidated Senior Leverage Ratio, Consolidated Leverage Ratio, Consolidated Fixed Charge Coverage Ratio and Consolidated Senior Asset Coverage Ratio financial covenants is waived for the period from December 31, 2005 through September 30, 2006.
- Until the later of December 31, 2006, and such time as the Company complies with these financial covenants: (1) revolving capacity under the Credit Agreement (which includes letters of credit) is limited to the lesser of $60 million and the Revolving Commitment; (2) all Base Rate Loans and Swing Line Loans bear interest at the Base Rate plus 3% per annum (unless the Default Rate is applicable); (3) the Company may not request any Eurocurrency Rate Loan in Dollars or continue any Eurocurrency Rate Loan in Dollars for another Interest Period and may not convert any loan into a Eurocurrency Rate Loan in Dollars; and (4) the Applicable Rate as it applies to Letters of Credit and Eurocurrency Rate Loans will be 3.25%.
- Any event of default arising from the Company's failure to comply with the conditions to credit extensions with respect to any borrowing prior to the delivery of audited financial statements for the period ending December 31, 2005 or for the potential breach of certain designated representations, warranties and covenants or the inaccuracy of any compliance certificate is, to the extent resulting from a restatement of the Company's financial results, waived.
- The "Letter of Credit Sublimit," which was previously set at the lesser of $75 million and the "Revolving Commitment," will be reduced to the lesser of $55 million and the Revolving Commitment.
- New covenants are added pursuant to which the Company will be required to provide Bank of America with additional reports, including revised capital and operating budgets for the year ended December 31, 2006 and for each month of the year on a cumulative basis commencing March 31, 2006, and weekly cash reports. The budget must provide for the Company to generate no less than $18 million of "Consolidated EBITDA," as defined in the Fourth Amendment, for the period January 1, 2006 to December 31, 2006. In addition, the Company will be required to generate Consolidated EBITDA equal to no less than 90% of projected Consolidated EBITDA for each monthly period on a

cumulative basis commencing March 31, 2006, as set out in the budget, and no less than $16.2 million for the fiscal year. The Company will also be required to hold cash in an amount that is not less than the outstanding principal amount of the term loan for any period of greater than 30 days.

Other than in respect of the Credit Agreement and Fourth Amendment, there are no material relationships between the Company, the Company's subsidiaries, the Lenders, Bank of America and their respective affiliates, except that Bank of America and some of the Lenders and their respective affiliates have engaged and may engage in commercial and investment banking transactions with the Company in the ordinary course of business, and also provide or have provided advisory and financial services to the Company.

The Lenders and their affiliates will receive customary fees and commissions for these transactions.

A copy of the Fourth Amendment is attached to this Current Report on Form 8-K as Exhibit 10 and is incorporated by reference as though fully set forth herein. The foregoing summary description of the Fourth Amendment and the transactions contemplated therein is not intended to be complete and is qualified in its entirety by the complete text of the Fourth Amendment.

**Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

(a) On March 8, 2006, the Company issued a press release announcing that the Company expects to restate its financial statements for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and its interim financial statements for the first, second and third quarters of 2005. Accordingly, the Board of Directors has concluded that the previously issued financial statements for such periods should not be relied upon because of expected errors in those financial statements. The Board of Directors reached this conclusion on March 6, 2006 upon the recommendation of management and after discussion with the Company's independent registered public accounting firm.

Management has become aware of unrecognized expenses related to a heat recovery equipment project in China that was substantially completed in December 2004. This led management to further review the revenue and cost recognition for this project as well as a separate auxiliary power equipment project that had also been sold through the Company's Chinese trading company, Global Power Equipment (Shanghai) Co., Ltd. ("GPESH"), in 2004. Following this review, the Company, in conjunction with the Company's Board of Directors and after discussion with the Company's independent registered public accounting firm, has determined that gross profit was inadvertently overstated in total for these projects, and that a restatement is required. Currently, management believes that a restatement will result in an unaudited adjustment to prior period financial statements for the second, third and fourth quarters of 2004 and the first, second and third quarters of 2005 that could cumulatively decrease previously reported operating income in an amount that is not currently expected to exceed approximately $7 million.

The Company expects to include restated financial results for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and the first, second and third quarters of 2005 in its Annual Report on Form 10-K for the year ended December 31, 2005, which it expects to file on or before March 31, 2006.

In the Company's 2004 Form 10-K that was filed on March 15, 2005, Management's Report on Internal Control Over Financial Reporting ("Management's 2004 Report"), previously concluded that the Company maintained effective internal control over financial reporting as of December 31, 2004. In connection with this restatement, the Company's management has re-evaluated the effectiveness of its internal control over financial reporting as of December 31, 2004 and determined that the Company did not maintain effective internal control over financial reporting as of December 31, 2004 due to the material weakness described below and that Management's 2004 Report should no longer be relied upon.

A material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. At December 31, 2004, the Company did not maintain effective control over the accounting for contract revenue and cost recognition relating to two completed projects in China. Specifically, effective controls were not designed and maintained to account for completeness and accuracy of revenue and costs on projects received by the Company's new Chinese trading company (GPESH) and co-administered by the Company's U.S. and China operations. These control deficiencies are expected to result in the restatement of the Company's 2004 annual consolidated financial statements and the interim consolidated financial statements for the second, third and fourth quarters of 2004, and each of the first three quarters of 2005. Accordingly, management has determined that these control deficiencies constitute a material weakness. Additionally, this control deficiency, until remediated, could result in a misstatement of the Company's revenue and cost of projects that would result in a material misstatement to the Company's interim or annual financial statements that would not be prevented or detected.

Management has not yet completed its assessment of internal control over financial reporting as of December 31, 2005 but has concluded that the Company's internal control over financial reporting is ineffective due to the material weakness described above. Since management has not completed its assessment of internal control over financial reporting as of December 31, 2005, it is possible that management may identify one or more additional material weaknesses.

In order to remediate the material weakness described above, management has implemented a new management information system at GPESH (effective February 6, 2006). This system is compatible with the Company's U.S. system, making all data for GPESH projects available to its U.S. operations.

The Audit Committee has discussed with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm, the matters disclosed under Item 4.02(a) in this Current Report on Form 8-K.

Statements contained in this Form 8-K regarding the Company's or management's intentions, beliefs, expectations, or predictions in the future are forward-looking statements

within the meaning of U.S. federal securities laws and are subject to a number of risks, assumptions and uncertainties that could cause the Company's actual results to differ materially from those projected, including the completion and audit of the Company's restated financial statements and the completion and audit of the Company's 2005 financial statements. Additional information concerning some of the other factors that could cause actual results to differ materially from those in, or implied by, the forward looking statements are set forth under "Risk Factors" in the Company's Form 10-K for the period ended December 31, 2004, and other reports on file with the U.S. Securities and Exchange Commission. The Company assumes no obligation to update publicly such forward looking statements, whether as a result of new information, future events or otherwise.

**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

(c) On March 8, 2006, the Company announced the appointment of John M. Matheson as Executive Vice President and Chief Operating Officer, effective March 6, 2006. Mr. Matheson joined the Company in November 2001 and has held several roles within the organization, including Senior Vice President of Global Power Equipment Group, Executive Vice President, Operations of the Company's Auxiliary Power segment and as the Company's general counsel and secretary. Mr. Matheson was responsible for many of the Company's key strategic initiatives, including mergers and acquisitions. He led the restructuring of the Auxiliary Power segment and the acquisitions of Williams Industrial Services Group and Deltak Power Equipment (China). From 1999 to 2001, Mr. Matheson served as Senior Attorney for The Williams Companies, Inc., an international energy and telecommunications company, where he was responsible for mergers, acquisitions and securities law matters. Formerly, he was a shareholder with the law firm of Conner & Winters, P.C., in Tulsa, Oklahoma, and was a Certified Public Accountant with Price Waterhouse. Mr. Matheson is a graduate of the Advanced Management Program of Harvard Business School and holds a Juris Doctorate from Georgetown University and a degree with Highest Honors from the University of Oklahoma School of Business.

Mr. Matheson previously entered into an employment agreement with the Company on April 22, 2004, which was filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 26, 2004 and is incorporated by reference herein. As Executive Vice President and Chief Operating Officer, Mr. Matheson will earn a base salary of $225,000 per year and will participate in (i) the Company's employee benefit programs, and (ii) the Company's Management Incentive Compensation Plans, under which he will be eligible for a 60% target bonus (with the actual bonus ranging from 50% to 200% of such target) or, in the event a Management Incentive Compensation Plan is not in effect for any bonus year, to receive substantially the same bonus opportunities as were in place for the prior calendar year. In the event Mr. Matheson's employment is terminated by the Company without Cause (as defined in his employment agreement) or by Mr. Matheson for Good Reason (as defined in the agreement), he will be entitled to receive his base salary for a 12-month period or, if more than 12 months remain in the initial two-year employment term on the date of termination, through the expiration of the Initial Employment Term as defined in the agreement. If termination occurs more than three months after commencement of a new bonus year, he will be entitled to receive a portion of

any bonus earned for the year in which termination occurred determined on a pro rated basis based on the number of days of such year employed. Mr. Matheson may not compete with the businesses of the Company for a one year period following his termination.

**Item 9.01. Financial Statements and Exhibits.**

(d) The following exhibit is filed herewith:

10 Waiver and Fourth Amendment to Credit Agreement.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GLOBAL POWER EQUIPMENT GROUP INC.

Date: March 8, 2006

By: /s/ Candice L. Cheeseman
Candice L. Cheeseman
General Counsel and Secretary

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 10 | Waiver and Fourth Amendment to Credit Agreement. |

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT PURSUANT
TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**Date of report (Date of earliest event reported) March 8, 2006**

# GLOBAL POWER EQUIPMENT GROUP INC.
**(Exact Name of Registrant as Specified in Its Charter)**

**Delaware**
**(State or Other Jurisdiction of Incorporation)**

| **001-16501** | **73-1541378** |
|---|---|
| **(Commission File Number)** | **(IRS Employer Identification No.)** |
| **6120 S. Yale, Suite 1480, Tulsa, Oklahoma** | **74136** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**(918) 488-0828**
**(Registrant's Telephone Number, Including Area Code)**

**Not Applicable**
**(Former Name or Former Address, if Changed Since Last Report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.02. Results of Operations and Financial Condition.**

On March 8, 2006, Global Power Equipment Group Inc. (the "Company") issued a press release announcing its estimate of results for the fourth quarter ended December 31, 2005 and that it expects to restate fiscal 2004 and quarterly 2005 results due to misreported gross profit on two completed projects in China. A copy of such press release is furnished as Exhibit 99.1 hereto.

On March 9, 2006, the Company participated in a telephone conference call relating to such press release. A transcript of the conference call is furnished as Exhibit 99.2 hereto.

The information being furnished hereunder discloses estimated earnings per diluted share, excluding estimated restructuring and share-based payment charges, with respect to fiscal year 2006, which is a non-GAAP financial measure within the meaning of Regulation G promulgated by the Securities and Exchange Commission. The Company has provided estimated earnings per diluted share adjusted to exclude estimated restructuring and share-based payment charges, which is not a measure of financial performance under GAAP, as such estimate excludes the effect of estimated restructuring charges to be incurred by the Company and the effect of SFAS 123(R) and restricted stock expense. The Company has provided this estimate because restructuring charges are typically non-recurring items that the Company generally excludes from its earnings guidance and excluding such items makes such information more comparable to prior disclosures for investors and financial analysts. Similarly, since the Company began recognizing compensation expense for the fair value of stock options at the grant date beginning on January 1, 2006 under SFAS 123(R), and since the Company expects to award a greater number of shares of restricted stock in 2006 than in prior periods, excluding the effect of these items makes such information more comparable to prior disclosures for investors and financial analysts. A reconciliation of the non-GAAP financial measure to the most directly comparable GAAP financial measure is included in the press release furnished as Exhibit 99.1 hereto.

The information included in this Form 8-K, including exhibits, is being furnished pursuant to this Item 2.02 and shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, nor shall it be incorporated by reference into any registration statement filed by the Company under the Securities Act of 1933, as amended, unless specifically identified therein as being incorporated therein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(d) The following exhibits are furnished herewith:

99.1 Press Release dated March 8, 2006, issued by the Company.

99.2 Transcript of the Company's March 9, 2006 telephone conference call.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GLOBAL POWER EQUIPMENT GROUP INC.

Date: March 14, 2006

By: /s/ Candice L. Cheeseman
Candice L. Cheeseman
General Counsel and Secretary

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated March 8, 2006, issued by the Company. |
| 99.2 | Transcript of the Company's March 9, 2006 telephone conference call. |

EX-99.1 2 dex991.htm PRESS RELEASE

**Exhibit 99.1**

**Global Power Equipment Group Inc.**
***Expects to Restate Fiscal 2004 and Quarterly 2005 Results Due To Misreported Gross Profit on Two Completed Projects in China and Provides Preliminary Fourth Quarter Earnings Estimate***

***Details for March 9, 2006 9:00 AM EST Conference Call***

TULSA, Oklahoma, March 8, 2006 – Global Power Equipment Group Inc. (NYSE: GEG), a leading design, engineering and manufacturing firm providing a broad array of equipment and services to the global energy, power infrastructure and process industries, today announced it expects to restate fiscal 2004, interim periods for the second, third and fourth quarters of fiscal 2004 and quarterly 2005 results. Previously issued financial statements for such periods should not be relied upon. The Company also provided a preliminary earnings estimate for the fourth quarter, which ended December 31, 2005.

***Restatement***

Management has become aware of previously unrecognized expenses related to a Heat Recovery equipment project in China that was substantially completed in December 2004. This led management to further review the revenue and cost recognition for this project as well as a separate Auxiliary Power equipment project that had also been sold through the Company's Chinese trading company, Global Power Equipment (Shanghai) Co., Ltd. ("GPESH"), in 2004. Following this review, the Company, in conjunction with the Company's Board of Directors and, after discussion with the Company's independent registered public accounting firm, has determined that gross profit was inadvertently overstated in total for these projects, and that a restatement is required. Currently, management believes that a restatement will result in an unaudited adjustment to prior period financial statements for the second, third and fourth quarters of 2004 and for the first, second and third quarters of 2005 that could cumulatively decrease previously reported operating income by approximately $7 million.

The Company expects to include restated financial results for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004 and the first, second and third quarters of 2005 in its Annual Report on Form 10-K for the fiscal year ended December 31, 2005. The Company is providing additional information regarding the restatement, including a discussion of related internal control issues, in a Form 8-K filed on March 8, 2006 and expects to file its Form 10-K on or before March 31, 2006.

***Preliminary Earnings Estimate – Fourth Quarter 2005***

Global Power Equipment Group's preliminary earnings estimate is a loss of between $11 to $13 million for the fourth quarter of 2005, or between $0.23 to $0.28 per diluted share, on revenues of approximately $116 million. This estimate excludes the possible impact from a potential goodwill impairment and/or an increase in deferred tax asset valuation allowance, which are under review as a result of the fourth quarter 2005 loss. These potential non-cash charges could be material.

Commenting on the fourth quarter loss, Al Brousseau, Global Power Equipment Group's president and chief executive officer stated, "During the fourth quarter 2005 the Company experienced unexpected cost overruns on several Heat Recovery projects that negatively impacted our earnings. I am now personally spearheading a major initiative within our Heat Recovery segment that mirrors the investment we made during the second half of 2005 to overhaul our Auxiliary Power segment to prevent similar cost overruns in the future. We will discuss this plan and what it means at length on tomorrow morning's conference call."

The Company expects to report a firm backlog at December 31, 2005 of approximately $387 million compared to $384 million at the end of September 2005 and $309 million at December 31, 2004.

At December 31, 2005, the Company had cash and cash equivalents of $21 million.

***Credit Agreement Amendment***

The Company also announced that it entered into an amendment to its credit facility that waives compliance with various existing financial covenants through September 30, 2006, waives any potential breaches of representations, warranties and covenants relating to the restatement of prior period results and establishes new financial terms and covenants. The Company will be providing a more detailed summary of the amendment to its credit facility in the Form 8-K, filed on March 8, 2006.

***Earnings Estimate – 2006***

Based upon information management currently has evaluated, in conjunction with this release the Company currently estimates 2006 diluted earnings per share of between $0.10 and $0.16, excluding an estimated $0.01 per diluted share of restructuring charges and $0.02 per diluted share of share-based payment charges. These earnings are based on projected 2006 revenues of between $475 and $500 million and assumes a 38 percent tax rate.

The Company will host a conference call on March 9, 2006 at 9:00 AM EST. The numbers to call for this interactive teleconference are: within the United States and Canada (800) 675-4431, outside North America (303) 752-5840. A playback of the call will be available from 1:00 p.m. EST on March 9 through midnight EST on March 24, 2006, by calling: within North America (800) 675-9924, outside North America (303) 750-0857. The replay ID code is 30806. To listen to the conference call over the Internet, please visit the Company's home page at www.globalpower.com.

This release contains disclosure of estimated earnings per diluted share for fiscal 2006 that exclude the effect of estimated restructuring and share-based payment charges, which is a non-GAAP financial measure within the meaning of Regulation G promulgated by the Securities and Exchange Commission. A reconciliation of estimated earnings per diluted share excluding restructuring and share-based payment charges to estimated earnings is included in the exhibits to this release.

Global Power Equipment Group Inc., 6120 S. Yale, Suite 1480, Tulsa, OK 74136 U.S.A.
Phone: 1-918 488-0828 FAX: 1-918 488-8389

**About Global Power Equipment Group**

Oklahoma based Global Power Equipment Group Inc. is a leading design, engineering and manufacturing firm providing a broad array of equipment and services to the global energy, power infrastructure and process industries. The Company designs, engineers and manufactures a comprehensive portfolio of equipment for gas turbine power plants and power-related equipment for industrial operations, and has over 30 years of power generation industry experience. The Company's equipment is installed in power plants and in industrial operations in more than 40 countries on six continents and believes, in its product lines, it has one of the largest installed bases of equipment for power generation in the world. In addition, the Company provides its customers with value-added services including engineering, retrofit, maintenance, repair and general plant services. Additional information about Global Power Equipment Group may be found at www.globalpower.com.

Statements contained in this release regarding the Company's or management's intentions, beliefs, expectations, or predictions for the future, including, but not limited to, those regarding anticipated operating results, are forward-looking statements within the meaning of U.S. federal securities laws and are subject to a number of risks, assumptions and uncertainties that could cause the Company's actual results to differ materially from those projected, including the audit of the Company's restated financial statements, the completion and audit of the Company's 2005 financial statements, ability to remain in compliance with, or obtain waivers under the Company's loan agreements, decreased demand for new gas turbine power plants, the loss of any of our major customers, the cancellation of projects, project cost overruns, including increases in prices for energy or for materials such as steel, and unforeseen schedule delays, competition for the sale of our products or services, poor performance by our subcontractors, warranty and product liability claims and changes in the economic, social and political conditions in the countries in which we operate, including fluctuations in foreign currency exchange rates. Additional information concerning these factors and some of the other factors that could cause actual results to differ materially from those in, or implied by, the forward looking statements are set forth under "Risk Factors" in the Company's Form 10-K for the period ended December 31, 2004, and other reports on file with the U.S. Securities and Exchange Commission. The Company assumes no obligation to update publicly such forward-looking statements, whether as a result of new information, future events or otherwise.

**Company Contact:**

Bob Zwerneman
Director of Investor Relations
(918) 274-2398

Global Power Equipment Group Inc., 6120 S. Yale, Suite 1480, Tulsa, OK 74136 U.S.A.
Phone: 1-918 488-0828 FAX: 1-918 488-8389

**GLOBAL POWER EQUIPMENT GROUP INC.**

**RECONCILIATION OF NON-GAAP ESTIMATED EARNINGS TO A GAAP BASIS**

| | Twelve Months Ended December 31, 2006 | |
|---|---|---|
| | (Low estimate) | (High estimate) |
| Estimated earnings per share on a non-GAAP basis | $ 0.10 | $ 0.16 |
| Impact of estimated restructuring charges | (0.01) | (0.01) |
| Impact of estimated share-based payment charges (1) | (0.02) | (0.02) |
| Estimated earnings per share on a GAAP basis | $ 0.07 | $ 0.13 |

(1) Includes the estimated effect of SFAS 123R for stock based compensation.

Global Power Equipment Group Inc., 6120 S. Yale, Suite 1480, Tulsa, OK 74136 U.S.A.
Phone: 1-918 488-0828 FAX: 1-918 488-8389

EX-99.2 3 dex992.htm TRANSCRIPT OF THE COMPANY'S MARCH 9, 2006 TELEPHONE CONFERENCE CALL

**Exhibit 99.2**

| **Global Power Equipment Group, Inc.** | GEG | Restatement of Fiscal 2004 and Quarterly 2005 Results Call | Mar. 9, 2006 |
|---|---|---|---|
| *Company* ▲ | *Ticker* ▲ | *Event Type* ▲ | *Date* ▲ |

**MANAGEMENT DISCUSSION SECTION**

Operator: Good morning and welcome ladies and gentlemen to the Preliminary Fourth Quarter Earnings Conference Call. At this time I would like to inform you that this conference is being recorded today, Thursday, March 9th, 2006. Currently all participants are in a listen-only mode. After the presentation we will conduct a question and answer session. [Operator Instructions]. It is now my pleasure to introduce Mr. Bob Zwerneman, Director of Investor Relations for Global Power. Please go ahead sir.

**Bob Zwerneman, Director of Investor Relations**

Thanks Heather. Good morning everyone and thank you for being with us this morning. Joining me today are Al Brousseau, Global Power Equipment Group's President and Chief Executive Officer; John Matheson, our newly-elected Executive Vice President and Chief Operating Officer; and Jim Wilson, our Chief Financial Officer.

We do not have a presentation to review for this call this morning, but I want to inform everyone that today's call will contain some forward-looking statements and non-GAAP financial information. We want to refer you to the language regarding these statements for the Safe Harbor and Reg G Compliance Statements that are contained in yesterday's press release. That information is available in the Investor Relations section on our website also.

We will be discussing a number of issues today including the restatement of our previously filed financial results for 2004, and the second, third, and fourth quarters of 2004, and the first, second, and third quarters of 2005. This information will be incorporated in our Form 10-K for 2005 which we expect to file somewhere before the end of March. As we have not completed the work on our 2005 audit as yet, some of the information that we will share with you today will be of a preliminary nature.

With that I'll turn the call over to Al.

**Reynolds A. Brousseau, President and Chief Executive Officer**

Good morning everyone and thanks for being on our call today on what was relatively short notice. We would like to spend a few minutes this morning addressing the issues we have encountered in our Heat Recovery and Auxiliary Power Business units, the current state of our business and sales performance, and providing everyone with an update of our financial situation and outlook. Jim will address the financial details in a few minutes. However, I want to comment briefly on the restatement, which will primarily impact fiscal 2004. The main issue resulted largely from a breakdown of communication between our Shanghai based trading company and the project teams that were overseeing the projects in the US. And after a thorough review, we have since implemented the appropriate processes and that will prevent a reoccurrence of such a situation again.

As we stated in yesterday's press release, we expect to record substantial cost overruns in our Heat Recovery segment during the fourth quarter. As we have shared with everyone in the past several conference calls, we have contended with a number of challenges in our business, including weak market conditions in late 2003 and into 2004 that created intense competition. Rising labor costs at some contract fabricators due to capacity constraints, mostly tied to a strong demand in other industries caused our labor costs to significantly increase at our subcontractors in

2005. Add to that the rising cost of steel and long-standing bid practices that our industry had been using for decades, along with poor execution in our own procurement practices, you have a recipe for trouble. The changes we witnessed were unprecedented and caught our industry and our organization flatfooted.

I have previously informed you of my participation in product review sessions and how I learned of the issues we shared with you on previous calls. As 2005 came to an end and several large projects were winding down, we became aware of substantial cost overruns which caused us to reassess all of our major Heat Recovery projects. While some of the execution problems were industry-related, most should have been avoided. The question is what are we doing to fix it? We've made significant management changes over the past six months and will continue to attract and hire the best people available to reinforce a higher level of performance.

To encourage the process, I have now become much more active in working with every level of our operating companies where there have been major issues, especially in our Heat Recovery business unit. In addition to project management reviews, I personally sit in on all the estimating meetings for major projects that we are bidding. In those meetings, we review the line-by-line details and firm backup quotes from material suppliers and from subcontractors. Our goal is to nail down the big ticket items that will comprise more than 80% of our total costs on a project to assure our bid amount has a solid basis for profitability.

Global Power is more fortunate than most of our competitors in that we also have a tremendous low-cost facility in Nanjing, China. We can produce and have produced world-class products at probably the lowest cost to be found at our own factory. And I want to emphasize this point. In the execution phase of some of the projects that turned unprofitable, the overall scope of work was split between our own Nanjing facility and our international manufacturing partners that had previously been a low-cost source.

Looking ahead at 2006 and 2007, the Heat Recovery jobs that we recently won will be manufactured at our Nanjing facility. This way we can better monitor costs, schedule, maintain our quality on a daily, weekly, and monthly basis. This ability to better insource or outsource our production as necessary will make us a stronger and more competitive company. But China production is only a part of the equation. We will continue to outsource a large part of our fabrication; however, with the addition of new people and systems, we will be much better prepared to monitor our own performance. We do have the industry's best product, the strongest reputation for quality and execution, and our organization to an individual understands we need to do much better. We have brought on board new people with great credentials and will add others that will improve our performance.

We are working closely with our engineering, procurement, and estimating teams, every major cost element in new awards were scrutinized to ensure that costs were consistent with current information or firm bids that we received to minimize any risk of major negative variances as we move through the build cycle for the projects. I have also been active in encouraging our sales teams to negotiate better payment terms and avoid the large working capital swings that we encountered during the second half of the year. The good news is in the past two months we have booked some very good jobs at substantially higher margins and we've also turned down some bids that didn't meet that threshold.

My commitment is that I will spend virtually all of my time in our Minneapolis office or in front of customers and vendors and manufacturing partners along with members of our operating unit to make sure that the problems we had during 2005 do not happen again. This is what I've done for most of my 35 years in the power business. I understand every part of the process from beginning to end, and I will devote as much time as necessary to this effort. You probably won't see me much on road trips or available for conferences or one-on-ones, but in my place you most likely will see John Matheson.

