UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

KINGS ROAD INVESTMENTS LTD.,

                    Plaintiff,                    06 Civ. 3433 (BSJ) (ECF)

          v.

GLOBAL POWER EQUIPMENT GROUP
INC.,

                    Defendant.
-------------------------------------------------------x

**MEMORANDUM OF LAW OF PLAINTIFF KINGS ROAD
INVESTMENTS LTD. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Plaintiff Kings Road Investments Ltd.*

July 24, 2006

TABLE OF CONTENTS

Page

Preliminary Statement..................................................................................................................1

Statement of Facts.......................................................................................................................3

Argument ...................................................................................................................................13

I.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS A RESULT OF
    GLOBAL POWER'S FAILURE TO KEEP ITS REGISTRATION
    STATEMENT EFFECTIVE.

A.  Standard of Review ...........................................................................................................13

B.  Global Power's Failure to Keep It's Registration Statement Effective is
    An Event of Default Under the Note .................................................................................14

C.  Kings Road Has Satisfied Its Obligations Under the Note And,
    Accordingly, Global Power Is Obligated to Redeem the Note and
    Make Other Payments........................................................................................................17

Conclusion .................................................................................................................................18

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................14

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*,
310 F. Supp. 2d 556 (S.D.N.Y. 2003)...............................................13, 14

*Mackinder v. Schawk, Inc.*,
No. 00 Civ. 6098 (DAB), 2005 WL 1832385 (S.D.N.Y.) ........................14

*Teragram Corp. v. Marketwatch.com, Inc.*,
444 F.3d 1 (1st Cir. 2006)............................................................................2

### STATUTES

15 U.S.C. § 77j(a)(3)...........................................................................................16

Fed. R. Civ. P. 56(c) ...........................................................................................13

Fed. R. Civ. P. 56(e) ...........................................................................................14

### MISCELLANEOUS

Form S-3, General Instructions............................................................................15

Louis Loss and Joel Seligman, *Fundamental of Securities Regulation* (5th ed. 2004) .................15

SEC Division of Corporate Finance, *Manual of Publicly Available Telephone Interpretations* (July 1997) .........................................................................15

## MEMORANDUM OF LAW OF PLAINTIFF KINGS ROAD
## <u>INVESTMENTS LTD. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Kings Road Investments Ltd. ("Kings Road") respectfully submits this memorandum of law and the attached affidavit of Gregory A. Kasper in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### <u>Preliminary Statement</u>

In 2004 Kings Road purchased a convertible note (the "Note") issued by Global Power Equipment Group Inc. ("Global Power" or the "Company") in the amount of $27,000,000. The Note provides that Kings Road is entitled to interest on its investment, that Kings Road can convert the Note to common stock of Global Power at a certain price, and that, upon the occurrence of an "Event of Default," a holder of the Note is entitled to have it redeemed at a premium (the "Event of Default Redemption Price") and receive increased interest until redemption. As a result of accounting irregularities involving two substantial foreign projects of the Company, a variety of Events of Default have occurred. Despite that, and Global Power's own pronouncements reflecting the occurrence of Events of Default, the Company steadfastly refuses to redeem the Note.

On May 4, 2006, Kings Road filed the present Complaint. The Complaint identifies two broad categories of Events of Default. First, the Note provides that it is an Event of Default if the Company "materially breaches" any of the representations, warranties or covenants found in any of the transaction documents. The Complaint describes numerous provisions that were breached such as a result of the Company's accounting irregularities. Second, the Note provides that it is an Event of Default if the registration statement covering the resale of the shares issuable pursuant to the Note becomes unavailable for ten consecutive trading days. As a result of the Company's failure to file its 2005 Annual Report on Form 10-K,

the registration statement became unavailable for ten consecutive trading days and remains unavailable.

This motion seeks summary judgment based on the second issue, regarding the failure to maintain the effectiveness of the registration statement.  It is not, however, a motion for partial summary judgment.  The occurrence of only one Event of Default is sufficient to provide the full relief sought from Defendant in the Complaint.  Accordingly, Kings Road now seeks summary judgment that, due to the unavailability of the Global Power registration statement for ten consecutive trading days, an Event of Default has occurred under the Note and, as a result, Global Power is required to pay the Event of Default Redemption Price, the interest at the default rate, liquidated damages as specified in the transaction documents, and any statutorily prescribed interest to which King's Road is entitled.