Now let me just explain a little bit of John Matheson's role going forward. As we announced separately yesterday, our Board has elected John to serve as our Executive Vice President and Chief Operating Officer for Global Power. John will share the responsibility for operations and other corporate functions. John has been instrumental in helping shape our company's vision and streamlining our operations, and is a proven leader. He has helped guide the strategic direction of the company and will effectively communicate the Global Power story. He and Bob Zwerneman will visit with investors and prospective investors over the coming weeks, and those of you who meet with them will come to realize we are fielding a strong team to communicate our initiatives and opportunities.

And with those opening remarks, I'll turn the call over to John to provide some additional updates on the business.

**John M. Matheson, Executive Vice President and Chief Operating Officer**

Well, thanks Al and good morning. The problems we encountered during 2005 in our Heat Recovery segment were similar to those we had encountered in our Auxiliary Power segment during the first half of 2005. After considerable research and discussion, we engaged Ernst & Young Transaction Advisory Services to help us implement a program to literally reinvent that business unit. It took the better part of 7 months and a huge effort by our employees, but it was well worth it.

Today in this business unit, we're operating on a management information system that has real-time reports, better sales people, estimating teams, procurement personnel, engineering, project management, and senior management can view on projects we have and are bidding. This new system greatly reduces our risks and provides the necessary information to effectively operate our business. It also becomes the binding glue that brings accountability into the operation and the equation. Bid proposals are constructed with input from engineering, procurement, project management, and sales. This allows us to update our database dynamically, which rolls forward in the jobs that we will bid. We expect that the improvements in costs and cycle time reduction will pay for this system many times over.

Now while the system supports the process, to be successful it still requires the right people. And to that end, we've made sweeping changes in a number of areas within our Auxiliary Power segment as we have upgraded personnel in the areas of finance, sourcing, and quality. Late last year, we also brought on board a new chief operating officer for this business unit with roots in international manufacturing companies such as Diebold and GE Power Systems. He's quickly come up to speed and is making a tremendous contribution by bringing new ideas and better practices to this business unit. Having played a key role in the process, I can say with confidence that the effort has been well worth the investment, as the organization now functions far more effectively with the new systems, processes, and people.

We also formed a new Global supply chain operations group that is driving our costs lower by implementing bulk buy programs, source material and fabrication, and reduce costs across all of our business units. As we move forward to implement the same tune-up in our Heat Recovery segment, the effort is expected to yield far greater results. You also saw in yesterday's press release that John McNaughton will be joining us as the company's Chief Information Officer and VP of Performance, Planning, and Strategy. John was a tremendous help in reinventing our Auxiliary Power business unit over the past 7 months while he was with Ernst & Young, and will be assisting Al in Minneapolis as we go about a similar process in our Heat Recovery business unit. We are very fortunate to have someone with John's background, experience and skills join Global Power to lead our performance improvement initiatives.

And we'll continue to invest in and strengthen our Heat Recovery segment to make it the industry leader in operational excellence. With a low-cost structure married to superior delivery, it will become the most value oriented provider of highly engineered solutions in the marketplace. Personally, I just returned from our Deltak Power Equipment China operation in Nanjing, and I witnessed again why it is such an important part of our current supply chain. We do intend to use it as an even larger part of our product sourcing as we move forward.

In closing, we're confident that we're taking the proper steps to prevent another disappointment like this in the future and what makes us even more optimistic is knowing that our end markets continue to strengthen, that our employees are professional and dedicated, and they are able to build processes that work and discard the ones that don't, and most importantly, what accountability means.

And with that, I'll turn it over to Jim to speak to the financial information.

**James P. Wilson, Vice President of Finance and Chief Financial Officer**

Okay, thanks John. We covered the specific details of our restatement in yesterday's press release and 8-K filing. I want to reaffirm that the restatement is related to two projects taken by our Chinese subsidiary, GPESH. The primary cause of the restatement was poor communication between our US companies and GPESH. In February 2006, we went live with a new ERP system at GPESH, which allows us to communicate better between our US companies and GPESH. Because of this increased communication, we believe that this will resolve the issues that led to the restatement.

Due to a number of project cost overruns within our Heat Recovery statement, which Al addressed earlier, Global Power Equipment Group currently estimates a preliminary net loss of between 11 million to 13 million for the fourth quarter of fiscal 2005 or between $0.23 to $0.28 per diluted share on revenues of approximately 116 million. Please note that this estimate excludes a possible impact from a potential goodwill impairment and/or an increase in the deferred tax asset valuation allowance, which are under review as a result of this significant fourth quarter loss. These potential non-cash charges could be material.

At December 31, 2004, the company had approximately 21 million of cash, which has increased slightly since this time. Based on company forecasts, using the latest actual and expected projects, we anticipate being cash flow positive for 2006. The company also announced that it entered into an amendment to its senior credit facility that waives compliance with various covenants for prior and future periods and also established new covenants for the 2006 calendar year. The specific details of this amendment have been incorporated into our Form 8-K, which was filed yesterday.

I would now like to address our bookings and backlog. In the fourth quarter, we booked 120 million of new orders against revenue of approximately 116 million which resulted in our year end backlog rising slightly to 387 million from the 384 million that we had at the end of September. However, we have received several significant project awards at significantly higher gross margins during early 2006 which we believe will improve the overall quality of orders on hand. We estimate that our consolidated first quarter net bookings will approach 125 million with an average expected gross margin of 16%. This includes 152 million of new bookings offset by 27 million moved from firm to primary backlog for an order on hold. The bookings include the Services segment where margins are typically in the 12% to 13% range. Also the average gross margin for our product segment during the first quarter is expected to be around 18%.

Our Services business was a great acquisition performing exactly as expected. We also expect that our Auxiliary Power business will have a good year after the systems and personnel changes implemented during 2005 start to take effect.

As Al addressed, we believe that we have a definitive plan in place for our Heat Recovery business and we will be implementing new processes and systems during the year that will deal with and resolve the issues that produced our fourth quarter losses. As we stated in yesterday's press release, the investment that we'll be making in our Heat Recovery segment, the loss of anticipated gross profit on several jobs that will be essentially finished by mid-year 2006, and unplanned fees associated with the recent amendment to our credit facility will reduce our estimated earnings by roughly $0.07 per diluted share from our previous guidance provided last November.

In spite of the fourth quarter setback, we believe 2006 will be a good year for Global Power. Once again, we will have an additional conference call after we release the final year end results and can go into a much higher level of detail at that time.

With those remarks, let's open it up for questions.

**Bob Zwerneman, Director of Investor Relations**

Heather, can you poll the group?

**QUESTION AND ANSWER SECTION**

Operator: Absolutely. [Operator Instructions]. The first question is going to come from Sanjay Shrestha from First Albany. Please go ahead sir.

**<Q – Sanjay Shrestha>:** Great, thank you. Good morning guys. First question here, I mean what I'm a little surprised about is you guys have done a great job of surviving one of the worst possible downturn in the power market and we seem to be kind of running on all these issues here after having revisited the numbers several times. So, could you guys go into some more detail in line with your positive expectation for 2006 at a level of comfort for us that you have looked at things pretty closely and pretty deep that there are no other negative surprises that can come out?

**<A – Reynolds Brousseau>:** Yes Sanjay, let me answer that question okay? As you know, I have been actively involved and have been living in Minneapolis in particular the last couple of months working through a lot of these issues. But let's be clear that there is no one that's pleased as an individual in our organization about what's happened as a result of 2004. The effect and the resonation throughout the organization has been dramatic. I could sum it up in two words: discipline and accountability. And that's what we're pushing for in 2006 is the discipline to do what we said we were going to do in '05 and make sure we go out and bid good jobs, profitable jobs, and manage those jobs well, and hold people accountable.

Now, let me go and answer specifically your question. Let me describe the process we went through as an organization to determine the losses. A portion of our losses were in the Auxiliary Power segment wherein these were costs incurred in a product line that we actually booked in 2004 and shipped in 2005, and we have not supplied this particular product since 2004 orders, nor do we intend to. But the process of looking at the losses as well is that we've had senior level experienced industry experts across the company, and we have pulled some of those from our Williams Industrial Services group who have a lot of industrial and EPC experience. We spent a lot of time going through all the projects, the major projects in the Heat Recovery segment, and doing a detailed analysis and performed what I call a risk management analysis of each significant Heat Recovery project. And, we've done that as well for all the other projects that we have in Heat Recovery in other areas in the last two months and we've identified any risks that need to be mitigated.

Now, as Jim mentioned in his discussion on backlog, we have booked over $60 million in new orders in the Heat Recovery segment during the first two months of 2006. And, I've spent a lot of time in having significant pre-bid discussions on risk management, payment terms, a lot of iterations on understanding the cost estimates for these projects before we actually put the final price in and based also on the current costs that we have incurred on all these projects. Right now, it's a fairly rigid practice for bidding for any new significant orders, and we are holding people accountable and my involvement is there for an indefinite period of time, as well as some other senior managers. So, that's the basis for where we are, where we've gotten to. And we felt that we scrubbed all of the projects, and we really have a – we probably now today in the last two months have a real good handle on what our costs to complete are on the existing projects that we have in there and going forward.

**<Q – Sanjay Shrestha>:** Okay. Kind of a follow-up question on that; just a bit of a surprise that, why didn't you guys scrub some of these projects when you readjusted the guidance? I mean, what was the surprise factor for you internally that again led to this Q4 performance being the way it is, and now what is the level of comfort? What are some of the systems that you've put in place from a risk management standpoint? What are some of the specific things that you've done that this is not going to get repeated again?

**<A – Reynolds Brousseau>:** Okay Sanjay. Let me answer the first part, okay? Let's describe some of the losses, okay?

**<Q – Sanjay Shrestha>:** Okay.

**<A – Reynolds Brousseau>:** As we explained about in the earlier calls, the higher than anticipated supplier and final material costs constituted probably about 60% of the losses that we incurred. But what we had also was a lot of unanticipated freight costs, shipping costs, because a lot of stuff is done overseas, and delays in shipping and all kinds of issues that occurred that, some were beyond our control, but they are part of the cost of doing business on major projects.

**<Q – Sanjay Shrestha>:** Okay.

**<A – Reynolds Brousseau>:** That was about 30% of the cost.

**<Q – Sanjay Shrestha>:** Okay.

**<A – Reynolds Brousseau>:** And then we had a couple projects where we actually were doing construction, which is not the norm for the Heat Recovery segment, okay? That probably incurred another 10% of the losses that we looked at and we felt that we wanted to mitigate some of those risks going forward. So, that was the basis for the description of the project losses that we discovered and went through and did the real deep analysis on.

**<Q – Sanjay Shrestha>:** Okay.

**<A – Reynolds Brousseau>:** And let me turn it over to John to describe some of the processes now that we've done and are going to do.

**<A – John Matheson>:** Yeah, let me talk about that because it was in part of my opening comments. As I said, many of these things that we saw in the latter part of '05 around November or so in the Heat Recovery segment we had seen earlier on in the year in our Auxiliary Power segment, now albeit it to a much smaller scale. But when we started seeing those things in our Auxiliary Power segment that's when we launched this initiative internally. We called it the Empower Project and went in and looked at processes, people, organizations, systems, and we implemented that and that is now live as of February of this year.

Now since we have that available and we have proper communication between the groups and we have information and tools available, better project management, and all those other groups I mentioned before can look at and share between the groups and with our China trading company, we're going to use those best practices and move that right over into our Heat Recovery segment. We're launching that; it's already been launched today through that process, and that should be complete by August of this year.

**<Q – Sanjay Shrestha>:** Okay, great. Two quick follow-ups, if I could. One, on the losses that you guys talked about with your trading partner in China and the lack of communication, does that change your view on doing business in China or the level of profitability associated with that?

**<A – James Wilson>:** No it really doesn't, Sanjay – this is Jim. It's more, the very first project we took on our HRSG group was through this trading company and that's really not the way we do that anymore. So it's more of a one-off type item. And some of the issues just related to, just a clear misunderstanding about the way that projects should be handled in China with regard to value-added tax and other issues and that's what led to some of the misunderstandings.

**<Q – Sanjay Shrestha>:** Okay great, one last question then. Did the EPS number for 2006, $0.10 to 0.16, that is slightly below the prior expectation, is that now related to most of this information technology-related stuff to make better reliability from a production standpoint, estimation standpoint, or there is some follow through cost overruns that is again going to have an impact in '06?

**<A – James Wilson>:** I guess I'll answer that. There's really, we feel like we've really looked through these projects good. Al has spent a lot of time up there as he mentioned on this call and in the questions so we feel like we've addressed those issues. If you look at the declining guidance like I talked about in my script…

**<Q – Sanjay Shrestha>:** Sure.

**<A – James Wilson>:** We have a $0.07 decline, and if you want to break that down, about $0.03 of that is due to this recent debt restructuring that we just talked about

**<Q – Sanjay Shrestha>:** Okay.

**<A – James Wilson>:** $0.02 of that is due to the Deltak restructuring that John talked about, Heat Recovery…

**<Q – Sanjay Shrestha>:** Okay.

**<A – James Wilson>:** With regard to new processes, systems, and so forth. And then the final $0.02 of that would just be due to the fact that you have less opportunity margin because you've recognized costs on these jobs. As they go into next year, we don't think they're going to get worse but we…

**<Q – Sanjay Shrestha>:** Yeah.

**<A – James Wilson>:** …don't think the margins would be lower than what we predicted originally. And that's really the summary.

**<Q – Sanjay Shrestha>:** Okay that's great and I'll back into queue. Thanks guys.

**<A – Bob Zwerneman>:** Next question please.

Operator: Thank you very much. The next question comes from Rich Wesolowski from Sidoti & Company.

**<Q – Richard Wesolowski>:** Thank you, just first on some data points. You mentioned the 11 to $13 million fourth quarter loss, but how much was the write down that you took on those 2 projects?

**<A – James Wilson>:** Well I'll try to explain that, it was actually several projects and the increased cost on those projects was approximately $15 million. The P&L impact wasn't as great as that, it was in the 11 million to $12 million range because some of that is just a reduction of future profitability, not necessarily in the fourth quarter.

**<Q – Richard Wesolowski>:** Okay, so in the fourth quarter you took, there was about 11 million or $12 million so you guys would have come in somewhere around breakeven. Had you not recognized this, say this went out into the first half of this year, you guys would have reported something of a breakeven number?

**<A – James Wilson>:** Well the 11 million or 12 million is after tax, and of course these are preliminary numbers because we're still working on getting our financials done, but we thought we needed to discuss this with everybody, but those were after-tax numbers so we still would have had a loss because we just wouldn't have had a lot of profitability from that segment.

**<Q – Richard Wesolowski>:** Okay. Were the 2 or the 3 projects highlighted on the third quarter call the only jobs that were written down in the fourth quarter?

**<A – James Wilson>:** Those were probably the majority, but then there were other ones which were written down somewhat.

**<Q – Richard Wesolowski>:** Which ones?

**<A – James Wilson>:** Other projects. There are 5 or 6 of them in total.

**<Q – Richard Wesolowski>:** Do you have any specifics as far as what types of equipment or geographically where they were, customers or anything like that?

**<A – James Wilson>:** Rich, it's all the Heat Recovery equipment, so all projects booked in 2005.

**<Q – Richard Wesolowski>:** Okay.

**<A – Bob Zwerneman >:** I think booked into our – nothing in '06 was affected by that. Booked in '04 or '05, and that was based on what Al had looked at.

**<Q – Richard Wesolowski>:** Okay.

**<A – Reynolds Brousseau>:** Rich, those were, I would say we probably had 10 to 12 major projects currently going on in the Heat Recovery segment right now and as Jim mentioned and as Bob has mentioned a little bit, most of those that we took the losses on were all booked in '04 or the first month or so of '05. And some of that is just going back and really understanding. Is it all losses? No. There's still some profit, but it's a reduced amount of profit on a couple of those jobs. But you've got to be realistic and take a look at what's my true cost going to be, cost to come, and really do a real good, deep analysis of the risk mitigation and that's what we've done the last couple of months.

**<Q – Richard Wesolowski>:** Okay. How much revenue do you expect that the jobs that were written down are going to contribute to the first quarter or first half, and when do you expect the big ones to be completed?

**<A – James Wilson>:** I think we'd better go over that in two weeks or when we do our final call so we have all the details of that, Rich.

**<Q – Richard Wesolowski>:** Okay. Moving towards, I mean we spoke a lot about the bidding practices and going line by line. Can you go into a little more detail as to the changes that you made in either personnel or systems for the internal controls? I mean, it sounds like there were just costs left out in Siberia on some of these China projects that caused the restated earnings for 2004 and 2005, and it seems that while Al is spending a lot of time in Minneapolis, it just appears that if he was not then things wouldn't right the ship. And, I just want to gain a little more confidence in the lower levels of management that is now in place in those segments.

**<A – Reynolds Brousseau>:** Let me tell you this Rich, is that we are actively looking at, as we have done in the Auxiliary Power segment, we're actively looking at hiring a few more good people. We have a lot of good people in the Heat Recovery segment. Part of it was we just weren't communicating among different groups in different sections. We have let go some key people in the organization who are no longer there, and we're actively looking to replace those, and that's part of the reason I'm there. The decision was made, I made to release some people and I'll step in and help out as much as possible. We're actively looking at trying to hire some people so that I

don't have to be there all the time, but what I want to do is find the right person who understands my philosophy of how to do business, who understands large project management philosophy, and what we as stakeholders, including yourselves as investors want to see in the company. So, that's the process. If you look at the other organizations we've had some other changes in other areas. And, again we're still looking to replace some of those people, and I'll just leave it at that for now.

**<Q – Richard Wesolowski>:** Okay. And finally, could you give us some more detail on where a potential goodwill write down will be taken, specifically whether or not there's a potential for a write down at Williams?

**<A – James Wilson>:** I can tell you right now there's not a potential for write down at Williams, so as I mentioned earlier, that business unit is really functioning exactly like we anticipated and they're doing very, very well. So there's no issue there. It would be probably premature until we do all of our final analyses to say when and where that might be and there's a lot of interrelated parts as we examine our deferred tax assets and our goodwill, so it all relates together.

**<Q – Richard Wesolowski>:** Okay, thank you very much.

Operator: Thank you very much sir. The next question comes from Martin Malloy from Hibernia Southcoast. Please go ahead.

**<Q – Martin Malloy>:** Good morning and I'm sorry if I missed this before, if you talked about it before, but in terms of the timing of when some of these projects are going to be completed, when will the last one that you know of be completed?

**<A – James Wilson>:** I would say Marty, that most of these projects are going to be completed during the first part, first half or so of 2006. There is one large project that Al referred to vaguely that we have installation on and that project actually goes into 2007, and so that's really the summary. I would say the majority of it, 75%, 80% would be completed during the first half of 2006.

**<A – Reynolds Brousseau>:** Yeah Marty, I think if you look at the material supply portion of all these contracts we're talking about, almost all of those are done in the next – first and second quarters of '06. It's just some of the construction and of course you always have commission, by the time they get it constructed, related issues later on. But that's down the road a piece. But our costs are at material costs.

**<Q – Martin Malloy>:** Okay and then in terms of, you mentioned you'd booked several good projects at good margins here recently, in the last couple of months. Can you give us any help in terms of geography, where those projects are being booked or where you see more opportunities perhaps?

**<A – James Wilson>:** For the HRSG projects, they're mainly in Canada and the United States, for now. And our Auxiliary Power, of course our Services business, they're all in the United States. And then for Auxiliary Power, there's several different locations. There are some in the Middle East, some in Asia, some in the US and that's the breakdown…

**<A – Bob Zwerneman >:** And some in China.

**<A – James Wilson>:** Some in China.

**<Q – Martin Malloy>:** Okay.

**<A – Bob Zwerneman >:** We'll provide that detail on our call in two weeks. We'll give you our revenue and try to give you some color on backlog.

**<Q – Martin Malloy>:** Okay. And then in terms of your revolver bank facility, can you update us as far as what capacity you have there for bonds as well as letters of credit?

**<A – James Wilson>:** Yes. Our total capacity on the revolver is $60 million. And we currently have outstanding about $25 million of letters of credit. And then we have some borrowings in China which impact that also, maybe 3 million or 4 million. So we have about $30 million in availability for LCs or cash borrowings.

**<Q – Martin Malloy>:** Okay. Thank you.

**<A – Bob Zwerneman>:** Thank you. Heather, do we have any other questions?

Operator: There are no further questions at this time. Actually we have another – we have a follow-up question form Rich Wesolowski. Please go ahead sir with your follow-up. Pardon me, sir, please go ahead with your follow-up. Mr. Wesolowski? Apparently he doesn't have a question, sir.

**Bob Zwerneman, Director of Investor Relations**

Yeah, he has cut off there. Well, thank you everyone for participating in the call. And as Jim stated, we'll be releasing somewhere we think in the next two weeks and filing our K by the end of March and we will be holding a conference call to discuss those results. We do not know that specific date at this time, but we will provide details as quickly as we can. Also before we close, I want to remind people that we did contain some forward-looking statements and non-GAAP financial information and refer you to the language that I spoke to earlier. Also I'm not sure if there is going to be, if Thomson actually picked this up today from a transcript point, so we do have a tape of it and a replay that will be available for a couple weeks by dialing 800-675-9924, again that's 800-675-9924 inside North America. Outside North America it's 303-750-0857. There is a replay ID code and that number is 30806, again the ID code is 30806. Thank you again and this concludes our call.

Operator: Thank you ladies and gentlemen, that does conclude the conference for today. We thank you for participating. You may now all disconnect.

**Disclaimer**

The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

*The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2005. CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.*

10-Q 1 d10q.htm FOR THE QUARTERLY PERIOD ENDED JUNE 26,2004.

Table of Contents

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 26, 2004**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
**(Address of principal executive offices)**

**74136**
**(Zip Code)**

**(918) 488-0828**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒ No ☐

The number of shares of the Registrant's common stock, $.01 par value, outstanding at August 2, 2004 was 46,325,798.

---

Table of Contents

**GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
**(Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | June 26, 2004 | June 28, 2003 | June 26, 2004 | June 28, 2003 |
| Revenues | $57,021 | $64,002 | $112,147 | $141,028 |
| Cost of sales | 47,892 | 47,052 | 91,205 | 102,860 |
| Gross profit | 9,129 | 16,950 | 20,942 | 38,168 |
| Selling and administrative expenses | 8,541 | 8,655 | 18,802 | 18,119 |
| Operating income | 588 | 8,295 | 2,140 | 20,049 |
| Interest expense | 111 | 394 | 311 | 892 |
| Income before income taxes | 477 | 7,901 | 1,829 | 19,157 |
| Income tax provision | 181 | 3,081 | 695 | 7,471 |
| Net income available to common stockholders | $ 296 | $ 4,820 | $ 1,134 | $ 11,686 |
| Earnings per weighted average common share: | | | | |
| Basic | $ 0.01 | $ 0.11 | $ 0.02 | $ 0.26 |
| Weighted average number of shares of common stock outstanding | 46,325 | 44,209 | 45,991 | 44,099 |
| Diluted | $ 0.01 | $ 0.11 | $ 0.02 | $ 0.26 |
| Weighted average number of shares of common stock outstanding | 46,949 | 45,756 | 46,839 | 45,618 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

**☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 25, 2004**

**OR**

**☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
**(Address of principal executive offices)**

**74136**
**(Zip Code)**

**(918) 488-0828**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒ No ☐

The number of shares of the Registrant's common stock, $0.01 par value, outstanding at November 1, 2004 was 46,366,148.

Table of Contents

**GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
**(Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 25, 2004 | September 27, 2003 | September 25, 2004 | September 27, 2003 |
| Revenues | $ 59,720 | $ 57,301 | $ 171,867 | $ 198,329 |
| Cost of sales | 50,621 | 43,454 | 141,826 | 146,314 |
| Gross profit | 9,099 | 13,847 | 30,041 | 52,015 |
| Selling and administrative expenses | 8,769 | 8,578 | 27,571 | 26,697 |
| Operating income | 330 | 5,269 | 2,470 | 25,318 |
| Interest expense | 185 | 326 | 496 | 1,218 |
| Income before income taxes | 145 | 4,943 | 1,974 | 24,100 |
| Income tax provision | 55 | 1,928 | 750 | 9,399 |
| Net income available to common stockholders | $ 90 | $ 3,015 | $ 1,224 | $ 14,701 |
| Earnings per weighted average common share: | | | | |
| Basic | $ 0.00 | $ 0.07 | $ 0.03 | $ 0.33 |
| Weighted average number of shares of common stock outstanding-basic | 46,330 | 44,785 | 46,104 | 44,327 |
| Diluted | $ 0.00 | $ 0.07 | $ 0.03 | $ 0.32 |
| Weighted average number of shares of common stock outstanding-diluted | 46,921 | 45,996 | 46,869 | 45,788 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

10-K 1 d10k.htm FOR THE YEAR ENDED DECEMBER 31, 2004

Table of Contents

Index to Financial Statements

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

**☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the year ended December 31, 2004**

**OR**

**☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
**(Address of principal executive offices)**

**74136**
**(Zip Code)**

**(918) 488-0828**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange. |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-

Case 1:06-cv-03433-BSJ-MHD Document 13-9 Filed 07/24/2006 Page 21 of 18

2). Yes ☒ No ☐

The aggregate market value of the voting stock held by non-affiliates (affiliates being directors, officers and holders of more than 10% of the Company's common stock), based on the closing price of the Common Stock on June 26, 2004, the last business day of the registrant's most recently completed second quarter, as reported by the New York Stock Exchange, was approximately $240.9 million.