King's Road has determined to move for summary judgment solely on the registration statement issue for the sake of expedience and efficiency, including minimizing burden on the Court and parties.  Unlike the other Events of Default, the one concerning the registration statement does not have a materiality component.  As we hope will be evident herein, it is difficult to imagine what defense Global Power could even attempt to mount on the registration statement issue.  While Kings Road believes that - in light of the undisputed facts - it also would be entitled to summary judgment on the Events of Defaults that have a materiality element,[1] we appreciate that moving on these grounds would require discussion of each of the various other breaches.  That would substantially increase the scope and length of the briefs for

---

[1]    We recognize that the materiality of a breach is generally a question for the trier of fact to decide. However, "'as is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law.'" *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006) (quoting *Gibson v. City of Cranston*, 37 F.3d 731, 736 (1st Cir. 1994).)

no purpose other than to include alternative bases for summary judgment which the Court is not likely to have to consider. Should the Court determine not to grant the present motion for summary judgment, Kings Road would be prepared immediately to move for summary judgment based on all of the other Events of Default. Alternatively, if the Court would prefer, King's Road can supplement this motion and brief those issues now.

**Statement of Facts**

The facts set forth herein are based on written agreements between the parties, correspondence between the parties, Securities and Exchange Commission ("SEC") filings made by Global Power, public statements made on behalf of Global Power by its officers, and publicly available statements of Global Power's trading history. True and correct copies of these documents are attached to the Affidavit of Gregory A. Kasper, dated July 24, 2006, submitted herewith ("Kasper Aff.").

The Convertible Senior Subordinated Note

On November 23, 2004, Global Power completed a $69 million private placement of 4.25% Convertible Senior Subordinated Notes (the "Notes"). (Amendment No. 1 to Form S-3 Registration Statement filed by Global Power on January 28, 2005 ("Amended Form S-3"), Kasper Aff. Ex. 1 at 4.) The Notes bear interest at a rate of 4.25% per year, payable semi-annually on May 23 and November 23 of each year, beginning on May 23, 2005. (*Id.*) They are convertible into shares of the Company's common stock at an initial conversion price of $10.61 per share of common stock (subject to adjustment in certain circumstances). (*Id.*)

To effect the private placement, on November 23, 2004, Global Power entered into a Securities Purchase Agreement with Kings Road and others. (Securities Purchase Agreement, Kasper Aff. Ex. 2.) The Notes were purchased by Kings Road ($27,000,000), Steelhead Investments Ltd. ($27,000,000), D.B. Zwirn Special Opportunities Fund, L.P.

3

($3,000,000), D.B. Zwirn Special Opportunities Fund, Ltd. ($6,000,000) and HCM/Z Special

Opportunities LLC ($6,000,000) (collectively, the "Note Holders").  (Securities Purchase

Agreement among Global Power, Kings Road and identified investors, dated November 23, 2004

(the "Securities Purchase Agreement"), Kasper Aff. Ex. 2 at attached Schedule of Buyers.)

    Pursuant to the Securities Purchase Agreement, on November 23, 2004, the

Company executed a Convertible Senior Subordinated Note in the amount of $27 million in

favor of Kings Road (the "Note").  (Note, Kasper Aff. Ex. 3.)  In addition, the Company and the

Note Holders entered into a Registration Rights Agreement, described more fully below.

(Registration Rights Agreement, dated November 23, 2004 ("Registration Rights Agreement"),

Kasper Aff. Ex. 4.)

> The Note permits redemption upon the occurrence of an Event of Default:
>
> Promptly after the occurrence of an Event of Default with respect to
> this Note or any Other Note, the Company shall deliver written
> notice thereof via facsimile and overnight courier (an "Event of
> Default Notice") to the Holder and the holders of the Other Notes.
> At any time after the earlier of the Holder's receipt of an Event of
> Default Notice and the Holder becoming aware of an Event of
> Default, the Required Holders may require the Company to redeem
> all or any portion of the Notes by delivering written notice thereof
> (the "Event of Default Redemption Notice") to the Company. . . .