The number of shares of the Registrant's common stock, $.01 par value, outstanding at February 28, 2005 was 46,775,264.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the registrant's proxy statement for the annual meeting of stockholders for 2005 are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

Index to Financial Statements

**12. SUMMARY OF QUARTERLY INFORMATION (unaudited)**

| | First | Second | Third | Fourth |
|---|---|---|---|---|
| | (in thousands except per common share data) | | | |
| **2004** | | | | |
| Revenues | $ 55,126 | $ 57,021 | $ 59,720 | $ 61,825 |
| Gross profit | 11,813 | 9,129 | 9,099 | 9,216 |
| Operating income (loss) | 1,552 | 588 | 330 | (2,375) |
| Income tax provision (benefit) | 514 | 181 | 55 | (1,201) |
| Net income (loss) | 838 | 296 | 90 | (1,929) |
| Income per share: | | | | |
| Basic | 0.02 | 0.01 | 0.00 | (0.05) |
| Diluted | 0.02 | 0.01 | 0.00 | (0.05) |
| **2003** | | | | |
| Revenues | $ 77,026 | $ 64,002 | $ 57,301 | $ 65,449 |
| Gross profit | 21,218 | 16,950 | 13,847 | 19,482 |
| Operating income | 11,754 | 8,295 | 5,269 | 8,096 |
| Income tax provision | 4,390 | 3,081 | 1,928 | 2,727 |
| Net income | 6,866 | 4,820 | 3,015 | 5,083 |
| Income per share: | | | | |
| Basic | 0.16 | 0.11 | 0.07 | 0.10 |
| Diluted | 0.15 | 0.11 | 0.07 | 0.10 |
| **2002** | | | | |
| Revenues | $203,527 | $162,916 | $112,673 | $107,689 |
| Gross profit | 36,728 | 35,890 | 28,498 | 30,350 |
| Operating income | 26,273 | 25,069 | 17,360 | 20,552 |
| Income tax provision | 9,746 | 9,346 | 6,322 | 7,753 |
| Net income | 15,244 | 14,618 | 9,889 | 12,126 |
| Income per share: | | | | |
| Basic | 0.35 | 0.33 | 0.22 | 0.28 |
| Diluted | 0.33 | 0.32 | 0.22 | 0.27 |

**13. EMPLOYMENT AND OPERATIONAL RESTRUCTURING**

In October 2003, we announced a management restructuring plan pursuant to which certain employees were offered either one-time termination or retirement benefits. Certain employees that were offered the retirement incentive packages entered into consulting agreements with us subsequent to their retirement. The expense related to the consulting agreements will be recognized as the services are provided over the term of the agreements. In addition, retiring employees were offered the right to amend their stock option agreements to extend the date such options remain exercisable from 90 days after termination of employment to one year after termination of employment. In some cases, this plan also provided for the acceleration of vesting for certain unvested stock options. Under APB Opinion No. 25, "Accounting for Stock Issued to Employees," we expensed the fair value of the options at the new measurement date. We recorded charges of approximately $3.2 and $3.9 million during 2004 and 2003, respectively, related to the management restructuring plan.

Under the 2003 management restructuring plan, a retirement benefits agreement was entered into with our Chief Executive Officer, Larry Edwards, pursuant to which he determines his own future retirement date. Subsequent to year end, Mr. Edwards announced his retirement effective June 30, 2005. On June 30, 2005, Mr. Edwards will receive a payment of approximately $1.9 million, which has been accrued in other current liabilities as of December 31, 2004.

The Company expects to incur approximately $2.5 million of management restructuring charges in the future, including an estimate of $2.2 million for the expected consulting fees and variable stock option expense related to the CEO's retirement benefits agreement.

10-Q 1 d10q.htm FOR THE QUARTERLY PERIOD ENDED MARCH 31, 2005

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

**☒ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2005**

**OR**

**☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
**(Address of principal executive offices)**

**74136**
**(Zip Code)**

**(918) 488-0828**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒ No ☐

The number of shares of the Registrant's common stock, $0.01 par value, outstanding at May 2, 2005 was 46,918,235.

Table of Contents

**GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
**(Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended | |
|---|---|---|
| | March 31, 2005 | March 27, 2004 |
| Revenues | $67,387 | $55,126 |
| Cost of sales | 57,606 | 43,313 |
| Gross profit | 9,781 | 11,813 |
| Selling and administrative expenses | 8,916 | 10,261 |
| Operating income | 865 | 1,552 |
| Interest expense | 896 | 200 |
| Income (loss) before income taxes and minority interest | (31) | 1,352 |
| Income tax provision (benefit) | (11) | 514 |
| Income (loss) before minority interest | (20) | 838 |
| Minority interest | 10 | — |
| Net income (loss) | $ (30) | $ 838 |
| Earnings per weighted average common share: | | |
| Basic: | | |
| Net income (loss) | $ — | $ 0.02 |
| Weighted average number of shares of common stock outstanding-basic | 46,813 | 45,657 |
| Diluted: | | |
| Net income (loss) | $ — | $ 0.02 |
| Weighted average number of shares of common stock outstanding-diluted | 46,813 | 46,727 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware**<br>(State or other jurisdiction of incorporation or organization) | **73-1541378**<br>(I.R.S. Employer Identification No.) |
|---|---|

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
(Address of principal executive offices)

**74136**
(Zip Code)

**(918) 488-0828**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒ No ☐

The number of shares of the Registrant's common stock, $0.01 par value, outstanding at August 2, 2005 was 46,945,585

Table of Contents

**GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF INCOME**
**(Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | June 30, 2005 | June 26, 2004 | June 30, 2005 | June 26, 2004 |
| Product revenues | $ 77,500 | $57,021 | $144,887 | $112,147 |
| Service revenues | 36,086 | — | 36,086 | — |
| Total revenues | 113,586 | 57,021 | 180,973 | 112,147 |
| Cost of product revenues | 69,413 | 47,892 | 127,019 | 91,205 |
| Cost of service revenues | 32,426 | — | 32,426 | — |
| Gross profit | 11,747 | 9,129 | 21,528 | 20,942 |
| Selling and administrative expenses | 12,641 | 8,541 | 21,557 | 18,802 |
| Operating income (loss) | (894) | 588 | (29) | 2,140 |
| Interest expense | 1,163 | 111 | 2,059 | 311 |
| Income (loss) before income taxes and minority interest | (2,057) | 477 | (2,088) | 1,829 |
| Income tax provision (benefit) | (783) | 181 | (794) | 695 |
| Income (loss) before minority interest | (1,274) | 296 | (1,294) | 1,134 |
| Minority interest | 37 | — | 47 | — |
| Net income (loss) | $ (1,311) | $ 296 | $ (1,341) | $ 1,134 |
| Earnings (loss) per weighted average common share: | | | | |
| Basic | $ (0.03) | $ 0.01 | $ (0.03) | $ 0.02 |
| Weighted average number of shares of common stock outstanding-basic | 46,918 | 46,325 | 46,866 | 45,991 |
| Diluted | $ (0.03) | $ 0.01 | $ (0.03) | $ 0.02 |
| Weighted average number of shares of common stock outstanding-diluted | 46,918 | 46,949 | 46,866 | 46,839 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

10-Q 1 d10q.htm FORM 10-Q

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ________ to ________**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
**(Address of principal executive offices)**

**74136**
**(Zip Code)**

**(918) 488-0828**
**(Registrant's telephone number, including area code)**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act). Yes ☒ No ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares of the Registrant's common stock, $0.01 par value, outstanding at November 3, 2005 was 47,131,235.

Table of Contents

## GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF INCOME
**(Unaudited)**
**(in thousands, except per share amounts)**

| | Three Months Ended | | Nine Months Ended | |
|---|---|---|---|---|
| | September 30, 2005 | September 25, 2004 | September 30, 2005 | September 25, 2004 |
| Product revenues | $ 83,970 | $ 59,720 | $ 228,857 | $ 171,867 |
| Service revenues | 28,888 | — | 64,974 | — |
| Total revenues | 112,858 | 59,720 | 293,831 | 171,867 |
| Cost of product revenues | 72,005 | 50,621 | 199,024 | 141,826 |
| Cost of service revenues | 25,313 | — | 57,739 | — |
| Gross profit | 15,540 | 9,099 | 37,068 | 30,041 |
| Selling and administrative expenses | 11,502 | 8,769 | 33,059 | 27,571 |
| Operating income | 4,038 | 330 | 4,009 | 2,470 |
| Interest expense | 1,289 | 185 | 3,348 | 496 |
| Income before income taxes and minority interest | 2,749 | 145 | 661 | 1,974 |
| Income tax provision | 1,045 | 55 | 251 | 750 |
| Income before minority interest | 1,704 | 90 | 410 | 1,224 |
| Minority interest | 23 | — | 70 | — |
| Net income | $ 1,681 | $ 90 | $ 340 | $ 1,224 |
| Earnings per weighted average common share: | | | | |
| Basic | $ 0.04 | $ — | $ 0.01 | $ 0.03 |
| Weighted average number of shares of common stock outstanding-basic | 47,010 | 46,330 | 46,915 | 46,104 |
| Diluted | $ 0.04 | $ — | $ 0.01 | $ 0.03 |
| Weighted average number of shares of common stock outstanding-diluted | 47,301 | 46,921 | 47,284 | 46,869 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

Yahoo! My Yahoo! Mail Search: Web Search

YAHOO! FINANCE Sign In New User? Sign Up Finance Home - Help

Saturday, July 22, 2006, 1:27PM ET - U.S. Markets Closed. Dow ↓ 0.55% Nasdaq ↓ 0.93%

Home Investing News & Commentary Retirement & Planning Banking & Credit Loans Taxes My Portfolios

Market Overview Market Stats Stocks Mutual Funds ETFs Bonds Options Industries Currency Education

Get Quotes GO Symbol Lookup | Finance Search

# Global Power Equipment Group Inc. (GEG)

On Jul 21: **2.49** ↓ 0.08 (3.11%)

5.56% APY 1-year CD E*TRADE Bank Member FDIC

## Historical Prices

Get **Historical Prices** for: GO

ADVERTISEMENT

**SET DATE RANGE**

**Start Date:** Mar 8 2006 Eg. Jan 1, 2003

**End Date:** Jul 21 2006

(•) Daily
( ) Weekly
( ) Monthly
( ) Dividends Only

Get Prices

First | Prev | Next | Last

**PRICES**

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| 21-Jul-06 | 2.51 | 2.59 | 2.43 | 2.49 | 194,400 | 2.49 |
| 20-Jul-06 | 2.63 | 2.70 | 2.55 | 2.57 | 97,500 | 2.57 |
| 19-Jul-06 | 2.63 | 2.63 | 2.51 | 2.59 | 123,000 | 2.59 |
| 18-Jul-06 | 2.71 | 2.71 | 2.53 | 2.58 | 1,104,600 | 2.58 |
| 17-Jul-06 | 2.67 | 2.76 | 2.60 | 2.61 | 294,300 | 2.61 |
| 14-Jul-06 | 2.60 | 2.61 | 2.55 | 2.60 | 204,600 | 2.60 |
| 13-Jul-06 | 2.55 | 2.70 | 2.55 | 2.56 | 337,100 | 2.56 |
| 12-Jul-06 | 2.63 | 2.70 | 2.60 | 2.60 | 236,500 | 2.60 |
| 11-Jul-06 | 2.69 | 2.70 | 2.62 | 2.64 | 120,900 | 2.64 |
| 10-Jul-06 | 2.75 | 2.76 | 2.66 | 2.68 | 678,800 | 2.68 |
| 7-Jul-06 | 2.74 | 2.77 | 2.66 | 2.68 | 333,100 | 2.68 |
| 6-Jul-06 | 2.84 | 2.85 | 2.73 | 2.74 | 214,400 | 2.74 |
| 5-Jul-06 | 2.92 | 2.94 | 2.68 | 2.79 | 425,200 | 2.79 |
| 3-Jul-06 | 3.14 | 3.14 | 2.84 | 2.84 | 783,200 | 2.84 |
| 30-Jun-06 | 2.68 | 3.18 | 2.58 | 3.18 | 4,930,300 | 3.18 |
| 29-Jun-06 | 2.66 | 2.71 | 2.51 | 2.66 | 628,100 | 2.66 |
| 28-Jun-06 | 2.90 | 2.90 | 2.65 | 2.65 | 246,500 | 2.65 |
| 27-Jun-06 | 2.91 | 2.96 | 2.89 | 2.89 | 105,200 | 2.89 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 26-Jun-06 | 2.94 | 3.05 | 2.87 | 2.90 | 382,900 | 2.90 |
| 23-Jun-06 | 2.79 | 2.92 | 2.78 | 2.89 | 316,700 | 2.89 |
| 22-Jun-06 | 2.85 | 2.87 | 2.77 | 2.79 | 353,100 | 2.79 |
| 21-Jun-06 | 2.86 | 2.90 | 2.83 | 2.87 | 334,800 | 2.87 |
| 20-Jun-06 | 2.95 | 2.98 | 2.83 | 2.87 | 612,600 | 2.87 |
| 19-Jun-06 | 3.03 | 3.12 | 2.91 | 2.96 | 431,900 | 2.96 |
| 16-Jun-06 | 3.23 | 3.23 | 3.01 | 3.04 | 583,800 | 3.04 |
| 15-Jun-06 | 3.05 | 3.27 | 2.98 | 3.23 | 265,000 | 3.23 |
| 14-Jun-06 | 3.10 | 3.11 | 2.95 | 3.00 | 549,900 | 3.00 |
| 13-Jun-06 | 3.14 | 3.22 | 3.10 | 3.14 | 324,600 | 3.14 |
| 12-Jun-06 | 3.19 | 3.19 | 3.13 | 3.14 | 214,500 | 3.14 |
| 9-Jun-06 | 3.28 | 3.33 | 3.14 | 3.18 | 143,000 | 3.18 |
| 8-Jun-06 | 3.27 | 3.28 | 3.14 | 3.24 | 290,700 | 3.24 |
| 7-Jun-06 | 3.36 | 3.38 | 3.22 | 3.28 | 265,500 | 3.28 |
| 6-Jun-06 | 3.36 | 3.50 | 3.27 | 3.32 | 339,700 | 3.32 |
| 5-Jun-06 | 3.55 | 3.60 | 3.35 | 3.35 | 358,300 | 3.35 |
| 2-Jun-06 | 3.53 | 3.72 | 3.53 | 3.59 | 286,000 | 3.59 |
| 1-Jun-06 | 3.49 | 3.58 | 3.37 | 3.51 | 228,000 | 3.51 |
| 31-May-06 | 3.45 | 3.54 | 3.35 | 3.51 | 381,000 | 3.51 |
| 30-May-06 | 3.42 | 3.50 | 3.35 | 3.36 | 219,600 | 3.36 |
| 26-May-06 | 3.43 | 3.46 | 3.34 | 3.36 | 247,100 | 3.36 |
| 25-May-06 | 3.53 | 3.53 | 3.28 | 3.43 | 260,200 | 3.43 |
| 24-May-06 | 3.50 | 3.56 | 3.28 | 3.44 | 287,000 | 3.44 |
| 23-May-06 | 3.61 | 3.71 | 3.40 | 3.50 | 572,400 | 3.50 |
| 22-May-06 | 3.63 | 3.68 | 3.55 | 3.56 | 142,300 | 3.56 |
| 19-May-06 | 3.62 | 3.73 | 3.60 | 3.63 | 133,500 | 3.63 |
| 18-May-06 | 3.70 | 3.78 | 3.62 | 3.65 | 250,400 | 3.65 |
| 17-May-06 | 3.71 | 3.78 | 3.60 | 3.64 | 612,500 | 3.64 |
| 16-May-06 | 4.17 | 4.17 | 3.46 | 3.70 | 911,100 | 3.70 |
| 15-May-06 | 4.20 | 4.50 | 4.11 | 4.16 | 200,400 | 4.16 |
| 12-May-06 | 4.42 | 4.58 | 4.16 | 4.29 | 174,500 | 4.29 |
| 11-May-06 | 4.59 | 4.86 | 4.42 | 4.44 | 166,800 | 4.44 |
| 10-May-06 | 4.75 | 4.86 | 4.51 | 4.57 | 214,300 | 4.57 |
| 9-May-06 | 4.81 | 4.93 | 4.73 | 4.75 | 134,700 | 4.75 |
| 8-May-06 | 4.75 | 5.00 | 4.73 | 4.79 | 275,400 | 4.79 |
| 5-May-06 | 4.69 | 4.98 | 4.66 | 4.79 | 160,000 | 4.79 |
| 4-May-06 | 4.44 | 4.67 | 4.41 | 4.61 | 211,200 | 4.61 |
| 3-May-06 | 4.31 | 4.54 | 4.31 | 4.38 | 259,000 | 4.38 |
| 2-May-06 | 4.11 | 4.31 | 4.11 | 4.31 | 201,500 | 4.31 |
| 1-May-06 | 4.22 | 4.29 | 4.11 | 4.13 | 148,800 | 4.13 |
| 28-Apr-06 | 4.26 | 4.31 | 4.11 | 4.30 | 213,600 | 4.30 |
| 27-Apr-06 | 4.11 | 4.37 | 4.11 | 4.27 | 141,300 | 4.27 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 26-Apr-06 | 4.09 | 4.41 | 4.06 | 4.17 | 327,700 | 4.17 |
| 25-Apr-06 | 4.17 | 4.17 | 4.02 | 4.06 | 361,400 | 4.06 |
| 24-Apr-06 | 4.33 | 4.36 | 4.11 | 4.15 | 214,200 | 4.15 |
| 21-Apr-06 | 4.30 | 4.43 | 4.18 | 4.28 | 249,700 | 4.28 |
| 20-Apr-06 | 4.25 | 4.38 | 4.03 | 4.18 | 416,400 | 4.18 |
| 19-Apr-06 | 4.05 | 4.40 | 4.05 | 4.25 | 333,600 | 4.25 |

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

Download To Spreadsheet

Add to Portfolio  Set Alert  Email to a Friend

Get **Historical Prices** for Another Symbol: GO Symbol Lookup

- Stock Screener
- Mergers & Acquisitions
- Splits

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.



Yahoo! My Yahoo! Mail Search: Web Search

Sign In
New User? Sign Up

Finance Home - Help

Saturday, July 22, 2006, 1:28PM ET - U.S. Markets Closed. Dow 0.55% Nasdaq 0.93%

Home Investing News & Commentary Retirement & Planning Banking & Credit Loans Taxes My Portfolios

Market Overview Market Stats Stocks Mutual Funds ETFs Bonds Options Industries Currency Education

Get Quotes GO Symbol Lookup | Finance Search

## Global Power Equipment Group Inc. (GEG)

On Jul 21: **2.49** 0.08 (3.11%)

ETF Center Fidelity

$9.99 Internet equity trades. AMERITRADE GO

Scottrade $7 stock trades

100 FREE TRADES E*TRADE Securities

## Historical Prices

Get **Historical Prices** for: GO

ADVERTISEMENT

**SET DATE RANGE**

**Start Date:** Mar 8 2006 Eg. Jan 1, 2003

**End Date:** Jul 21 2006

Daily
Weekly
Monthly
Dividends Only

Get Prices

First | Prev | Next | Last

**PRICES**

| Date | Open | High | Low | Close | Volume | Adj Close* |
|---|---|---|---|---|---|---|
| 18-Apr-06 | 3.87 | 4.06 | 3.87 | 4.03 | 364,100 | 4.03 |
| 17-Apr-06 | 3.84 | 3.87 | 3.81 | 3.86 | 160,000 | 3.86 |
| 13-Apr-06 | 3.82 | 3.83 | 3.73 | 3.80 | 490,800 | 3.80 |
| 12-Apr-06 | 3.65 | 3.81 | 3.65 | 3.80 | 156,500 | 3.80 |
| 11-Apr-06 | 3.69 | 3.73 | 3.51 | 3.65 | 394,800 | 3.65 |
| 10-Apr-06 | 3.76 | 3.80 | 3.66 | 3.69 | 574,000 | 3.69 |
| 7-Apr-06 | 3.78 | 3.83 | 3.75 | 3.76 | 266,600 | 3.76 |
| 6-Apr-06 | 3.88 | 3.89 | 3.74 | 3.76 | 964,900 | 3.76 |
| 5-Apr-06 | 3.89 | 3.95 | 3.85 | 3.89 | 446,800 | 3.89 |
| 4-Apr-06 | 3.86 | 3.90 | 3.83 | 3.90 | 257,000 | 3.90 |
| 3-Apr-06 | 3.84 | 3.90 | 3.83 | 3.85 | 885,000 | 3.85 |
| 31-Mar-06 | 4.03 | 4.15 | 3.80 | 3.85 | 3,200,200 | 3.85 |
| 30-Mar-06 | 4.27 | 4.41 | 4.24 | 4.30 | 363,700 | 4.30 |
| 29-Mar-06 | 4.19 | 4.32 | 4.14 | 4.23 | 333,600 | 4.23 |
| 28-Mar-06 | 4.06 | 4.30 | 4.06 | 4.21 | 491,900 | 4.21 |
| 27-Mar-06 | 4.05 | 4.10 | 4.00 | 4.07 | 1,913,400 | 4.07 |
| 24-Mar-06 | 3.98 | 4.10 | 3.93 | 4.01 | 2,178,800 | 4.01 |
| 23-Mar-06 | 3.95 | 4.00 | 3.88 | 3.95 | 630,900 | 3.95 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 22-Mar-06 | 3.80 | 3.96 | 3.76 | 3.92 | 2,130,500 | 3.92 |
| 21-Mar-06 | 3.71 | 3.77 | 3.66 | 3.76 | 897,400 | 3.76 |
| 20-Mar-06 | 3.82 | 3.82 | 3.64 | 3.71 | 363,500 | 3.71 |
| 17-Mar-06 | 3.64 | 3.90 | 3.55 | 3.79 | 1,981,900 | 3.79 |
| 16-Mar-06 | 3.58 | 3.68 | 3.47 | 3.64 | 1,997,400 | 3.64 |
| 15-Mar-06 | 3.52 | 3.61 | 3.48 | 3.55 | 598,900 | 3.55 |
| 14-Mar-06 | 3.62 | 3.62 | 3.43 | 3.51 | 1,546,400 | 3.51 |
| 13-Mar-06 | 3.80 | 3.85 | 3.60 | 3.60 | 993,800 | 3.60 |
| 10-Mar-06 | 4.00 | 4.00 | 3.72 | 3.79 | 816,800 | 3.79 |
| 9-Mar-06 | 3.95 | 4.22 | 3.82 | 3.99 | 1,959,500 | 3.99 |
| 8-Mar-06 | 4.80 | 4.93 | 4.71 | 4.85 | 185,200 | 4.85 |

* Close price adjusted for dividends and splits.

First | Prev | Next | Last

Download To Spreadsheet

Add to Portfolio   Set Alert   Email to a Friend

Get **Historical Prices** for Another Symbol:  Symbol Lookup

- Stock Screener
- Mergers & Acquisitions
- Splits

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

NT 10-K 1 dnt10k.htm NOTIFICATION OF LATE FILING

*(Check One):*

- ☒ Form 10-K
- ☐ Form 20-F
- ☐ Form 11-K
- ☐ Form 10-Q
- ☐ Form N-SAR
- ☐ Form N-CSR

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

OMB APPROVAL
OMB Number: 3235-0058
Expires: March 31, 2006
Estimated average burden hours per response… 2.50

SEC FILE NUMBER

CUSIP NUMBER

# FORM 12b-25

## NOTIFICATION OF LATE FILING

For Period Ended: December 31, 2005

- ☐ Transition Report on Form 10-K
- ☐ Transition Report on Form 20-F
- ☐ Transition Report on Form 11-K
- ☐ Transition Report on Form 10-Q
- ☐ Transition Report on Form N-SAR

For the Transition Period Ended: ______________________

*Read Attached Instruction Sheet Before Preparing Form. Please Print or Type.*

**Nothing in this form shall be construed to imply that the Commission has verified any information contained herein.**

If the notification relates to a portion of the filing checked above, identify the Item(s) to which the notification relates: ______

**PART I — REGISTRANT INFORMATION**

Global Power Equipment Group Inc.

**Full Name of Registrant**

**Former Name if Applicable**

6120 South Yale, Suite 1480

**Address of Principal Executive Office *(Street and Number)***

Tulsa, Oklahoma 74136

**City, State and Zip Code**

---

**PART II — RULES 12b-25(b) AND (c)**

If the subject report could not be filed without unreasonable effort or expense and the registrant seeks relief pursuant to Rule 12b-25(b), the following should be completed. (Check box if appropriate)

☒ (a) The reason described in reasonable detail in Part III of this form could not be eliminated without unreasonable effort or expense;

(b) The subject annual report, semi-annual report, transition report on Form 10-K, Form 20-F, Form 11-K, Form N-SAR or Form N-CSR, or portion thereof, will be filed on or before the fifteenth calendar day following the prescribed due date; or the subject quarterly report or transition report on Form 10-Q, or portion thereof, will be filed on or before the fifth calendar day following the prescribed due date; and

(c) The accountant's statement or other exhibit required by Rule 12b-25(c) has been attached if applicable.

SEC 1344 (07-03) Persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

**PART III — NARRATIVE**

State below in reasonable detail why Forms 10-K, 20-F, 11-K, 10-Q, N-SAR, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

Global Power Equipment Group Inc. (the "Company") is filing Form 12b-25 because it needs additional time to file its Annual Report on Form 10-K for the year ended December 31, 2005, which is due on March 16, 2006. The primary reason for the delay is that, as disclosed in the Form 8-K filed by the Company on March 8, 2006, the Company reported that it expects to restate its financial statements for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and its interim financial statements for the first, second and third quarters of 2005.

Management has become aware of unrecognized expenses related to a heat recovery equipment project in China that was substantially completed in December 2004. This led management to further review the revenue and cost recognition for this project as well as a separate auxiliary power equipment project that had also been sold through the Company's Chinese trading company, Global Power Equipment (Shanghai) Co., Ltd., in 2004. Following this review, the Company, in conjunction with the Company's Board of Directors and after discussion with the Company's independent registered public accounting firm, has determined that gross profit was inadvertently overstated in total for these projects, and that a restatement is required. Currently, management believes that a restatement will result in an unaudited adjustment to prior period financial statements for the second, third and fourth quarters of 2004 and the first, second and third quarters of 2005 that could cumulatively decrease previously reported operating income in an amount that is not currently expected to exceed approximately $7.0 million.

The Company expects to include restated financial results for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and the first, second and third quarters of 2005 in its Annual Report on Form 10-K for the year ended December 31, 2005, which it expects to file on or before March 31, 2006.

In the Company's 2004 Form 10-K that was filed on March 15, 2005, Management's Report on Internal Control Over Financial Reporting, previously concluded that the Company maintained effective internal control over financial reporting as of December 31, 2004. In connection with this restatement, the Company's management has re-evaluated the effectiveness of its internal control over financial reporting as of December 31, 2004 and determined that the Company did not maintain effective internal control over financial reporting as of December 31, 2004 due to a material weakness. For more information regarding the material weakness and the Company's efforts to remediate the material weakness, see the Company's Form 8-K filed with the Securities and Exchange Commission on March 8, 2006.