(Note, Kasper Aff. Ex. 3 at § 4(b).)  "Required Holders" is defined in the Note to mean "the

holders of Notes representing at least a majority of the aggregate principal amount of the Notes

then outstanding."  (Note, Kasper Aff. Ex. 3 at § 30(uu).)  The amount to which holders are

entitled upon redemption after occurrence of an Event of Default is, at a minimum, 110% of the

principal and interested converted, and is called the Event of Default Redemption Price.  (Kasper

Aff. ¶ 6.)

    Section 2(a) of the Registration Rights Agreement provides that the Company is

to file a registration statement on Form S-3 covering the resale of all shares issuable pursuant to

the Note.  (Registration Rights Agreement, Kasper Aff. Ex. 4 at § 2(a).)  The failure to keep this

registration statement effective is an Event of Default under the Note.  In particular, pursuant to

Section 4(a)(i) of the Note, it shall be an Event of Default if

> the effectiveness of the applicable Registration Statement lapses
> for any reason . . . or is unavailable to any holder of the Notes for
> sale of all of such holder's Registrable Securities (as defined in the
> Registration Rights Agreement) in accordance with the terms of
> the Registration Rights Agreement, and such lapse or
> unavailability continues for a period of 10 consecutive Trading
> Days. . . .

(Note, Kasper Aff. Ex. 3 at § 4(a)(i).)  A "Trading Day" is defined in Section 30(iii) of the Note.

Pursuant to that section and the definition of the terms contained therein, "Trading Day" means

days on which the common stock of Global Power was traded on the New York Stock Exchange.

(Kasper Aff. ¶ 8.)  For purpose of the periods discussed herein, that means weekdays other than

holidays.  (*Id.*)

On December 23, 2004, Global Power filed a Form S-3 registration statement

with the SEC and filed an amended Form S-3 on January 28, 2005.  (Form S-3 Registration

Statement filed by Global Power on December 23, 2004 ("Form S-3"), Kasper Aff. Ex. 5;

Amended Form S-3, Kasper Aff. Ex. 1.)  Global Power explained that the Form S-3 registration

statement was being filed in connection with the Notes at issue here:  "The shares of common

stock being registered for resale consist of shares of common stock issuable upon the conversion

of convertible notes sold in a private placement on November 23, 2004."  (Amended Form S-3,

Kasper Aff. Ex. 1 at 1.)

Global Power's Financial Statement Problems

In a Current Report on Form 8-K filed on March 8, 2006 (the "March 8 Form 8-

K"), the Company disclosed that its "[m]anagement [had] become aware of unrecognized

expenses related to a heat recovery equipment project in China that was substantially completed

in December 2004." (March 8 Form 8-K, Kasper Aff. Ex. 6 at 3.) "This led management to further review the revenue and cost recognition for this project as well as a separate auxiliary power equipment project that had also been sold" in 2004. (*Id.*) Following that review, Global Power "determined that gross profit was inadvertently overstated in total for these projects, and that a restatement is required." (*Id.*) The Company said that the financial statements expected to be restated would be those for the fiscal year ended December 31, 2004, including the second, third and fourth quarters of 2004, and the interim financial statements for the first, second and third quarters of 2005. (*Id.*) The Company further stated that financial statements issued for those periods should not be relied upon because they are expected to contain errors. (*Id.*)

In a press release dated March 8, 2006, the Company said that the restatement "could cumulatively decrease previously reported operating income by approximately $7 million." (Press Release, "Global Power Equipment Group Inc. Expects to Restate Fiscal 2004 and Quarterly 2005 Results Due To Misreported Gross Profit on Two Completed Projects in China and Provides Preliminary Fourth Quarter Earnings Estimate" (March 8, 2004) (the "March 8 Press Release"), attached at Exhibit 99.1 to Global Power's Current Report on Form 8-K filed on March 14, 2006 (the "March 14 Form 8-K"), Kasper Aff. Ex. 7 at 1.) The Company had previously reported cumulative operating income of approximately $2.6 million over the second, third, and fourth quarters of 2004 and the first three quarters of 2005, the periods the Company expects to be restated. (Kasper Aff. ¶ 12.) Decreasing the operating income for those periods by $7 million thus would result in an operating loss of $4.4 million over those periods.