Management has not yet completed its assessment of internal control over financial reporting as of December 31, 2005, but has concluded that the Company's internal control over financial reporting is ineffective due to the material weakness noted above. Since management has not completed its assessment of internal control over financial reporting as of December 31, 2005, it is possible that management may identify one or more additional material weaknesses.

**PART IV — OTHER INFORMATION**

(1) Name and telephone number of person to contact in regard to this notification

| **James P. Wilson** | **918** | **488-0828** |
|---|---|---|
| (Name) | (Area Code) | (Telephone Number) |

(2) Have all other periodic reports required under section 13 or 15(d) of the Securities Exchange Act of 1934 or Section 30 of the Investment Company Act of 1940 during the preceding 12 months or for such shorter period that the registrant was required to file such report(s) been filed? If the answer is no, identify report(s). ☒ Yes ☐ No

(3) Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof? ☒ Yes ☐ No

If so, attach an explanation of the anticipated change, both narratively and quantitatively, and, if appropriate, state the reasons why a reasonable estimate of the results cannot be made.

Global Power Equipment Group Inc.

**(Name of Registrant as specified in charter)**

has caused this notification to be signed on its behalf by the undersigned thereunto duly authorized.

Date March 16, 2006

By: /s/ Candice L. Cheeseman
General Counsel and Secretary

INSTRUCTION: The form may be signed by an executive officer of the registrant or by any other duly authorized representative. The name and title of the person signing the form shall be typed or printed beneath the signature. If the statement is signed on behalf of the registrant by an authorized representative (other than an executive officer), evidence of the representative's authority to sign on behalf of the registrant shall be filed with the form.

**ATTENTION**

Intentional misstatements or omissions of fact constitute Federal Criminal Violations (See 18 U.S.C. 1001).

**GENERAL INSTRUCTIONS**

1. This form is required by Rule 12b-25 (17 CFR 240.12b-25) of the General Rules and Regulations under the Securities Exchange Act of 1934.
2. One signed original and four conformed copies of this form and amendments thereto must be completed and filed with the Securities and Exchange Commission, Washington, D.C. 20549, in accordance with Rule 0-3 of the General Rules and Regulations under the Act. The information contained in or filed with the Form will be made a matter of the public record in the Commission files.
3. A manually signed copy of the form and amendments thereto shall be filed with each national securities exchange on which any class of securities of the registrant is registered.
4. Amendments to the notifications must also be filed on Form 12b-25 but need not restate information that has been correctly furnished. The form shall be clearly identified as an amended notification.
5. *Electronic Filers*. This form shall not be used by electronic filers unable to timely file a report solely due to electronic difficulties. Filers unable to submit a report within the time period prescribed due to difficulties in electronic filing should comply with either Rule 201 or Rule 202 of Regulation S-T (§232.201 or §232.202 of this chapter) or apply for an adjustment in filing date pursuant to Rule 13(b) of Regulation S-T (§232.13(b) of this chapter).

**Explanation Referred to in Part IV, Item (3) of Form 12b-25**

On March 8, 2006, the Company issued a press release providing a preliminary earnings estimate of a loss of between $11 to $13 million for the fourth quarter of 2005, or between $0.23 to $0.28 per diluted share, on revenues of approximately $116 million. This estimate excludes the possible impact from a potential goodwill impairment and/or an increase in deferred tax asset valuation allowance, which are under review as a result of the fourth quarter 2005 loss. These potential non-cash charges could be material.

The Company expects to report a firm backlog at December 31, 2005 of approximately $387 million compared to $384 million at the end of September 2005 and $309 million at December 31, 2004.

At December 31, 2005, the Company had cash and cash equivalents of $21 million.

* * * * * *

Statements contained in this Form 12b-25 regarding the Company's or management's intentions, beliefs, expectations, or predictions for the future, including, but not limited to, those regarding anticipated operating results, are forward-looking statements within the meaning of U.S. federal securities laws and are subject to a number of risks, assumptions and uncertainties that could cause the Company's actual results to differ materially from those projected, including the completion and audit of the Company's restated financial statements and the completion and audit of the Company's 2005 financial statements. Additional information concerning some of the other factors that could cause actual results to differ materially from those in, or implied by, the forward looking statements are set forth under "Risk Factors" in the Company's Form 10-K for the period ended December 31, 2004, and other reports on file with the U.S. Securities and Exchange Commission. The Company assumes no obligation to update publicly such forward-looking statements, whether as a result of new information, future events or otherwise.

8-K 1 d8k.htm FORM 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 8-K

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(d) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

**Date of report (Date of earliest event reported) March 30, 2006**

# GLOBAL POWER EQUIPMENT GROUP INC.
(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| | |
|---|---|
| **001-16501**<br>(Commission File Number) | **73-1541378**<br>(IRS Employer Identification No.) |
| **6120 S. Yale, Suite 1480, Tulsa, Oklahoma**<br>(Address of Principal Executive Offices) | **74136**<br>(Zip Code) |

**(918) 488-0828**
(Registrant's Telephone Number, Including Area Code)

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 8.01. Other Events.**

On March 30, 2006, the Registrant issued a press release announcing that additional time will be required to complete its financial statements which will delay the filing of its Form 10-K for 2005 beyond the previously announced March 31, 2006 date. The press release is attached hereto as Exhibit 99 and incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(d) The following exhibit is filed herewith:

99 Press Release dated March 30, 2006.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GLOBAL POWER EQUIPMENT GROUP INC.

Date: March 31, 2006

By: /s/ Candice L. Cheeseman
Candice L. Cheeseman
General Counsel and Secretary

**EXHIBIT INDEX**

| Exhibit No. | Description |
|---|---|
| 99 | Press Release dated March 30, 2006. |

EX-99 2 dex99.htm PRESS RELEASE

**Exhibit 99**

**Global Power Equipment Group Inc.
Provides Update on 2005 10-K Filing and Restatement**

TULSA, Oklahoma, March 30, 2006 – Global Power Equipment Group Inc. (NYSE: GEG), a leading design, engineering and manufacturing firm providing a broad array of equipment and services to the global energy, power infrastructure and process industries, today announced that additional time will be required to complete its financial statements which will delay the filing of its Form 10-K for 2005 beyond the previously announced March 31, 2006 date. The unanticipated delay in filing is due to additional time required for review and completion of the previously announced restatement, as well as for a review of contract cost reporting issues in connection with several projects in the Company's Heat Recovery segment. The Audit Committee of the Company's Board of Directors has retained independent legal counsel, Jones Day, to conduct a review of the Heat Recovery segment contract cost reporting issues.

As previously announced, the Company expects to include restated results for fiscal 2004, including the second, third, and fourth quarters of fiscal 2004 and the first, second and third quarters of 2005 in its Form 10-K for 2005. Management continues to believe that the restatement relating to two projects in China will result in an unaudited adjustment to these quarters that could cumulatively decrease previously reported operating income by approximately $7 million.

As a result of this delay in filing the 2005 Form 10-K, the Company will be in technical default under its senior credit facility and will not be able to access credit under the credit facility. Additionally, the Company will be in technical default under its outstanding convertible notes, which will result in a higher rate of interest and other penalties under the convertible notes provisions. The Company has been in discussions with its credit facility lenders, and expects to begin discussions with the convertible note holders, regarding appropriate waivers. Management believes it has sufficient cash on hand to provide liquidity to operate the business until the Form 10-K is filed or until an appropriate waiver is obtained. The Company expects to have cash and cash equivalents of approximately $30 million at March 31, 2006 compared to approximately $21 million at December 31, 2005.

Al Brousseau, president and chief executive officer, said, "Serving our customers and effective management of our business operations – including the establishment of the operational and process improvements cited in our last earnings update call – continue to be the top priorities for the entire senior management team. We are implementing the measures necessary to ensure that the issues behind our restatement and delayed 10-K filing are resolved immediately. Across our three businesses units, we believe our execution has improved significantly and the market opportunities continue to gain momentum. With the new processes, systems and controls that we are implementing, we strongly believe our future financial performance will be significantly enhanced."

**About Global Power Equipment Group**

Oklahoma based Global Power Equipment Group Inc. is a leading design, engineering and manufacturing firm providing a broad array of equipment and services to the global energy, power infrastructure and process industries. The Company designs, engineers and manufactures a comprehensive portfolio of equipment for gas turbine power plants and power-related equipment for

industrial operations, and has over 30 years of power generation industry experience. The Company's equipment is installed in power plants and in industrial operations in more than 40 countries on six continents and believes, in its product lines, it has one of the largest installed bases of equipment for power generation in the world. In addition, the Company provides its customers with value-added services including engineering, retrofit, maintenance, repair and general plant services. Additional information about Global Power Equipment Group may be found at www.globalpower.com.

Statements contained in this release regarding the Company's or management's intentions, beliefs, expectations, or predictions for the future, including, but not limited to, those regarding anticipated operating results, are forward-looking statements within the meaning of U.S. federal securities laws and are subject to a number of risks, assumptions and uncertainties that could cause the Company's actual results to differ materially from those projected, including completion of the audit of the Company's restated financial statements and 2005 annual financial statements, ability to remain in compliance with, or obtain waivers under the Company's loan agreements, completion of the independent review of contract cost reporting issues, decreased demand for new gas turbine power plants, the loss of any of our major customers, the cancellation of projects, project cost overruns, including increases in prices for energy or for materials such as steel, and unforeseen schedule delays, competition for the sale of our products or services, poor performance by our subcontractors, warranty and product liability claims and changes in the economic, social and political conditions in the countries in which we operate, including fluctuations in foreign currency exchange rates. Additional information concerning these factors and some of the other factors that could cause actual results to differ materially from those in, or implied by, the forward looking statements are set forth under "Risk Factors" in the Company's Form 10-K for the period ended December 31, 2004, and other reports on file with the U.S. Securities and Exchange Commission. The Company assumes no obligation to update publicly such forward-looking statements, whether as a result of new information, future events or otherwise.

**Company Contact:**

Bob Zwerneman
Director of Investor Relations
(918) 274-2398

Global Power Equipment Group Inc., 6120 S. Yale, Suite 1480, Tulsa, OK 74136 U.S.A.
Phone: 1-918 488-0828 FAX: 1-918 488-8389

8-K 1 d8k.htm FORM 8-K

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

# FORM 8-K

## CURRENT REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**Date of report (Date of earliest event reported) March 31, 2006**

# GLOBAL POWER EQUIPMENT GROUP INC.

(Exact Name of Registrant as Specified in Its Charter)

**Delaware**
(State or Other Jurisdiction of Incorporation)

| **001-16501** | **73-1541378** |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |
| **6120 S. Yale, Suite 1480, Tulsa, Oklahoma** | **74136** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(918) 488-0828**
(Registrant's Telephone Number, Including Area Code)

**Not Applicable**
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 2.04. Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement.**

On March 8, 2006, Global Power Equipment Group Inc. (the "Company") issued a press release announcing that the Company expects to restate its financial statements for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and its interim financial statements for the first, second and third quarters of 2005. Also, on March 8, 2006, the Company filed a Current Report on Form 8-K (the "Restatement 8-K") in which the Company stated that its management had determined in connection with the restatement that the Company did not maintain effective internal control over financial reporting as of December 31, 2004, due to the material weakness described in the Restatement 8-K.

On November 23, 2004, the Company issued Convertible Senior Subordinated Notes in the aggregate principal amount of $69 million (the "Notes") pursuant to the Securities Purchase Agreement dated as of that date (the "Purchase Agreement") by and among the Company and the investors listed on the Schedule of Buyers attached thereto (the "Holders"). In addition, the Company entered into a Registration Rights Agreement dated as of November 23, 2004 (the "Registration Rights Agreement"), with the Holders. The Purchase Agreement and Form of Note and the Registration Rights Agreement are included as exhibits to the Company's Current Report on Form 8-K filed on November 30, 2004, and such exhibits and the discussions of the same in such Form 8-K are incorporated herein by reference.

In the Purchase Agreement, the Company made representations and warranties to the Holders with respect to, among other matters, undisclosed events, maintenance of internal accounting controls, the Company's filings with the Securities and Exchange Commission, and disclosure materials provided to the Holders. The Company's covenants under the Purchase Agreement and the Registration Rights Agreement include, among other things, obligations for the Company to make required filings with the Securities and Exchange Commission. Events of default under the Notes include a material breach of the Company's representations and warranties under the Purchase Agreement or of the Company's covenants under the Purchase Agreement or Registration Rights Agreement, subject to a cure period. If an event of default were to occur, the Holders of a majority of the aggregate principal amount of the Notes may require the Company to redeem all or any portion of the Notes at a price equal to 110% times the amount to be redeemed plus accrued and unpaid interest. In addition, upon the occurrence of an event of default under the Notes, the interest rate under the Notes increases from 4.25% to 9.25% until cured. Any event of default under the Notes would also constitute an event of default under the Company's senior credit facility.

The Company has received letters, each dated March 31, 2006, from two Holders (the "Subject Holders"), each of which holds a Note with an outstanding principal amount of $27,000,000 (together representing approximately 78.3% of the Notes). In their letters, the Subject Holders have notified the Company of the occurrence of an event of default resulting from breaches of representations and warranties related to matters discussed in the Restatement 8-K and have called for the redemption of their Notes.

The Company does not believe that an event of default has occurred as a result of the matters discussed in the Restatement 8-K because, even if the representations and warranties

alleged by the Subject Holders to have been breached were found to have been breached as a result of the matters discussed in the Restatement 8-K, the breaches would not rise to the level of materiality required for an event of default under the Notes. In addition, to the Company's knowledge, the Subject Holders have not complied with the provisions of the Notes that require advance notice to the administrative agent of the Company's senior credit facility in this circumstance.

As a result of the delay in the filing of the Company's 2005 Form 10-K beyond March 31, 2006, other events of default will or may occur under the Notes and liquidated damages will accrue under the Registration Rights Agreement.

The Company has been in discussions with its senior credit facility lenders and with the Holders with respect to the matters described herein. There can be no assurance that the Company will be successful in its discussions with such lenders and Holders. If the Company is unsuccessful with these discussions, there could be material adverse consequences to the Company.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

GLOBAL POWER EQUIPMENT GROUP INC.

Date: April 6, 2006

By: /s/ Candice L. Cheeseman
Candice L. Cheeseman
General Counsel and Secretary

**Erik Caspersen**

---

**From:** Y Reed (GPEG) [YReed@GlobalPower.com]
**Sent:** Wednesday, May 24, 2006 10:41 AM
**To:** Operations
**Subject:** RE: GEG 4.25% Interest payment

**Follow Up Flag:** jp
**Flag Status:** Red

James,

We initiated a wire for $650,404.11 from our Bank of America account on Monday morning, May 22, 2006. You should have received the payment the same day.

The calculation is as follows:

| | 4.25% |
|---|---|
| 11/23/2005 | 27,000,000.00 |
| 5/1/2006 | 159.00 days |
| | $499,869.86 |

| | 9.25% |
|---|---|
| 5/1/2006 | 27,000,000.00 |
| 5/23/2006 | 22.00 days |
| | $150,534.25 |

Total $650,404.11



Deltak, LLC
Braden Manufacturing, LLC
Consolidated Fabricators
Williams Industrial Services Group, L.L.C.

April 5, 2006

**VIA FACSIMILE NO. (214) 758-1207**
**AND OVERNIGHT COURIER**

Steelhead Investments Ltd.
c/o HBK Investments L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Attention: Legal Department

Re: Securities Purchase Agreement dated as of November 23, 2004 (the "Purchase Agreement"), by and among Global Power Equipment Group Inc. (the "Company") and the investors listed on the Schedule of Buyers attached thereto, and the Convertible Senior Subordinated Notes dated of even date therewith (the "Notes") in the aggregate principal amount of $69 million issued pursuant thereto. Unless the context otherwise requires, capitalized terms used herein without definition have the respective meanings given them in the Notes.

Ladies and Gentlemen:

The Company acknowledges receipt of your letter dated March 31, 2006, which purports to be an Event of Default Redemption Notice. Despite the indication that the letter was transmitted via overnight courier and fax, the Company first received your letter via email this morning.

The Company disagrees that an Event of Default under the Notes had occurred as of the date of your letter. The specific breaches of the Purchase Agreement that you allege in your letter must be material in order to give rise to an Event of Default. Without admitting that the Purchase Agreement or any other Transaction Document has been breached in any respect as of the date of your letter, the Company does not agree that any breach that may have occurred would have risen to the level of materiality required to constitute an Event of Default. Accordingly, because no Event of Default had occurred as of the date of your letter, your letter does not constitute a valid Event of Default Redemption Notice.

Two Warren Place • 6120 South Yale • Suite 1480 • Tulsa, Oklahoma 74136 USA • Phone: 918.488.0828 • Fax: 918.488.8389

Steelhead Investments Ltd.
c/o HBK Investments L.P.
April 5, 2006
Page 2

In addition, to the Company's knowledge, you have not complied with Section 14(e) of the Notes which requires advance notice to the Agent of the actions purportedly taken by your letter.

Very truly yours,

Global Power Equipment Group Inc.

By: [signature]
Candice Cheeseman
General Counsel and Secretary

cc via facsimile and overnight courier:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention: Christian H. Mittweg, Esq.
Facsimile: (212) 593-5955

**D.B. Zwirn Special Opportunities Fund, L.P.,**
**D.B. Zwirn Special Opportunities Fund, Ltd.,**
**and**
**HCM/Z Special Opportunities LLC**
**c/o D.B. Zwirn & Co., L.P.**
**745 Fifth Avenue, 18th Floor**
**New York, New York 10151**

April 10, 2006

<u>VIA FEDEX AND FAX (918) 274-2367</u>
Global Power Equipment Group Inc.
6120 South Yale Street, Suite 1480
Tulsa, Oklahoma 74136

Attention: General Counsel

**RE: Event of Default Redemption Notice**

Ladies and Gentlemen:

Reference is made to: (i) the Convertible Senior Subordinated Notes issued by Global Power Equipment Group Inc. (the "Company"), to D.B. Zwirn Special Opportunities Fund, L.P., (the "L.P.") in the original principal amount of $3 million (the "L.P. Note"), (ii) the Convertible Senior Subordinated Notes issued by the Company, to D.B. Zwirn Special Opportunities Fund, Ltd., (the "Ltd.") in the original principal amount of $6 million (the "Ltd. Note"), and (iii) the Convertible Senior Subordinated Notes issued by the Company, to HCM/Z Special Opportunities LLC., (the "LLC", and together with the L.P. and the Ltd. the "D.B.Z. Entities") in the original principal amount of $6 million (the "LLC Note" and together with the L.P Note and the Ltd. Note the "Notes" and each a "Note"), each pursuant to the Securities Purchase Agreement, dated as of November 23, 2004 (the "Securities Purchase Agreement"), by and among the Company and the investors signatory thereto. Any capitalized term used but not defined herein shall have the meaning assigned to it in the Note or the Securities Purchase Agreement.

This notice constitutes a request for redemption and an Event of Default Redemption Notice in accordance with the terms of Section 4(b) of the Notes. Without limiting any right the undersigned may have to declare other defaults or Events of Default by the Company, an Event of Default has occurred as set forth in Section 4(a)(x) of the Note, as the Company has materially breached representations and warranties it made in the Securities Purchase Agreement. Specifically, the Company has breached the representations and warranties contained in:

(i) Section 3(m) of the Securities Purchase Agreement relating to undisclosed events, liabilities, developments or circumstances that would be required to be disclosed by the Company on a registration statement and that were not publicly announced;

(ii) Section 3(bb) of the Securities Purchase Agreement relating to the Company's maintenance of internal accounting controls; and

(iii) Sections 3(k) and 3(dd) of the Securities Purchase Agreement relating to the Company's SEC filings and disclosure materials provided to the Buyers.

The Company may have also breached other provisions of the Transaction Documents.

As a result of the occurrence of the above mentioned Event of Default, each of the D.B.Z. Entities hereby notifies the Company of their respective election to exercise their redemption right pursuant to Section 4(b) of the full amount of their Notes (at the Event of Default Redemption Price equal to 110% of the outstanding Conversion Amount of the Notes plus accrued and unpaid interest thereon) to be paid on the earliest possible date as provided under the Notes. Pursuant to Section 14(e) of the Notes we are simultaneously sending notice to the Agent regarding the D.B.Z. Entities' intent to redeem their respective Notes.

This letter is without prejudice to any and all rights and remedies of the D.B.Z. Entities, and each of the D.B.Z Entities fully and specifically reserves any and all rights, powers, privileges and remedies under the Securities Purchase Agreement, their respective Note or otherwise, including, but not limited to, any rights, payments or other benefits offered by or for the Company to any of the other Buyers or current holders of any Note or other security purchased under the Security Purchase Agreement. Nothing herein shall be construed to suggest that there are not currently existing other Events of Default, and the undersigned reserves all of its rights with respect to any such Events of Default.

This letter shall not entitle the Company or any other party to further notice or demand.

**D.B. Zwirn Special Opportunities Fund, L.P.,**

By: D.B. Zwirn & Co., L.P.

By: ______________________

Name: David A. Proshan
Title: General Counsel

**D.B. Zwirn Special Opportunities Fund, Ltd.,**

By: D.B. Zwirn & Co., L.P.

By: ______________________

Name: David A. Proshan
Title: General Counsel

**HCM/Z Special Opportunities LLC**

By: D.B. Zwirn & Co., L.P.

By: ______________________

Name: David A. Proshan
Title: General Counsel

cc:   S. Ward Atterbury, Esq.
     White & Case LLP
     155 Avenue of the Americas
     New York, New York 10036

     Banc of America, N.A. as "Agent"

     Proskauer Rose LLP
     1585 Broadway
     New York, NY 10036
     Facsimile: (212) 969-2900
     Attention: Adam J. Kansler, Esq.

POLYGON

Polygon Investment Partners LP
598 Madison Avenue
14th Floor
New York, NY 10022
United States of America

Main + 1 212 359 7300
Fax + 1 212 359 7301
www.polygoninv.com

**KINGS ROAD INVESTMENTS LTD.**

April 6, 2006

**VIA FACSIMILE AND OVERNIGHT COURIER**

Bank of America, N.A
Attn: David A. Johanson
Mail Call IL1-231-08-30
231 South LaSalle Street
Chicago, IL 60604

US Bank National Association
Attn: James P. Cecil
Mail Code BC-MN-H22A
U.S. Bancorp Center
800 Nicollet Mall
Minneapolis, MN 55402

Bank of Oklahoma
Attn: Paul Mesmer
1 Williams Center
BOK Tower
16 North West
Tulsa, OK 74172

Re: Global Power Equipment Group Inc.

Ladies and Gentlemen:

Reference is made to the Convertible Senior Subordinated Note (the "Note") made by the Global Power Equipment Group Inc. (the "Company") in favor of Kings Road Investments Ltd. (the "Holder") on November 23, 2004 (the "Note").

Pursuant to Section 14(e) of the Note, this letter shall constitute notice of the Holder's intent to exercise its redemption rights, by virtue of there having been an Event of Default under the Note. For your convenience, the form of Note is attached as Exhibit 10.3 to the Company's Form 8-K filed November 30, 2004.

POLYGON

Sincerely yours,

**KINGS ROAD INVESTMENTS LTD.**

By:_____________________________
Name: Erik M. W. Caspersen
Title: Co-head, Private Investments

cc: Alan R. Glickman, Esq

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn: S. Ward Atterbury, Esq.