The Company further disclosed in the March 8 Form 8-K, that it "did not maintain effective internal control over financial reporting as of December 31, 2004" because of a "material weakness." (March 8 Form 8-K, Kasper Aff. Ex. 6 at 4.) The Company explained that

6

"[a] material weakness is a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." (*Id.*)  According to the Company, "this control deficiency, until remediated, could result in a misstatement of the Company's revenue and cost of projects that would result in a material misstatement to the Company's interim or annual financial statements that would not be prevented or detected." (*Id.*)  The Company further disclosed that "management may identify one or more additional material weaknesses." (*Id.*)

On March 9, 2006 the Company hosted a conference call in which these issues were discussed.  (Transcript of Global Power's March 9, 2006 telephone conference call (the "March 9 Transcript"), attached at Exhibit 99.2 to March 14 Form 8-K, Kasper Aff. Ex. 7.)  During the call, Reynolds A. Brousseau, the President and Chief Executive Officer of the Company stated:

> [W]e became aware of substantial cost overruns which caused us to reassess all of our major Heat Recovery projects.  While some of the execution problems were industry-related, most should have been avoided.  The question is what are we going to do to fix it?  We've made significant management changes over the past six months. . . .

(March 9 Transcript, Kasper Aff. Ex. 7 at 2.)  Mr. Brousseau also said:  "[L]et's be clear that there is no one that's pleased as an individual in our organization about what's happened as a result of 2004.  The effect and resonation throughout the organization has been dramatic." (*Id.* at 6.)  During the same call, John M. Matheson, Executive Vice President and Chief Operating Officer for the Company, revealed that the Company had hired Ernst & Young's Transaction Advisory Services "to help us implement a program to literally reinvent [the] business unit" containing the two projects in China with overstated gross profit.  (*Id.* at 3.)

7

The Company's stock price dropped over 17% on the day following the announcement of the planned restatement. On March 8, 2006, Global Power closed at $4.85 per share. (Yahoo Finance Historical Prices for Global Power, Kasper Aff. Ex. 9.) On that day, the Company issued the press release announcing the restatement and the Company's failure to maintain effective control over financial reporting as described above. (March 8 Press Release, Kasper Aff. Ex. 7.) The following day Global Power traded down to $3.99 per share. (Yahoo Finance Historical Prices for Global Power, Kasper Aff. Ex. 9.) Its most recent close, on July 21, 2006 was $2.49. (*Id.*)

Global Power's Registration Statement Ceases To Be Effective

As described below, because of the foregoing financial statement problems, the Company failed to file its 2005 Annual Report on Form 10-K as required under the Securities Exchange Act of 1934 and, as a result, its registration statement ceased to be effective at least as of that date.

On or about March 16, 2006, the Company filed Form 12b-25 in which it extended its time to file the Form 10-K until March 31, 2006. (Form 12b-25, Kasper Aff. Ex. 10.) The Company stated that it was "filing Form 12b-25 because it needs additional time to file its Annual Report on Form 10-K for the year ended December 31, 2005, which is due on March 16, 2006" and that "it expects to file [its Form 10-K] on or before March 31, 2006." (*Id.* at 3.)

In a press released dated March 30, 2006, the Company disclosed that it would not meet the March 31, 2006 deadline as a result of the anticipated restatement of its financial statements for the fiscal year ended December 31, 2004, as well as its interim financial statements for the first, second and third quarters of 2005, and a review of contract cost reporting issues. (Press Release, "Global Power Equipment Group Inc. Provides Update on 2005 10-K Filing and Restatement" (March 30, 2006), attached at Exhibit 99 to Global Power's Current

8

Report on Form 8-K filed on March 31, 2006, Kasper Aff. Ex. 11 at 1.)  The March 31, 2006

deadline was not met and, as of this date, Global Power's 2005 Annual Report on Form 10-K has

not been filed.

       As more fully described in the Argument, as a result of Global Power's failure to

timely file its 2005 Annual Report on Form 10-K, the Company's Form S-3 registration

statement ceased to be effective by operation of law at that time, or by, at the latest, May 1, 2006.