EX-10.1 2 dex101.htm CREDIT AGREEMENT

**Exhibit 10.1**

---

Published CUSIP Number: 37944SAB5

**CREDIT AGREEMENT**

Dated as of October 1, 2004

among

**GLOBAL POWER EQUIPMENT GROUP INC.,**
and
**CERTAIN SUBSIDIARIES**
as Borrowers,

**BANK OF AMERICA, N.A.,**
as Administrative Agent, Swing Line Lender
and
L/C Issuer,

**US BANK NATIONAL ASSOCIATION,**
as Syndication Agent,

**BANK OF OKLAHOMA, N.A.,**
as Managing Agent

and

**THE OTHER LENDERS PARTY HERETO**

---

**BANC OF AMERICA SECURITIES LLC,**

As
Sole Lead Arranger and Book Manager

---

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| ARTICLE I DEFINITIONS AND ACCOUNTING TERMS | | 1 |
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 32 |
| Section 1.03 | Accounting Terms | 33 |
| Section 1.04 | Rounding | 34 |
| Section 1.05 | Times of Day | 34 |
| Section 1.06 | Letter of Credit Amounts | 34 |
| Section 1.07 | Exchange Rates; Currency Equivalents | 34 |
| Section 1.08 | Additional Alternative Currencies | 35 |
| Section 1.09 | Change of Currency | 35 |
| ARTICLE II THE LOANS | | 36 |
| Section 2.01 | The Loans | 36 |
| Section 2.02 | Borrowings, Conversions and Continuations of Loans | 37 |
| Section 2.03 | Letters of Credit | 39 |
| Section 2.04 | Swing Line Loans | 48 |
| Section 2.05 | Alternative Currency Loans | 51 |
| Section 2.06 | Prepayments | 55 |
| Section 2.07 | Termination or Reduction of Commitments | 58 |
| Section 2.08 | Repayment of Loans; Conversion of Revolving Loans | 58 |
| Section 2.09 | Interest | 59 |
| Section 2.10 | Fees | 60 |
| Section 2.11 | Computation of Interest and Fees | 60 |
| Section 2.12 | Evidence of Debt | 61 |
| Section 2.13 | Payments Generally; Administrative Agent's Clawback | 61 |
| Section 2.14 | Sharing of Payments by Lenders | 63 |
| Section 2.15 | Designated Borrowers. | 64 |

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY 65
Section 3.01 Taxes 65
Section 3.02 Illegality 68
Section 3.03 Inability to Determine Rates 68
Section 3.04 Increased Costs 69
Section 3.05 Compensation for Losses 70
Section 3.06 Matters Applicable to all Requests for Compensation 71
Section 3.07 Survival 71
Section 3.08 Mitigation Obligations 71
ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS 72
Section 4.01 Conditions of Initial Credit Extension 72
Section 4.02 Conditions to all Credit Extensions 75
ARTICLE V REPRESENTATIONS AND WARRANTIES 76
Section 5.01 Existence, Qualification and Power 76
Section 5.02 Authorization; No Contravention 76
Section 5.03 Governmental Authorization; Other Consents 77
Section 5.04 Binding Effect 77
Section 5.05 Financial Statements; No Material Adverse Effect 77
Section 5.06 Litigation 78
Section 5.07 No Default 78
Section 5.08 Subsidiaries and Equity Investments 78
Section 5.09 Ownership 78
Section 5.10 Ownership of Personal Property; Liens 79
Section 5.11 Intellectual Property; Licenses, Etc 79
Section 5.12 Real Estate, Lease 79
Section 5.13 Environmental Matters 80
Section 5.14 Security Documents 81
Section 5.15 Insurance 82
Section 5.16 Taxes 82
Section 5.17 ERISA Compliance 82
Section 5.18 Purpose of Loans and Letters of Credit 83

Section 5.19 Margin Regulations; Investment Company Act; Public Utility Holding Company Act 83
Section 5.20 Disclosure 83
Section 5.21 Compliance with Laws 84
Section 5.22 Labor Matters 84
Section 5.23 Solvency 84
Section 5.24 Material Contracts 85
Section 5.25 Broker's Fees 85
Section 5.26 Representations as to Foreign Obligors 85
ARTICLE VI AFFIRMATIVE COVENANTS 86
Section 6.01 Financial Statements 86
Section 6.02 Certificates; Other Information 87
Section 6.03 Notices 89
Section 6.04 Payment of Tax Obligations 89
Section 6.05 Preservation of Existence, Etc 89
Section 6.06 Maintenance of Properties 90
Section 6.07 Maintenance of Insurance; Certain Proceeds 90
Section 6.08 Compliance with Laws 90
Section 6.09 Books and Records 91
Section 6.10 Inspection Rights 91
Section 6.11 Further Assurances with Respect to Additional Loan Parties 91
Section 6.12 Further Assurances with Respect to Additional Collateral 91
Section 6.13 Use of Proceeds 92
Section 6.14 Environmental 92
Section 6.15 Deposit Accounts 93
ARTICLE VII NEGATIVE COVENANTS 93
Section 7.01 Liens 93
Section 7.02 Investments 95
Section 7.03 Indebtedness 96
Section 7.04 Fundamental Changes and Acquisitions 98

| | | |
|---|---|---|
| Section 7.05 | Dispositions | 99 |
| Section 7.06 | Restricted Payments | 100 |
| Section 7.07 | Amendment of Organizational Documents and Management Agreement | 101 |
| Section 7.08 | Change in Nature of Business | 101 |
| Section 7.09 | Transactions with Affiliates | 101 |
| Section 7.10 | Limitations on Restricted Actions | 101 |
| Section 7.11 | Sale-Leasebacks; Off-Balance Sheet Obligation | 102 |
| Section 7.12 | Use of Proceeds | 102 |
| Section 7.13 | Impairment of Security Interests | 102 |
| Section 7.14 | Ownership of Subsidiaries and Other Restrictions Relating to the Subsidiaries | 102 |
| Section 7.15 | Fiscal Year | 102 |
| Section 7.16 | Consolidated Capital Expenditures | 102 |
| Section 7.17 | Financial Covenants | 103 |
| ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES | | 103 |
| Section 8.01 | Events of Default | 103 |
| Section 8.02 | Remedies Upon Event of Default | 105 |
| Section 8.03 | Application of Funds | 106 |
| ARTICLE IX ADMINISTRATIVE AGENT | | 107 |
| Section 9.01 | Appointment and Authority | 107 |
| Section 9.02 | Rights as a Lender | 107 |
| Section 9.03 | Exculpatory Provisions | 107 |
| Section 9.04 | Reliance by Administrative Agent | 108 |
| Section 9.05 | Delegation of Duties | 109 |
| Section 9.06 | Resignation of Administrative Agent | 109 |
| Section 9.07 | Non-Reliance on Administrative Agent and Other Lenders | 110 |
| Section 9.08 | No Other Duties, Etc | 110 |
| Section 9.09 | Administrative Agent May File Proofs of Claim | 110 |
| Section 9.10 | Collateral and Guaranty Matters | 111 |

| | | |
|---|---|---|
| ARTICLE X MISCELLANEOUS | | 111 |
| Section 10.01 | Amendments, Etc | 111 |
| Section 10.02 | Notices; Effectiveness; Electronic Communication | 113 |
| Section 10.03 | No Waiver; Cumulative Remedies | 114 |
| Section 10.04 | Expenses; Indemnity; Damage Waiver | 115 |
| Section 10.05 | Payments Set Aside | 116 |
| Section 10.06 | Successors and Assigns | 117 |
| Section 10.07 | Treatment of Certain Information; Confidentiality | 120 |
| Section 10.08 | Right of Setoff | 121 |
| Section 10.09 | Interest Rate Limitation | 121 |
| Section 10.10 | Counterparts; Integration; Effectiveness | 121 |
| Section 10.11 | Survival of Representations and Warranties | 122 |
| Section 10.12 | Severability | 122 |
| Section 10.13 | Governing Law; Jurisdiction; Etc | 122 |
| Section 10.14 | Waiver of Jury Trial | 123 |
| Section 10.15 | Entire Agreement | 123 |
| Section 10.16 | Judgment Currency | 123 |
| Section 10.17 | USA Patriot Act Notice | 124 |

SCHEDULES *

  1.01 Mandatory Cost Formulae

  1.02 Management Investors

  1.03 Restructuring Charges and Non-Recurring Expenses

  2.01 Commitments and Applicable Percentages

  5.03 Consents

  5.08 Subsidiaries and Other Equity Investments

  5.09 Shareholder Agreements

  5.12 Real Estate Matters

  5.15 Insurance

  5.17 ERISA Matters

  5.22 Labor Matters

  7.01 Existing Liens

  7.02 Existing Investments

  7.03 Existing Indebtedness

10.02 Administrative Agent's Office, Certain Addresses for Notices

EXHIBITS

  Form of

A  Loan Notice

B  Swing Line Loan Notice

C  Alternative Currency Loan Notice

D  Compliance Certificate

E  Assignment and Assumption

F  Subsidiary Guaranty

G  Joinder Agreement

H  Pledge Agreement

I  Opinions

J  Security Agreement

K  Company Guaranty

L  Designated Borrower Request and Assumption Agreement

M  Designated Borrower Notice

N  Reminbi Facility Letter Agreement

* Omitted. The Registrant agrees to furnish supplementally a copy of any such omitted schedule to the Securities and Exchange Commission upon its request.

## CREDIT AGREEMENT

This CREDIT AGREEMENT is entered into as of October 1, 2004, among GLOBAL POWER EQUIPMENT GROUP INC., a Delaware corporation (the "Company"), certain Subsidiaries of the Company party hereto pursuant to Section 2.15 (each a "Designated Borrower" and, together with the Company, the "Borrowers" and, each a "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), BANK OF AMERICA, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, US BANK NATIONAL ASSOCIATION, as Syndication Agent, and BANK OF OKLAHOMA, N.A., as Managing Agent. Capitalized terms used herein shall have the meanings assigned thereto in Section 1.01 of this Agreement.

WITNESSETH:

WHEREAS, the Company has requested that the Lenders provide credit facilities to the Borrowers in the aggregate principal amount of up to $100,000,000 and the Lenders are willing to do so on the terms and conditions set forth herein;

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01 Defined Terms**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Account Control Agreements" means, collectively, the Account Control Agreements each substantially in the form of Exhibits A-1 and A-2, as applicable, to the Security Agreement or such other form as is reasonably acceptable to the Administrative Agent.

"Acquisition" means the purchase or acquisition by any Person of any Equity Interest of another Person other than a Loan Party or all or any substantial portion of the Property (other than the Equity Interest) or a line or lines of business of another Person other than a Loan Party, whether involving a merger or consolidation with such other Person or otherwise.

"Administrative Agent" means Bank of America in its capacity as administrative agent and collateral agent, as applicable, under any of the Loan Documents, or any successor administrative agent and collateral agent, as provided in Section 9.06.

"Administrative Agent's Office" means, with respect to any currency, the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02 with respect to such currency, or such other address or account with respect to such currency as the Administrative Agent may from time to time notify to the Company and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agent" means any of the Administrative Agent, the Syndication Agent or the Managing Agent.

"Agreement" means this Credit Agreement, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Agreement Currency" has the meaning specified in Section 10.16.

"Alternative Currency" means each of Euro, Saudi Arabian Riyal, Hong Kong Dollars, Chinese Renminbi, Singapore Dollars, Mexican Pesos and each other currency (other than Dollars) that is approved in accordance with Section 1.08.

"Alternative Currency Borrowing" means a Borrowing of an Alternative Currency Loan pursuant to Section 2.05.

"Alternative Currency Lender" means Bank of America, or an Affiliate or branch thereof, in its capacity as provider of Alternative Currency Loans or any successor Alternative Currency lender hereunder; provided that if any Alternative Currency Loans are made to a Designated Borrower organized in the Netherlands, such Alternative Currency Lender shall be qualified as a "professional market party" under the Exemption Regulation of the Ministry of Finance (Vrÿstellingsregeling Wtk 1992) to the extent required under applicable law of the Netherlands at such time.

"Alternative Currency Loan" has the meaning specified in Section 2.05(a).

"Alternative Currency Loan Notice" means a notice of an Alternative Currency Borrowing pursuant to Section 2.05(b), which, if in writing, shall be substantially in the form of Exhibit C hereto.

"Alternative Currency Participation" has the meaning given to such term in Section 2.05(c)(i).

"Alternative Currency Participation Payment Date" has the meaning given to such term in Section 2.05(c)(ii).

"Alternative Currency Sublimit" means an amount equal to the lesser of (a) $15,000,000 and (b) the Revolving Commitments. The Alternative Currency Sublimit is part of, and not in addition to, the Revolving Commitments.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the aggregate Commitments represented by such Lender's Commitment at such time. If the Commitment of each Lender to make Loans and the obligation of the L/C Issuer to make L/C Credit Extensions have been terminated pursuant to

**KINGS ROAD INVESTMENTS LTD.**

April 13, 2006

**VIA FACSIMILE AND OVERNIGHT COURIER**

Global Power Equipment Group Inc.
6120 South Yale Street
Suite 1480
Tulsa, Oklahoma 74136
Attn: General Counsel

Event of Default Redemption Notice

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement, dated as of November 23, 2004 (the "Securities Purchase Agreement"), by and among Global Power Equipment Group Inc. (the "Company"), and the investors listed on the Schedule of Buyers attached thereto, including the undersigned, King Road Investments Ltd. ("Kings Road"), as Collateral Agent for the Buyers, and to the Convertible Senior Subordinated Note made by the Company in favor of Kings Road (the "Note"). Any capitalized term used herein and not defined herein shall have the meaning assigned to it in the Securities Purchase Agreement and/or the Note.

Pursuant to the Securities Purchase Agreement, Kings Road purchased on November 23, 2004, a Senior Secured Convertible Note for an aggregate purchase price of $27,000,000. As you are aware, the Company disclosed in its Current Report on Form 8-K filed on March 8, 2006 (the "March 8 Form 8-K") that, among other things, gross profit for two projects in China was overstated, requiring a restatement which will result in an adjustment to, and restatement of, prior period financial statements for the second, third and fourth quarters of 2004, and the first, second and third quarters of 2005, and which is likely to cumulatively decrease previously reported operating income by approximately $7 million.

The Company further stated that previously issued financial statements for those periods should not be relied upon because of expected errors. Moreover, the Company disclosed that it did not maintain effective control over financial reporting as of December 31, 2004 because of control deficiencies constituting a material weakness that could result in a misstatement of the Company's revenue and cost of projects that would result in a material misstatement to the Company's interim or annual financial statements.

The Company also disclosed in a Current Report on Form 8-K filed on March 31, 2006 that the filing of its 2005 Form 10-K would be further delayed as a result of the restatement and a review of certain contract cost reporting issues.

Among other things, and without limiting any rights the undersigned may have under the Securities Purchase Agreement, the Note or otherwise, the Company has breached the representations and warranties contained in (i) Section 3(m) of the Securities Purchase Agreement, pursuant to which the Company represented as of November 23, 2004, that no event or circumstance had occurred or existed that would be required to be disclosed by the Company on a registration statement, and that had not been publicly announced; (ii) Section 3(bb) of the Securities Purchase Agreement, pursuant to which the Company represented as of November 23, 2004, that, except as would not reasonably be expected to have a Material Adverse Effect, the Company maintained a system of internal controls sufficient to provide certain reasonable assurances; and (iii) Sections 3(k) and 3(dd), pursuant to which the Company represented as of November 23, 2004 that its SEC filings and the disclosure materials given to the Buyers, did not, when taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

The Company may also have breached other provisions of the Securities Purchase Agreement and the other Transaction Documents as well, including without limitation the representations and warranties contained in Sections 3(l) and 3(p) and the covenant contained in Section 4(c) of the Securities Purchase Agreement.

The assertions contained in the Company's April 5 letter with respect to materiality are difficult to reconcile with the Company's own public admissions. By way of example only and as noted above, the Company disclosed in its March 8 Form 8-K that there were "material" weaknesses in its accounting controls that could result in a misstatement of the Company's revenue and cost of projects that would result in a "material misstatement" to the Company's interim or annual financial statements. Moreover, a restatement of $7 million can hardly be deemed immaterial. Indeed, the market evidently perceived the problems disclosed by the Company to be material inasmuch as the Company's stock price dropped over 17% on the day following the March 8 Form 8-K announcement and has decreased by over 21% overall since that announcement.

Pursuant to Section 14(e) of the Note, on April 6, 2006, Kings Road Investments Ltd. informed each of the Agents for the Senior Bank Indebtedness of its intent to exercise its redemption rights, by virtue of there having been an Event of Default under the Note.

In light of the foregoing Events of Default, the undersigned hereby exercises its right, pursuant to Section 4(b) of the Note, to require the Company to redeem all of the Notes at the Event of Default Redemption Price equal to 110% of the outstanding Conversion Amount of the Notes plus accrued and unpaid interest thereon.

We believe our Event of Default Redemption Notice dated March 31, 2006 (the "March 31 Notice"), which we withdrew pursuant to our letter of April 6, 2006, was valid under the terms of the Note. However, for the avoidance of doubt, this Event of Default Redemption Notice replaces and supplements in its entirety the March 31 Notice.

This letter is without prejudice to the undersigned, and the undersigned fully and specifically reserves any and all rights, powers, privileges and remedies under the Securities Purchase Agreement, the Note or otherwise. Nothing contained herein shall entitle the Company or any other party to further notice or demand.

Sincerely yours,

**KINGS ROAD INVESTMENTS LTD.**

By: [signature]
Name: Brandon L. Jones
Title: Authorized Signatory

cc: Alan R. Glickman, Esq

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn: S. Ward Atterbury, Esq.

POLYGON

Polygon Investment Partners LP
598 Madison Avenue
14th Floor
New York, NY 10022
United States of America

Main + 1 212 359 7300
Fax + 1 212 359 7301
www.polygoninv.com

May 4, 2006

**VIA FACSIMILE AND OVERNIGHT COURIER**

Global Power Equipment Group Inc.
6120 South Yale Street
Suite 1480
Tulsa, Oklahoma 74136
Attn: General Counsel

Re: Event of Default Redemption Notice

Ladies and Gentlemen:

Reference is made to the Securities Purchase Agreement, dated as of November 23, 2004 (the "Securities Purchase Agreement"), by and among Global Power Equipment Group Inc. (the "Company"), and the investors listed on the Schedule of Buyers attached thereto, including the undersigned, Kings Road Investments Ltd. ("Kings Road"), as Collateral Agent for the Buyers, to the Convertible Senior Subordinated Note made by the Company in favor of Kings Road (the "Note"), and to the Registration Rights Agreement by and among the Company and the Buyers listed therein (the "Registration Rights Agreement"). Any capitalized term used herein and not defined herein shall have the meaning assigned to it in the Securities Purchase Agreement, the Note and/or the Registration Rights Agreement.

Pursuant to the Securities Purchase Agreement, Kings Road purchased on November 23, 2004, a Senior Secured Convertible Note for an aggregate purchase price of $27,000,000. As you are aware, the Company disclosed in a March 30, 2006 press release that it would not meet the March 31, 2006 deadline for the filing of its 2005 Form 10-K.

Among other things, and in addition to the breaches of representations and warranties identified in our April 13, 2006 Event of Default Redemption Notice and without limiting any rights the undersigned may have under the Securities Purchase Agreement, the Note or otherwise, the Company has breached the covenant found in Section 8(b) of the Registration Rights Agreement pursuant to which the Company agreed to "file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act." Furthermore, in Paragraph 4(c) of the Securities Purchase Agreement, Global Power covenanted that "the Company shall file all reports required to be filed with the SEC pursuant to the 1934 Act."

POLYGON

The failure to timely file the 2005 Form 10-K constitutes a breach of the foregoing covenants. To the extent that breach was curable, it was not cured during the 30-day period provided in Paragraph 4(a)(x) of the Note.

In addition, Paragraph 2(a) of the Registration Rights Agreement provides that the Company is to file a Registration Statement covering the shares issuable pursuant to the Notes. The Registration Rights Agreement further provides that the "Company shall keep each Registration Statement effective pursuant to Rule 415 [under the Securities Act of 1933] at all times." (Registration Rights Agreement ¶ 3(a).) Pursuant to Paragraph 4(a)(i) of the Note, it shall be an Event of Default if "the effectiveness of the applicable Registration Statement lapses for any reason ... or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of 10 consecutive Trading Days." The Registration Statement has lapsed and been unavailable for ten consecutive trading days or more, at least as a result of the Company's failure to file its Form 10-K for 2005 when due and possibly for other reasons as well.

The foregoing Events of Default serve as additional bases for Kings Road's exercise of its redemption rights. Other Events of Default may have occurred in addition to those specified herein and in our April 13, 2006 Event of Default Redemption Notice.

This letter is without prejudice to the undersigned, and the undersigned fully and specifically reserves any and all rights, powers, privileges and remedies under the Securities Purchase Agreement, the Note or otherwise. Nothing contained herein shall entitle the Company or any other party to further notice or demand.

Sincerely yours,

**KINGS ROAD INVESTMENTS LTD.**

By:____________________________
Name: Erik M. W. Caspersen
Title: Authorized Signatory

cc: Alan R. Glickman, Esq

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036
Attn: S. Ward Atterbury, Esq.

10130435.5

FROM W&C LLP FAXDEPT·F#2123548113T#2128197583 (FRI) 5. 5'06 17:46/ST. 17:44/NO. 4864582098 P 2

WHITE & CASE

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Tel + 1 212 819 8200
Fax + 1 212 354 8113
www.whitecase.com

Direct Dial + (212) 819-8297 ahammond@whitecase.com

May 5, 2006

VIA FACSIMILE & FED EX

Erik M. W. Casperson
Kings Road Investments Ltd.
c/o Polygon Investment Partners LLP
598 Madison Avenue, 14th Floor
New York, NY 10022

Re: Securities Purchase Agreement, dated as of November 23, 2004 (the "Purchase Agreement"), and Convertible Senior Subordinated Notes Issued Pursuant Thereto (the "Notes")

Dear Mr. Casperson:

We write in response to your letter of May 4, 2006 and recent purported attempt to redeem the Note made by Global Power Equipment Company ("Company") in favor of Kings Road Investments Ltd. ("Kings Road") by delivering said Note to the Company.

It has come to our attention that Kings Road recently filed a lawsuit against the Company in the Southern District of New York alleging breach of contract. Under the circumstances, it would serve no useful purpose to respond to the allegations in your May 4 letter and the Company will instead address your allegations in due course in an appropriate forum. To avoid any doubt, however, the Company rejects your purported Event of Default Redemption Notice as it is procedurally and substantively defective. Accordingly, the Company will be returning your Note under separate cover.

Sincerely,

Andrew W. Hammond

cc: Christian H. Mittweg, Esq. (by fax and FedEx)
Candice L. Cheeseman, Esq. (by fax)

ALMATY ANKARA BANGKOK BEIJING BERLIN BRATISLAVA BRUSSELS BUDAPEST DRESDEN DÜSSELDORF FRANKFURT HAMBURG HELSINKI HO CHI MINH CITY HONG KONG ISTANBUL JOHANNESBURG LONDON LOS ANGELES MEXICO CITY MIAMI MILAN MOSCOW MUMBAI NEW YORK PALO ALTO PARIS PRAGUE RIYADH ROME SAN FRANCISCO SÃO PAULO SHANGHAI SINGAPORE STOCKHOLM TOKYO WARSAW WASHINGTON, DC

5/5/2006 3:25 PM (2K)
NEWYORK 5577573 v1 [5577573_1.DOC]



Deltak, LLC
Braden Manufacturing, LLC
Consolidated Fabricators, Inc.

May 8, 2006

**Via Federal Express**

Polygon Investment Partners LP
598 Madison Avenue
14th Floor
New York, NY 10022

Re: Event of Default Redemption Notice

Ladies and Gentlemen:

In accordance with the White and Case letter dated May 5, 2006, enclosed is your original Promissory Note.

Yours very truly,

Candice Cheeseman

Candice L. Cheeseman
General Counsel and Secretary

CLC/ec

cc: Christian H. Mittweg, Esq.
Andrew W. Hammond, Esq.

Two Warren Place • 6120 South Yale • Suite 1480 • Tulsa, Oklahoma 74136 USA • Phone: 918.488.0828 • Fax: 918.488.8389

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

06 CV 3433

JUDGE JONES

-------------------------------------------------------x
KINGS ROAD INVESTMENTS LTD.,

Plaintiff,

v.

GLOBAL POWER EQUIPMENT GROUP INC.,

Defendant.
-------------------------------------------------------x

Civ. No.:_____________

**COMPLAINT**

RECEIVED MAY 04 2006 U.S.D.C. S.D. CASHIERS

Plaintiff Kings Road Investments Ltd. ("Kings Road"), by its attorneys Schulte Roth & Zabel LLP, as and for its Complaint against defendant Global Power Equipment Group Inc. ("Global Power" or the "Company"), hereby alleges on the basis of knowledge with respect to itself and its actions and on the basis of information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This is an action for damages resulting from Global Power's breach of representations, warranties and covenants relating to a Convertible Senior Subordinated Note issued to Kings Road, including Global Power's refusal to redeem that Note as it is required to do.

## THE PARTIES

2. Plaintiff Kings Road Investments Ltd. is a Cayman Islands exempted company with its registered office at George Town, Grand Cayman.

3. Defendant Global Power is a Delaware corporation with its principal place of business at 6120 South Yale, Suite 1480, Tulsa, Oklahoma.

## JURISDICTION AND VENUE

4. Jurisdiction in this action is based upon diversity of citizenship of the parties pursuant to 28 U.S.C. § 1332.

5. The amount in controversy exceeds the sum of seventy-five thousand dollars, exclusive of interest and costs.

6. Venue for this action is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to these claims occurred in this District.

7. In addition, the parties have agreed that this dispute may be adjudicated in this Court. The Note that is the subject of this action was issued pursuant to a Securities Purchase Agreement, further described herein, to which plaintiff and defendant are parties. The Securities Purchase Agreement provides in Paragraph 9(a):

> Each party hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper.

## FACTS

The Securities Purchase Agreement
and Convertible Senior Subordinated Note

8. On November 23, 2004, Global Power completed a $69 million private placement of 4.25% Convertible Senior Subordinated Notes (the "Notes"). The Notes are convertible into shares of the Company's common stock at a conversion price of $10.61 per share of common stock (subject to adjustment in certain circumstances). The purchasers of the Notes were Kings Road ($27,000,000), Steelhead Investments Ltd. ($27,000,000), D.B. Zwirn Special

Opportunities Fund, L.P. ($3,000,000), D.B. Zwirn Special Opportunities Fund, Ltd. ($6,000,000) and HCM/Z Special Opportunities LLC ($6,000,000) (collectively, the "Note Holders").

9. To effect the private placement, on November 23, 2004, Global Power entered into a Securities Purchase Agreement with Kings Road and the other Note Holders. Pursuant to the Securities Purchase Agreement, also on November 23, 2004, the Company executed a Convertible Senior Subordinated Note in the amount of $27 million in favor of Kings Road (the "Note"). Notes were executed for the other Note Holders as well.

10. The Note provides, *inter alia*, that Kings Road may require the Company to redeem the Note at a premium if there is an Event of Default thereunder. Specifically, the Note provides that "holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding" "may require the Company to redeem all or any portion of the Notes" if there is an Event of Default. (Note ¶¶ 30(uu), 4(b).) In addition, the Note provides that "[f]rom and after the occurrence of an Event of Default the Interest Rate shall be increased to 9.25%." (Note ¶ 2.)

<u>Events of Default Under Note Paragraph 4(a)(x)</u>

11. Paragraph 4(a)(x) of the Note provides that an Event of Default occurs if "the Company materially breaches any representation, warranty, covenant or other term or condition of the Note . . . or any other Transaction Document to which the Holder is a party." Among the Transaction Documents are the Note, the Securities Purchase Agreement and the Registration Rights Agreement.

12. In Paragraph 3 of the Securities Purchase Agreement, "[t]he Company represents and warrants to each of the [Note Holders]" that as of November 23, 2004, among other things:

a. no event or circumstance had occurred or existed that would be required to be disclosed by the Company on a registration statement, and that had not been publicly announced (Securities Purchase Agreement ¶ 3(m));

b. except as would not reasonably be expected to have a material adverse effect (as defined in the Securities Purchase Agreement), the Company maintained a system of internal controls sufficient to provide certain reasonable assurances, including, without limitation, that "transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset and liability accountability" (Securities Purchase Agreement ¶ 3(bb));

c. the Company's Securities and Exchange Commission (the "SEC") filings and the disclosure materials given to the Note Holders, did not, when taken as a whole, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading (Securities Purchase Agreement ¶¶ 3(k), 3(dd)); and

d. there had been "no material adverse change and no material adverse development in the business" of the Company since December 27, 2003 (Securities Purchase Agreement ¶ 3(l)).

13.    In Paragraph 4(c) of the Securities Purchase Agreement, Global Power covenanted that "the Company shall file all reports required to be filed with the SEC pursuant to the 1934 Act."

14.    In Paragraph 8(b) of the Registration Rights Agreement, executed on November 23, 2004 in connection with the Securities Purchase Agreement and by the Company and the Note Holders, the Company agreed to "file with the SEC in a timely manner all reports and other documents required of the Company under the 1933 Act and the 1934 Act."

15.    As described herein, the Company has breached each of the representations, warranties and covenants enumerated above and each breach constitutes an Event of Default under the Note. Based on these Events of Default, each of the Note Holders have demanded that the Company redeem the Notes. Despite its clear contractual obligation to do so, the Company has refused.