Ten consecutive Trading Days later, the ineffectiveness of the registration statement became an

Event of Default under Section 4(a)(i) of the Note.

Global Power Acknowledges An Event of Default

       In its March 30, 2006 press release, Global Power acknowledged that "[a]s a

result of this delay in filing the 2005 Form 10-K, . . . the Company will be in technical default

under its outstanding convertible notes, which will result in a higher rate of interest and other

penalties under the convertible notes provisions."  (Press Release, Global Power Equipment

Group Inc. Provides Update on 2005 10-K Filing and Restatement (March 30, 2006), attached at

Exhibit 99 to Global Power's Current Report on Form 8-K filed on March 14, 2006, Kasper Aff.

Ex. 11 at 1.)  In a Current Report on Form 8-K filed on April 6, 2006, the Company denied that

certain Events of Default claimed by Note Holders (see discussion below) had occurred,[2] but

stated that "[a]s a result of the delay in the filing of the Company's 2005 Form 10-K beyond

March 31, 2006, other events of default will or may occur under the Notes and liquidated

damages will accrue under the Registration Rights Agreement."  (Global Power's Current Report

on Form 8-K filed on April 6, 2006, Kasper Aff. Ex. 12 at 3.)

---

[2]     Among other things, the Company said that the breaches claimed by Note Holders had to be material to
constitute an Event of Default, and purportedly none of them were material.

Global Power's references to liquidated damages and a higher rate of interest are telling. Section 2(f) of the Registration Rights Agreement makes clear that the obligation to pay liquidated damages is triggered by the Company's failure to keep the required registration statement effective:

> If . . . sales of all of the Registrable Securities required to be included on such Registration Statement cannot be made . . . pursuant to such Registration Statement (including, without limitation, because of a failure to keep such Registration Statement effective . . .) (a "**Maintenance Failure**") then, as partial relief for the damages to any holder by reason of any such delay in or reduction of its ability to sell the underlying shares of Common Stock (which remedy shall not be exclusive of any other remedies available at law or in equity), the Company shall pay to each holder of Registrable Securities relating to such Registration Statement an amount (the "**Liquidated Damages Amount**") in cash equal to (A) one-quarter of one percent (0.25%) of the aggregate Purchase Price . . . of the Notes relating to such Investor's Registrable Securities included in such Registration Statement for the first 90 day period following a . . . Maintenance Failure, (B) one-half of one percent (0.50%) of the aggregate Purchase Price of the Notes relating to such Investor's Registrable Securities included in such Registration Statement for the following 60 day period, and (C) three-quarters of one percent (0.75%) of the aggregate Purchase Price of the Notes relating to such Investor's Registrable Securities included in such Registration Statement for each subsequent 30 day period. Liquidated Damages Amounts will accrue . . . [on] the initial day of a Maintenance Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) thereafter until such Maintenance Failure is cured.

(Registration Rights Agreement, Kasper Aff. Ex. 4 at § 2(f).)

As for the obligation to pay a higher rate of interest referenced by Global Power, that plainly results from the occurrence of an Event of Default: "[f]rom and after the occurrence of an Event of Default the Interest Rate shall be increased to 9.25%." (Note, Kasper Aff. Ex. 3 at § 2.) And, in fact, on May 24, 2006, Global Power informed Kings Road, through Kings Road's agent, that Global Power had commenced paying interest at the default rate of 9.25% beginning

10

after May 1, 2006.[3]  (E-mail from Y Reed, Global Power, to "Operations," a group of certain e-mail recipients within Polygon Investment Partners LP, manager to Kings Road (May 24, 2006), Kasper Aff. Ex. 13; Kasper Aff. ¶ 17.)  Global Power did pay such interest at that rate beginning after that date.  (Kasper Aff ¶ 17.)

Given the foregoing, the Company's statements and actions with respect to increased interest and liquidated damages are admissions as to the occurrence of an Event of Default.