16.    The Company disclosed in its Current Report on Form 8-K filed on March 8, 2006 (the "March 8 Form 8-K") that its "[m]anagement [had] become aware of unrecognized expenses related to a heat recovery equipment project in China that was substantially completed in December 2004. This led management to further review the revenue and cost recognition for this project as well as a separate auxiliary power equipment project that had also been sold" in 2004. Following that review, the Company "determined that gross profit was inadvertently overstated in total for these projects, and that a restatement is required."  Global Power stated that the financial statements expected to be restated would be those for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and the interim financial statements for the first, second and third quarters of 2005. According to the March 8 Form 8-K, Global Power's management believes that the restatement "could cumulatively

decrease previously reported operating income in an amount that is not currently expected to exceed approximately $7 million." The Company further stated that financial statements issued for those periods should not be relied upon because they are expected to contain errors. In a press release dated March 8, 2006, the Company also stated that the restatement "could cumulatively decrease previously reported operating income by approximately $7 million."

17.     The Company further disclosed in the March 8 Form 8-K, that it "did not maintain effective internal control over financial reporting as of December 31, 2004" because of a "material weakness." The Company explained that "[a] material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." According to the Company, "this control deficiency, until remediated, could result in a misstatement of the Company's revenue and cost of projects that would result in a material misstatement to the Company's interim or annual financial statements that would not be prevented or detected." The Company further disclosed that its management had yet to complete an assessment of the internal control over financial reporting as of December 31, 2005 and that it was "possible that management may identify one or more additional material weaknesses."

18.     The Company also failed to file its 2005 Form 10-K as required under the Securities Exchange Act of 1934 (the "1934 Act"). On or about March 16, 2006, the Company extended its time to file the Form 10-K until March 31, 2006. In a press released dated March 30, 2006, the Company disclosed that it would  not meet that deadline as a result of the restatement and a review of certain contract cost reporting issues. The same press release further stated, "the Company will be in technical default under its outstanding convertible notes, which will result in a higher rate of interest and other penalties under the convertible notes provisions."

The March 31, 2006 deadline was not met and, as of the date of this Complaint, the 2005 Form 10-K still has not been filed.

19.     The foregoing facts revealed by the Company establish that it has breached the representations, warranties and covenants found in the Securities Purchase Agreement and Registration Rights Agreement that are detailed above. Paragraph 4(a)(x) of the Note requires that such breaches be material in order to constitute an Event of Default, and they are material.

20.     The discovery of an overstatement of gross profit that could result in a decrease of previously-reported operating income by approximately $7 million is clearly material. The Company had previously reported cumulative operating income of $2.6 million over the second, third, and fourth quarters of 2004 and the first three quarters of 2005, the periods the Company expects to be restated. Decreasing the operating income for those periods by $7 million would result in an operating loss of $4.4 million over the periods. Restating the reported operating income to an operating loss nearly twice its magnitude is plainly material.

21.     As for the failure to maintain controls, the Company has conceded that this is material. In its March 8 Form 8-K, the Company expressly characterized the weakness in its accounting controls as "material," and stated that the material weakness "could result in a misstatement of the Company's revenue and cost of projects that would result in a *material* misstatement to the Company's interim or annual financial statements." (Emphasis added.)

22.     Moreover, the market plainly perceived the problems disclosed by the Company to be material inasmuch as the Company's stock price dropped over 17% on the day following the March 8 Form 8-K announcement. On March 8, 2006, Global Power closed at $4.85 per share. On that day, the Company issued a press release announcing the restatement

and its failure to maintain effective control over financial reporting as described above. The following day Global Power traded down to $3.99 per share. Global Power has continued to trade substantially below its pre-announcement levels.

23. On March 9, 2006 the Company hosted a conference call to address these issues. During that conference call, the Company made a number of statements conceding the significance of the problems disclosed in the March 8 Form 8-K. During the call, Reynolds A. Brousseau, the President and Chief Executive Officer of the Company stated:

> [W]e became aware of *substantial* cost overruns which caused us to reassess all of our major Heat Recovery projects. While some of the execution problems were industry-related, most should have been avoided. The question is what are we going to do to fix it? We've made *significant* management changes over the past six months.

(Emphasis added.) Mr. Brousseau also stated: "[L]et's be clear that there is no one that's pleased as an individual in our organization about what's happened as a result of 2004. The effect and resonation throughout the organization has been dramatic." During the same call, John M. Matheson, Executive Vice President and Chief Operating Officer for the Company, revealed that the Company had hired Ernst & Young's Transaction Advisory Services "to help us implement a program to literally reinvent [the] business unit" containing the two projects in China with overstated gross profit.

24. The Company also has acknowledged that the failure to file its Form 10-K in a timely fashion is sufficiently material to cause an Event of Default, inasmuch as it stated in its March 30, 2006 press release that the failure "will result in a higher rate of interest and other penalties under the convertible notes provisions." Those are consequences of the occurrence of an Event of Default. To the extent the breach of the Company's covenants to make the required filings under the 1934 Act was curable, the Company failed to cure it within 30 days from

knowledge of such failure by an executive officer of the Company, as provided in Paragraph 4(a)(x) of the Note.

The Event of Default Under Note Paragraph 4(a)(i)

25.    Paragraph 2(a) of the Registration Rights Agreement provides that the Company is to file a Registration Statement covering the shares issuable pursuant to the Notes. The Registration Rights Agreement provides that the "Company shall keep each Registration Statement effective pursuant to Rule 415 [under the Securities Act of 1933] at all times." (Registration Rights Agreement ¶ 3(a).)

26.    Pursuant to Paragraph 4(a)(i) of the Note, it shall be an Event of Default if "the effectiveness of the applicable Registration Statement lapses for any reason ... or is unavailable to any holder of the Notes for sale of all of such holder's Registrable Securities (as defined in the Registration Rights Agreement) in accordance with the terms of the Registration Rights Agreement, and such lapse or unavailability continues for a period of 10 consecutive Trading Days."

27.    As a result of the Company's failure to file its Form 10-K for 2005 when due, the Registration Statement has lapsed and been unavailable for at least ten consecutive trading days. Accordingly, an Event of Default has occurred under Paragraph 4(a)(i) of the Note.

The Note Holders Demand Redemption

28.    On March 31, 2006, Note Holder Steelhead Investments Ltd. sent the Company an Event of Default Redemption Notice. On April 10, 2006, Note Holders D.B. Zwirn Special Opportunities Fund, L.P., D.B. Zwirn Special Opportunities Fund, Ltd., and HCM/Z Special Opportunities LLC collectively sent the Company an Event of Default Redemption Notice.

29.    On April 13, 2006 Kings Road sent an Event of Default Redemption Notice, via facsimile and overnight courier, to Global Power specifying certain of the Events of Default specified herein that had occurred at that time and stating that it "exercises its right, pursuant to Section 4(b) of the Note, to require the Company to redeem all of the notes." On May 4, 2006, Kings Road sent another letter, also via facsimile and overnight courier, to the Company specifying additional Events of Default described herein that serve as additional bases for Kings Road's exercise of its redemption rights.

30.    Accordingly, Note Holders representing 100% of the aggregate principal amount of the Notes outstanding have now demanded repayment of the Notes, thereby satisfying the requirement that "holders of Notes representing at least a majority of the aggregate principal amount of the Notes then outstanding" have made demand that the Company redeem the Notes.

Global Power Fails To Make Payment

31.    Pursuant to the Note, the Company is obligated to deliver the redemption price to Kings Road within ten business days of its receipt of a demand for repayment. (Notes ¶ 13(a).) More than ten business days have passed since Kings Road sent its Event of Default Redemption Notice.

## CLAIM FOR RELIEF

### Breach of Contract

32.    Kings Road realleges and incorporates by reference the allegations contained in paragraphs 1 through 31 of this Complaint.

33.    As described above, Global Power has breached its representations, warranties and covenants under the Transaction Documents, including without limitation its obligation to redeem the Note as demanded by Kings Road.

34. As a result of the Company's breaches, Kings Road has been damaged in an amount to be determined at trial, but which is no less than $29,700,000, plus interest accruing thereon.

**WHEREFORE,** Kings Road prays for judgment in its favor and against Global Power as set forth below:

A. Money damages of not less than $29,700,000, plus interest accruing thereon;

B. Costs and reasonable attorneys' fees in enforcing its rights in bringing this action; and

C. Such other and further relief as the Court my deem just and proper.

Dated: New York, New York
May 4, 2006

SCHULTE ROTH & ZABEL LLP

By: ______________________
Alan R. Glickman (ARG-0927)
Gregory A. Kasper (GAK-6596)

919 Third Avenue
New York, New York 10022
(212) 756-2000

Attorneys for Kings Road Investments Ltd.

10-K 1 d10k.htm FOR THE YEAR ENDED DECEMBER 31, 2004

Table of Contents

Index to Financial Statements

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

**☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the year ended December 31, 2004**

**OR**

**☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ______ to ______**

**Commission File Number: 001-16501**

# GLOBAL POWER EQUIPMENT GROUP INC.

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **73-1541378** |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**6120 South Yale, Suite 1480, Tulsa, Oklahoma**
**(Address of principal executive offices)**

**74136**
**(Zip Code)**

**(918) 488-0828**
**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange. |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this form 10-K. ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-

Table of Contents

Index to Financial Statements

ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA

GLOBAL POWER EQUIPMENT GROUP INC.

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | Page |
|---|---|
| Management's Report on Internal Control Over Financial Reporting | 38 |
| Report of Independent Registered Public Accounting Firm | 39-40 |
| Consolidated Balance Sheets as of December 31, 2004 and December 27, 2003 | 41 |
| Consolidated Statements of Operations for the Years Ended December 31, 2004, December 27, 2003 and December 28, 2002 | 42 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2004, December 27, 2003 and December 28, 2002 | 43 |
| Consolidated Statements of Stockholders' Equity (Deficit) for the Years Ended December 31, 2004, December 27, 2003 and December 28, 2002 | 44 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2004, December 27, 2003 and December 28, 2002 | 45 |
| Notes to the Consolidated Financial Statements | 46 |

Table of Contents

Index to Financial Statements

***Management's Report on Internal Control Over Financial Reporting***

Management of Global Power Equipment Group Inc. is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those written policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets;
- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with United States generally accepted accounting principles;
- Provide reasonable assurance that receipts and expenditures are being made only in accordance with authorizations of management and directors; and
- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of assets that could have a material effect on the consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of internal control over financial reporting as of December 31, 2004. Management based this assessment on criteria for effective internal control over financial reporting described in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included an evaluation of the design and testing of the operational effectiveness of its internal control over financial reporting. Management reviewed the results of its assessment with the Audit Committee of the Board of Directors.

Based on this assessment, management determined that, as of December 31, 2004, the Company maintained effective internal control over financial reporting.

The scope of management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004 excludes Deltak Power Equipment (China) Co., Ltd. which the Company acquired on July 30, 2004. Deltak Power Equipment (China) Co., Ltd is a 90% owned subsidiary whose total assets and total revenues represent 6.8% and 3.2%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2004.

Our assessment of the effectiveness of our internal controls over financial reporting as of December 31, 2004 has been audited by PricewaterhouseCoopers, LLP, an independent registered public accounting firm, as stated in their report which is located immediately following this report.

Table of Contents

Index to Financial Statements

*Report of Independent Registered Public Accounting Firm*

To the Shareholders and Board of Directors of Global Power Equipment Group Inc.:

We have completed an integrated audit of Global Power Equipment Group Inc.'s 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its December 27, 2003 and December 28, 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

**Consolidated financial statements and financial statement schedule**

In our opinion, the consolidated financial statements listed in the accompanying index, present fairly, in all material respects, the financial position of Global Power Equipment Group Inc. and subsidiaries at December 31, 2004 and December 27, 2003, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in Item 15 (a)2 presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

**Internal control over financial reporting**

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 8 that the Company maintained effective internal control over financial reporting as of December 31, 2004 based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) is fairly stated, in all material respects, based on those criteria. Furthermore, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2004, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Table of Contents**

**Index to Financial Statements**

As described in Management's Report on Internal Control Over Financial Reporting, management has excluded Deltak Power Equipment (China) Co., Ltd. from its assessment of internal control over financial reporting as of December 31, 2004 which was acquired by the Company in a purchase business combination during 2004. We have also excluded Deltak Power Equipment (China) Co., Ltd. from our audit of internal control over financial reporting. Deltak Power Equipment (China) Co., Ltd. is a 90% owned subsidiary whose total assets and total revenues represent 6.8% and 3.2%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2004.

/s/ PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP
Minneapolis, Minnesota
March 11, 2005

Table of Contents

Index to Financial Statements

GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS
(in thousands)

| | December 31, 2004 | December 27, 2003 |
|---|---|---|
| ASSETS | | |
| Current assets: | | |
| Cash and cash equivalents | $ 24,331 | $ 51,315 |
| Restricted cash | 16,669 | — |
| Accounts receivable, net of allowance of $894 and $1,325 | 40,260 | 42,582 |
| Inventories | 8,857 | 3,013 |
| Costs and estimated earnings in excess of billings | 60,861 | 40,706 |
| Deferred income taxes | 10,576 | 17,315 |
| Other current assets | 15,966 | 3,983 |
| Total current assets | 177,520 | 158,914 |
| Property, plant and equipment, net | 22,983 | 20,740 |
| Deferred income taxes | 51,030 | 55,094 |
| Goodwill | 45,000 | 45,000 |
| Restricted cash | 57,688 | — |
| Other assets | 12,673 | 1,248 |
| Total assets | $ 366,894 | $ 280,996 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| Current liabilities: | | |
| Current maturities of long-term debt | $ 16,854 | $ 14 |
| Accounts payable | 27,852 | 18,974 |
| Accrued compensation and employee benefits | 4,545 | 7,285 |
| Accrued warranty | 9,758 | 15,004 |
| Billings in excess of costs and estimated earnings | 52,707 | 53,293 |
| Other current liabilities | 8,005 | 5,203 |
| Total current liabilities | 119,721 | 99,773 |
| Other long-term liabilities | 4,374 | 1,888 |
| Long-term debt, net of current maturities | 78,750 | 24,949 |
| Minority interest | 1,629 | — |
| Commitments and contingencies (Notes 5 and 9) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value, 5,000,000 shares authorized, no shares issued or outstanding | — | — |
| Common stock, $0.01 par value, 100,000,000 shares authorized, 46,770,314 and 45,207,930 shares issued and outstanding for 2004 and 2003 | 468 | 452 |
| Paid-in capital deficit | (17,698) | (25,492) |
| Deferred compensation | (91) | — |
| Accumulated comprehensive income | 3,636 | 2,616 |
| Retained earnings | 176,105 | 176,810 |
| Total stockholders' equity | 162,420 | 154,386 |
| Total liabilities and stockholders' equity | $ 366,894 | $ 280,996 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

## GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS
**(in thousands, except per share amounts)**

| | For the Year Ended December 31, 2004 | For the Year Ended December 27, 2003 | For the Year Ended December 28, 2002 |
|---|---|---|---|
| Revenues | $ 233,692 | $ 263,778 | $ 586,805 |
| Cost of sales | 194,435 | 192,281 | 455,339 |
| Gross profit | 39,257 | 71,497 | 131,466 |
| Selling and administrative expenses | 39,162 | 38,083 | 42,212 |
| Operating income | 95 | 33,414 | 89,254 |
| Interest expense | 1,281 | 1,504 | 4,210 |
| Income (loss) before income taxes and minority interest | (1,186) | 31,910 | 85,044 |
| Income tax provision (benefit) | (451) | 12,126 | 33,167 |
| Income (loss) before minority interest | (735) | 19,784 | 51,877 |
| Minority interest | (30) | — | — |
| Net income (loss) available to common stockholders | $ (705) | $ 19,784 | $ 51,877 |
| Earnings per weighted average common share: | | | |
| Basic: | | | |
| Net income (loss) available to common stockholders | $ (0.02) | $ 0.44 | $ 1.18 |
| Weighted average number of shares of common stock outstanding-basic | 46,195 | 44,521 | 43,959 |
| Diluted: | | | |
| Net income (loss) available to common stockholders | $ (0.02) | $ 0.43 | $ 1.14 |
| Weighted average number of shares of common stock outstanding-diluted | 46,195 | 45,911 | 45,636 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

## GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME
**(in thousands)**

| | For the Year Ended December 31, 2004 | For the Year Ended December 27, 2003 | For the Year Ended December 28, 2002 |
|---|---|---|---|
| Net income (loss) | $ (705) | $ 19,784 | $ 51,877 |
| Foreign currency translation adjustments | 1,020 | 1,794 | 902 |
| Comprehensive income | $ 315 | $ 21,578 | $ 52,779 |

The accompanying notes are an integral part of these consolidated financial statements.

Case 1:06-cv-03433-BSJ-MHD Document 13-24 Filed 07/24/2006 Page 166 of 412

Table of Contents

Index to Financial Statements

**GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**(in thousands, except share amounts)**

| | Common Shares | | | | | | |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Paid-in Capital (Deficit) | Retained earnings | Deferred compensation | Accumulated other comprehensive income (loss) | Total |
| Balance, December 29, 2001 | 43,953,340 | $ 440 | $(28,329) | $105,149 | $ — | $ (80) | $ 77,180 |
| Exercise of options | 23,339 | — | 8 | — | — | — | 8 |
| Foreign currency translation adjustment | — | — | — | — | — | 902 | 902 |
| Net income | — | — | — | 51,877 | — | — | 51,877 |
| Balance, December 28, 2002 | 43,976,679 | 440 | (28,321) | 157,026 | — | 822 | 129,967 |
| Exercise of options | 1,231,251 | 12 | 431 | — | — | — | 443 |
| Tax benefit on exercise of stock options | — | — | 2,393 | — | — | — | 2,393 |
| Stock-based compensation | — | — | 5 | — | — | — | 5 |
| Foreign currency translation adjustment | — | — | — | — | — | 1,794 | 1,794 |
| Net income | — | — | — | 19,784 | — | — | 19,784 |
| Balance, December 27, 2003 | 45,207,930 | 452 | (25,492) | 176,810 | — | 2,616 | 154,386 |
| Exercise of options | 1,552,384 | 16 | 1,729 | — | — | — | 1,745 |
| Tax benefit on exercise of stock options | — | — | 5,392 | — | — | — | 5,392 |
| Stock-based compensation | — | — | 580 | — | — | — | 580 |
| Restricted stock award | 10,000 | — | 93 | — | (93) | — | — |
| Amortization of restricted stock | — | — | — | — | 2 | — | 2 |
| Foreign currency translation adjustment | — | — | — | — | — | 1,020 | 1,020 |
| Net loss | — | — | — | (705) | — | — | (705) |
| Balance, December 31, 2004 | 46,770,314 | $ 468 | $(17,698) | $176,105 | $ (91) | $ 3,636 | $162,420 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

## GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS
**(in thousands)**

| | For the Year Ended December 31, 2004 | For the Year Ended December 27, 2003 | For the Year Ended December 28, 2002 |
|---|---|---|---|
| Operating activities: | | | |
| Net income (loss) | $ (705) | $ 19,784 | $ 51,877 |
| Adjustments to reconcile net income to net cash (used in) provided by operating activities- | | | |
| Write-down of fixed assets (Note 2) | 489 | — | — |
| Depreciation and amortization | 4,276 | 4,202 | 4,625 |
| Deferred income taxes | 10,803 | 11,464 | 3,334 |
| Loss on disposal of equipment | 577 | 402 | 494 |
| Changes in operating items (Note 10) | (25,111) | (13,364) | 42,758 |
| Other long-term liabilities | (1,915) | 1,888 | — |
| Stock-based compensation | 582 | 5 | — |
| Net cash (used in) provided by operating activities | (11,004) | 24,381 | 103,088 |
| Investing activities: | | | |
| Purchase of a business, net of cash acquired | (8,710) | — | — |
| Net change in restricted cash (Notes 2 and 7) | (74,357) | — | — |
| Proceeds from sale of equipment | 30 | 606 | 208 |
| Purchases of property, plant, and equipment | (1,942) | (411) | (2,869) |
| Net cash (used in) provided by investing activities | (84,979) | 195 | (2,661) |
| Financing activities: | | | |
| Proceeds from revolving credit facility | 4,369 | — | 124,000 |
| Payments on revolving credit facility | (1,524) | — | (132,550) |
| Proceeds from issuance of long-term debt | 94,000 | — | — |
| Payments on long-term debt | (26,204) | (35,110) | (37,006) |
| Proceeds from exercise of stock options | 1,745 | 443 | 8 |
| Increase in deferred financing costs | (4,384) | — | — |
| Net cash provided by (used in) financing activities | 68,002 | (34,667) | (45,548) |
| Effect of exchange rate changes on cash | 997 | 2,364 | 1,728 |
| Net increase (decrease) in cash and cash equivalents | (26,984) | (7,727) | 56,607 |
| Cash and cash equivalents, beginning of period | 51,315 | 59,042 | 2,435 |
| Cash and cash equivalents, end of period | $ 24,331 | $ 51,315 | $ 59,042 |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

Index to Financial Statements

## GLOBAL POWER EQUIPMENT GROUP INC. AND SUBSIDIARIES NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### 1. BUSINESS AND ORGANIZATION

Global Power Equipment Group Inc. and subsidiaries (the "Company" or "GPEG", formerly GEEG Holdings, L.L.C.) designs, engineers and manufactures heat recovery and Auxiliary Power Equipment. Our products include:

- heat recovery steam generators;
- filter houses;
- inlet systems;
- gas turbine, steam turbine and generator enclosures;
- exhaust systems;
- diverter dampers;
- specialty boilers and related products; and
- industrial boilers.

The Company's corporate headquarters are located in Tulsa, Oklahoma, with operating facilities in Plymouth, Minnesota; Tulsa, Oklahoma; Auburn, Massachusetts; Monterrey, Mexico; Shanghai, China; Nanjing, China and Heerlen, Netherlands.

### 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of Global Power Equipment Group Inc. and its wholly owned and majority owned subsidiaries: Deltak; Deltak Construction Services, Inc.; Deltak Europe – BV; Deltak Israel, Ltd.; Braden Manufacturing, L.L.C. (Braden); Braden Construction Services, Inc.; Braden Europe – BV; Braden Manufacturing S.A. de C.V.; Global Power Equipment (Shanghai) Co., Ltd. and Deltak Power Equipment (China) Co., Ltd. All intercompany accounts and transactions have been eliminated in consolidation.

*Fiscal Year End*

Effective for the fourth quarter of 2004 and periods beyond, the Company's Board of Directors approved a change in the fiscal year-end from the last Saturday in December to December 31. Accordingly, references to 2004 or to fiscal year 2004 refer to the fiscal year ended December 31, 2004. Prior to 2004, the Company used a 52-/53-week fiscal year ending on the last Saturday in December. As a result, references in this report to fiscal year 2003 refers to the fiscal year ended December 27, 2003, and fiscal year 2002 refers to the fiscal year ended December 28, 2002. The fiscal years 2003 and 2002 include 52 weeks, and 2004 includes 53 weeks.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments that are convertible into known amounts of cash and have original maturities of three months or less to be cash equivalents. Cash equivalents consist primarily of investments in commercial paper.

*Restricted Cash*

Restricted cash represents cash and cash equivalents that are not available for withdrawal by the Company. The noncurrent portion of the restricted cash is expected to be used to finance the WISG acquisition.

*Inventories*

Inventories consist of raw materials and are stated at the lower of first-in, first-out cost, average cost or market.

*Property, Plant and Equipment*

Property, plant and equipment are stated at historical cost, less accumulated depreciation. Depreciation is calculated using the straight-line method for financial reporting purposes over the estimated useful lives.

Table of Contents

Index to Financial Statements

The Company's property, plant and equipment balances, by significant asset category, are as follows:

| | December 31, 2004 | December 27, 2003 | Lives |
|---|---|---|---|
| | (in thousands) | | |
| Land | $ 1,650 | $ 2,418 | — |
| Buildings and improvements | 16,760 | 12,121 | 5-39 years |
| Machinery and equipment | 14,845 | 13,462 | 5-12 years |
| Furniture and fixtures | 6,645 | 6,514 | 2-10 years |
| | 39,900 | 34,515 | |
| Less accumulated depreciation | (16,917) | (13,775) | |
| Property, plant and equipment, net | $ 22,983 | $ 20,740 | |

Depreciation expense for 2004, 2003 and 2002 was $3.6 million, $3.6 million and $3.7 million, respectively. Costs of significant additions, renewals and betterments are capitalized. When an asset is sold or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts and the gain or loss on disposition is reflected in earnings. Maintenance and repairs are charged to operations when incurred.

*Goodwill*

Goodwill represents the costs of acquisitions in excess of the fair value of the net assets acquired and prior to fiscal year 2002 was amortized using the straight-line method over 30 years. Accumulated amortization as of December 29, 2001 was $4.7 million. Upon adoption of SFAS 142 on December 30, 2001, the Company no longer amortizes goodwill. Goodwill is tested for impairment annually, or as events dictate; however, no impairment adjustments were required in 2002, 2003 or 2004.

*Deferred Financing Costs*

Deferred financing costs are amortized by the effective interest method over the terms of the related debt facilities. Total interest expense associated with the amortization of these costs was $0.7 million, $0.6 million and $0.9 million in 2004, 2003 and 2002, respectively.

*Long-Lived Assets*

Long-lived assets, such as property, plant and equipment and intangible assets, are evaluated for impairment when events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable through the estimated undiscounted future cash flows from the use of these assets. No impairments were required in 2003 or 2002.

During the fourth quarter of 2004, the Company placed its Clinton, South Carolina plant and an insignificant amount of equipment for sale. Since the property met the requirements of an "asset held for sale" in accordance with FASB 144 "Accounting for Impairment or Disposal of Long-Lived Assets," the Company wrote down the property to its fair market value less costs to sell and ceased depreciation. The remaining net book value of the property of approximately $1.2 million has been reclassified to other assets on the balance sheet.

*Warranty Costs*

The Company typically warrants labor and fabrication for three years or less. Estimated costs of warranty repairs are accrued and included on the accompanying consolidated balance sheets as Accrued warranty.

*Income Taxes*

The current provision for income taxes is based on current federal and state statutory rates which are adjusted based on changes in tax laws and significant fluctuations in taxable income.