The Note Holders Demand Redemption

On March 31, 2006, Note Holder Steelhead Investments Ltd. sent the Company an Event of Default Redemption Notice.  (*See* letter from Candice Cheeseman, Global Power, to Steelhead Investments Ltd. (Apr. 5, 2006), Kasper Aff. Ex. 14 ("The Company acknowledges receipt of your letter dated March 31, 2006, which purports to be an Event of Default Redemption Notice.").)  On April 10, 2006, Note Holders D.B. Zwirn Special Opportunities Fund, L.P., D.B. Zwirn Special Opportunities Fund, Ltd., and HCM/Z Special Opportunities LLC collectively sent the Company an Event of Default Redemption Notice.  (Letter from David A. Proshan to Global Power (Apr. 10, 2006), Kasper Aff. Ex. 15.)

Pursuant to Section 14(e) of the Note, on April 6, 2006 Kings Road sent a notice of its intent to exercise its redemption rights to certain lenders of the Company's senior credit facility.[4]  (Letter from Erik Caspersen, Kings Road, to Bank of America, US Bank National

---

[3]     Global Power did not specify why it picked May 1, 2006.  However, as described above and discussed in further detail below, that is the date by which, at the latest, the registration statement ceased being effective.  The actual registration statement Event of Default, which triggers the obligation to pay interest at a higher rate, did not occur until ten Trading Days after the registration statement was no longer effective.  Regardless, the Company's payment of default interest clearly indicates that the Company assumed an Event of Default had occurred.

[4]     Section 14(e) of the Note provides for a Note Holder to "give the Agent at least 3 Business Days' prior notice of its intention to exercise its redemption rights upon the occurrence of an Event of Default."  (Note, Kasper Aff. Ex. 3 at § 14(e).)  "Agent" is defined to mean certain lenders under Global Power's senior credit facility.  (Note,

Association and Bank of Oklahoma (Apr. 6, 2006), Kasper Aff. Ex. 16.)  On April 13, 2006

Kings Road sent an Event of Default Redemption Notice, via facsimile and overnight courier, to

Global Power specifying certain Events of Default that had occurred at that time and stating that

it "exercises its right, pursuant to Section 4(b) of the Note, to require the Company to redeem all

of the Notes."  (Letter from Brandon Jones, Kings Road, to Global Power (Apr. 13, 2006),

Kasper Aff. Ex. 18.)  On May 4, 2006, Kings Road sent another letter, also via facsimile and

overnight courier, to the Company specifying additional Events of Default.  (Letter from Erik

Caspersen, Kings Road, to Global Power (May 4, 2006), Kasper Aff. Ex. 19.)

On or about May 3, 2006, Kings Road submitted the Note for redemption to

Global Power, pursuant to Section 13 of the Note.  (*See* letter from Andrew W. Hammond,

White & Case LLP (counsel for Global Power) to Erik W. Caspersen, Kings Road (May 5,

2006), Kasper Aff. Ex. 20 (referring to a "recent purported attempt to redeem the Note . . . by

delivering said Note to the Company.").)  Section 13 provides that, upon sending an Event of

Default Redemption Notice,

> [T]he Holder shall promptly submit this Note to the Company.
> The Company shall deliver the applicable Event of Default
> Redemption Price . . . to the Holder within ten (10) Business Days
> after the Company's receipt of the Holder's Event of Default
> Redemption Notice. . . .

(Note, Kasper Aff. Ex. 3 at § 13(a).)  On May 8, 2006, Global Power returned the Note and

declined to make payment thereunder.  (Letter from Candice L. Cheeseman, Global Power, to

Polygon Investment Partners LP, manager to Kings Road (May 8, 2006), Kasper Aff. Ex. 21.)

---

Kasper Aff. Ex. 3 at § 30(b); Credit Agreement among Global Power, Bank of America, N.A., US Bank National
Association, Bank of Oklahoma and other lenders, dated October 1, 2004, Kasper Aff. Ex. 17 at 1-2.)