Table of Contents

Index to Financial Statements

Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The Company classifies deferred tax liabilities and assets into current and non-current amounts based on the classification of the related assets and liabilities. Certain judgments are made relating to recoverability of deferred tax assets, level of expected future taxable income and available tax planning strategies. These judgments are routinely reviewed by management.

*Insurance*

Certain subsidiaries of the Company are self-insured for health and workers' compensation up to certain policy limits. Amounts charged to expense include insurance premiums and claims in 2004, 2003 and 2002 for these items of $2.1 million, $1.9 million and $3.0 million, respectively, and were based on actual and estimated claims incurred. The Company has provided a $3.0 million letter of credit at December 31, 2004, as security for possible workers' compensation claims.

*Revenue Recognition*

GPEG has two segments: Heat Recovery Equipment and Auxiliary Power Equipment. Heat Recovery Equipment products include heat recovery steam generators, heat recovery boilers, and other types of waste heat products. Auxiliary Power Equipment products include exhaust and inlet systems, filter houses, retrofit activity, diverter dampers, turbine enclosures and other power equipment.

Revenues for the Company's Heat Recovery Equipment segment are recognized on the percentage-of-completion method based on the percentage of actual hours incurred to date in relation to total estimated hours for each contract. Changes in job performance, job conditions, estimated profitability and final contract settlements may result in revisions to costs and income, and the effects of such revisions are recognized in the period that the revisions are determined. Revenues for the Company's Auxiliary Power Equipment segment are recognized on the completed-contract method due to the short-term nature of the product production period. The Company recognizes various types of service revenues as the services are provided. Service revenues are not significant in any period presented.

*Major Customers*

The Company has certain customers that represent more than 10 percent of consolidated revenues. The revenue for these customers, as well as corresponding accounts receivable, as a percentage of the consolidated revenues and accounts receivable balances, for 2004, 2003 and 2002 are as follows:

| | Revenues | | | Accounts Receivable | | |
|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | For the Year Ended December 31, 2004 | For the Year Ended December 27, 2003 | For the Year Ended December 28, 2002 |
| General Electric | 32% | 32% | 35% | 16% | 27% | 9% |
| The Southern Company | 3% | 7% | 14% | 0% | 0% | 0% |
| Exxon Mobil | 3% | 10% | 1% | 3% | 9% | 0% |

Customers for both our Heat Recovery Equipment segment and our Auxiliary Power Equipment segment include OEMs, engineering and construction firms, operators of power generation facilities and firms engaged across several process related industries. The end users of most of our products are developers and operators of gas turbine power plants. Our top ten customers vary from year to year due to the relative size and duration of our projects.

*Accounts Receivable*

Accounts receivable are reported net of allowance for doubtful accounts. The allowance is based on current conditions, review of specific accounts and other estimates based on the judgment of management.

Table of Contents

**Index to Financial Statements**

*Fair Value of Financial Instruments*

The carrying amount of cash and cash equivalents, restricted cash, accounts receivable, accounts payable, accrued expenses and short-term debt approximates fair value due to the short-term nature of these instruments.

The fair value of the Company's long-term debt is estimated based on the discounted value of the future cash flows expected to be paid on the loans. The discount rate used to estimate the fair value of the loans is the rate currently available to the Company for loans with similar terms and maturities. The fair value at December 31, 2004 and December 27, 2003 approximated the carrying value.

*Income Per Common Share*

Basic and diluted income per common share are calculated as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (in thousands, except per share amounts) | | |
| Numerator: | | | |
| Net income (loss) available to common stockholders | $ (705) | $ 19,784 | $ 51,877 |
| Basic earnings per common share: | | | |
| Denominator: | | | |
| Weighted average shares outstanding | 46,195,357 | 44,520,607 | 43,958,918 |
| Basic earnings per common share: | | | |
| Net income (loss) available to common stockholders | $ (0.02) | $ 0.44 | $ 1.18 |
| Diluted earnings per common share: | | | |
| Denominator: | | | |
| Weighted average shares outstanding | 46,195,357 | 44,520,607 | 43,958,918 |
| Dilutive effect of options to purchase common stock | — | 1,390,217 | 1,676,626 |
| Weighted average shares outstanding assuming dilution | 46,195,357 | 45,910,824 | 45,635,544 |
| Diluted earnings per common share: | | | |
| Net income (loss) available to common stockholders | $ (0.02) | $ 0.43 | $ 1.14 |

Anti-dilutive stock options for 2004, 2003 and 2002 are 2,678,130, 1,299,000 and 566,000, respectively. The Company must include the impact of the conversion of the convertible notes in its earnings per share calculation. Currently, the $69.0 million of convertible notes are convertible into 6,503,299 common shares. The Company did not present the dilutive effect of stock options and convertible shares for the 2004 income (loss) per share calculation as the presentation of any dilutive stock options and convertible shares would have been anti-dilutive.

*Derivative Financial Instruments*

SFAS 133, "Accounting for Derivative Instruments and Hedging Activities," establishes accounting and reporting standards requiring that every derivative instrument be recorded on the balance sheet as either an asset or a liability measured at fair value. SFAS 133 requires that changes in a derivative's fair value be recognized currently in earnings unless specific hedge accounting criteria are met. Special accounting for qualifying hedges allows a derivative's gains and losses to be deferred in other comprehensive income until the transaction occurs ("cash flow hedge") or to offset related results on the hedged item in the income statement ("fair value hedge"). Hedge accounting requires that a company formally document, designate and assess the effectiveness of transactions that receive hedge accounting treatment.

Periodically, the Company uses derivative financial instruments in the management of its foreign currency exchange and interest rate exposures. As of December 31, 2004, there were foreign currency forward exchange contracts with notional amounts totaling approximately $30.8 million with varying amounts due through August 2007. Of the $30.8 million, $29.6 million represents forward contracts to sell Euros in the future for a specific number of U.S. dollars. Currently, the company

Case 1:06-cv-03433-BSJ-MHD Document 13-24 Filed 07/24/2006 Page 17 of 40

recognizes changes in fair values of the forward agreements through earnings. The fair value of the forward agreements was an unrealized loss of approximately

Table of Contents

Index to Financial Statements

$0.6 million at December 31, 2004. As of December 27, 2003, there were foreign currency forward exchange contracts with notional amounts totaling approximately $1.4 million with varying amounts due through May 2004. The fair value of the forward agreements was an unrealized gain of approximately $0.1 million at December 27, 2003.

*Stock-Based Compensation*

Stock-based compensation is accounted for using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees". No compensation expense is recorded for stock options when granted, as option prices have historically been set at the market value of the underlying stock at the date of grant.

SFAS 123 "Accounting for Stock-Based Compensation", requires the measurement of the fair value of options to be included in the statement of operations or disclosed in the notes to financial statements. The Company elected the disclosure-only alternative under SFAS 123.

In determining compensation cost pursuant to SFAS 123, the fair value of each option grant is estimated on the date of grant using the Black-Scholes option pricing model with the following weighted average assumptions used for grants during 2004, 2003 and 2002.

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Risk free interest rate | 2.95% -3.50% | 3.25% | 2.50% |
| Expected dividend yield | None | None | None |
| Expected lives | 1 - 3.2 years | 5 years | 5 years |
| Expected volatility | 46% | 34% | 65% |
| Option fair value at grant date | $ 1.89 - $3.49 | $ 2.16 | $ 2.73 |

The decrease in the expected lives of the stock options from 2003 to 2004 was due to the vesting term of each issuance of that stock options. The expected volatility decreased significantly from 2002 to 2003 due to a more stable Company stock price in 2003.

Had compensation cost been determined consistent with SFAS 123, the Company's pro forma net income (loss) would have been as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | (in thousands, except per common share data) | | |
| Net income (loss) available to common stockholders: | | | |
| As reported | $ (705) | $ 19,784 | $ 51,877 |
| Stock-based compensation expense included in net income (loss) as reported | 361 | 3 | — |
| Additional stock-based compensation expense had the fair value been applied to all awards | (1,232) | (642) | (167) |
| Pro forma net income (loss) | $ (1,576) | $ 19,145 | $ 51,710 |
| Basic income (loss) per common share : | | | |
| As reported | $ (0.02) | $ 0.44 | $ 1.18 |
| Pro forma net income (loss) | (0.03) | 0.43 | 1.18 |
| Diluted income (loss) per common share: | | | |
| As reported | $ (0.02) | $ 0.43 | $ 1.14 |
| Pro forma net income (loss) | (0.03) | 0.42 | 1.13 |

In December 2004, the FASB issued FASB 123R (revised 2004) "Share-Based Payment." FASB 123R is a revision of FASB 123 "Accounting for Stock-Based Compensation", and it supercedes APB Opinion No. 25 "Accounting for Stock Issued to Employees."

For the year ended December 31, 2004 Page 74 of 112

50

http://www.sec.gov/Archives/edgar/data/1136294/000119312505051183/d10k.htm 7/18/2006

Table of Contents

Index to Financial Statements

FASB 123R provides guidance on transactions whereby companies exchange equity instruments for goods and services. This new rule requires companies to expense the fair market value of stock options issued to employees. The Company will be required to adopt FASB 123R in the third quarter of 2005, and it has chosen the "modified prospective" transition method whereby no prior periods will be restated. The Company is in the process of evaluating its alternatives under FASB 123R and determining the impact on the consolidated financial statements.

*Foreign Currency*

Assets and liabilities of the Company's foreign operations are translated at year-end exchange rates, and revenues and expenses are translated at average exchange rates prevailing during the period. Translation adjustments are recorded as a separate component of stockholders' equity and other comprehensive income on the accompanying consolidated financial statements. Gains and losses from foreign currency transactions are included in earnings. Such gains and losses have not been significant in any period.

*Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. The most significant estimates relate to projected total costs of projects, including percentage of completion on contract accounting, warranty and contingency costs and goodwill impairment analyses. Ultimate results could differ from those estimates.

**3. GOODWILL**

The balances by operating segment for the years ended December 28, 2002, December 27, 2003 and December 31, 2004 by operating segment are as follows (in thousands):

| Heat Recovery Equipment | Auxiliary Power Equipment | Corporate | Total |
|---|---|---|---|
| $ 25,230 | $ 18,623 | $ 1,147 | $45,000 |

The Company reviews its goodwill for potential impairment on at least an annual basis.

**4. INCOME TAXES**

The following summarizes the income tax provision (benefit) for the fiscal years 2004, 2003 and 2002 (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Current: | | | |
| Federal | $(10,206) | $ (2,571) | $23,002 |
| State | (1,797) | 207 | 2,682 |
| Foreign | 749 | 3,026 | 4,148 |
| Total current | (11,254) | 662 | 29,832 |
| Deferred | 10,803 | 11,464 | 3,335 |
| Income tax provision (benefit) | $ (451) | $12,126 | $33,167 |

Table of Contents

Index to Financial Statements

Income (loss) before the provision for income taxes for the tax years 2004, 2003 and 2002 was as follows (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Domestic | $ (833) | $23,478 | $72,630 |
| Foreign | (353) | 8,432 | 12,414 |
| Total | $(1,186) | $31,910 | $85,044 |

As of December 31, 2004 and December 27, 2003, respectively, the components of deferred income taxes consist of the following (in thousands):

| | 2004 | 2003 |
|---|---|---|
| Assets: | | |
| Cost in excess of net assets of business acquired | $52,135 | $58,718 |
| Inventories | 4,497 | 9,637 |
| Reserves and other accruals | 4,856 | 6,840 |
| Accrued compensation and benefits | 1,115 | 633 |
| State net operating loss carryforward | 1,331 | — |
| Foreign net operating loss | 1,338 | — |
| Other expenses not currently deductible | (16) | 211 |
| Total assets | 65,256 | 76,039 |
| Liabilities: | | |
| Property and equipment | (2,882) | (3,630) |
| Net deferred tax assets | 62,374 | 72,409 |
| Valuation allowance | (768) | — |
| Net deferred tax assets after valuation allowance | $61,606 | $72,409 |

A valuation allowance has been established for uncertainties in realizing the benefit of foreign net operating loss carryforwards. During 2004, international subsidiaries sustained $3.9 million of net operating losses. A valuation allowance has been recorded against $2.3 million of the loss carryforwards. Management believes it is more likely than not that a tax benefit will not be realized from these losses. Changes in the estimates of future taxable income or in tax laws may alter this expectation. The remaining foreign net operating loss carryforward of $1.6 million will expire in 2014. The Company also has state net operating loss carryforwards of $35.2 million, which will begin expiring in the years 2008 through 2023.

The Company expects a federal net operating loss of approximately $37 million for the year ended December 31, 2004. The loss will be fully utilized via carry back to the 2002 U.S. tax return. A tax benefit of approximately $13 million has been recorded in other current assets.

Table of Contents

Index to Financial Statements

A reconciliation of the federal statutory tax rate to the Company's effective tax rate is as follows:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Statutory federal income tax rate | (34.0)% | 34.0% | 35.0% |
| State income taxes, net of federal income tax benefits | (2.5)% | 3.5% | 3.5% |
| Foreign taxes | (2.4)% | (1.9)% | — |
| Miscellaneous permanent items and other | 0.9% | 2.4% | 0.5% |
| Effective tax rate cost/(benefit) | (38.0)% | 38.0% | 39.0% |

The Company is currently reflecting a (38%) effective tax rate in the 2004 tax provision due to the lower marginal tax rate at lower income levels. However, for purposes of determining the deferred tax assets, the Company used a 39% effective income tax rate as we expect to have higher income levels when the deferred tax assets are realized.

The Company provides income taxes on the undistributed earnings of non-U.S. subsidiaries except to the extent that such earnings are indefinitely reinvested outside the United States. As of December 31, 2004, none of the undistributed earnings of international subsidiaries were considered to be reinvested indefinitely.

The Company's federal income tax returns for 2001 through 2003 are currently under examination by the Internal Revenue Service. The Company currently believes the resolution of such audits will not have a material adverse effect on the Company's financial position, results of operations or cash flows. There are no other significant domestic or foreign tax audits in process or pending.

The Company establishes accruals for certain tax contingencies for losses that are probable and the amounts are reasonably estimable. The tax contingency accruals are adjusted due to changing circumstances, such as the progress of tax audits, case law and emerging legislation. A number of years may elapse before a particular matter, for which the Company has recorded a contingent liability, is audited and finally resolved. While it is often difficult to predict the final outcome or the timing of the resolution of any particular tax matter, the Company believes its tax contingency accruals are adequate to address known tax contingencies. Favorable resolution of such contingencies could be recognized as a reduction in our effective tax rate in the year of resolution. Unfavorable settlement of any particular issue could increase the effective tax rate and may require the use of cash in the year of resolution.

On October 22, 2004, President Bush signed the American Jobs Creation Act of 2004. The Act creates a temporary incentive for U.S. corporations to repatriate accumulated income earned abroad by providing an 85% dividends received deduction for certain dividends from controlled foreign corporations, replacement of the extraterritorial income exclusion (ETI) with a domestic manufacturing deduction and various other tax incentives to generate American job growth. The deduction is subject to a number of limitations and, as of today, uncertainty remains as to how to interpret numerous provisions of the Act. As such, we will assess our position on repatriation of foreign earnings in 2005. Currently, we estimate the range of dividends to be repatriated to be $0 to $5 million.

Table of Contents

Index to Financial Statements

## 5. RELATED-PARTY TRANSACTIONS

Certain of the Company's investors provide consultation services to the Company, for which the Company is charged management fees. Total expenses under these arrangements were $1.0 million, $1.3 million and $1.3 million for 2004, 2003 and 2002, respectively. Under a management agreement with Harvest, we are contractually committed to make annual payments to Harvest of certain fees for financial advisory and strategic planning services. Commencing August 2004, the annual fee is comprised of two components. First, the Company pays Harvest a fixed fee of $625,000. In addition, the Company will pay Harvest an additional fee of between $0 and $625,000 depending on the amount of the Company's EBITDA as follows:

| | Additional Fee |
|---|---|
| EBITDA equal to or less than $20 million | $ — |
| EBITDA greater than $20 million but equal to or less than $30 million | 125,000 |
| EBITDA greater than $30 million but equal to or less than $50 million | 375,000 |
| EBITDA greater than $50 million | 625,000 |

The management agreement terminates on February 1, 2006, subject to automatic renewals of additional one-year periods commencing on February 1, 2006, and continuing indefinitely thereafter, unless terminated for cause or by Harvest. The management agreement will terminate in the event that the affiliates of Harvest sell more than 66.6% of the shares of the Company's common stock they owned on May 23, 2001. The total management fee paid to Harvest for the 2004 "Harvest Year" (beginning on February 1, 2004 and ending on January 31, 2005) is $937,500.

## 6. UNCOMPLETED CONTRACTS

The Heat Recovery Equipment segment enters into contracts that allow for periodic billings over the contract term. At any point in time, each project under construction could have either costs and estimated earnings in excess of billings or billings in excess of costs and estimated earnings. The Auxiliary Power Equipment segment typically bills customers only at the completion of contracts and no earnings are recognized by the Auxiliary Power Equipment segment until contract completion.

Costs, earnings and billings related to uncompleted contracts consist of the following:

| | December 31, 2004 | December 27, 2003 |
|---|---|---|
| | (in thousands) | |
| Costs incurred on uncompleted contracts | $ 614,066 | $ 811,140 |
| Earnings recognized on uncompleted contracts | 128,478 | 131,385 |
| Total | 742,544 | 942,525 |
| Less - billings to date | 734,390 | 955,112 |
| Net | $ 8,154 | $ (12,587) |

The net amounts are included in the accompanying consolidated balance sheets under the following headings:

| | December 31, 2004 | December 27, 2003 |
|---|---|---|
| | (in thousands) | |
| Costs and estimated earnings in excess of billings | $ 60,861 | $ 40,706 |
| Billings in excess of costs and estimated earnings | (52,707) | (53,293) |
| Net | $ 8,154 | $ (12,587) |

54

Table of Contents

Index to Financial Statements

**7. LONG-TERM DEBT**

The Company's long-term debt consisted of the following:

| | December 31, 2004 | December 27, 2003 |
|---|---|---|
| | (in thousands) | |
| Term loan, $23,750 bearing interest at Eurodollar rate plus margin (4.43% at December 31, 2004 and 2.46% at December 27, 2003), principal and interest payable quarterly, as defined through October 2009 | $ 23,750 | $ 24,938 |
| Convertible senior subordinated notes at 4.25%, interest payable semiannually as defined through November 2011 | 69,000 | — |
| Other | 2,854 | 25 |
| | 95,604 | 24,963 |
| Less current maturities | (16,854) | (14) |
| Total long-term debt | $ 78,750 | $ 24,949 |

Future maturities of long-term debt as of December 31, 2004 are as follows (in thousands):

| | |
|---|---|
| 2005 | $16,854 |
| 2006 | 5,000 |
| 2007 | 5,000 |
| 2008 | 5,000 |
| 2009 | 3,750 |
| Thereafter | 60,000 |
| Total | $95,604 |

During the first quarter of 2004, the Company entered into two loan agreements with banks in China. The agreements allow for the Company to borrow a total of $4.8 million at a weighted average rate of 5.21%. The agreements expire April 1, 2005. As of December 31, 2004, approximately $2.8 million has been borrowed under the loan agreements with an interest rate of 5.31%. The loans are collateralized by letters of credit issued under the Company's senior credit facility. Once these loan agreements expire and the amounts are repaid, any borrowings necessary in China are expected to occur under the senior credit facility.

*Senior Credit Facility*

On October 1, 2004, the Company replaced its amended and restated senior credit facility with a new credit facility. The new credit facility provides for a term loan of $25.0 million and revolving credit facility of up to $75.0 million. The credit facility includes a $65.0 million sub-limit for the issuance of letters of credit. Up to $15.0 million of the revolving credit facility may consist of foreign currency loans to the Company's subsidiaries. The credit facility will be used for working capital, issuance of letters of credit and other lawful corporate purposes.

At the closing of the new credit agreement, on October 1, 2004, the Company borrowed $25.0 million under the term loan. The Company had no borrowings outstanding under the revolving credit facility at October 1, 2004. Approximately $16.6 million of the proceeds from the term loan were used to pay in full the outstanding balance on the existing amended and restated senior credit facility. While the existing amended and restated credit facility was terminated effective October 1, 2004, all letters of credit under that facility were outstanding as of October 1, 2004. A standby letter of credit in the amount of approximately $32.7 million securing letters of credit issued under the existing amended and restated senior credit agreement was issued under the new credit facility to Deutsche Bank Trust Company Americas. The standby letter of credit has been and will continue to be reduced as letters of credit under the amended and restated senior credit facility expire or are replaced by letters of credit under the new credit facility. As of December 31, 2004, the balance of the standby letter of credit

was approximately $7.4 million.

Table of Contents

Index to Financial Statements

At the time of the termination of the amended and restated senior credit facility, $0.2 million of unamortized loan fees were written off by the Company. In addition, the Company incurred approximately $1.9 million in new loan fees related to the new credit facility, which were capitalized and subject to amortization over the life of the new credit facility.

At the Company's option, amounts borrowed under the new credit agreement will bear interest at either the Eurocurrency rate or an alternate base rate, plus, in each case, an applicable margin. The applicable margin will range from 1.75% to 2.75% in the case of a Eurocurrency rate loan, and from 0% to 1.00% in the case of a base rate loan, in each case, based on a leverage ratio. At December 31, 2004, the $23.8 million of term debt bore interest at an average rate of 4.43%.

All amounts outstanding under the term loan will be due and payable on October 1, 2009. All amounts outstanding under the revolving credit facility will be due and payable on October 1, 2008. On that date, the Company will have the option, subject to certain conditions, to convert all or a portion of the revolving loans then outstanding to term loans due and payable on October 1, 2009. Borrowings under the revolving credit facility bear interest in the same manner as the senior credit facility described above, and the Company pays an unused facility fee of 0.35%. As of December 31, 2004, there was no balance outstanding under the revolver.

The new credit agreement includes customary affirmative and negative covenants, such as limitations on the creation of new indebtedness and on certain liens, restrictions on certain transactions and payments and maintenance of a consolidated leverage ratio, a consolidated fixed charge coverage ratio and a consolidated asset coverage ratio. A default under the credit agreement may be triggered by events such as a failure to comply with financial covenants or other covenants under the credit agreement, a failure to make payments when due under the credit agreement, a failure to make payments when due in respect of or a failure to perform obligations relating to debt obligations in excess of $5.0 million, a change of control of the Company or certain insolvency proceedings. A default under the credit agreement would permit the participating banks to restrict the Company's ability to further access the credit facility for loans, require the immediate repayment of any outstanding loans with interest and require the cash collateralization of outstanding letter of credit obligations.

The credit agreement prohibits the Company from paying cash dividends to its stockholders. The credit agreement is:

- guaranteed by all of the Company's domestic subsidiaries; and

- secured by a lien on all of the property and assets of the Company's domestic subsidiaries, including, without limitation, a pledge of all capital stock owned by the Company and its domestic subsidiaries, subject to a limitation of 65% of the voting stock of any foreign subsidiary.

The Company is currently in compliance with all covenant requirements of the senior credit agreement.

The Company uses letters of credit in its normal course of business. Letters of credit totaling $40.8 million were issued and outstanding as of December 31, 2004 under the revolving credit facility. While no amounts had been drawn upon these letters of credit, the letters of credit outstanding reduces amounts available for borrowing under the revolver.

*Senior Credit Facility – Amendment One*

On November 23, 2004, the Company entered into an amendment (the First Amendment) to the senior credit agreement.

Among other things, the First Amendment:

- modifies the definition of the term "Permitted Acquisition" to include the acquisition of WISG;

- excludes borrowings under the Notes from the prohibition on the creation of additional indebtedness;

- amends various financial and operating covenants;

- requires the Company to repay certain outstanding loans under the senior credit agreement with the net proceeds from the sale of the Notes if the acquisition of WISG is not completed prior to June 30, 2005; and

Table of Contents

Index to Financial Statements

- requires the Company to escrow the net proceeds from issuance of the Notes. The net proceeds of approximately $57.7 million are included in restricted cash as of December 31, 2004, and the Company expects to use this amount to finance the WISG acquisition in April 2005.

*Senior Credit Facility – Amendment Two*

On March 14, 2005, the Company entered into an amendment (the Second Amendment) to the senior credit agreement.

Among other things, the Second Amendment:

- waives our compliance with the "Consolidated Fixed Charge Coverage Ratio" included in the credit agreement solely for the period ended March 31, 2005;

- amends our senior and total leverage ratios;

- increases our letter of credit sub-limit from $65 million to $75 million; and

- increases the applicable rate under any Eurocurrency rate loans, letters of credit, base rate loans and swing line loans by 0.50 percent per annum during any period in which our Consolidated Leverage Ratio exceeds 4.00 to 1.00.

*Convertible Senior Subordinated Notes*

On November 23, 2004, the Company completed a private placement of $69.0 million aggregate principal amount of its 4.25% convertible senior subordinated notes due 2011 (the Notes). The Company intends to use the net proceeds of the offering, together with borrowings under its senior credit facility and cash on hand, to fund the purchase of WISG as described in Note 14 to the consolidated financial statements.

The Notes were issued under a Securities Purchase Agreement (the Securities Purchase Agreement), among the Company and various investors. The Securities Purchase Agreement and form of note provide, among other things, that the Notes will bear interest at a rate of 4.25% per year, which interest is payable semi-annually beginning May 2005. During the occurrence of an "Event of Default" under the Notes, the Notes will bear interest at a rate of 9.25% per year. The Notes are convertible into shares of the Company common stock at an initial conversion price of $10.61 per share of common stock, which is equal to approximately 122% of the volume weighted average price of the Company's common stock on November 22, 2004. The conversion price is subject to certain anti-dilutive provisions, as defined in the agreement.