<u>The Complaint</u>

On May 4, 2006, Kings Road filed its Complaint in this action (the "Complaint"). (Complaint, Kasper Aff. Ex. 22.)  The Complaint alleges two categories of Events of Default. First, the Complaint alleges Events of Default under Note Section 4(a)(x) based on Global Power's breach of certain misrepresentations, warranties and covenants.  (*Id.* at ¶¶ 11-24.) Second, the Complaint alleges an Event of Default pursuant to Note Section 4(a)(i) based on the failure to maintain the registration statement.  (*Id.* at ¶¶ 25-27.)  Based on the Company's breach of its obligations to redeem the Notes and make other payments relating to the occurrence of an Event of Default, the Complaint seeks money damages of not less than $29,700,000, which is the Event of Default Redemption Price, plus interest and such other and further relief as the Court may deem just and proper.  (*Id.* at 11.)

**Argument**

**I.**
**PLAINTIFF IS ENTITLED TO SUMMARY**
**JUDGMENT AS A RESULT OF GLOBAL POWER'S**
**FAILURE TO KEEP ITS REGISTRATION STATEMENT EFFECTIVE.**

**A.    <u>Standard of Review</u>**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.  *See Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556 (S.D.N.Y. 2003) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

Once the moving party has met that burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party must do more than simply show that there is "some metaphysical doubt as to the material facts." *Bristol*, 310 F.Supp.2d at 561 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Genuine issues of fact cannot be created by mere conclusory allegations. *Mackinder v. Schawk, Inc.*, No. 00 Civ. 6098 (DAB) 2005 WL 1832385 (S.D.N.Y.) (citing *Heublein v. United States*, 996 F.2d 1455 (2d Cir. 1993).

The cause of action in the Complaint is for breach of contract and, by agreement of the parties, New York law is applicable here. (Securities Purchase Agreement, Kasper Aff. Ex. 2 at § 9(a); Note, Kasper Aff. Ex. 3 at § 29; Registration Rights Agreement, Kasper Aff. Ex. 4 at §11(d).) As a matter of law and indisputable fact, the Company manifestly has breached its obligations to maintain the effectiveness of its registration statement, as well as its obligations to make the payments required as a result of that, and as a result of the Note Holders' demand for redemption.

**B.    Global Power's Failure to Keep Its Registration Statement Effective is an Event of Default Under the Note.**

As described above, the Registration Rights Agreement requires the Company to file a registration statement on Form S-3 covering the resale of all shares issuable pursuant to the Note, and an Event of Default occurs if the registration statement lapses or becomes unavailable for ten consecutive Trading Days. (Registration Rights Agreement, Kasper Aff. Ex. 4 at § 2(a); Note, Kasper Aff. Ex. 3 at § 4(a)(i).)

As noted above, on December 23, 2004, Global Power filed a Form S-3 registration statement with the SEC for the shares of common stock issuable upon the conversion of the Notes and filed an amended Form S-3 on January 28, 2005.  (Form S-3, Kasper Aff. Ex. 5; Amended Form S-3, Kasper Aff. Ex. 1.)  In order to avoid an Event of Default under the Note, Global Power was obliged to not let this registration statement lapse for ten consecutive Trading Days.

"A company filing Form S-3 is required . . . to incorporate by reference the following:  (1) its latest Form 10-K . . . annual report [and] (2) all other 1934 Act reports filed pursuant to § 13(a) or § 15(d) since the end of the fiscal year covered by the annual report."  Louis Loss and Joel Seligman, *Fundamental of Securities Regulation* 152-153 (5th ed. 2004).  In order to be able to use Form S-3, the registrant must have "filed in a timely manner all reports required to be filed during the twelve calendar months and any portion of a month immediately preceeding the filing of the registration statement."  Form S-3, General Instructions, ¶ I.A.3(b).  When that condition is no longer met, a previously-filed Form S-3 is no longer effective.  As the SEC Division of Corporate Finance has stated:

> During the pendency of the 15-day extension for filing Form 10-K pursuant to Rule 12b-25, ongoing secondary offerings utilizing a previously effective Form S-3 may continue. Of course, should the Form 10-K not be filed after the Rule 12b-25 extension is over, this use also would have to discontinue.

SEC Division of Corporate Finance, *Manual of Publicly Available Telephone Interpretations* H.80 (July 1997).