The Notes will be subordinate in right of payment to the Company's existing and future "Senior Indebtedness," including all secured indebtedness of the Company under its credit facility and certain "Indebtedness" permitted under its credit facility, pari passu with certain other Indebtedness permitted under its credit facility and senior in right of payment to any of the Company's other indebtedness. The Company's obligations under the Securities Purchase Agreement, Notes and other transaction documents are guaranteed by all of the Company's domestic subsidiaries which are borrowers under or guarantors of its senior credit facility. Upon the occurrence of an "Event of Default" under the Notes, the holders of the Notes may require the Company to redeem all or any portion of the Notes. The term "Event of Default" includes, among other things (i) any failure by the Company to pay principal and interest when and as due under the Notes and, in the case of interest, the continuation of such failure for a period of five days and (ii) any payment default or non-payment default on other indebtedness with an unpaid principal amount in excess of $5 million, provided such non-payment default continues for a period of at least 30 consecutive days after the earlier to occur of any executive officer of the Company becoming aware of such default and the receipt of written notice from the holder of such default. As long as the Notes are outstanding, the Company and its subsidiaries will not be permitted to incur any indebtedness other than "Permitted Indebtedness," which includes "Senior Bank Indebtedness" not exceeding the greater of (i) the sum of $100 million plus "Available Cash" or (ii) three times consolidated EBITDA of the Company for the four prior calendar quarters, and "Indebtedness" permitted under the credit facility. A "Triggering Event" will be deemed to occur if the Company incurs any indebtedness in addition to "Permitted Indebtedness," and at the time of such incurrence, the Company's trailing 12 months "Consolidated EBITDA" does not equal or exceed $30.0 million or, as a result of the incurrence, the Company's "Consolidated Leverage Ratio" exceeds 4.75 to 1.0. Within 30 days of the occurrence of a Triggering Event, the Company will be required to offer to redeem all or any portion of the Notes then outstanding at a redemption price equal to the principal balance of the Notes plus all accrued and unpaid interest. If at any time prior to the incurrence of a Triggering Event, the weighted average price of the Company's common stock equals or exceeds 150% of the conversion price then in effect for a period of 15 out of 30 consecutive trading days, the restrictions on "Permitted Indebtedness" will be removed.

The Company may redeem all or any portion of the Notes, at its option, at any time on or after November 23, 2007 if the weighted average price of the Company's common stock exceeds 165% of the conversion price then in effect for a period of 20 out of 30 consecutive trading days. At any time beginning on May 23, 2005 and continuing until August 2, 2005, the Investors may, at their option, require the Company to redeem up to $9.0 million of the Notes at par plus accrued but unpaid interest. Beginning on November 23, 2009, the Investors may, at their option, require the Company to redeem all or any portion of the Notes. In such event, the Company may elect, at its option and subject to certain conditions, to pay up to 50% of the redemption price in shares of the Company common stock valued at 94% of the weighted average price of the Common Stock for the 20-day trading period immediately preceding the redemption date. The redemption price is at par.

The Company escrowed $9.0 million of the proceeds from the sale of the Notes to meet its obligation to redeem up to $9.0 million of the Notes at the option of the Investors. If on or prior to April 30, 2005, the contemplated acquisition of WISG has not been consummated, the Company will be required to escrow an additional $7.65 million of the proceeds from the sale of the Notes for the benefit of the Investors until the WISG acquisition is consummated. The terms of the Notes agreement require the Company to keep a cash balance of at least $7.65 million until April 30, 2005. Both the $9.0 and $7.65 million are reflected as restricted cash on the balance sheet at December 31, 2004.

The Investors have a right of redemption at a premium to principal and unpaid interest upon the occurrence of an event of default under the Notes or a change of control of the Company. The redemption price in respect of an event of default will be equal to the greater of (i) the 110% of the amount to be redeemed plus accrued and unpaid interest and (ii) the product of the conversion rate in effect at such time with respect to the amount to be redeemed and the closing sale price of the Company's common stock on the date immediately preceding such event of default. The redemption premium in respect of a change in control will range from a minimum of 10% to a maximum equal to the product of 120% of the amount to be redeemed and the quotient determined by dividing the closing sale price of the common stock immediately following the public announcement of such proposed change of control by the conversion price of the Notes. In addition, the terms of the Notes provide certain anti-dilution protection for the Investors. Finally, the convertible notes agreement stipulates that an event of default under the senior credit facility would result in a default under the convertible notes agreement.

Table of Contents

Index to Financial Statements

## 8. STOCKHOLDERS' EQUITY

*Preferred Stock / Preferred Units*

Prior to the Company's IPO, the Company had authorized and issued 1,008,968 preferred units with a $100 par value. The preferred units were not convertible and had no voting rights. Preferred unit members were entitled to an eight percent annual preferred dividend computed on the members' aggregate preferred equity balance. Preferred units had liquidation preference to the common units in the event of a liquidation of the Company and had priority on all equity distributions. The Board of Directors could, at its sole option, redeem all or any part of the preferred units at a price equal to their aggregate preferred capital contribution plus accrued but not yet paid preferred dividends. Upon completion of the IPO these preferred units were converted to 5,044,839 shares of common stock. The Company's new capital stock includes 5,000,000 authorized shares of preferred stock, $0.01 par value per share, of which no shares are outstanding.

The board of directors, without stockholder approval, can issue preferred stock with voting and conversion rights.

*Common Stock / Common Units*

Prior to the Company's IPO, the Company had authorized and issued 1,122,280 current common units with a $10 par value. Common units were entitled to one vote. Prior to the Recapitalization, the Company had authorized 52,106,800, 6,513,350 and 2,709,554 of Class A, B and Junior Units, respectively. Prior Class A and Junior units had one vote per unit. Class B units were nonvoting. All previously outstanding prior common units were converted to common stock as part of the IPO.

Upon completion of the IPO these common units were converted to 31,558,501 shares of common stock. The Company's new capital stock includes 100,000,000 authorized shares of common stock, $0.01 par value per share, of which 46,770,314 are outstanding at December 31, 2004.

*Stock Incentive Plans*

In conjunction with the IPO all common unit option amounts previously granted under the 2000 Plan have been restated to give effect to the conversion of common units to common shares using the 28.1 to 1.0 ratio.

In May 2004, the Company adopted the 2004 Stock Incentive Plan (the 2004 Plan). Under the provisions of the 2004 Plan, the Company may issue up to 1,500,000 options to purchase stock, restricted stock awards or performance shares. Options to purchase common stock are based on an exercise price equal to the fair value on the date of grant. Vesting provisions are at the discretion of the board of directors along with the period of time during which options may be exercised, but in no event may it be more than 10 years from the grant date of an option. Restricted shares of stock are issued under the 2004 Plan based on the relevant "award agreement" given to the employee. Performance shares are shares of stock issued based on meeting targets of objective performance established by the board of directors. As of December 31, 2004, 760,000 stock options and 10,000 shares of restricted stock have been issued under the 2004 Plan. The 10,000 restricted shares vest one-third each year for three years. The related deferred compensation is presented in the equity section of the consolidated balance sheet as of December 31, 2004.

In April 2001, the Company adopted the 2001 Option Plan (the 2001 Plan). The 2001 Plan provides options to purchase up to 1,500,000 shares of common stock at an exercise price equal to fair value on the date of grant. Vesting provisions are at the discretion of the board of directors along with the period of time during which options may be exercised, but in no event may it be more than 10 years from the grant date of an option. As of December 31, 2004, 1,500,000 options have been granted under the 2001 Plan with 1,210,000 options outstanding at the end of 2004.

In August 2000, the Company adopted the 2000 Option Plan (the 2000 Plan). The 2000 Plan provided for granting of up to 3,440,257 options to purchase common units of the Company. Initially, forty percent of the common units available for grant under the 2000 Plan were to vest over four years and sixty percent of the common units available for grant under the 2000 Plan were to vest over the earlier of nine years or when certain performance vesting criteria are met. In conjunction with our IPO all options under this plan became immediately one hundred percent vested. Options granted under this plan subsequent to the IPO were also fully vested. However, none of the shares acquired upon exercise of the options under this plan were allowed to be sold until May, 2003. As of December 31, 2004, 3,433,804 options have been granted and 6,453 options are available to be granted. Total options exercised under the 2000 Plan totaled 2,622,729 as of the end of 2004.

Table of Contents

Index to Financial Statements

As part of the Recapitalization, all options outstanding under a previous option plan (whether or not exercisable or vested) were cancelled and holders of the cancelled options were paid an amount equal to the options' fair value, resulting in a recapitalization charge of $38.1 million.

Information with respect to the Company's stock option plans is summarized as follows:

| | Number of Common Shares | |
|---|---|---|
| | Options Outstanding | Weighted Average Exercise Price |
| Outstanding at December 29, 2001 | 3,433,804 | $ 2.71 |
| Granted | 750,000 | 4.87 |
| Forfeited | (4,000) | 14.47 |
| Exercised | (23,339) | 0.36 |
| Outstanding at December 28, 2002 | 4,156,465 | 3.10 |
| Granted | 739,000 | 6.10 |
| Forfeited | (40,500) | 6.65 |
| Exercised | (1,231,251) | 0.36 |
| Outstanding at December 27, 2003 | 3,623,714 | 4.60 |
| Granted | 780,000 | 9.69 |
| Forfeited | (173,200) | 13.21 |
| Exercised | (1,552,384) | 1.13 |
| Outstanding at December 31, 2004 | 2,678,130 | $ 4.77 |
| Exercisable at December 28, 2002 | 3,406,465 | $ 2.73 |
| Exercisable at December 27, 2003 | 2,242,214 | $ 4.03 |
| Exercisable at December 31, 2004 | 918,530 | $ 7.68 |

| | Stock option grant prices | | | | | |
|---|---|---|---|---|---|---|
| | $0.36 | $4.87 | $6.10 | $6.86 | $9.76 | $14.47 |
| Options outstanding: | | | | | | |
| Number outstanding | 298,630 | 526,000 | 664,000 | 20,000 | 760,000 | 409,500 |
| Weighted average remaining contractual life (years) | 5.60 | 7.96 | 8.96 | 9.42 | 9.97 | 6.83 |
| Options exercisable: | | | | | | |
| Number exercisable | 298,630 | 210,400 | — | — | — | 409,500 |

Table of Contents

Index to Financial Statements

## 9. COMMITMENTS AND CONTINGENCIES

*Employment Agreements*

The Company enters into employment agreements with terms of two to three years with certain members of management with automatic one-year renewal periods at expiration dates. The agreements provide for, among other things, compensation, benefits and severance payments.

*Litigation*

The Company is involved in legal actions which arise in the ordinary course of its business. Although the outcomes of any such legal actions cannot be predicted, in the opinion of management, the resolution of any currently pending or threatened actions will not have a material adverse effect upon the consolidated financial position or results of operations of the Company.

*Warranty*

Estimated costs related to product warranty are accrued as revenue is recognized and included in cost of sales. Estimated costs are based upon past warranty claims and sales history. Warranty terms vary by contract but generally provide for a term of three years or less. We manage our exposure to warranty claims by having our field service and quality assurance personnel regularly monitor our projects and maintain ongoing and regular communications with the customer.

A reconciliation of the changes to our warranty accrual for 2004 and 2003 is as follows (dollars in thousands):

|  | 2004 | 2003 |
|---|---|---|
| Balance at beginning of period | $15,004 | $ 19,460 |
| Changes to previous estimates | (1,831) | (2,559) |
| Accruals during the period | 3,377 | 9,614 |
| Settlements made (in cash or in kind) during the period | (6,792) | (11,511) |
| Ending balance | $ 9,758 | $ 15,004 |

*Leases*

The Company leases machinery, transportation equipment and office, warehouse and manufacturing facilities, which are noncancellable and expire at various dates. Total rental expense for all operating leases for 2004, 2003 and 2002 was $2.7 million, $2.5 million and $2.9 million, respectively.

Future minimum annual lease payments under these noncancellable operating leases at December 31, 2004 are as follows (in thousands):

| | |
|---|---|
| 2005 | $2,149 |
| 2006 | 1,710 |
| 2007 | 1,638 |
| 2008 | 1,429 |
| 2009 | 1,289 |
| Thereafter | 827 |
| Total | $9,042 |

None of the leases include contingent rental provisions.

Table of Contents

Index to Financial Statements

*Employee Benefit Plans*

Deltak maintains a profit-sharing plan for employees. Deltak's expense for this plan totaled $0.3 million, $0.4 million and $0.8 million for 2004, 2003 and 2002, respectively. In addition to the Deltak profit-sharing plan, GPEG maintains a 401(k) plan covering substantially all of Deltak, Braden and Corporate's employees. Expense for the GPEG 401(k) plan for 2004, 2003 and 2002 was $0.9 million, $0.9 million and $1.0 million, respectively.

Braden participates in a defined benefit multi-employer union pension fund covering all union employees. As required by labor contracts, Braden made contributions totaling $0.1 million, $0.2 million and $0.3 million for 2004, 2003 and 2002, respectively. These contributions are determined in accordance with the provisions of negotiated labor contracts and generally are based on the number of hours worked. Braden may be liable for its share of unfunded vested benefits, if any, related to the union pension fund. Information from the union pension fund's administrators indicates there are no unfunded vested benefits.

*Purchase Agreement*

As discussed in Note 14, the Company entered into a Purchase Agreement to acquire WISG. The acquisition is expected to close in April 2005.

**10. SUPPLEMENTAL CASH FLOW INFORMATION**

Changes in current operating items were as follows (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Accounts receivable | $ 7,723 | $ 23,262 | $ 40,338 |
| Inventories | (64) | 1,390 | 1,570 |
| Costs and estimated earnings in excess of billings | (20,155) | 21,583 | 69,066 |
| Accounts payable | 4,812 | (6,399) | (26,232) |
| Accrued expenses and other | (13,918) | 749 | (3,704) |
| Billings in excess of costs and estimated earnings | (3,509) | (53,949) | (38,280) |
| | $(25,111) | $(13,364) | $ 42,758 |

Supplemental cash flow disclosures are as follows (in thousands):

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| Cash paid (received) during the period for: | | | |
| Interest | $ 557 | $ 1,671 | $ 3,867 |
| Income taxes | (6,188) | 3,751 | 29,415 |
| Non-cash transactions: | | | |
| Settlement of customer accounts receivable against estimated costs | — | 12,600 | — |
| Settlement of customer accounts receivable against amounts owed to customer included in accounts payable | — | 4,400 | — |
| Tax benefit of stock options exercised | 5,392 | 2,392 | — |
| Asset held for sale reclassified to other assets | 1,209 | — | — |

### 11. SEGMENT INFORMATION

The "management approach" called for by SFAS 131, "Disclosures about Segments of an Enterprise and Related Information" has been used by the Company management to present the segment information which follows. The Company considered the way its management team organizes its operations for making operating decisions and assessing performance and considered which components of its enterprise have discrete financial information available. Management makes decisions using a product group focus and its analysis resulted in two operating segments, Heat Recovery Equipment and Auxiliary Power Equipment. The Company evaluates performance based on net income or loss not including certain items as noted below.

Accounting policies used by the segments are the same as those described in Note 2. Intersegment revenues and transactions were not significant. Corporate assets consist primarily of cash and deferred tax assets. Capital expenditures do not include amounts arising from the acquisition of businesses. Expenses associated with the loss on debt extinguishment have not been allocated. Interest income has not been allocated as cash management activities are handled at a corporate level. In the first quarter of 2004, the Company changed the basis by which it allocates corporate general and administrative expenses to the operating segments. This new method of allocating corporate expenses better reflects the use of corporate resources by the operating segments. Prior year amounts were reclassified to conform to the 2004 presentation.

The following table presents information about segment income and assets:

| | Heat Recovery Equipment | Auxiliary Power Equipment |
|---|---|---|
| | (in thousands) | |
| **2004** | | |
| Revenues | $117,316 | $116,376 |
| Interest expense | 780 | 1,140 |
| Depreciation | 1,551 | 1,981 |
| Income tax provision (benefit) | 2,034 | (2,247) |
| Segment income (loss) | 3,347 | (3,662) |
| Assets | 108,108 | 104,976 |
| Capital expenditures | 979 | 963 |
| **2003** | | |
| Revenues | $119,893 | $143,885 |
| Interest expense | 812 | 1,260 |
| Depreciation | 1,334 | 2,175 |
| Income tax provision | 1,416 | 11,027 |
| Segment income | 2,238 | 18,067 |
| Assets | 77,027 | 97,545 |
| Capital expenditures | 75 | 226 |
| **2002** | | |
| Revenues | $308,628 | $278,177 |
| Interest expense | 1,784 | 2,624 |
| Depreciation | 1,428 | 2,218 |
| Income tax provision | 11,505 | 22,124 |
| Segment income | 17,994 | 34,605 |
| Assets | 139,637 | 106,763 |
| Capital expenditures | 569 | 2,281 |

Table of Contents

Index to Financial Statements

The following tables present information which reconciles segment information to consolidated totals:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (in thousands) | |
| **Income from Continuing Operations** | | | |
| Total segment income (loss) | $ (315) | $20,305 | $52,599 |
| Unallocated interest income | 639 | 560 | 198 |
| Other | (1,029) | (1,081) | (920) |
| Consolidated net income (loss) | $ (705) | $19,784 | $51,877 |

| | December 31, 2004 | December 27, 2003 |
|---|---|---|
| | (in thousands) | |
| **Assets** | | |
| Total segment assets | $ 213,084 | $ 174,572 |
| Corporate cash and cash equivalents | 17,238 | 42,172 |
| Restricted cash | 74,357 | — |
| Other unallocated amounts, principally deferred tax assets | 62,215 | 64,252 |
| Consolidated assets | $ 366,894 | $ 280,996 |

| | 2004 | | |
|---|---|---|---|
| | Segment Totals | Adjustments | Consolidated Totals |
| | | (in thousands) | |
| **Other Significant Items** | | | |
| Interest expense | $1,920 | $ — | $ 1,920 |
| Interest income | — | 639 | 639 |
| Expenditures for assets | 1,942 | — | 1,942 |
| Depreciation | 3,532 | 51 | 3,583 |

| | 2003 | | |
|---|---|---|---|
| | Segment Totals | Adjustments | Consolidated Totals |
| | | (in thousands) | |
| **Other Significant Items** | | | |
| Interest expense | $2,072 | $ — | $ 2,072 |
| Interest income | 8 | 560 | 568 |
| Expenditures for assets | 301 | 110 | 411 |
| Depreciation | 3,509 | 54 | 3,563 |

Table of Contents

Index to Financial Statements

| | 2002 | | |
|---|---|---|---|
| | Segment Totals | Adjustments | Consolidated Totals |
| | | (in thousands) | |
| **Other Significant Items** | | | |
| Interest expense | $4,408 | $ — | $ 4,408 |
| Interest income | — | 198 | 198 |
| Expenditures for assets | 2,850 | 19 | 2,869 |
| Depreciation | 3,646 | 36 | 3,682 |

*Fixed Assets by Regions*

The following table represents assets by geographic region:

| | 2004 | 2003 |
|---|---|---|
| | (in thousands) | |
| North America | $31,752 | $33,722 |
| Asia | 1,122 | 790 |
| Europe | 7,026 | 3 |
| Total | $39,900 | $34,515 |

*Product Revenues*

The following table represents revenues by product group:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (in thousands) | |
| Heat Recovery Equipment Segment: | | | |
| HRSGs | $ 74,103 | $ 86,667 | $231,019 |
| Specialty boilers | 35,651 | 33,226 | 77,609 |
| Industrial boilers | 7,562 | — | — |
| | 117,316 | 119,893 | 308,628 |
| Auxiliary Power Equipment Segment: | | | |
| Exhaust systems | $ 39,412 | $ 48,463 | $ 67,375 |
| Inlet systems | 42,997 | 58,897 | 134,153 |
| Other | 33,967 | 36,525 | 76,649 |
| | 116,376 | 143,885 | 278,177 |
| Total | $233,692 | $263,778 | $586,805 |

*Geographic Revenues*

The following table presents revenues by geographic region:

| | 2004 | 2003 | 2002 |
|---|---|---|---|
| | | (in thousands) | |
| North America | $ 93,548 | $180,766 | $483,541 |
| Asia | 66,585 | 17,650 | 30,775 |

| | | | |
|---|---|---|---|
| Middle East | 39,766 | 14,439 | 5,744 |
| Europe | 24,282 | 38,988 | 48,481 |
| South America | 748 | 1,400 | 5,963 |
| Other | 8,763 | 10,535 | 12,301 |
| Total | $233,692 | $263,778 | $586,805 |

Management attributed sales to geographic location based on the customer-determined destination of the delivered product.

Table of Contents

Index to Financial Statements

## 12. SUMMARY OF QUARTERLY INFORMATION (unaudited)

| | First | Second | Third | Fourth |
|---|---|---|---|---|
| | (in thousands except per common share data) | | | |
| **2004** | | | | |
| Revenues | $ 55,126 | $ 57,021 | $ 59,720 | $ 61,825 |
| Gross profit | 11,813 | 9,129 | 9,099 | 9,216 |
| Operating income (loss) | 1,552 | 588 | 330 | (2,375) |
| Income tax provision (benefit) | 514 | 181 | 55 | (1,201) |
| Net income (loss) | 838 | 296 | 90 | (1,929) |
| Income per share: | | | | |
| Basic | 0.02 | 0.01 | 0.00 | (0.05) |
| Diluted | 0.02 | 0.01 | 0.00 | (0.05) |
| **2003** | | | | |
| Revenues | $ 77,026 | $ 64,002 | $ 57,301 | $ 65,449 |
| Gross profit | 21,218 | 16,950 | 13,847 | 19,482 |
| Operating income | 11,754 | 8,295 | 5,269 | 8,096 |
| Income tax provision | 4,390 | 3,081 | 1,928 | 2,727 |
| Net income | 6,866 | 4,820 | 3,015 | 5,083 |
| Income per share: | | | | |
| Basic | 0.16 | 0.11 | 0.07 | 0.10 |
| Diluted | 0.15 | 0.11 | 0.07 | 0.10 |
| **2002** | | | | |
| Revenues | $203,527 | $162,916 | $112,673 | $107,689 |
| Gross profit | 36,728 | 35,890 | 28,498 | 30,350 |
| Operating income | 26,273 | 25,069 | 17,360 | 20,552 |
| Income tax provision | 9,746 | 9,346 | 6,322 | 7,753 |
| Net income | 15,244 | 14,618 | 9,889 | 12,126 |
| Income per share: | | | | |
| Basic | 0.35 | 0.33 | 0.22 | 0.28 |
| Diluted | 0.33 | 0.32 | 0.22 | 0.27 |

## 13. EMPLOYMENT AND OPERATIONAL RESTRUCTURING

In October 2003, we announced a management restructuring plan pursuant to which certain employees were offered either one-time termination or retirement benefits. Certain employees that were offered the retirement incentive packages entered into consulting agreements with us subsequent to their retirement. The expense related to the consulting agreements will be recognized as the services are provided over the term of the agreements. In addition, retiring employees were offered the right to amend their stock option agreements to extend the date such options remain exercisable from 90 days after termination of employment to one year after termination of employment. In some cases, this plan also provided for the acceleration of vesting for certain unvested stock options. Under APB Opinion No. 25, "Accounting for Stock Issued to Employees," we expensed the fair value of the options at the new measurement date. We recorded charges of approximately $3.2 and $3.9 million during 2004 and 2003, respectively, related to the management restructuring plan.

Under the 2003 management restructuring plan, a retirement benefits agreement was entered into with our Chief Executive Officer, Larry Edwards, pursuant to which he determines his own future retirement date. Subsequent to year end, Mr. Edwards announced his retirement effective June 30, 2005. On June 30, 2005, Mr. Edwards will receive a payment of approximately $1.9 million, which has been accrued in other current liabilities as of December 31, 2004.

The Company expects to incur approximately $2.5 million of management restructuring charges in the future, including an estimate of $2.2 million for the expected consulting fees and variable stock option expense related to the CEO's retirement benefits agreement.

Table of Contents

Index to Financial Statements

In the second quarter of 2004, the Company merged the operations of Consolidated Fabricators, Inc. (CFI) with Braden Manufacturing, L.L.C.(Braden). The plan of merger included the closing of CFI's manufacturing facilities in Toluca, Mexico and Clinton, South Carolina. The Toluca plant is a leased facility while the Company owns the Clinton plant. In addition, the merger plan called for Braden to assume many of CFI's administrative and management responsibilities.

Through December 31, 2004, the Company has incurred approximately $1.6 million of restructuring costs in connection with this merger. The $1.6 million is comprised of severance payments, early lease termination penalties, write down a building to its fair market value less selling costs, loss on disposal of fixed assets, moving expenses and plant clean up costs.

A reconciliation of the liability (included in other current liabilities) for the restructuring costs from December 27, 2003 to December 31, 2004 is as follows (in thousands):

| | |
|---|---|
| Balance, December 27, 2003 | $ 797 |
| Payments to employees | (797) |
| Balance, December 31, 2004 | $ 0 |

Approximately $1.7 million and $3.1 million of 2004 restructuring costs were allocated to the Heat Recovery Equipment and Auxiliary Power Equipment segments, respectively. Approximately $1.1 million and $2.8 million of the fiscal year 2003 restructuring costs were allocated to the Heat Recovery Equipment and Auxiliary Power Equipment segments, respectively.

**14. ACQUISITION OF BUSINESSES**

On July 30, 2004, the Company purchased a 90 percent interest in Nanjing Boiler Works (NBW) from Nanjing Machinery & Electronics for approximately $10.9 million (including direct transaction costs of $0.6 million) in cash. In connection with acquisition, the Company acquired $2.2 million of cash. Beginning in January 2006, the Company has the option to purchase the remaining 10 percent of NBW.

NBW designs and manufactures industrial and package boilers used by domestic customers in China for various applications where steam is required. NBW has begun to manufacture heat recovery steam generating units for combined-cycle gas turbine power plants, as well as specialty boiler systems for worldwide customers of Deltak LLC based on Deltak's design and engineering specifications. NBW is located in Jiangsu province in eastern China. As of the closing date, the Company changed NBW's name to Deltak Power Equipment (China) Co., Ltd.

Deltak Power Equipment (China) Co., Ltd.'s results of operations from the acquisition date through December 31, 2004 have been included in the accompanying consolidated statement of operations for the year ended December 31, 2004. Deltak Power Equipment (China) Co., Ltd.'s results of operations were not significant to the condensed consolidated statement of operations. Proforma information has not been presented due to the size of the acquisition.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the date of acquisition (in thousands):

| | At July 30, 2004 |
|---|---|
| Current assets, including cash acquired of $2.2 million | $ 13,356 |
| Property, plant and equipment, net | 6,108 |
| Other assets | 6,457 |
| Total assets acquired | 25,921 |
| Current liabilities | 9,007 |
| Other long-term liabilities | 4,371 |
| Minority interest | 1,659 |
| Total liabilities assumed | 15,037 |

| | |
|---|---|
| Net assets acquired | $ 10,884 |

The Company's allocation of the purchase price to the net assets acquired did not result in reportable goodwill.