There can be no dispute that Global Power did not timely file its 2005 Form 10-K following the expiration of the Rule 12b-25 extension it obtained.  As described above, the Company filed Form 12b-25, thereby extending its time to file the Form 10-K until March 31, 2006.  (Form 12b-25, Kasper Aff. Ex. 10.)  Global Power failed to meet the March 31, 2006

15

deadline and, as of this date, its Annual Report on Form 10-K for 2005 still has not been filed. As a result of Global Power's failure to timely file its 2005 Annual Report on Form 10-K, the Company's Form S-3 lapsed on March 31, 2006. After ten consecutive Trading Days, on April 17, 2006, an Event of Default occurred under the Note.

Global Power's failure to file its 2005 Annual Report on Form 10-K caused its registration statement to become unavailable for another reason as well. Under Section 10(a)(3) of the Exchange Act of 1933, "when a prospectus is used more than nine months after the effective date of the registration statement, the information contained therein shall be as of a date not more than sixteen months prior to such use." 15 U.S.C. § 77j(a)(3). Put differently, a registration statement will not be available for sales of registered securities occurring more than nine months after its effective date if the registration statement contains financial information more than sixteen months old. The financial information incorporated by reference in Global Power's registration statement was from Global Power's 2004 Annual Report on Form 10-K. (Amended Form S-3, Kasper Aff. Ex. 1 at 25.) That information was as of December 31, 2004 (Global Power's 2004 Annual Report on Form 10-K, Kasper Aff. Ex. 23 at 37-66) and became more than sixteen months old after May 1, 2006. By then, nine months had passed since the registration statement became effective - which occurred on December 23, 2004. (Form S-3, Kasper Aff. Ex. 5.) Accordingly, the Global Power Form S-3 lapsed at least as of May 1, 2006. After ten consecutive Trading Days, on May 16, 2006, an Event of Default occurred under the Note.[5]

---

[5]     Indeed, even prior to the passage of sixteen months after December 31, 2004, the Company stated on March 8, 2006 that its 2004 financials could not be relied upon because of expected errors. (March 8 Form 8-K, Kasper Aff. Ex. 6 at 3.) Accordingly, the lapse of the registration statement could well be deemed to have occurred as early as the date of that statement.

Accordingly, whether one makes reference to Form S-3 General Instruction I.A.3(b) and the SEC's *Telephone Interpretation*, or Section 10(a)(3) of the Exchange Act of 1933, Global Power's Form S-3 lapsed more than ten consecutive Trading Days ago and an Event of Default has occurred.

The Company effectively has acknowledged that the failure to file its 2005 Form 10-K caused an Event of Default. As described above, though claiming it was a "technical" default, Global Power has paid the higher rate of interest required upon an Event of Default. What is more, shortly before the registration statement lapsed, the Company specifically acknowledged that an Event of Default might occur and stated that liquidated damages would be owing - which is precisely what the Registration Rights Agreement provides for when there has been such a lapse.

**C.     Kings Road Has Satisfied Its Obligations Under the Note And, Accordingly, Global Power Is Obligated to Redeem the Note and Make Other Payments.**

As reflected above, Section 4(b) expressly provides that the Required Holders, those holding at least a majority of aggregate principal amount outstanding, may require the Company to redeem the Notes after the holders become aware of an Event of Default. That is what has occurred here. By letters dated March 31, 2006 and April 10, 2006, the other Note Holders have submitted Event of Default Redemption Notices to the Company. Kings Road itself provided an Event of Default Redemption Notice to Global Power on April 13 and May 4, 2006, and has tendered its Note as required by Section 13(a) of the Note.

In view of the foregoing, there can be no genuine issue of material fact that Kings Road is entitled to summary judgment awarding it the Event of Default Redemption Price, interest owing at the default rate, contractually-mandated liquidated damages, and any statutorily prescribed interest owing on the foregoing.

17

## **Conclusion**

For the foregoing reasons, Plaintiff respectfully requests that its Motion for

Summary Judgment be granted.

Dated: New York, New York                 SCHULTE ROTH & ZABEL LLP
       July 24, 2006

                                       By: s/ Alan R. Glickman_____
                                         Alan R. Glickman (AG-0927)
                                       Gregory A. Kasper (GK-6596)

                                     919 Third Avenue
                                   New York, New York  10022
                                   (212) 756-2000

                                   Attorneys for Kings Road Investments Ltd.